## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DELAWARE STATE SPORTSMEN'S             :
ASSOCIATION, INC; BRIDGEVILLE          :
RIFLE & PISTOL CLUB, LTD.;             :
DELAWARE RIFLE AND PISTOL CLUB;        :    C.A. No.: 22-cv-00951-RGA
DELAWARE ASSOCIATION OF                :
FEDERAL FIREARMS LICENSEES;            :
MADONNA M. NEDZA; CECIL CURTIS         :
CLEMENTS; JAMES E. HOSFELT, JR;        :
BRUCE C. SMITH; VICKIE LYNN            :
PRICKETT; and FRANK M. NEDZA,          :
                                       :
            Plaintiffs,                :
                                       :
      v.                               :
                                       :
DELAWARE DEPARTMENT OF                 :
SAFETY AND HOMELAND SECURITY;          :
NATHANIAL MCQUEEN JR. in his           :
official capacity as Cabinet Secretary,:
Delaware Department of Safety and      :
Homeland Security; and COL. MELISSA    :
ZEBLEY in her official capacity as     :
superintendent of the Delaware State Police, :
                                       :
            Defendants.                :
                                       :

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiffs Delaware State Sportsmen's Association ("DSSA"); Bridgeville

Rifle and Pistol Club, Ltd. ("BRPC"); Delaware Rifle and Pistol Club ("DRPC");

Delaware Association of Federal Firearms Licensees ("DAFFL"); Madonna M.

Nedza; Cecil Curtis Clements; James E. Hosfelt, Jr.; Bruce C. Smith; Vickie Lynn Prickett; and Frank M. Nedza (collectively, "Plaintiffs"), by and through undersigned counsel, bring this complaint against Defendants, Delaware Department of Safety and Homeland Security; Secretary Nathanial McQueen Jr., Cabinet Secretary of the Delaware Department of Safety and Homeland Security; and Col. Melissa Zebley as the top law enforcement officer at the Delaware State Police, all of whom are Delaware state officials responsible for enforcing and implementing Delaware's laws and regulations infringing the right of law-abiding citizens to keep and bear commonly possessed firearms for defense of self and family, and for other lawful purposes, and allege as follows:

## **INTRODUCTION**

1.      The United States Supreme Court and a unanimous Delaware Supreme Court have recognized that the fundamental right to self-defense includes the right to keep and bear firearms both inside and outside the home. In defiance of this established and unassailable authority, the State of Delaware recently enacted into law House Bill 450 ("HB 450"[1]) and Senate Substitute 1 for Senate Bill 6 ("SS 1

---

[1] "HB 450" refers to 11 *Del. C.* §§ 1464-1467 as well as provisions in HB 450. HB 450 is attached hereto as Exhibit "A."

for SB 6"[2])(collectively "The Regulatory Scheme"[3]) which flout the fundamental civil rights of Delawareans and others visiting the First State, by making them criminals–felons–for exercising one of their most exalted rights enshrined in both the Delaware Constitution and the United States Constitution.

2.      The Second Amendment to the United States Constitution guarantees "the right of the people to keep and bear Arms." U.S. Const., amend. II. Under the Second Amendment, Plaintiffs DSSA (and its members), BRPC (and its members), DRPC (and its members), DAFFL (and its members and their customers), and the individual Plaintiffs are all similarly situated individuals who are legally eligible to possess and acquire firearms and have a fundamental constitutionally-guaranteed right to keep common firearms for defense of self and family and for other lawful pursuits.

3.      Article I, § 20 of the Delaware Constitution affords even broader protections than the United States Constitution does, providing that: "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." DEL. CONST., art. I, § 20; *see Doe v. Wilmington*

---

[2] "SS 1 for SB 6" refers to 11 *Del. C.* §§ 1441, 1468-1469A as well as provisions in Senate Substitute 1 for Senate Bill 6. SS 1 for SB 6 is attached hereto as Exhibit "B."

[3] The "Regulatory Scheme" collectively refers to 11 *Del. C.* §§ 1464-1467 as well as provisions in House Bill 450 ("HB 450") and to 11 *Del. C.* §§ 1441, 1468-1469A as well as provisions in Senate Substitute 1 for Senate Bill 6 ("SS 1 for SB 6", and sometimes referred to as simply SB 6).

*Housing Authority*, 88 A.3d 654, 665 (Del. 2014) ("[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation.").

### Delaware Criminalizes Lawful Behavior by Law-Abiding Citizens

4.     But when HB 450 was signed into law on June 30, 2022, the State of Delaware criminalized possession, transportation and sale of common firearms used by law abiding citizens for lawful purposes—mislabeling them as "assault weapons"—and making it a felony for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 11 *Del. C.* §§ 1457, 1464-1467 (2022).

5.     Further, when SS 1 for SB 6 was signed into law, also on June 30, 2022, the State of Delaware also criminalized possession, transportation and sale of common "ammunition feeding devices" or "magazines" capable of holding more than seventeen rounds—mislabeling them as "large-capacity magazines"—and making it illegal, and ultimately a felony, for law-abiding citizens to exercise their fundamental right to keep and bear such arms. *See* 11 *Del. C.* §§ 1468-1469 (2022).

6.      The State's limited exceptions to these broad criminal statutes do not allow typical law-abiding citizens to keep and bear common firearms for lawful purposes. *See* 11 *Del. C.* §§ 1465(2), 1469(c).[4]

7.      The State of Delaware's laws, regulations, policies, practices, and customs individually and collectively deny hundreds of thousands of individuals who reside in Delaware, including Plaintiffs, their members and customers, and others like them, their fundamental, individual right to keep and bear common arms through the Regulatory Scheme.

8.      Plaintiffs seek declaratory and injunctive relief not only on the basis that the Regulatory Scheme violates their rights under the Second and Fourteenth Amendments to the U.S. Constitution, but also on the fact that the Regulatory Scheme violates their rights under Delaware Constitution at Article I, § 20; their rights to Due Process under the Fourteenth Amendment to the U.S. Constitution and Article I, § 7 of the Delaware Constitution; their right to Equal Protection under the Fourteenth Amendment of the U.S. Constitution; violates the Commerce Clause of Article I, § 8, Clause 3 of the U.S. Constitution; and is preempted by 18 U.S.C. § 926A and § 926A(3).

---

[4] The Delaware Legislature and the Governor took advantage of the tragic shooting occurring at Uvalde, Texas, on May 24, 2022, to introduce HB 450 and SS 1 for SB 6 with other statutes criminalizing the exercise of Second Amendment rights, and rushed them through the legislative process and passed them into law in only approximately two-weeks' time.

## <u>The Regulatory Scheme Relies On Pre-*Bruen* Precedent</u>

9.      Both HB 450 and SS 1 for SB 6 rely upon laws and court precedent formulated before the U.S. Supreme Court's recent landmark decision in *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. _, 142 S.Ct. 2111 (2022).

10.     In *Bruen* the Supreme Court held that "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical  tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. (*citing Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

11.     The Supreme Court, thus, reinforced the approach to assessing a Second Amendment challenge it had established in *District of Columbia v. Heller*, 554 U.S. 570 (2008). That approach requires only (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on  the historical  understanding of the Amendment to demark the limits on the exercise of that right.  *Id*.

12.     In so doing, the *Bruen* court repudiated the "means-end" scrutiny to restrictions upon fundamental Second Amendment rights that had developed in Circuit courts following *Heller*. HB 450 and SS 1 for SB 6 draw their inspiration from exactly those types of flawed, now repudiated restrictions.

13.     Across the country, legislation that relied upon the type of flawed, now repudiated reasoning that was formulated before *Bruen* has begun to crumble in the decision's wake. HB 450 and SS1 to SB 6 are no different.

14.     HB 450 denies the fundamental right to bear arms based in large measure on a court decision relied on for support of HB 450--that has been vacated by *Bruen*.

15.     The legislative history of HB 450, as signed into law, includes a prior iteration of HB 450 known previously as Senate Bill 68 ("SB 68").[5] SB 68's synopsis states that it relies on a Maryland statute that bans commonly-used firearms as so-called "assault rifles." SB 68, and thus HB 450, further relies upon a now-repudiated decision of the U.S. Court of Appeals for the Fourth Circuit, *Kolbe v. Hogan,* 849 F. 3d 114 (4th Cir. 2017)(en banc), that wrongly upheld that similarly flawed Maryland ban. However, the United States Supreme Court expressly abrogated another Fourth Circuit decision that relied exclusively on *Kolbe* in light of *Bruen. Bianchi v. Frosh*, U.S. Supr. Ct. No. 21-902, Order (June 30, 2022)[6] (vacating *Bianch v. Frosh,* 858 F. App'x 645 (4th Cir. 2021))[7].

---

[5] HB 450 is attached hereto as Exhibit "A" and the prior SB 68 is attached hereto as Exhibit "C."

[6] Attached as Exhibit "D" hereto is a copy of the vacated decision in *Bianch v. Frosh*, 858 F. App'x 645 (4th Cir. 2021), which relied on the now-discredited decision in *Kolbe*, that HB 450 relies on.

16.     Further, also in light of its decision in *Bruen*, the United States Supreme Court  vacated and remanded a Ninth Circuit Court of Appeals decision upholding a ban of "large-capacity magazines" similar to those banned in SS 1 for SB  6. *See Duncan v. Becerra*, U.S. Supr. Ct. No. 21-1194, Order (June 30, 2022).

17.     Two judges on the United States District Court for the District of Colorado also very recently  granted temporary restraining orders preventing similarly flawed bans of common arms, including common ammunition magazines similar to those banned by SS 1 for SB 6, from being enacted following *Bruen*. *See Rocky Mountain Gun Owners v. The Town of Superior*, Civ. Action No. 22-cv-01685-RM (D. Colo. July 22, 2022); *Rocky Mountain Gun Owners v. Board of County Commissioners of Boulder County*, Civ. Action No. 1:22-cv-02113-CNS-MEH (D. Colo. Aug. 30, 2022).[8]

18.     Here in the Third Circuit, on August 30th of this year, also relying on *Bruen*, the Court of Appeals reversed a District Court dismissal of a claim brought

---

[7] The legislative findings and several prefatory "Whereas Clauses" of HB 450, *see* Exhibit "A" attached hereto, are based on false premises. For example, contrary to the "Whereas Clause" on lines 28 to 30 on page one of HB 450, the AR-15 was not originally designed for military use. Moreover, the U.S. Supreme Court rejected an "interest-balancing inquiry" that weighs the burden on a right with important governmental interests. *Bruen*, 142 S. Ct. 2111, at 2118; *see also Id*. at 2158 (Alito, J., concurring)("And while the dissent seemingly thinks that the ubiquity of guns and our country's high level of gun violence provide reasons for sustaining the New York law, the dissent appears not to understand that it is these very facts that cause law-abiding citizens to feel the need to carry a gun for self-defense.")

[8] A copy of these two decisions are attached as Exhibit "E."

pursuant to the Second Amendment and the Fifth Amendment's Takings Clause. In *Frein v. Pennsylvania State Police*, No. 21-1830, 2022 WL 3724097 (3d Cir. Aug. 30, 2022), the Court of Appeals held that the seizing of the firearms of the parents of a convicted criminal constituted a violation of the Fifth Amendment's Takings Clause, where the warrant's justification, under which they were seized, had run out, the firearms were not contraband and/or proceeds of a crime, and the Plaintiff-parents did not forfeit the guns. *Id.*[9] Citing to *Bruen*, the Court also held that the Plaintiff-parents' Second Amendment rights had been violated where "this Nation's historical tradition" did not permit seizing and holding onto the firearms. *Id.* at *10; *see also*, *Id.* at *12 ("…the Second Amendment prevents the government from hindering citizens' ability to "keep" their guns.")[10]

## JURISDICTION AND VENUE

19.    This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331 and 1343.

20.    Plaintiffs seek remedies under 28 U.S.C. §§ 1651, 2201 and 2202; 42 U.S.C. §§ 1983 and 1988; U.S. Constitution Amendment II and Amendment XIV;

---

[9] A copy of this decision is attached hereto as Exhibit "F."

[10] Similarly, the Third Circuit Court of Appeals has ordered parties in a New Jersey magazine ban case to submit supplemental briefing to address the proper disposition of the matter in light of *Bruen*. *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, Case No. 19-3142 (3rd Cir. July 7, 2022).

U.S. Constitution art. 1, § 8, Clause 3 as well as art. 2 paragraph 2, and DEL. CONST., art. I, § 7 as well as art. I, § 20.

21.    Venue lies in this Court under 28 U.S.C. § 1391(b)(1) and (b)(2).

## PARTIES

22.    Plaintiff DSSA is a Delaware corporation with a principal place of business in Sussex County, Delaware. DSSA was founded in 1968 as the official State-level affiliate of the National Rifle Association of America, and its membership currently consists of approximately 4,500 individual members and constituent clubs. DSSA's prime purpose is to preserve, protect and defend the constitutional rights of its members and the people of the State of Delaware to keep and bear arms for lawful purposes. DSSA brings this action on behalf of itself and its members, including Plaintiffs M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza in order to protect and defend the constitutional rights of its members and of itself.

23.    Plaintiff BRPC is a Delaware corporation with a principal place of business in Sussex County, Delaware. BRPC was formed in the early 1950s by a group of veterans returning from World War II and the Korean Conflict for the purpose of establishing and providing a venue where its members and their guests might lawfully and safely exercise their right to keep and bear arms for lawful purposes. BRPC membership currently stands at approximately 1,600 individual

members and their families, residing in Delaware, Maryland, Pennsylvania, Virginia, New Jersey, and other states. BRPC serves as a competitive shooting club that conducts education, training and competitive shooting events drawing competitors and participants throughout the United States. BRPC brings this action on behalf of itself and its members, including Plaintiffs M. Nedza, Smith and Prickett, in order to protect the rights of its members and to protect BRPC's ability to continue to engage in competitive shooting sports and the education of its members in the safe and responsible use and ownership of firearms.

24.     Plaintiff DRPC is a Delaware non-profit corporation, formed in 1946 and offering the following forms of membership: Active Membership, Spousal Membership, Honorary Membership, Military Service Inactive Membership, Inactive Membership, and Junior Membership. DRPC membership currently stands at approximately 498 individual members and their families residing in Delaware, Maryland, New Jersey and New York.  DRPC's mission is (1) to protect and promote the right to keep and bear arms; (2) encourage organized rifle and pistol shooting by United States citizens and legal residents; (3) increase knowledge of the lawful and safe handling and proper care of firearms; and (4) to promote the proper use of firearms in marksmanship programs, hunting and self-defense. DRPC brings this action on behalf of itself and its members, including Plaintiff Prickett, in order to protect the rights of its members and to protect DRPC's ability to continue to engage

in the competitive and non-competitive shooting sports and the education of its members in the safe and responsible use and ownership of firearms.

25.　Plaintiff DAFFL is a voluntary unincorporated association consisting of Federal Firearms Licensees, licensed to do business in the State of Delaware. DAFFL exists for the purpose of protecting and defending the Constitutional right to keep and bear arms for lawful purposes by law-abiding citizens, to protect and enhance the lawful commerce in arms in the State of Delaware, to support and assist members in establishing and executing best business practices, and to educate customers and the public at large in the safe and lawful handling, use and storage of firearms. DAFFL brings this action on behalf of itself and its members, including Plaintiff Smith, in order to protect and defend its members' constitutional right to keep and bear arms for lawful purposes by law-abiding citizens.

26.　Plaintiff Madonna M. Nedza is a natural person, a resident of Kent County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. M. Nedza is a member of DSSA and BRPC.

27.　Plaintiff Cecil Curtis Clements is a natural person, a resident of New Castle County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Clements is a member of DSSA and is an NRA certified firearms instructor.

28.     Plaintiff James Hosfelt Jr. is a natural person, a resident of Kent County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Hosfelt is a member of DSSA.

29.     Plaintiff Bruce C. Smith is a natural person, a resident of Sussex County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms.  Smith is a member of DSSA, BRPC and DAFFL.

30.     Plaintiff Vickie Lynn Prickett is a natural person, a resident of New Castle County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. Prickett is a member of DSSA, BRPC, and DRPC and is an NRA certified firearms instructor.

31.     Plaintiff Frank M. Nedza is a natural person, a resident of Kent County, Delaware, an adult over the age of 21, a citizen of the United States, and legally eligible under federal and state law to possess and acquire firearms. F. Nedza is a member of DSSA and is an NRA certified firearms instructor.

32.     Defendant Delaware Department of Safety and Homeland Security is a department within the State of Delaware that oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws,

including the Regulatory Scheme. Defendant Delaware Department of Safety and Homeland Security's enforcement of the Regulatory Scheme's ban on "assault weapons" and "large-capacity magazines" against Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Regulatory Scheme, which leaves them unable to keep common firearms.  All other members and supporters of DSSA, BRPC, DRPC and DAFFL in Delaware face the same clear threat of enforcement.

33.    Defendant Nathanial McQueen Jr. is the Cabinet Secretary of the Delaware Department of Safety and Homeland Security for the State of Delaware. Suit is brought against Defendant McQueen in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security. In such capacity, Defendant McQueen oversees the Delaware State Police and the Delaware Capitol Police, both of which execute and administer the State's laws, including the Regulatory Scheme.  Defendant McQueen's ongoing enforcement of the Regulatory Scheme's ban on "assault weapons" and "large-capacity magazines" against Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Regulatory Scheme, which leaves them unable to keep common firearms. All other members and supporters of DSSA, BRPC, DRPC and DAFFL in Delaware face the same clear threat of enforcement.

34.     Defendant Col. Melissa Zebley is the Superintendent of the Delaware State Police. Suit is brought against Defendant Zebley in her official capacity as Superintendent of the Delaware State Police. In such capacity Defendant Zebley executes and administers the State's laws, including the Regulatory Scheme. Defendant Zebley's ongoing enforcement of the Regulatory Scheme's ban on "assault weapons" and "large-capacity magazines" against Delaware residents places Plaintiffs under imminent threat of arrest and/or prosecution should they violate the Regulatory Scheme, which leaves them unable to keep common firearms. All other members and supporters of DSSA, BRPC, DRPC and DAFFL in Delaware face the same clear threat of enforcement.

## FACTUAL ALLEGATIONS

## I.     DELAWARE'S UNCONSTITUTIONAL HB 450

35.     The State of Delaware mislabels scores of common rifles, common shotguns, common pistols, and "copycat' weapons with a misnomer of "assault weapons"—and bans all of them outright pursuant to the enactment of HB 450.  11 *Del. C.* §§ 1457, 1464-1467.

36.     This broad ban on transporting, manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing any "assault weapon" applies to everyone who does not fall into one of a few narrow categories, primarily on-duty

military personnel, law enforcement officers, and certain personnel of the United States government or a unit of that government.  *See* 11 *Del. C.* § 1466 (a)(1)-(2).

37.   Ordinary citizens may possess and transport an "assault weapon" only if they lawfully possessed it prior to June 30, 2022,  and then only,  "[a]t that person's residence, place of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair." *See* 11 *Del. C.* § 1466 (c)(3)(a)-(d).

38.   Ordinary citizens meeting the above criteria of 11 *Del. C.* § 1466 (c)(3)(a)-(d) are further encouraged, no later than 1 year from June 30, 2022, to apply to the Secretary of the Department of Safety and Homeland Security for a certificate of possession.  11 *Del. C.* § 1467(a).

39.   Moreover, HB 450 mandates that a law-abiding citizen meeting the above criteria of 11 *Del. C.* § 1466 (c)(3)(a)-(d) must transport that "assault weapon" in "secure storage," meaning "stored in a locked container or equipped with a tamper resistant mechanical lock…" rendering the "assault weapon"

incapable of being used for defense of self or family outside the home, contrary to the rights enumerated in the United States and Delaware Constitutions. See 11 *Del. C.* § 1465 (12); 11 *Del. C.* § 1466 (c)(4).

40.    If an ordinary, law-abiding citizen keeps or bears an arm that he did not lawfully possess prior to June 30, 2022, or keeps or bears an arm anywhere but the locations enumerated in 11 *Del. C.* § 1466 (c)(3)(a)-(d), and HB 450 has dubbed that arm an "assault weapon," then Defendants or their agents may seize and dispose of that arm, regardless of whether it is in common use. See 11 *Del. C.* § 1466 (e). Moreover, any ordinary, law-abiding citizen who possesses an "assault weapon," or transports one into the State, commits a Class D felony offense and is subject to severe criminal sanctions, including imprisonment for up to eight years for the first offense.  11 *Del. C.* §§ 4205, 1466 (d).  Further, under both state and federal law, conviction under these provisions would result in a lifetime ban on possession even of firearms that have not been prohibited under the Regulatory Scheme as "assault weapons." 11 *Del. C.* § 1448(a)(1) (Delaware law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).[11]

---

[11] Conviction under these provisions would also result in the convicted person losing their right to vote and serve on a jury, under both state and federal law. *See* DEL. CONST., art. V, § 2; Del. Code Ann. tit. 15, § 1701 (vote); Del. Code Ann. tit. 10 § 4509(b)(6)(jury).

## II.   FIREARMS IN COMMON USE

41.    Like the handgun ban invalidated by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), HB 450 amounts to "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes, even in one's home. *Id.* at 628-629.

42.    HB 450 bans as "assault weapons" the below named firearms, any "copy" of those firearms, and firearms with certain features that have no necessary relation to the named firearms that are banned.

43.    The semiautomatic pistols banned as "assault pistols" are any of the following or their copies, regardless of the producer or manufacturer:

<blockquote>

a.   AA Arms AP-9 pistol;<br>
b.   Beretta 93R pistol;<br>
c.   Bushmaster pistol;<br>
d.   Claridge HI-TEC pistol;<br>
e.   D Max Industries pistol;<br>
f.   EKO Cobra pistol;<br>
g.   Encom MK-IV, MP-9, or MP-45 pistol;<br>
h.   Heckler and Koch MP5K, MP7, SP-89, or VP70 pistol.<br>
i.   Holmes MP-83 pistol;<br>
j.   Ingram MAC 10/11 pistol and variations, including the Partisan Avenger and the SWD Cobray;<br>
k.   Intratec TEC-9/DC-9 pistol in any centerfire variation;<br>
l.   P.A.W.S. type pistol;<br>
m.   Skorpion pistol;<br>
n.   Spectre double action pistol (Sile, F.I.E., Mitchell);<br>
o.   Stechkin automatic pistol;<br>
p.   Steyer tactical pistol;<br>
q.   UZI pistol;<br>
r.   Weaver Arms Nighthawk pistol;<br>
s.   Wilkinson "Linda" pistol.

</blockquote>

11 *Del. C.* § 1465(3).

44.    The semiautomatic long guns banned as "assault long guns" are any of the following or their copies, regardless of the producer or manufacturer:

    a.    American Arms Spectre da Semiautomatic carbine;
    b.    Avtomat Kalashnikov semiautomatic rifle in any format, including the AK-47 in all forms;
    c.    Algimec AGM-1 type semi-auto;
    d.    AR 100 type semi-auto;
    e.    AR 180 type semi-auto;
    f.    Argentine L.S.R. semi-auto;
    g.    Australian Automatic Arms SAR type semi-auto;
    h.    Auto-Ordnance Thompson M1 and 1927 semi-automatics;
    i.    Barrett light .50 cal. semi-auto;
    j.    Beretta AR70 type semi-auto;
    k.    Bushmaster semi-auto rifle;
    l.    Calico models M-100 and M-900;
    m.    CIS SR 88 type semi-auto;
    n.    Claridge HI TEC C-9 carbines;
    o.    Colt AR-15, CAR-15, and all imitations except Colt AR-15 Sporter H-BAR rifle;
    p.    Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K-1, and K-2;
    q.    Dragunov Chinese made semi-auto;
    r.    Famas semi-auto (.223 caliber);
    s.    Feather AT-9 semi-auto;
    t.    FN LAR and FN FAL assault rifle;
    u.    FNC semi-auto type carbine;
    v.    F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;
    w.    Steyr-AUG-SA semi-auto;
    x.    Galil models AR and ARM semi-auto;
    y.    Heckler and Koch HK-91 A3, HK-93 A2, HK-94 A2 and A3;
    z.    Holmes model 88 shotgun;
    aa.    Manchester Arms "Commando" MK-45, MK-9;
    bb.    Mandell TAC-1 semi-auto carbine;
    cc.    Mossberg model 500 Bullpup assault shotgun;
    dd.    Sterling Mark 6;
    ee.    P.A.W.S. carbine;

ff.   Ruger mini-14 folding stock model (.223 caliber);

gg.   SIG 550/551 assault rifle (.223 caliber);

hh.   SKS with detachable magazine;

ii.   AP-74 Commando type semi-auto;

jj.   Springfield Armory BM-59, SAR-48, G3, SAR-3, M-21 sniper rifle, and M1A, excluding the M1 Garand;

kk.   Street sweeper assault type shotgun;

ll.   Striker 12 assault shotgun in all formats;

mm.   Unique F11 semi-auto type;

nn.   Daewoo USAS 12 semi-auto shotgun;

oo.   UZI 9mm carbine or rifle;

pp.   Valmet M-76 and M-78 semi-auto;

qq.   Weaver Arms "Nighthawk" semi-auto carbine;

rr.   Wilkinson Arms 9mm semi-auto "Terry."

11 *Del. C.* § 1465(2).

45.   HB 450 also bans any "copycat weapon," which is defined as any of the following:

a.   A semiautomatic, centerfire rifle that can accept a detachable magazine and has at least 1 of the following:

1.   A folding or telescoping stock;

2.   Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

3.   A forward pistol grip;

4.   A flash suppressor;

5.   A grenade launcher or flare launcher.

b.    A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

c.    A semiautomatic pistol that can accept a detachable magazine and has at least 1 of the following:

1.    An ability to accept a detachable ammunition magazine that attaches at some location outside of the pistol grip;

2.    A threaded barrel capable of accepting a flash suppressor, forward pistol grip or silencer;

3.    A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to fire the firearm without being burned, except a slide that encloses the barrel;

4.    A second hand grip.

d.    A semiautomatic shotgun that has both of the following:

1.    A folding or telescoping stock;

2.    Any grip of the weapon, including a pistol grip, a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing.

e.    A semiautomatic shotgun that has the ability to accept a detachable magazine.

f.    A shotgun with a revolving cylinder.

g.    A semiautomatic pistol with a fixed magazine that can accept more than 17 rounds.

h.    A semiautomatic, centerfire rifle that has a fixed magazine that can accept more than 17 rounds.

21

*11 Del. C.* § 1465(5).

46.     Handguns are "indisputably in 'common use' for self-defense today. They are, in fact, 'the quintessential self-defense weapon." *Bruen*, 142 S. Ct. at 2143 (citing *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)); *see also*, *Heller v. District of Columbia* ("*Heller II*"), 670 F.3d 1244, 1269 (D.C. Cir. 2011)(Kavanaugh, J., dissenting) ("[H]andguns—the vast majority of which today are semi-automatic—… have not traditionally been banned and are in common use by law-abiding citizens.").

47.     At the start of the last decade, over eighty percent of the handguns sold in the United States were semiautomatic. Nicholas J. Johnson, et al., *Firearms Law and the Second Amendment* 8, 11 (2012).

48.     "Nationally, modern rifles are ubiquitous . . . In 2018, 909,330 Ford F-150s were sold. Twice as many modern rifles were sold the same year." *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1022 (S.D. Cal, 2021). A 2022 study by the NSSF®, the firearm industry trade association, estimated there are 24,446,000 Modern Sporting Rifles in circulation in the United States since 1990. That is an increase of over 4.5 million rifles since the last estimate was released in 2020 and far exceeds the 16,100,000 F-150 trucks estimated to be on the road. https://www.nssf.org/articles/commonly-owned-nssf-announces-over-24-million-msrs-in-circulation/.

49.     Semiautomatic rifles are also in common use and accounted for 40 percent of rifles sold in 2010; with two million AR-15s, America's most popular rifle, manufactured between 1986 and 2010. *Heller II* at 1287; *see also Friedman v. City of Highland Park, Ill*., 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from  denial of cert) ("Roughly five million Americans own AR-styled semiautomatic rifles….The overwhelming majority of citizens who own and use such rifles do so for lawful purposes including self-defense and target shooting.")

50.     Semiautomatic long guns "traditionally have been widely accepted as lawful possessions..." *See Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle). And they too are in common use presently. Counting just "modern sporting rifles" (a category that includes semiautomatic AR-style and AK-style rifles), the number in circulation today approaches twenty-five million. According to industry sources, more than one out of every five firearms sold in certain recent years were semiautomatic modern sporting rifles.

51.     The banned semiautomatic firearms deemed as "assault weapons" under HB 450, like all other semiautomatic firearms, fire only one round for each pull of the trigger.  They are not machine guns.[12] *See Staples*, 511 U.S. at 602 n.1.

---

[12] The State of Delaware was corrected by the Delaware Superior Court for mistakenly conflating this distinction in a firearms case the State lost and did not

What is more, the designation "assault weapons" is a complete misnomer, "developed by anti-gun publicists" in their crusade against lawful firearm ownership. *See Stenberg v. Carhart*, 530 U.S. 914, 1001 n.16 (2000) (Thomas, J., dissenting). *See generally* Charles C. W. Cooke, *When The News Becomes Propaganda, America's 1st Freedom*, at 56 (August 2022) ("rifles of all types are used in fewer murders than are hands and feet, and…the rifles that have been arbitrarily deemed "assault weapons" are used in only a fraction of those crimes.")

52.     Rifles built on an AR-style platform are a paradigmatic example of the type of arm HB 450 bans. AR-15 rifles are among the most popular firearms in the nation, and they are owned by millions of Americans.

53.     Central among the common uses of "assault weapons" banned in Delaware is defense of self in the home. For example, most AR-style firearms are chambered for 5.56x45mm NATO (similar to .223 Remington) ammunition, a relatively inexpensive and highly common cartridge that is particularly well suited for home-defense purposes because it has sufficient stopping power in the event a home intruder is encountered, but loses velocity relatively quickly after passing through a target and other objects, thus decreasing the chance that an errant shot will strike an unintended target. Although most pistol rounds have less muzzle velocity than a 5.56x45mm NATO round, they have greater mass, maintain velocity after

---

appeal. *Del. State Sportsmen's Ass'n v. Garvin,* 2020 Del. Super. LEXIS 2927, *1, *13 (Del. Super. 2020).

passing through walls and other objects, and pose substantially greater risk to unintended targets in the home. An AR-15 rifle chambered for 5.56x45mm NATO ammunition is an optimal firearm to rely on in a self-defense encounter.

54.     Further, the .223 caliber round does not more easily penetrate walls or car doors, must less soft body armor at great distances. Cartridges used in deer hunting rifles have far greater penetration.

55.     Like the AR-15 generally, the specific features of banned so-called "copycat weapons" aid home defense. A flash suppressor, for example, not only reduces the chance that a home-invader will mark his victim's position; it also protects a homeowner against momentary blindness when firing in self-defense. David B. Kopel, *Rational Basis Analysis of "Assault Weapon" Prohibition*, 20 J. Contemp. L. 381, 397 (1994). Similarly, folding stocks, whether on rifles or shotguns, support maneuverability in tight home spaces, *Kopel* at 398-99, as well as safe storage of defense instruments.

56.     Encounters with criminal intruders in the home are not uncommon.  For instance, according to a report by the U.S. Department of Justice, Bureau of Justice Statistics, household members are present for almost a third of all burglaries and become victims of violent crimes in more than a quarter of those cases. Studies on the frequency of defensive gun uses in the United States have determined that there

are up to 2.5 million instances each year in which civilians use firearms to defend themselves or their property.

57.    Other common, lawful uses of the "assault weapons" are for hunting and for sporting purposes. At least a third of all gun-owners own a firearm for hunting or sport shooting, and recreational target shooting has been cited as the top reason, albeit closely followed by home defense, for owning a modern sporting rifle.

58.    Here again, the banned features of "copycat weapons" serve lawful purposes. Folding stocks, for example, allow for safe transportation and easier carrying over long distances while hunting. Flash suppressors promote accuracy in target-shooting and hunting (especially at dawn.)

59.    By contrast, one use that is not common for "assault rifles" is crime. These arms "are used in a small fraction of gun crimes." *See* Gary Kleck, *Targeting Guns: Firearms and Their Control* 112 (1997) (evidence indicates that "well under 1% of [crime guns] are 'assault rifles.'")

60.    HB 450 harms law-abiding citizens, not criminals.

61.    HB 450's prohibition on the enumerated long guns, their "copies," and the "copycat weapons," as "assault weapons" effectively bans the acquisition of semiautomatic firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## III.   DELAWARE'S UNCONSTITUTIONAL SS 1 FOR SB 6

62.   The State of Delaware also mislabels scores of common ammunition magazines with a misnomer of "large-capacity magazines"—and bans all of them outright.  11 *Del. C.* §§ 1468-1469A. Like the term "assault weapon," "there simply is no such thing as a 'large capacity magazine.' It is a regulatory term created by the State, meaning no more than the maximum amount of ammunition the State has decided may be loaded into any firearm at one time." *Association of New Jersey Rifle and Pistol Clubs, Inc. v. Attorney General of New Jersey*, No. 19-3142, at *9 (3d Cir. Aug. 25, 2022) (Matey, J. dissenting from Order remanding case back to the district court) (Dkt. 147-1).

63.   This broad ban on transporting, manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing any "large-capacity magazine" applies to everyone who does not fall into one of a few narrow categories, primarily on-duty military personnel, law enforcement officers, and certain personnel of the United States government or a unit of that government.  11 *Del. C.* § 1469.

64.   This broad ban contains no provision for owners of "large-capacity magazines" purchased prior to enactment of the ban to retain the "large-capacity magazine" and instead mandates that Defendant Nathanial McQueen Jr., "establish and administer a compensation program for residents of this State to allow a

resident in possession of a large-capacity magazine on August 29, 2022 to relinquish the large-capacity magazine to the Department of Safety and Homeland Security ("Department") or a participating local law-enforcement agency in exchange for a monetary payment established under this subsection." 11 *Del. C.* § 1469(d).

65.     SS 1 for SB 6 also creates a purported exception to the outright ban for "[a]n individual who holds a valid concealed carry permit issued by the Superior Court under § 1441." 11 *Del. C.* § 1469(c)(5). However, the standard for such exception is entirely arbitrary and vague, requiring that successful applicant be "of good moral character" and stating that the Court "may or may not, in its discretion, approve any application…" 11 *Del. C.* § 1441(a), (d).

66.     This purported exception further creates an unconstitutional registration and licensing process for applicants, providing, in part, that "[t]he Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county..." 11 *Del. C.* § 1441(b).

67.     What's more, many of the common arms deemed "assault weapons" by HB 450, such as the AR-15, are equipped with standard-capacity ammunition magazines that are deemed "large-capacity magazines" by SS 1 for SB 6.

However, because SS 1 for SB 6 contains no provision for owners of "large-capacity magazines" purchased prior to the enactment of the ban to retain the "large-capacity" in the same manner provided by HB 450 in a "grandfather clause," SS 1 for SB 6 effectively contradicts and/or overrules HB 450's prior ownership provision for any common arm deemed an "assault weapon" under HB 450 that is equipped with a standard-capacity magazine "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 *Del. C.* § 1468(2)(a).

68.    If an ordinary, law-abiding citizen keeps or bears an ammunition magazine and SS 1 for SB 6 has dubbed that ammunition magazine a "large-capacity magazine" then Defendants or their agents may seize and dispose of that ammunition magazine, regardless of whether it is in common use. See 11 *Del. C.* § 1469(b). Moreover, any ordinary, law-abiding citizen who possesses a "large-capacity magazine," or transports one into the State, is subject to a civil penalty for a first violation, commits a Class B misdemeanor offense for a second violation, and a Class E felony offense for any further violations. *Id.*

69.    Any ordinary, law-abiding citizen who is convicted of a Class E felony is subject to severe criminal sanctions, including imprisonment for up to five years for the first offense. 11 *Del. C.* §§ 4205(b)(5), 1469(b). Further, under both state and federal law, conviction under these provisions would result in a

lifetime ban on possession even of firearms and ammunition magazines that have not been prohibited under the Regulatory Scheme as "assault weapons" and "large-capacity magazines." 11 *Del. C.* § 1448(a)(1) (Delaware law); 18 U.S.C. § 922(g)(1), § 921(a)(20) (federal law).[13]

## IV. AMMUNITION MAGAZINES IN COMMON USE

70.    Like the handgun ban invalidated by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008), SB 6 amounts to "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" for lawful purposes, even in one's home.  Id.  at 628-629.

71.    SS 1 for SB 6 bans as "large-capacity magazines" "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 *Del. C.* § 1468(2)(a).

72.    Firearms with ammunition magazines capable of holding more than seventeen rounds, which includes many commonly used arms deemed "assault weapons" under HB 450, are indisputably in common use today by law-abiding citizens for lawful purposes, including self-defense.

---

[13] Conviction under these provisions would also result in the convicted person losing their right to vote and serve on a jury, under both state and federal law. *See* DEL. CONST., art. V, § 2; Del. Code Ann. tit. 15, § 1701 (vote); Del. Code Ann. tit. 10 § 4509(b)(6)(jury).

73.    There are currently tens of millions of rifle magazines that are lawfully-possessed in the United States with capacities of more than seventeen rounds.

74.    The most popular rifle in American history, and to this day, is the AR-15 platform, a semiautomatic rifle with standard magazines of 20 or 30 rounds.

75.    The AR-15 was brought to the market in 1963, with a then-standard magazine of 20; the 30-round standard magazine was developed a few years later. Patrick Sweeney, *Gun Digest Book of the AR-15*, 104 (2005).

76.    Two million AR-15s alone were manufactured between 1986 and 2010. *Heller II* at 1287; *see also Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from  denial of cert) ("Roughly five million Americans own AR-styled semiautomatic rifles…The overwhelming majority of citizens who own and use such rifles do so for lawful purposes including self-defense and target shooting.")

77.    Springfield Armory also introduced the M1A semi-automatic rifle in 1974, with a 20-round detachable box magazine. The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard 5-, 10-, or 20-round

detachable magazines. *2014 Standard Catalog of Firearms*, 1102 (2014). Both the M1A and the Mini-14 are very popular to this day.[14]

78.    Further, SS 1 for SB 6 bans ammunition magazines capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition. However, ammunition magazines can often be used for multiple calibers of cartridge, and the number of rounds they can hold depends on the caliber. For example, a certain magazine often affiliated with the AR-15 will hold 30 rounds of 5.56 mm ammunition but only 10 rounds of the larger .458 SOCOM ammunition. Many popular magazines have similarly variable capacities. The existence of this variability means that  common arms that come equipped with standard-capacity magazines of 17 rounds of ammunition or below are still banned under SB 6. Matthew Larosiere, *CATO Institute Legal Bulletin: Losing Count: The Empty    Case    for    "High-Capacity"    Magazine    Restrictions* https://www.cato.org/legal-policy-bulletin/losing-count-empty-case-high-capacity-magazine-restrictions (July 17, 2018).

---

[14] Ammunition magazines capable of holding more than seventeen rounds are not only in common use today, they have been for centuries. At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 20 or 22-shot magazine capacity. Merriweather Lewis carried one on the Lewis & Clark expedition. Jim Garry, *Weapons of the Lewis & Clark Expedition* 91-103 (2012)

79.     Firearms with ammunition magazines capable of holding more than seventeen rounds, such as the AR-15, the M1A, and the Ruger Mini-14 are well-suited and preferred for self-defense.

80.     These ammunition magazines decrease the risk of running out of ammunition before one can successfully repel a criminal attack.

81.     The availability of more ammunition in an arm for self-defense is particularly preferable given that: (1) violent crimes often involve multiple attackers, increasing the likelihood that a greater number of defensive discharges will be required to eliminate the threat, and (2) the stress of a criminal attack greatly reduces the likelihood that shots fired will hit the aggressor, and (3) a single shot that does strike will rarely incapacitate the aggressor before he or she can complete his or her attack.

82.     SS 1 for SB 6 harms law-abiding citizens, not criminals.

83.     SS 1 for SB 6's prohibition on "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition" effectively bans the acquisition of  firearms that are commonly possessed and used for lawful purposes, including self-defense in the home.

## V.    THE UNCONSTITUTIONAL REGISTRY AND LICENSING PROCESS CREATED BY THE REGULATORY SCHEME

84.    The State of Delaware, through the Regulatory Scheme, further creates unconstitutional firearms registries and imposes unconstitutional licensing requirements upon ordinary, law-abiding citizens, including Plaintiffs.

85.    The State of Delaware purports to create an "exception" HB 450's ban whereupon ordinary law-abiding citizens may possess and transport an "assault weapon" only if they lawfully possessed it prior to June 30, 2022, and then only, "[a]t that person's residence, place of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair." *See* 11 *Del. C.* § 1466 (c)(3)(a)-(d).

86.    However, ordinary law-abiding citizens meeting the above criteria of 11 *Del. C.* § 1466 (c)(3)(a)-(d) are further encouraged, no later than 1 year from June 30, 2022, to apply to the Secretary of the Department of Safety and Homeland Security for a certificate of possession. 11 *Del. C.* § 1467(a).

87.    This "certificate of possession" is an unconstitutional firearms registration and licensing process.

88.    The State of Delaware also purports to create an "exception" to SS 1 for SB 6's ban whereupon SS 1 for SB 6 does not apply to "[a]n individual who holds a valid concealed carry permit issued with the approval of the Superior Court under § 1441 of this title." 11 *Del. C.* § 1469(c)(5).

89.    However, this "exception" requires prospective permit holders to comply with an extremely vague, arbitrary and burdensome registration and licensing process.

90.    The permit that provides a purported "exception" to SS 1 for SB 6 is open to "[a] person of full age and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection or the protection of the person's property," and requires prospective permit holders to strictly comply with the following conditions:

> "(1) The person shall make application therefor in writing and file the same with the Prothonotary of the proper county, at least 15 days before the then next term of the Superior Court, clearly stating that the person is of full age and that the person is desirous of being licensed to carry a concealed deadly weapon for personal protection or protection of the person's property, or both, and also stating the person's residence and occupation. The person shall submit together with such application all information necessary to conduct a criminal history background check. The Superior Court may conduct a criminal history background check pursuant to the procedures set forth in Chapter 85 of Title 11 for the purposes of licensing any person pursuant to this section.

(2) At the same time the person shall file, with the Prothonotary, a certificate of 5 respectable citizens of the county in which the applicant resides at the time of filing the application. The certificate shall clearly state that the applicant is a person of full age, sobriety and good moral character, that the applicant bears a good reputation for peace and good order in the community in which the applicant resides, and that the carrying of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the applicant's property, or both. The certificate shall be signed with the proper signatures and in the proper handwriting of each such respectable citizen.

(3) Every such applicant shall file in the office of the Prothonotary of the proper county the application verified by oath or affirmation in writing taken before an officer authorized by the laws of this State to administer the same, and shall under such verification state that the applicant's certificate and recommendation were read to or by the signers thereof and that the signatures thereto are in the proper and genuine handwriting of each. Prior to the issuance of an initial license the person shall also file with the Prothonotary a notarized certificate signed by an instructor or authorized representative of a sponsoring agency, school, organization or institution certifying that the applicant: (i) has completed a firearms training course which contains at least the below-described minimum elements; and (ii) is sponsored by a federal, state, county or municipal law enforcement agency, a college, a nationally recognized organization that customarily offers firearms training, or a firearms training school with instructors certified by a nationally recognized organization that customarily offers firearms training. The firearms training course shall include the following elements:

    a.    Instruction regarding knowledge and safe handling of firearms;

    b.    Instruction regarding safe storage of firearms and child safety;

c.      Instruction regarding knowledge and safe handling of ammunition;

d.      Instruction regarding safe storage of ammunition and child safety;

e.      Instruction regarding safe firearms shooting fundamentals;

f.      Live fire shooting exercises conducted on a range, including the expenditure of a minimum of 100 rounds of ammunition;

g.      Identification of ways to develop and maintain firearm shooting skills;

h.      Instruction regarding federal and state laws pertaining to the lawful     purchase, ownership, transportation, use and possession of firearms;

i.      Instruction regarding the laws of this State pertaining to the use of deadly force for self-defense; and

j.      Instruction regarding techniques for avoiding a criminal attack and how to manage a violent confrontation, including conflict resolution.

(4) At the time the application is filed, the applicant shall pay a fee of $65 to the Prothonotary issuing the same…

a. The Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county. In making such publication it shall be sufficient for the

Prothonotary to do the same as a list in alphabetical form stating therein simply the name and residence of each applicant respectively.

b. The Prothonotary of the county in which the application for license is made shall lay before the Superior Court, at its then next term, all applications for licenses, together with the certificate and recommendation accompanying the same, filed in the Prothonotary's office, on the first day of such application.

c. The Court may or may not, in its discretion, approve any application, and in order to satisfy the Judges thereof fully in regard to the propriety of approving the same, may receive remonstrances and hear evidence and arguments for and against the same, and establish general rules for that purpose…" 11 *Del. C.* § 1441.

91.     Further, the Department of Safety and Homeland Security has published "Regulations Governing the Delaware Large Capacity Magazine Compensation Program" that provide a proposal for the collection and disposition of "recovered large capacity magazines." This proposal states that:

"3.1   Upon surrender, all LCM [large capacity magazines] shall be tagged or marked by the collecting agency as to:

3.1.1  Where collected;
3.1.2  Whom collected by;
3.1.3  Who collected from;
3.1.4  The date of collection;
3.1.5  The make, model and serial number if applicable."

*See, Department of Safety and Homeland Security Proposed 103 Regulations Governing the Delaware Large Capacity Magazine Compensation Program*

92.     This Compensation Program is an unconstitutional firearms registration and licensing process.

38

93.     The Regulatory Scheme's unconstitutional registration and licensing process reduces fundamental rights to mere privileges to be granted or denied at the whim of public officials and private individuals, accountable to no one, to whom the State of Delaware has impermissibly delegated the authority to review and publish applicants.

94.     The Regulatory Scheme's unconstitutional registration and licensing process is lengthy, expensive, invasive and completely unnecessary. Every firearm purchaser must already pass a background check under federal law which the federal government has streamlined via computer to take place in mere minutes.[15]

95.     Ordinary, law-abiding citizens are completely barred from possession, transportation and sale of common firearms-mislabeled as "assault weapons" and "large-capacity magazines" prior to applying to and participating in   the Regulatory Scheme's unconstitutional registration and licensing process.

96.     The registration and licensing process imposed by the Regulatory Scheme heavily discriminates against and acts as a complete barrier to the acquisition of commonly used firearms by the poor or disadvantaged citizens of State of Delaware, who live in urban areas, where access to a public shooting range

---

[15] It is further believed, and therefore averred, that the State of Delaware intends to implement a program for return of "large-capacity magazines" whereupon compensation for those returned ammunition magazines is only granted to those who provide their names to the State. In so requiring, the State of Delaware creates not only an unconstitutional registry of "large-capacity magazine" owners but also of "assault weapon" owners.

is effectively non-existent and where the registration and licensing process is costly. The underlying intent and practical effect of these requirements is the disenfranchisement of Second Amendment rights for the poor and disadvantaged. These and the other requirements imposed by the registration and licensing process of the Regulatory Scheme form undue and effective practical barriers to the exercise of fundamental constitutional rights preserved by the Second Amendment.[16]

## VI.   THE EFFECT ON PLAINTIFFS

97.   Members of Plaintiff DSSA intend and desire to acquire, possess, and transport pistols, rifles, and shotguns banned by the Regulatory Scheme as "assault

---

[16] There is an overtly racist history of gun licensing and registration laws in the colonies and at the time of America's founding. The first American law requiring a license to own a firearm appears to be Virginia's 1723 statute forbidding any "negro, mulatto, or Indian . . . to keep, or carry any gun," unless they were "a house-keeper, or listed in the militia." William Waller Hening, *The Statutes at Large; Being a Collection of All the Laws of Virginia*, 131 (1823). An exception was provided, however, for "negroes, mullattos, or Indians, bond or free, living at any frontier plantation," who could "keep and use guns" if they "first obtained a license for the same, from some justice of the peace." *Id.* Delaware, in its early history, like many states, used laws to restrict the use of firearms as a means of racial discrimination. *Laws of the State of Delaware*, Chapter 94, Vol. 12, March 6, 1861, at Section 7 (prohibiting free blacks from possessing guns); Stephen P. Halbrook, *The Right to Bear Arms: A Constitutional Right of the People or a Privilege of the Ruling Class*? at 233 (2021); Stephen B. Tahmassebi, *Gun Control and Racism*, 2 Civil Rights Law Journal 67 (1991) (describing history of gun control coinciding with oppression of blacks); *First Conviction under Weapon Law; Judge Foster gives Marino Rossi One Year for Arming himself…*" N.Y. Times (Sept. 28, 1911) at 5 (describing Sullivan Law targeting minorities to restrict their Second Amendment rights.)

weapons" and ammunition magazines capable of holding more than seventeen rounds  banned by the Regulatory Scheme as "large-capacity magazines" and are subject to and adversely affected by each and every restriction on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

98.    But for the Regulatory Scheme, some DSSA members would possess semiautomatic rifles designated as "assault weapons" under the Regulatory Scheme and ammunition magazines capable of holding more than seventeen rounds designated as "large-capacity magazines" under the Regulatory Scheme. Such rifles and ammunition magazines are commonly used for self-defense, hunting and target-shooting.

99.    Further, some DSSA members are in the business of selling firearms in the State of Delaware. DSSA members' businesses are subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

100.   Plaintiff BRPC is a competitive shooting club that also conducts education, training, and competitive shooting events. BRPC and its members are subject to and adversely affected by the restrictions on "assault weapons" (including

the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

101.   BRPC conducts competitive shooting events that involve the use of rifles, including semiautomatic rifles. Further, BRPC membership permits the immediate family living in the same household as a named member to participate in the same club activities and competitive shooting programs as the named member. As a direct result of the "assault weapons" and "large-capacity magazines" bans BRPC and its members are prohibited from exercising their right to keep and bear arms by acquiring, possessing, and transporting "assault weapons" and "large-capacity magazines" for use in club activities. The restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint adversely affect the continued operation of BRPC and the rights of its individual members.

102.   Plaintiff DRPC is a shooting club that also conducts education, training, and regular and special shooting events that include competitive shooting events. DRPC and its members are subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint.

103.   All members of Plaintiff DAFFL are Federal Firearms Licensees, licensed to do business in the State of Delaware. All of DAFFL's members are in

the business of selling firearms, including firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme in the State of Delaware. DAFFL's members' businesses are subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and the restrictions on "large-capacity magazines" articulated in this complaint.

104.   For example, DAFFL's members' businesses involve the sale of rifles, including semiautomatic rifles. As a direct result of the "assault weapons" ban, DAFFL's members are prohibited from selling many of the most popular semiautomatic rifles, such as the AR-15-type rifles which are often equipped with ammunition magazines capable of holding more than seventeen rounds, to customers in Delaware. But for Delaware's ban on "assault weapons" and "large-capacity magazines" DAFFL's members would sell AR-15-type rifles and other banned firearms in Delaware. Delaware's ban therefore has substantially harmed DAFFL's members' business.

105.   Plaintiff Madonna M. Nedza is a resident of Harrington, Delaware, and a member of DSSA and BRPC, who owns an AR-15 rifle that she uses regularly in shooting competitions and for self-defense that would be impacted by the Regulatory Scheme. M. Nedza intends and desires to exercise her right to keep and bear arms by continuing to possess and purchase firearms deemed "assault weapons" and

ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme. M. Nedza would continue to purchase and possess these firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. Particularly, M. Nedza would acquire and possess an AR platform rifle with a collapsible buttstock for purposes of self-defense as it is light and easy to use, which is an important characteristic to her as she ages. Further, M. Nedza currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme. M. Nedza also does not currently have a license to carry concealed weapons pursuant to 11 Del. C. § 1441, so as to purportedly be "exempt" from the "large-capacity magazine" ban of SS 1 for SB 6.

106.   Plaintiff Cecil Curtis Clements is a married engineer and legal guardian to his grandchild, who resides in Wilmington, Delaware, and is a member of DSSA. He is also an NRA certified firearms instructor, a range safety officer and instructor, and a competitive shooter who owns several firearms that would be impacted by the Regulatory Scheme. Clements intends and desires to exercise his right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and

ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense and in furtherance of his roles as a firearms instructor, range safety officer and instructor and competitive shooter. Clements would continue to purchase and possess these firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. In light of Defendants' enforcement, however, Clements continues to refrain from acquiring, possessing, or transporting these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" for self-defense and other lawful purposes. Further, Clements currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

107.   Plaintiff James E. Hosfelt Jr. is the retired Chief of Police for the City of Dover, and a member of DSSA who owns several firearms that would be impacted by the Regulatory Scheme, including AR-15 style rifles and pistols. Hosfelt intends and desires to exercise his right to keep and bear arms by continuing to possess and purchase firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes,

45

especially for self-defense. Hosfelt would continue to purchase and possess these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms.  Particularly Hosfelt would acquire and possess additional AR-15 style rifles and pistols.  Further, Hosfelt currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

108.   Plaintiff Bruce C. Smith is a resident of Bridgeville, Delaware, and is a member of DSSA, BRPC and DAFFL, who owns several firearms that would be impacted by the Regulatory Scheme.  Smith is also a Federal Firearms Licensee who owns a business, BKK Firearms, which involves the sale of firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme. Personally, Smith intends and desires to exercise his right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense. Further, Smith currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that

represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

109.   As a Federal Firearms Licensee, and owner of BKK Firearms, Smith is also in the business of selling firearms, including firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, in the State of Delaware. Therefore, Smith's business is subject to and adversely affected by the restrictions on "assault weapons" (including the definitions thereof) and "large-capacity magazines" (including the definitions thereof) articulated in this complaint. But for Delaware's ban on "assault weapons" and "large-capacity magazines" Smith would sell banned firearms in Delaware. Delaware's ban therefore has substantially harmed Smith's business.

110.   Plaintiff Vickie Lynn Prickett is a resident of Middletown, Delaware, and is a member of DSSA, BRPC and DRPC, and is also an NRA certified firearms instructor who owns several firearms that would be impacted by the Regulatory Scheme. Prickett intends and desires to exercise her right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense and in furtherance of her roles as a firearms instructor. Prickett is also a female of small stature and the Regulatory Scheme has an adverse impact upon her and women like her by banning certain

"assault weapons" that are lighter and easier to use for home and self-defense purposes. Prickett would continue to purchase and possess these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. In light of Defendants' enforcement, however, Prickett continues to refrain from acquiring, possessing, or transporting these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" for self-defense and other lawful purposes. Further, Prickett currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme.

111.  Plaintiff Frank M. Nedza is a veteran of the United States Armed Forces and a member of DSSA, who resides in Harrington, Delaware. He is also an NRA certified firearms instructor, a range safety officer and instructor, and a competitive shooter who owns several firearms that would be impacted by the Regulatory Scheme. F. Nedza intends and desires to exercise his right to keep and bear arms by possessing and purchasing firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme, for lawful purposes, especially for self-defense and in furtherance of

his roles as a firearms instructor, range safety officer and instructor and competitive shooter. F. Nedza would continue to purchase and possess these firearms deemed "assault weapons" and these ammunition magazines deemed "large-capacity magazines" were it not for Defendants' enforcement of Delaware's outright ban on these common arms. In light of Defendants' enforcement, however, F. Nedza continues to refrain from acquiring, possessing, or transporting these firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" for self-defense and other lawful purposes. Further, F. Nedza currently possesses firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" by the Regulatory Scheme that represent a significant investment in an appreciable asset, which are severely degraded by the passage and enforcement of the Regulatory Scheme. F. Nedza also does not currently have a license to carry concealed weapons pursuant to 11 *Del. C.* § 1441, so as to purportedly be "exempt" from the "large-capacity magazine" ban of SS 1 for SB 6.

112. But for Delaware's unconstitutional Regulatory Scheme and Defendants' enforcement thereof, and the severe lifelong and criminal penalties associated with violations of the Regulatory Scheme, Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DAFFL and its similarly situated members, DRPC and its similarly situated members, and M.

Nedza,Clements, Hosfelt, Smith, Prickett and F. Nedza would exercise their right to keep and bear the banned firearms deemed "assault weapons" and ammunition magazines deemed "large-capacity magazines" for lawful purposes, including self-defense, without the fear or risk of arrest, prosecution and loss of their right to keep and bear arms for engaging in constitutionally protected, lawful conduct.

## VII.   DEFENDANTS' LAWS AND REGULATIONS VIOLATE THE SECOND AMENDMENT AND THE BROADER RIGHTS AFFORDED BY THE DELAWARE CONSTITUTION

113.   The Second Amendment to the United States Constitution provides: "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed."

114.   "[I]t 'has always been widely understood that the Second Amendment codified a pre-existing right.' The Amendment "was not intended to lay down a novel principle but rather codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct. at 2127 (*citing Heller*, 554 U.S. at 599.)

115.   The Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

116.   The Second Amendment is fully applicable to the States through the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010).

117.   "The very enumeration of the right [to keep and bear arms] takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at  634 (2008).

118.   "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad." *Id*. at 634-635.

119.   In the wake of the Supreme Court's decisions in *Heller* and *McDonald*, Courts of Appeals developed a two-step test to assess Second Amendment claims. But in the recently decided *Bruen* case the Supreme Court rejected that two-step test as inconsistent with *Heller* and *McDonald* and as containing one step too many.  The Court determined that "[s]tep one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127.

120.   In so doing, the Supreme Court held that, "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct…. Only if a firearm regulation is consistent with this Nation's historical  tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2126 (*citing Kongsberg v. State Bar of Cal*. 366 U.S. 36, 50 n. 10 (1961)).

121.   *Bruen*, thus, reinforced the Heller approach to assessing a Second Amendment challenge by (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right.  *Id*. at 2127-28.

122.   *Bruen* further reinforced reasoning by analogy, maintaining that "[m]uch like we use history to determine which modern "arms" are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding.  When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve reasoning by analogy—a commonplace task for any lawyer or judge." *Id*. at 2132.

123.    Drawing from this historical tradition, *Bruen* and *Heller* instruct that the Second Amendment protects the carrying of weapons "in common use at the time." *Id.* at 2128 (*quoting Heller* at 627).

124.    Indeed, for this reason, "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller* at 582 (citations omitted).

125.    What's more, the plain text of the Delaware Constitution affords even broader rights to bear arms than the Second Amendment, providing that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20 (emphasis added); *see also Doe v. Wilmington Housing Authority*, 88 A.3d 654, 665 (Del. 2014)("[o]n its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation."); *Del. State Sportsmen's Ass'n v. Garvin*, 196 A.3d 1254, 1269 (Del. Super. 2018).

126.    In assessing the right to bear arms enumerated under the Delaware Constitution, the Supreme Court of the State of Delaware has emphasized "the significance of knowing the original text, context and evolution of any phrase that

appears in the present Delaware Constitution." *Bridgeville Rifle & Pistol Club, Ltd*. *v. Small*, 176 A.3d 632, 642 (Del. 2017) (citations omitted).

127.   The *Bridgeville* court further emphasized that "Section 20 protects a bundle of rights--including hunting, recreation, and the defense of self, family, and State." *Id*. at 652.

128.   The firearms at issue in this case, mislabeled as "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, are the sorts of bearable arms in common use for lawful purposes that law-abiding people possess at home by the millions. And they are, moreover, exactly what they would bring to service, e.g., militia duty and repelling violent mobs, should that be necessary.

129.   Plaintiffs and their members have a constitutional right to make use of common firearms, given the misnomer "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, for effective self-defense and not to be disarmed by the Regulatory Scheme and its enforcement by Defendants.

130.   The State must permit ordinary, law-abiding citizens to keep and bear common firearms, deemed "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, for lawful purposes.

131.   The right to keep and bear common firearms, improperly deemed "assault weapons" and "large-capacity magazines" under the Regulatory Scheme, guaranteed under the Bill of Rights, cannot be subjected to laws and regulations

such as the Regulatory Scheme's licensing and registration process, that act as an undue and unconstitutional burden preventing law-abiding citizens from keeping and bearing common firearms.

132.   The enshrinement of the right to keep and bear arms in the Second Amendment has necessarily taken such "policy choices off the table." *Heller* 554 U.S. at 636.

133.   Yet, this is precisely how the Regulatory Scheme in Delaware operates, completely shutting out ordinary, law-abiding citizens from exercising their rights in the State -- and making a "policy choice" that the Federal and State Constitutions have "taken off the table."

## COUNT I

### 42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution
### (HB 450)

134.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

135.   There is an actual and present controversy between the parties.

136.   The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

137.   The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

138.   The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms for all lawful purposes, including self-defense.

139.   Under HB 450, the State of Delaware bans "assault weapons" that are common firearms, listed in sections *11 Del. C.* § 1465(2)-(3) of the Delaware Criminal Code.

140.   Further, under HB 450, in section 11 *Del. C.* § 1465(5)  of the Delaware Criminal Code, the State of Delaware bans arms commonly used for lawful purposes by labeling them "assault weapons, grounding this ban on features that do not make a firearm more powerful or dangerous. Moreover, HB 450 mandates that a law-abiding citizen possessing an "assault weapon" legally under the exceptions to HB 450 enumerated in 11 *Del. C.* § 1466 (c)(3)(a)-(d) must transport that "assault weapon" in "secure storage," meaning "stored in a locked container or equipped with a tamper resistant mechanical lock…" rendering the "assault weapon" incapable of being used for defense of self or family outside the home. *See* 11 *Del. C.* § 1465 (12); 11 *Del. C.* §1466 (c)(4).

141.   HB 450's registration and licensing process further violates the Second Amendment because:

    (a)   a constitutional right may not be denied until a license to exercise that right is issued;

    (b)   the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

    (c)   the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

142.   42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

143.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its members, BRPC and its members, DRPC and its members, DAFFL and its members, and M. Nedza, Clements, Hosfelt, Smith, Prickett, and F. Nedza through Defendants' enforcement and implementation of HB 450.

144.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs to seek.

## COUNT II

**Action for Deprivation of Plaintiffs' Rights under Delaware Constitution
Article I, § 20
(HB 450)**

145.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

146.   There is an actual and present controversy between the parties.

147.   Article I, § 20 of the Delaware Constitution states that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20.

148.   Article I, § 20 was adopted by supermajorities of two successive Delaware General Assemblies, became effective in 1987, and is much broader than the more limited scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of § 20 is much broader than the scope of the Second Amendment.)

149.   The Delaware Supreme Court in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), recognized that "the enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it.)." *Id*. at 643.

150.   Article I, § 20 of the Delaware Constitution guarantees ordinary, law-abiding citizens of the State their fundamental right to keep and bear arms, both in the home and in public.

151.   The right to keep and bear arms under Article I, § 20 includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms for all lawful purposes, including self-defense.

152.   Under HB 450, the State bans so-called "assault weapons" that are common firearms, listed in sections 11 *Del. C.* § 1465(2)-(3) of the Delaware Criminal Code.

153.   Further, in 11 *Del. C.* § 1465(5) of the Delaware Criminal Code, the State bans arms commonly used for lawful purposes, as "assault weapons," grounding this ban on features that do not make a firearm more powerful or dangerous.

154.   Further, HB 450 mandates that a law-abiding citizen possessing an "assault weapon" legally under the exceptions enumerated in 11 *Del. C.* § 1466 (c)(3)(a)-(d) must transport that "assault weapon" in "secure storage," meaning "stored in a locked container or equipped with a tamper resistant mechanical lock…" rendering the "assault weapon" incapable of being used for defense of self or

family outside the home, contrary to the rights enumerated in the Delaware Constitution. *See* 11 *Del. C.* § 1465 (12); 11 *Del. C.* §1466 (c)(4).

155.   HB 450's registration and licensing process further violates Article I, § 20 of the Delaware Constitution because:

(a)   a constitutional right may not be denied until a license to exercise that right is issued;

(b)   the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

(c)   the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

156.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza through Defendants' enforcement and implementation of HB 450.

157.   Defendants have burdened the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly

situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza more than reasonably necessary to achieve important government objectives.

158.   For all the reasons asserted herein, Defendants have acted in violation of Article I, § 20 of the Delaware Constitution and continue to act in violation thereof, compelling the relief Plaintiffs seek.

## COUNT III

**Action for Violation of Plaintiffs' Rights to Due Process under the Fourteenth Amendment of the U.S. Constitution and Article I, § 7 of the Delaware Constitution**
**(HB 450)**

159.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

160.   There is an actual and present controversy between the parties.

161.   The Fourteenth Amendment of the United States Constitution prohibits denying a citizen the due process of law.

162.   The Due Process Clause contains both a substantive and a procedural component. Substantive due process forbids the government from infringing on certain 'fundamental' liberty interests at all, no matter what process is provided unless the infringement is narrowly tailored to serve a compelling state interest. Procedural due process imposes constraints on governmental decisions which

deprive individuals of liberty or property interests within the meaning of the Due Process Clause.

### Impermissible Burden-Shifting

163.   "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

164.   The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." *Id*. at 361 (citing C. McCormick, Evidence § 321, at 681-682 (1954)); *see also* 9 J. Wigmore, Evidence § 2497 (3d ed. 1940).

165.   Further, the Delaware Constitution requires at least as much as the Due Process Clause, providing in part that an accused in a criminal prosecution, "shall not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." DEL. CONST., art. I, § 7.

166.   "While the State provision may not be interpreted to provide less rights to criminal defendants than those mandated by the Federal provision, it may be

interpreted so as to provide greater rights." *Goddard v. State*, 382 A.2d 238, 240 (Del. 1977).

167.   Under the provisions of the Delaware Criminal Code, no person may be convicted of an offense unless the State proves each element of the offense beyond a reasonable doubt; the defendant is entitled to a jury instruction delineating the aforestated burden of the State, and the defendant may produce whatever credible evidence he has to negate the existence of any element of the crime charged. 11 *Del. C.* §§ 301, 302; *see also Goddard* at 241.

168.   HB 450, in a restrictive way, may permit ordinary citizens to possess and transport an "assault weapon"—but only if they lawfully possessed it prior to June 30, 2022,  and then only "[a]t that person's residence, place  of business, or other property owned by that person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair  " See 11 *Del. C.* § 1466 (c)(3)(a)-(d).

169.   Under HB 450: "[a] person who is exempt from § 1466(a) of this title under § 1466(c)(3) of this title may, no later than 1 year from [June 30, 2022], apply to the Secretary of the Department of Safety and Homeland Security for a certificate of possession." 11 *Del. C.* § 1467(a).[17]

170.   Further, "it is an affirmative defense that the defendant was lawfully in possession or had completed a purchase of the "assault weapon" prior to [June 30, 2022]. A certificate of possession is conclusive evidence that a person lawfully possessed or had completed a purchase of an assault weapon before [June 30, 2002] and is entitled to continue to possess and transport the assault weapon on or after [June 30, 2022] under § 1466(c)(3) of this title." 11 *Del. C.* § 1467(a).

171.   HB 450 shifts the burden of proof away from the State of Delaware and onto ordinary citizens lawfully possessing "assault weapons"—contrary to the Due Process Clause's protection  of the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged, and contrary to the protections afforded by the Delaware Constitution, Article I, § 7 and 11 *Del. C.* §§ 301, 302.

---

[17] This "registry" enabled by HB 450 is in violation of 18 U.S.C. § 926(a)(3): "No such rule or regulation prescribed after the date of the enactment of the Firearm Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established."

172.   Defendants lack any legitimate or compelling interest for depriving Plaintiffs of their right to Due Process.

**Vagueness**

173.   HB 450 is arbitrary and capricious and thus is invalidated by the Fourteenth Amendment's procedural due process protections.

174.   HB 450's listed "assault pistols" do not enumerate what generic features tie them together so as to justify their prohibition. *See* 11 *Del. C.* § 1465(3).

175.   HB 450 also does not enumerate any nexus between the generic definition of "assault long guns" and the listed firearms. *See* 11 *Del. C.* § 1465(2).

176.   Further, the only pistol identified as a "copycat weapon" is a semiautomatic pistol with a fixed magazine that holds more than 10 rounds, and what, exactly, is considered a "copy" is in no way defined or enumerated in HB 450. *See* 11 *Del. C.* § 1465(5).

177.   The randomly-chosen named firearms, mislabeled "assault weapons," have no common denominator that ties them together.

178.   The definitions are thus vague and arbitrary, in violation of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 251 (6th Cir. 1994) (Invalidating an ordinance defining "assault weapon" as a list of 46 named firearms together with "other

models by the same manufacturer with the same action design that have slight modifications or enhancements" as unconstitutionally vague).

179.   Particularly, the definition of the term "copy" is unconstitutionally vague. *See Id*. at 253 ("A copy-cat weapon is only outlawed if it is developed from a listed weapon by a listed manufacturer…. [O]rdinary consumers cannot be expected to know the developmental history of a particular weapon…"); *see also Robertson v. Denver*, 874 P. 2d 325, 335 (Col. 1994) ("ascertaining the design history … of a pistol is not something that can be expected of a person of common intelligence.)

180.   Here the vagueness is worse than that in *Springfield*, as the term "copy" found in HB 450 need not be by the same manufacturer.

181.   This vagueness extends to the features listed in the definition that qualify an arm as a "copy." For example, an arm is considered a "copy" when it has a grip that allows an individual to grip the weapon in a manner "resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing." 11 *Del. C*. § 1465(a)(2). What constitutes "below any portion of the action" is vague and undefined.

182.   HB 450 violates the Due Process Clause because it is vague, as the randomly chosen firearms mislabeled "assault weapons" have no common denominator that ties them together and the average ordinary, law-abiding gun

owner has no way of knowing the relevant history of firearms so as to be able to determine what constitutes a "copy."

## COUNT IV

**Action for Violation of Plaintiffs' Rights Pursuant to the Takings Clause under the Fifth Amendment and the Fourteenth Amendment of the U.S. Constitution**
**(HB 450)**

183.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

184.   There is an actual and present controversy between the parties.

185.   The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

186.   The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960). Lawfully possessed firearms—which the citizens have the right to "keep" under the Second Amendment and Article I, § 20 of the Delaware Constitution—cannot be taken without just compensation. *Frein v. Pennsylvania State Police*, No. 21-1830, 2022 WL 3724097, at *2 (3d Cir. Aug. 30, 2022).

187.   The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc*, 544 U.S. 528, 537 (2005).

188.   The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). While these factors provide "important guideposts," "[t]heTakings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634, 636 (O'Connor, J., concurring)

189.   "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

190.   HB 450 goes "too far" and must be recognized as a taking.

191.   HB 450 prohibits the sale, manufacture, and possession of "assault weapons" in common use by law-abiding citizens and, in so doing, destroys the value of the lawful property of such citizens, including Plaintiffs, and destroys the

businesses of Federal Firearms Licensees, arbitrarily and capriciously and without just compensation.

192.   HB 450 takes the private property of Plaintiffs, for public use, without just compensation.

193.   In so doing, HB 450 constitutes a taking based on "the magnitude of [HB 450's] economic impact and the degree to which [HB 450] interferes with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

194.   HB 450 has a massive economic impact upon Plaintiffs, has significantly interfered with the distinct investment-backed expectations of individual law-abiding citizens who own "assault weapons" and businesses who sell "assault weapons," and, as described throughout this complaint, has been done in violation of the United States Constitution and the Delaware Constitution.

195.   Thus, HB 450 violates the Takings Clause of the Fifth and Fourteenth Amendments, for which Plaintiffs seek relief.

196.   Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Due Process of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of HB 450.

## COUNT V

**Action Pursuant to Deprivation of Plaintiffs' Rights under the Equal
Protection Clause of the Fourteenth Amendment of the U.S. Constitution
(HB 450)**

197.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

198.   There is an actual and present controversy between the parties.

199.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

200.   All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to keep and bear arms.

201.   HB 450 permits "possession by a qualified retired law-enforcement officer who is not otherwise prohibited from receiving an assault weapon if … the assault weapon is sold or transferred to the qualified retired law-enforcement officer by the law-enforcement agency on retirement" or "was purchased or obtained by the qualified retired law-enforcement officer for official use with the law-enforcement agency before retirement." 11 *Del. C.* § 1466(b)(7)(a)-(b).

202.   This is not limited to "assault weapons" obtained by the effective date of the enactment of HB 450.

203.   When they retire, those officers have no further law enforcement duties and become private citizens, yet other private, law-abiding citizens at large, including retired law enforcement officers who did not obtain a weapon through their agency prior to retirement,  would be committing a felony by obtaining the banned firearms.

204.   The law thus discriminates in favor of selected retired officers and against other law-abiding citizens of the State of Delaware, such as Plaintiffs  DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza.

205.   HB 450's officer exception arbitrarily and unreasonably affords a privilege—ownership of "assault weapons"—to one group of individuals that is denied to others and is wholly unconnected to any legitimate state interest.

206.   Further, as referenced in Count III, the arms enumerated as "assault weapons" under HB 450 are arbitrary.

207.   HB 450, thus, violates the Equal Protection Clause because the arms enumerated as "Assault Long Guns," "Assault Pistols," and more  generally, "assault weapons," are arbitrary and without any grounding, common denominator or nexus.

208.   HB 450 is also impermissibly vague, as the randomly chosen firearms mislabeled "assault weapons" have no common denominator that ties them together and the average ordinary, law-abiding gun owner has no way of knowing the relevant history of firearms so as to be able to determine what constitutes a "copy."

209.   Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Equal Protection of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of HB 450's officer exception.

## COUNT VI

### Action Pursuant to the Commerce Clause, U.S. Constitution Article I, Section 8, Clause 3 (HB 450)

210.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

211.   There is an actual and present controversy between the parties.

212.   The Commerce Clause vests Congress with "Power ... [t]o regulate Commerce with foreign Nations, and among the several States," U.S. Const. art. I, § 8, cl. 3, but also prohibits states from discriminating against interstate commerce.

213.   "Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies

the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 98 (1994)

214.   "The critical inquiry" under this "dormant" aspect of the Commerce Clause "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989).

215.   HB 450 prohibits ordinary, law-abiding citizens from transporting an "assault weapon" into Delaware and from manufacturing, selling, offering to sell, transferring, purchasing, receiving, or possessing an "assault weapon" in Delaware. *See* 11 *Del. C.* § 1466(a)(1)-(2).

216.   Federally-licensed firearm importers have firearms, including "assault weapons" transported from foreign nations into U.S. ports where they clear customs and are then transported to the premises of importers, manufacturers, and dealers throughout the United States.

217.   The Port of Wilmington is a favorable destination for such purposes, but the Regulatory Scheme prohibits it. Firearms are also shipped by traveling on the Delaware River, through the boundaries of the State of Delaware, to the Port of Philadelphia. HB 450 criminalizes the transport of "assault weapons" to and through the Port of Wilmington and while traveling on theDelaware River, enroute to the Port of Philadelphia and other destinations.

218.   Although the ban does not apply to "[p]ossession, importation, manufacture, receipt for manufacture, shipment for manufacture, storage, purchases, sales, and transport to or by a licensed firearms dealer or manufacturer" who "[a]cts to sell or transfer an assault weapon to a licensed firearm dealer in another state or to an individual purchaser in another state through a licensed firearms dealer" under 11 *Del. C.* § 1466(b)(3)(b), this exception does not allow a sale or transfer to a licensed manufacturer, nor does it allow a sale or transfer from or to a licensed firearm importer, and thus, bans the transport into and through Delaware of "assault weapons" by a federally-licensed importer, contrary to the power of Congress to regulate commerce with foreign nations.

219.   Further, "[i]f a restriction on commerce is discriminatory, it is virtually per se invalid" under the Commerce Clause. *Oregon Waste Systems, Inc*., at 99.

220.   The Supreme Court has repeatedly held that, in all but the narrowest of circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests. *Granholm v. Heald*, 544 U.S. 460, 466 (2005); *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383 (1994).

221.   HB 450 permits Delaware residents to possess and transport an "assault weapon" only if they lawfully possessed it prior to June 30, 2022, and then only "[a]t that person's residence, place of business, or other property owned by that

person, or on property owned by another person with the owner's express permission; [w]hile on the premises of a shooting range; [w]hile attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law-enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms;" or while transporting between the aforementioned places or "to any licensed firearms dealer for servicing or repair. *See* 11 *Del. C.* § 1466 (c)(3)(a)-(d).

222.   However, HB 450 is discriminatory because it does not permit non-Delaware residents to possess and transport "assault weapons" in identical circumstances while passing through Delaware.

223.   HB 450 violates the dormant Commerce Clause because it is discriminatory, and it interferes with the natural functioning of the interstate market through prohibition and burdensome regulation. *See McBurney v. Young*, 569 U.S. 221, 235 (2013).

## COUNT VII

**Preemption Under 18 U.S.C. § 926A**
**(HB 450)**

224.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

225.    There is an actual and present controversy between the parties.

226.    18 U.S.C. § 926A, expressly permits a person to carry a firearm "from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," provided the person properly stores the firearm.

227.    The Senate Judiciary Committee explained about § 926A: "This is intended to prevent local laws, which may ban or restrict firearm ownership, possession or transportation, from being used to harass interstate commerce and travelers."  Report 98-583, 9th Cong. 2d Sess., 27-28 (1984).

228.    Section 926A specifically entitles a person "'not otherwise prohibited … from transporting, shipping, or receiving a firearm' to 'transport a firearm … from any place where he may lawfully possess and carry' it to 'any other place' where he may do so." *Muscarello v. United States*, 524 U.S. 125, 134 (1998).

229.    HB 450 prohibits ordinary, law-abiding citizens from transporting an "assault weapon" into the State of Delaware and further prohibits the manufacture, sale, transfer, purchase, receipt, or possession of an "assault weapon."

230.    HB 450 conflicts with and stands as an obstacle to the accomplishment of 18 U.S.C. § 926A's purposes, which include the free transport of firearms across state lines, and for which Plaintiffs seek a remedy.

---

## COUNT VIII

**42 U.S.C. § 1983 Action for Deprivation of Plaintiffs' Rights under the Second and Fourteenth Amendments of the U.S. Constitution
(SS 1 for SB 6)**

231.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

232.   There is an actual and present controversy between the parties.

233.   The Second and Fourteenth Amendments to the United States Constitution guarantee ordinary, law-abiding citizens of states their fundamental right to keep and bear arms, both in the home and in public.

234.   The keeping and bearing of arms is a fundamental right that is necessary to our system of ordered liberty and is additionally a privilege and immunity of citizenship, protected by the Fourteenth Amendment.

235.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

236.   The right to keep and bear arms includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms, including common ammunition magazines, for all lawful purposes, including self-defense.

237. Under SS 1 for SB 6, the State of Delaware bans "large-capacity magazines" that are common firearms, defined in 11 *Del. C.* § 1468 and SB 6 as "any ammunition feeding device capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 Del. C. § 1468

238. Further, under SS 1 for SB 6, in section 11 *Del. C.* §§ 1468-1469 of the Delaware Criminal Code, the State of Delaware bans arms, including ammunition magazines, commonly used for lawful purposes by labeling them "large-capacity magazines," grounding this ban on features that do not make a firearm more powerful or dangerous.

239. SS 1 for SB 6's registration and licensing process further violates the Second Amendment because:

(a)   a constitutional right may not be denied until a license to exercise that right is issued;

(b)   the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

(c)   the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

240. 42 U.S.C. § 1983 creates a cause of action against state actors who deprive individuals of federal constitutional rights under the color of state law.

241.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its members, BRPC and its members, DRPC and its members, DAFFL and its members, and M. Nedza, Clements, Hosfelt, Smith, Prickett, and F. Nedza through Defendants' enforcement and implementation of SS 1 for SB 6.

242.   For all the reasons asserted herein, Defendants have acted in violation of and continue to act in violation of 42 U.S.C. § 1983, compelling the relief Plaintiffs to seek.

## COUNT IX

**Action for Deprivation of Plaintiffs' Rights under Delaware Constitution
Article I, § 20
(SS 1 for SB 6)**

243.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

244.   There is an actual and present controversy between the parties.

245.   Article I,  § 20 of the Delaware Constitution states that "[a] person has the right to keep and bear arms for the defense of self, family, home, and State, and for hunting and recreational use." DEL. CONST., art. I, § 20.

246.   Article I, § 20 was adopted by supermajorities of two successive Delaware General Assemblies, became effective in 1987, and is much broader than

the more limited scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, at 665 ("our interpretation of Section 20 is not constrained by federal precedent," and emphasizing that the scope of § 20 is much broader than the scope of the Second Amendment.)

247.   The Delaware Supreme Court in *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), recognized that "the enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it.)." *Id*. at 643.

248.   Article I, § 20 of the Delaware Constitution guarantees ordinary, law-abiding citizens of the State their fundamental right to keep and bear arms, including common ammunition magazines, both in the home and in public.

249.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

250.   The right to keep and bear arms under Article I, § 20 includes, but is not limited to, the right of individuals to transport, manufacture, sell, offer to sell, transfer, purchase, receive or possess common firearms, including common ammunition magazines, for all lawful purposes, including self-defense.

251.   Under SS 1 for SB 6, the State bans "large-capacity magazines" that are common firearms.

252.   Further, in  11 *Del. C.* § 1468-1469 of the Delaware Criminal Code, the State bans arms commonly used for lawful purposes, as "large-capacity magazines," grounding this ban on features that do not make a firearm and/or ammunition magazine more powerful or dangerous.

253.   SS 1 for SB 6's registration and licensing process further violates Article I,  § 20 of the Delaware Constitution because:

    (a)   a constitutional right may not be denied until a license to exercise that right is issued;

    (b)   the registration and licensing process, both on the face of the statute and as applied, is unconstitutionally burdensome;

    (c)   the registration and licensing process, both on the face of the statute and as applied, was designed to ration and deny constitutional rights.

254.   Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza,

Clements,Hosfelt, Smith, Prickett and F. Nedza through Defendants' enforcement and implementationof SS 1 for SB 6.

255.   Defendants have burdened the fundamental constitutional rights of persons in the State of Delaware, including Plaintiffs, DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza more than reasonably necessary to achieve important government objectives.

256.   For all the reasons asserted herein, Defendants have acted in violation of Article I, § 20 of the Delaware Constitution and continue to act in violation thereof, compelling the relief Plaintiffs seek.

## COUNT X

**Action for Violation of Plaintiffs' Rights to Due Process under the Fourteenth Amendment of the U.S. Constitution and Article I, § 7 of the Delaware Constitution
(SS 1 for SB 6)**

257.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

258.   There is an actual and present controversy between the parties.

259.   The Fourteenth Amendment of the United States Constitution prohibits denying a citizen the due process of law.

260.   The Due Process Clause contains both a substantive and a procedural component. Substantive due process forbids the government from infringing on certain 'fundamental' liberty interests at all, no matter what process is provided unless the infringement is narrowly tailored to serve a compelling state interest. Procedural due process imposes constraints on governmental decisions which deprive individuals of liberty or property interests within the meaning of the Due Process Clause.

### Impermissible Burden-Shifting

261.   "The Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

262.   The "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times, [though] its crystallization into the formula 'beyond a reasonable doubt' seems to have occurred as late as 1798. It is now accepted in common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all the essential elements of guilt." *Id*. at 361 (citing C. McCormick, Evidence § 321, at 681-682 (1954)); *see also* 9 J. Wigmore, Evidence § 2497 (3d ed. 1940).

263.   Further, the Delaware Constitution requires at least as much as the Due Process Clause, providing in part that an accused in a criminal prosecution, "shall

not be compelled to give evidence against himself, nor shall he be deprived of life, liberty or property, unless by the judgment of his peers or by the law of the land." DEL. CONST., art. I, § 7.

264.   "While the State provision may not be interpreted to provide less rights to criminal defendants than those mandated by the Federal provision, it may be interpreted so as to provide greater rights." *Goddard v. State*, 382 A.2d 238, 240 (Del. 1977).

265.   Under the provisions of the Delaware Criminal Code, no person may be convicted of an offense unless the State proves each element of the offense beyond a reasonable doubt; the defendant is entitled to a jury instruction delineating the aforestated burden of the State, and the defendant may produce whatever credible evidence he has to negate the existence of any element of the crime charged. 11 *Del. C.* §§ 301, 302; *see also Goddard* at 241.

266.   SS 1 for SB 6, in a restrictive way, permits ordinary citizens to possess and transport a "large-capacity magazine"—but only if they hold a valid concealed carry permit issued by the Superior Court under § 1441 of this title." 11 *Del. C.* § 1469(c)(5).

267.   Under 11 *Del. C.* § 1441 as applied to SB 6 and, thus, "large-capacity magazines," "[a] person of full age and good moral character desiring to be licensed to carry a concealed deadly weapon for personal protection or the

protection of the person's property may be licensed to do so" when certain, arbitrary, impermissibly vague conditions are strictly met. 11 *Del. C.* § 1441.

268.   Chief among the conditions of this license are that "[t]he Court may or may not, in its discretion, approve any application…." and that "[t]he Prothonotary of the county in which any applicant for a license files the same shall cause notice of every such application to be published once, at least 10 days before the next term of the Superior Court. The publication shall be made in a newspaper of general circulation published in the county." 11 *Del. C.* § 1441(b)-(c).[18]

269.   SS 1 for SB 6, thus shifts the burden of proof away from the State of Delaware and onto ordinary citizens lawfully possessing "large-capacity magazines"—contrary to the Due Process Clause's protection of the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged" and contrary to the protections afforded by the Delaware Constitution, Article I, § 7 and 11 *Del. C.* §§ 301, 302.

---

[18] This public "registry" created by SB 6 is in violation of 18 U.S.C. § 926(a)(3): "No such rule or regulation prescribed after the date of the enactment of the Firearm Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established."

270.   Defendants lack any legitimate or compelling interest for depriving Plaintiffs of their right to Due Process.

## Vagueness

271.   SS 1 for SB 6 is arbitrary, capricious and impermissibly vague, and thus is invalidated by the Fourteenth Amendment's procedural due process protections.

272.   SS 1 for SB 6 bans ammunition magazines "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." 11 *Del. C.* § 1468. However, ammunition magazines can often be used for multiple calibers of cartridge, and the number of rounds they can hold depends on the caliber. The existence of this variability renders the definition of "large-capacity magazine" vague and arbitrary, in violation of the Due Process Clause of the Fourteenth Amendment. *See, e.g., Springfield Armory, Inc. v. City of Columbus*, 29 F.3d 250, 251 (6th Cir. 1994) (Invalidating an ordinance defining "assault weapon" as a list of 46 named firearms together with "other models by the same manufacturer with the same action design that have slight modifications or enhancements" as unconstitutionally vague).

273.   Further, the average ordinary, law-abiding gun owner has no way of knowing what ammunition magazines are "capable of accepting" or are "readily convertible" over 17 rounds of ammunition.

274.    Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Due Process of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation SS 1 for SB 6 by shifting the burden of proof for violation of SS 1 for SB 6 away from the State and upon ordinary citizens lawfully possessing "large-capacity magazines," and by creating an arbitrary, capricious and impermissibly vague law.

## COUNT XI

**Action for Violation of Plaintiffs' Rights Pursuant to the Takings Clause under the Fifth Amendment and the Fourteenth Amendment of the U.S. Constitution**
**(SS 1 for SB 6)**

275.    Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

276.    There is an actual and present controversy between the parties.

277.    The Takings Clause of the Fifth Amendment provides that private property shall not "be taken for public use, without just compensation." U.S. Const. Amend. V.

278.    The Takings Clause bars government actors "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

87

Lawfully possessed magazines—which the citizens have the right to "keep" under the Second Amendment and Article I, § 20 of the Delaware Constitution—cannot be taken without just compensation. *Frein v. Pennsylvania State Police*, No. 21-1830, 2022 WL 3724097, at *2 (3d Cir. Aug. 30, 2022).

279.   The Supreme Court "recognized that government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Lingle v. Chevron U.S.A. Inc*, 544 U.S. 528, 537 (2005).

280.   The court looks to three factors when analyzing a taking: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action," *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978). While these factors provide "important guideposts," "[t]heTakings Clause requires careful examination and weighing of all the relevant circumstances." *Palazzolo v. Rhode Island*, 533 U.S. 606, 634, 636 (O'Connor, J., concurring)

281.   "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will  be  recognized as a taking." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16 (1922).

282.   SS 1 for SB 6 takes the private property of Plaintiffs for public use, without just compensation.

283.   SS 1 for SB 6 goes "too far" and must be recognized as a taking.

284.   SS 1 for SB 6 prohibits the sale, manufacture, and possession of "large-capacity magazines" in common use by law-abiding citizens and, in so doing, destroys the value of the lawful property of such citizens, including Plaintiffs, and destroys the businesses of Federal Firearms Licensees, arbitrarily and capriciously and without just compensation.

285.   In so doing, SS 1 for SB 6 constitutes a taking based upon "the magnitude of [SS 1 for SB 6's] economic impact and the degree to which [SS 1 for SB 6] interferes with legitimate property interests." *Lingle*, 544 U.S. 528 at 540.

286.   SS 1 for SB 6 has a massive economic impact upon Plaintiffs, has significantly interfered with the distinct investment-backed expectations of individual law-abiding citizens who own "large-capacity magazines" and businesses who sell "large-capacity magazines," and, as laid out throughout this complaint, has been done in violation of the United States Constitution and the Delaware Constitution.

287.   Thus, SS 1 for SB 6 violates the Takings Clause of the Fifth and Fourteenth Amendments, for which Plaintiffs seek relief.

## COUNT XII

**Action Pursuant to Deprivation of Plaintiffs' Rights under the Equal
Protection Clause of the Fourteenth Amendment of the U.S. Constitution
(SS 1 for SB 6)**

288.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

289.   There is an actual and present controversy between the parties.

290.   The Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."

291.   All law-abiding, competent adults are similarly situated in that they are equally entitled to exercise the constitutional right to keep and bear arms.

292.   SS 1 for SB 6 does not apply to "a qualified retired law-enforcement officer," and thus permits possession of a "large-capacity magazine" by "a qualified retired law-enforcement officer." 11 *Del. C.* § 1469(c)(4).

293.   When they retire, such officers have no further law enforcement duties and become private citizens, yet other private, law-abiding citizens at large would be breaking the law by obtaining the banned "large-capacity magazines."

294.   The law thus discriminates in favor of selected retired officers and against other law-abiding citizens of the State of Delaware, such as Plaintiffs  DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC

and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza.

295.   SS 1 for SB 6's officer exception arbitrarily and unreasonably affords a privilege--ownership of "large-capacity magazines"—to one group of individuals that is denied to others and is wholly unconnected to any legitimate state interest.

296.   Further, the arms and ammunition magazines defined under SS 1 for SB 6 as "large-capacity magazines" because they are "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition"  are arbitrary and impermissibly vague as ammunition magazines can often be used for multiple calibers of cartridge, and the number of rounds they can hold depends on the caliber.

297.   SS 1 for SB 6, thus, violates the Equal Protection Clause because the arms enumerated as "large-capacity magazines" are arbitrary, impermissibly vague and without any grounding, common denominator or nexus.

298.   Therefore, Defendants, individually and collectively, and under the color of state law at all relevant times, have deprived the fundamental right to Equal Protection of persons in the State of Delaware, including Plaintiffs, through Defendants' enforcement and implementation of SS 1 for SB 6's officer exception.

## COUNT XIII

**Action Pursuant to the Commerce Clause, U.S. Constitution Article I, Section 8, Clause 3
(SS 1 for SB 6)**

299.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

300.   There is an actual and present controversy between the parties.

301.   The Commerce Clause vests Congress with "Power ... [t]o regulate Commerce with foreign Nations, and among the several States," U.S. Const., art. I, § 8 cl. 3, but also  prohibits states from discriminating against interstate commerce.

302.   "Though phrased as a grant of regulatory power to Congress, the [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department of Environmental Quality*, 511 U.S. 93, 98 (1994)

303.   "The critical inquiry" under this "dormant" aspect of the Commerce Clause "is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." *Healy v. Beer Inst.,* 491 U.S. 324, 336 (1989).

304. SS 1 for SB 6 prohibits ordinary, law-abiding citizens from transporting a "large-capacity magazine" into Delaware and from manufacturing,

selling, offering to sell, transferring, purchasing, receiving, or possessing a "large-capacity magazine" in Delaware.  See 11 *Del. C.* § 1469(a).

305.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

306.   Federally-licensed firearm importers have firearms, including "large-capacity magazines" transported from foreign nations into U.S. ports where they clear customsand are then transported to the premises of importers, manufacturers, and dealers throughout the United States.

307.   The Port of Wilmington is a favorable destination for such purposes, but the Regulatory Scheme prohibits it. Firearms, including "large-capacity magazines" are also shipped by traveling on the Delaware River, through the boundaries of the State of Delaware, to the Port of Philadelphia. SS 1 for SB 6 criminalizes the transport of "large-capacity magazines" to and through the Port of Wilmington and while traveling on the Delaware River, en route to the Port of Philadelphia and other destinations.

308.   Although the ban does not apply to "[a] licensed firearms dealer that sells a large-capacity magazine to another licensed firearms dealer" under 11 *Del. C.* § 1469(c)(6), this exception does not allow a sale or transfer to a licensed

manufacturer, nor does it allow a sale or transfer from or to a licensed firearm importer, and thus, bans the transport into and through Delaware of "large-capacity magazines" by a federally-licensed importer, contrary to the power of Congress to regulate commerce with foreign nations.

309.   Further, "[i]f a restriction on commerce is discriminatory, it is virtually per se invalid" under the Commerce Clause. *Oregon Waste Systems, Inc*., at 99.

310.   The Supreme Court has repeatedly held that, in all but the narrowest of circumstances, state laws violate the Commerce Clause if they mandate differential treatment of in-state and out-of-state economic interests. *Granholm v. Heald*, 544 U.S. 460, 466 (2005); *C&A Carbone, Inc. v. Town of Clarkstown,* 511 U.S. 383 (1994).

311.   SS 1 for SB 6 purports to permit certain Delaware residents possessing "a valid concealed carry permit issued by the Superior Court under § 1441 of this title" to possess a "large-capacity magazine." 11 *Del. C*. § 1469(c)(5). However, SS 1 for SB 6 is discriminatory because it does not permit non-Delaware residents to possess and transport "large-capacity magazines" in identical circumstances while passing through Delaware.

312.   SS 1 for SB 6 violates the dormant Commerce Clause because it is discriminatory, and it interferes with the natural functioning of the interstate

market through prohibition and burdensome regulation. *See McBurney v. Young*, 569 U.S. 221, 235 (2013).

## COUNT XIV

### Preemption Under 18 U.S.C. § 926A
### (SS 1 for SB 6)

313.   Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

314.   There is an actual and present controversy between the parties.

315.   18 U.S.C. § 926A, expressly permits a person to carry a firearm "from any place where he may lawfully possess and carry such firearm to any other place where he may lawfully possess and carry such firearm," provided the person properly stores the firearm.

316.   The Senate Judiciary Committee explained about § 926A: "This is intended to prevent local laws, which may ban or restrict firearm ownership, possession or transportation, from being used to harass interstate commerce and travelers."  Report 98-583, 9th Cong. 2d Sess., 27-28 (1984).

317.   Section 926A specifically entitles a person "'not otherwise prohibited … from transporting, shipping, or receiving a firearm' to 'transport a firearm … from any place where he may lawfully possess and carry' it to 'any other place' where he may do so." *Muscarello v. United States*, 524 U.S. 125, 134 (1998).

318.   The right to keep and bear arms includes, but is not limited to, the right to keep and bear common ammunition magazines. In fact, many common arms banned as "assault weapons" under HB 450 are equipped with common ammunition magazines banned as "large-capacity magazines" under SS 1 for SB 6.

319. SS 1 for SB 6 prohibits ordinary, law-abiding citizens from transporting a "large-capacity magazine" into the State of Delaware and further prohibits the manufacture, sale, transfer, purchase, receipt, or possession of an "large-capacity magazine."

320. SS 1 for SB 6 conflicts with and stands as an obstacle to the accomplishment of 18 U.S.C. § 926A's purposes, which include the free transport of firearms across state lines, and for which Plaintiffs seek a remedy.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully pray for the following relief:

(a)     A declaratory judgment that Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza have a fundamental right to keep and bear arms including by offering for sale, acquiring, transporting into and within Delaware, possessing, transferring, and lawfully using common semiautomatic firearms banned under the Regulatory Scheme for all lawful

purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments of the United States Constitution and Article I, Section 20 of the Delaware Constitution;

(b)     A declaratory judgment that the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same, prevent Plaintiffs DSSA and its similarly situated members, BRPC and its similarlysituated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza from exercising their fundamental right to keep and bear arms, including by offering for sale, acquiring, transporting into and within Delaware, possessing, transferring, and lawfully using common semiautomatic firearms banned under the Regulatory Scheme for all lawful purposes including self-defense, as guaranteed under the Second and Fourteenth Amendments to the United States Constitution and Article I, § 20 of the Delaware Constitution;

(c)     A declaratory judgment that the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same violates Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and

F. Nedza's rights to Due Process under the Fourteenth Amendment of the U.S. Constitution and Article I, § 7 of the Delaware Constitution;

(d)   A declaratory judgment that the Regulatory Scheme and all related regulations, policies, and/or customs designed to enforce or implement the same violates Plaintiffs DSSA and its similarly situated members, BRPC and its similarly situated members, DRPC and its similarly situated members, DAFFL and its similarly situated members, and M. Nedza, Clements, Hosfelt, Smith, Prickett and F. Nedza's rights to Equal Protection under the Fourteenth Amendment of the U.S. Constitution;

(e)   Permanent injunctive relief to prevent Defendants from enforcing the Regulatory Scheme, thereby avoiding irreparable harm as a result of such enforcement.

(f)   Attorney's fees pursuant to 42 U.S.C. § 1988.

(g)    Any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper, including attorney's fees and costs.

Respectfully Submitted,

LEWIS BRISBOIS
      BISGAARD & SMITH LLP

*/s/ Francis G.X. Pileggi*
Francis G.X. Pileggi, Esquire (No. 2624)
Cheneise V. Wright, Esquire (No. 6597)
Alexander MacMullan, Esquire
(Pro Hac Vice Motion Forthcoming)
500 Delaware Ave., Suite 700
Wilmington, Delaware 19801
302-985-6000
Francis.Pileggi@LewisBrisbois.com
Cheneise.Wright@LewisBrisbois.com
Alexander.MacMullan@LewisBrisbois.com

*Attorneys for Plaintiffs*

Dated: September 9, 2022