## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC; BRIDGEVILLE RIFLE & PISTOL CLUB, LTD.; DELAWARE RIFLE AND PISTOL CLUB; DELAWARE ASSOCIATION OF FEDERAL FIREARMS LICENSEES; MADONNA M. NEDZA; CECIL CURTIS CLEMENTS; JAMES E. HOSFELT, JR; BRUCE C. SMITH; VICKIE LYNN PRICKETT; and FRANK M. NEDZA, | ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 1:22-cv-00951-RGA (Consolidated) |
| DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; NATHANIAL MCQUEEN JR. in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and COL. MELISSA ZEBLEY in her official capacity as superintendent of the Delaware State Police, | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |
| GABRIEL GRAY; WILLIAM TAYLOR; DJJAMS LLC; FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| KATHY JENNINGS, Attorney General of Delaware, | ) ) ) |  |
| Defendant. | ) ) |  |

## DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

ROSS ARONSTAM & MORITZ LLP

STATE OF DELAWARE DEPARTMENT OF JUSTICE

David E. Ross (#5228)
Bradley R. Aronstam (#5129)
Garrett B. Moritz (#5646)
S. Reiko Rogozen (#6695)
Roger S. Stronach (#6208)
Holly Newell (#6687)
Elizabeth M. Taylor (#6468)
Thomas C. Mandracchia (#6858)
1313 North Market Street, Suite 1001
Wilmington, DE 19801
(302) 576-1600
dross@ramllp.com
baronstam@ramllp.com
gmoritz@ramllp.com
rrogozen@ramllp.com
rstronach@ramllp.com
hnewell@ramllp.com
etaylor@ramllp.com
tmandracchia@ramllp.com

Kenneth L. Wan (#5667)
Caneel Radinson-Blasucci (#6574)
Deputy Attorneys General
Carvel State Office Building
820 N. French Street, 6th Floor
Wilmington, DE 19801
(302) 577-8400
kenneth.wan@delaware.gov
caneel.radinson-blasucci@delaware.gov

*Attorneys for Defendants*

Dated:  January 31, 2023

# <u>TABLE OF CONTENTS</u>

**PAGE**

TABLE OF AUTHORITIES ......................................................................................... iii

TABLE OF DEFINITIONS........................................................................................ vii

NATURE AND STAGE OF THE PROCEEDINGS .....................................................1

SUMMARY OF THE ARGUMENT ............................................................................2

STATEMENT OF FACTS ............................................................................................5

    A.    The Challenged Laws ................................................................................5

    B.    The Historical Regulation Of Weapons ...................................................6

    C.    Assault Weapons And LCMs..................................................................11

    D.    Plaintiffs' Challenges.............................................................................24

ARGUMENT ..............................................................................................................25

I.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS .............26

    A.    Plaintiffs' LCM Challenges Fail Because LCMs Are Not Arms ..........26

    B.    Plaintiffs' Challenges Under The Federal Constitution Fail..................29

        i.    Assault Weapons (And LCMs, Even If "Arms") Are Not
                    Protected By The Second Amendment.......................................29

        ii.    The Regulation Of Assault Weapons (And LCMs) Is
                    Analogous To Burdens Imposed Historically............................33

    C.    Plaintiffs' Challenges Under The Delaware Constitution Fail ..............37

        i.    The Court Should Review Plaintiffs' Delaware
                    Constitutional Challenge Using Intermediate Scrutiny .............38

        ii.    The Assault Weapon Statute Readily Survives
                    Intermediate Scrutiny.................................................................39

        iii.    Even If LCMs Are "Arms," The LCM Statute Readily
                    Survives Intermediate Scrutiny..................................................41

        iv.    Even If The Court Applies Strict Scrutiny, Or The Test
                    Articulated In *Bruen*, The Statutes Are Constitutional.............43

D.      Plaintiffs' Inapposite Authority Does Not Compel A Different
        Result ................................................................................................................44

II.     THE REMAINING FACTORS WEIGH HEAVILY AGAINST AN
        INJUNCTION ................................................................................................................45

        A.      Plaintiffs Have Not Established That They Will Suffer Irreparable
                Harm ................................................................................................................45

        B.      The Balance Of The Equities And Public Policy Disfavor An
                Injunction ................................................................................................................47

III.    ENTRY OF A PERMANENT INJUNCTION IS INAPPROPRIATE ............................48

CONCLUSION................................................................................................................49

# TABLE OF AUTHORITIES

**CASES**                                                                    **PAGE(S)**

*Anderson v. Davila,*
  125 F.3d 148 (3d Cir. 1997)...................................................................................48

*Antonyuk v. Hochul,*
  2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ........................................................44

*Antonyuk v. Hochul,*
  2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022) ......................................................44

*Antonyuk v. Hochul,*
  2022 WL 18228317 (2d Cir. Dec. 7, 2022) ..........................................................44

*Antonyuk v. Nigrelli,*
  143 S. Ct. 481 (Mem) (Jan. 11, 2023) .................................................................44

*Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. N.J.,*
  910 F.3d 106 (3d Cir. 2018).................................................................16, 29, 42

*Bd. of Trs. of State Univ. of N.Y. v. Fox,*
  492 U.S. 469 (1989)..........................................................................................26

*Benisek v. Lamone,*
  138 S. Ct. 1942 (2018).......................................................................................25

*Bridgeville Rifle & Pistol Club, Ltd. v. Small,*
  176 A.3d 632 (Del. 2017) .............................................................................38, 39

*Checker Cab of Phila. Inc. v. Uber Techs., Inc.,*
  643 F. App'x 229 (3d Cir. 2016) ........................................................................47

*Chestnut Hill Sound Inc. v. Apple Inc.,*
  2015 WL 6870037 (D. Del. Nov. 6, 2015) ...........................................................45

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)................................................................................ *passim*

*Doe v. Wilmington Hous. Auth.,*
  88 A.3d 654 (Del. 2014) .......................................................................... *passim*

*Drummond v. Robinson Twp.,*
  9 F.4th 217 (3d Cir. 2021) .................................................................................47

*Duncan v. Bonta,*
  19 F.4th 1087 (9th Cir. 2021) ...............................................................29, 42, 43

*Fitz v. Rosenblum*,
    2022 WL 17480937 (D. Or. Dec. 6, 2022) ...........................................................................46

*Frein v. Pa. State Police*,
    47 F. 4th 247 (3d Cir. Aug. 30, 2022) ...................................................................................45

*Fyock v. Sunnyvale*,
    779 F.3d 991 (9th Cir. 2015) .................................................................................................42

*GOLO, LLC v. Goli Nutrition Inc.*,
    2020 WL 5203601 (D. Del. Sept. 1, 2020) ......................................................................45-46

*Griffin v. State*,
    47 A.3d 487 (Del. 2012) .........................................................................................................28

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ..................................................................................40, 41, 42

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*,
    49 F.3d 1551 (Fed. Cir. 1995) ................................................................................................45

*Hohe v. Casey*,
    868 F.2d 69 (3d Cir. 1989) .....................................................................................................45

*Hunters United for Sunday Hunting v. Pa. Game Comm'n*,
    28 F. Supp. 3d 340 (M.D. Pa. 2014) ......................................................................................40

*Knights of Columbus Star of Sea Council 7297 v. City of Rehoboth Beach, Del.*,
    506 F. Supp. 3d 229 (D. Del. 2020) .......................................................................................25

*Kohr v. Raybestos-Manhattan, Inc.*,
    552 F. Supp. 1070 (E.D. Pa. 1981) ........................................................................................39

*Kolbe v. Hogan*,
    849 F.3d 114 (4th Cir. 2017) ........................................................................................ *passim*

*Md. v. King*,
    567 U.S. 1301 (2012) ..............................................................................................................47

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
    142 S. Ct. 2111 (2022) ................................................................................................. *passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
    804 F.3d 242 (2d Cir. 2015) ...................................................................................................41

*Nken v. Holder*,
    556 U.S. 418 (2009) ................................................................................................................47

iv

*Ocean State Tactical, LLC v. State of R.I.*,
  2022 WL 17721175 (D.R.I. Dec. 14, 2022) ...........................................................27, 28

*Or. Firearms Fed'n, Inc. v. Brown*,
  2022 WL 17454829 (D. Or. Dec. 6, 2022) ..............................................................28, 45, 46

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017)................................................................................................25

*Rigby v. Jennings*,
  2022 WL 4448220 (D. Del. Sept. 22, 2022) ......................................................................44

*Rocky Mountain Gun Owners, N.A. v. Bd. of Cnty. Comm'rs*,
  2022 WL 4098998 (D. Colo. Aug. 30, 2022) .....................................................................44

*Rocky Mountain Gun Owners v. Town of Superior*,
  C.A. No. 22-cv-01685-RM (D. Colo. July 22, 2022) ........................................................44

*Short v. State*,
  586 A.2d 1203, 1991 WL 12101 (Del. Jan. 14, 1991) (Table)................................38

*Smith v. State*,
  882 A.2d 762, 2005 WL 2149410 (Del. Aug. 17, 2005) (Table) ...........................38

*Tracy Rifle & Pistol LLC v. Harris*,
  118 F. Supp. 3d 1182 (E.D. Cal. 2015).............................................................................47

*United States v. Hasson*,
  2019 WL 4573424 (D. Md. Sept. 20, 2019) ......................................................................28

*United States v. Miller*,
  307 U.S. 174 (1939)......................................................................................................11, 37

*United States v. Nat'l Treasury Emps. Union*,
  513 U.S. 454 (1995).........................................................................................................26

*United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame*,
  822 F.3d 136 (3d Cir. 2016)..................................................................................... 32-33, 36

*United States v. Salerno*,
  481 U.S. 739 (1987)........................................................................................................3, 25

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981)...........................................................................................................48

*Walters v. Kemp*,
  2020 WL 9073550 (N.D. Ga. May 5, 2020) ......................................................................45

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008)...................................................................................3, 25

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)...........................................................................................25

*Worman v. Healey*,
    922 F.3d 26 (1st Cir. 2019)................................................23, 40, 41, 42

**STATUTES**

11 *Del. C.* § 1444 ........................................................................................15, 37

11 *Del. C.* § 1446A ...........................................................................................37

11 *Del. C.* § 1448 .............................................................................................37

11 *Del. C.* § 1464 ...............................................................................................5

11 *Del. C.* § 1465 ............................................................................................5-6

11 *Del. C.* § 1466 ...............................................................................................6

11 *Del. C.* § 1468 ...............................................................................................6

11 *Del. C.* § 1469 ...............................................................................................6

**OTHER AUTHORITIES**

U.S. CONST. amend. II ........................................................................................29

DEL. CONST. art. I § 20 ......................................................................................37

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND (1769)............................31

Samuel L. Bray, "*Necessary and Proper" and "Cruel and Unusual":
    Hendiadys in the Constitution*, 102 VA. L. REV. 687 (2016)..................................31

Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence
    and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150
    (Fall 1995)................................................................................................18

Cameron McWhirter, *Accused Buffalo Gunman Describes Why He Chose His
    Firearms, Body Armor*, WALL ST. J. (May 15, 2022)............................................2

Reese Oxner, *Uvalde gunman legally bought AR rifles day before shooting,
    law enforcement says*, THE TEXAS TRIBUNE (May 25, 2022)..................................2

## **TABLE OF DEFINITIONS**

| | |
|---|---|
| 1989 ATF Report | Department of the Treasury, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* (July 6, 1989). |
| 1998 ATF Report | Department of the Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (April 1998). |
| AC | Amended Complaint for Declaratory and Injunctive Relief filed on September 9, 2022 (D.I. 5). |
| Allen Decl. | Declaration of Lucy Allen in Support of Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction, filed contemporaneously herewith. |
| Baron Decl. | Declaration of Dennis Baron in Support of Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction, filed contemporaneously herewith. |
| Clements Decl. | Declaration of Cecil Curtis Clements in Support of Plaintiffs' Motion For Preliminary Injunction filed on December 19, 2022 (D.I. 21). |
| Defendants | Delaware Department of Safety and Homeland Security; Secretary Nathanial McQueen Jr., Cabinet Secretary of the Delaware Department of Safety and Homeland Security; Col. Melissa Zebley; and Kathy Jennings. |
| DJJAMS Decl. | Declaration of Matthew Jenkins, Solely in his Capacity as Principal of DJJAMS LLC, in Support of Plaintiffs' Motion For a Preliminary and Permanent Injunction filed on December 23, 2022 (D.I. 26). |
| DSSA Action | *Delaware State Sportsmen's Association, Inc. et al. v. Delaware Department of Safety and Homeland Security et al.*, C.A. No. 1:22-cv-00951-RGA. |
| DSSA Br. | Opening Brief in Support of Plaintiffs' Motion For Preliminary Injunction filed on November 15, 2022 (D.I. 11). |
| Gray Action | *Gabriel Gray et al. v. Kathy Jennings*, C.A. No. 1:22-cv-01500-MN. |
| Gray Br. | Opening Brief in Support of Plaintiffs' Motion For a Preliminary and Permanent Injunction filed on November 22, 2022 (D.I. 5). |
| Hague Decl. | Declaration of Jeffrey W. Hague, President of Delaware State Sportsmen's Association, Inc., in Support of Plaintiffs' Motion For Preliminary Injunction filed on December 19, 2022 (D.I. 22). |

| | |
|---|---|
| HB 450 | 11 *Del. C.* §§ 1464-1467. |
| LCMs | Large-capacity magazines. |
| Plaintiffs | Delaware State Sportsmen's Association, Inc.; Bridgeville Rifle and Pistol Club, Ltd.; Delaware Rifle and Pistol Club; Delaware Association of Federal Firearms Licensees; Madonna M. Nedza; Cecil Curtis Clements; James E. Hosfelt, Jr.; Bruce C. Smith; Vickie Lynn Prickett; Frank M. Nedza; Gabriel Gray; William Taylor; DJJAMS LLC; Firearms Policy Coalition, Inc.; and Second Amendment Foundation. |
| SS 1 for SB 6 | 11 *Del. C.* §§ 1441, 1468-1469A. |
| Spitzer Decl. | Declaration of Robert J. Spitzer in Support of Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction, filed contemporaneously herewith. |
| Statutes (the) | The package of gun safety bills enacted on June 30, 2022, including statutes regulating assault weapons, 11 *Del. C.* §§ 1464-1467 ("HB 450"), and large-capacity magazines ("LCMs"), 11 *Del. C.* §§ 1441, 1468-1469A ("SS 1 for SB 6"). |
| Sweeney Decl. | Declaration of Kevin M. Sweeney in Support of Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction, filed contemporaneously herewith. |
| Taylor Decl. | Declaration of William Taylor in Support of Plaintiffs' Motion For a Preliminary and Permanent Injunction filed on December 23, 2022 (D.I. 27). |
| Yurgealitis Decl. | Declaration of James Yurgealitis in Support of Defendants' Opposition to Plaintiffs' Motion For Preliminary Injunction, filed contemporaneously herewith. |

## NATURE AND STAGE OF THE PROCEEDINGS

On June 30, 2022, Delaware enacted a package of gun safety bills, including statutes regulating assault weapons, 11 *Del. C.* §§ 1464-1467 ("HB 450"), and large-capacity magazines ("LCMs"), 11 *Del. C.* §§ 1441, 1468-1469A ("SS 1 for SB 6," and collectively with HB 450, the "Statutes").

### A.    The DSSA Action

On July 20, 2022, plaintiffs in *Delaware State Sportsmen's Association, Inc. et al. v. Delaware Department of Safety and Homeland Security et al.*, C.A. No. 1:22-cv-00951-RGA (the "DSSA Action") filed suit challenging HB 450.  DSSA Action, D.I. 1.  On September 9, 2022, plaintiffs filed an Amended Complaint for Declaratory and Injunctive Relief, which added claims challenging SS 1 for SB 6.  *Id.*, D.I. 5.  On November 9, 2022, defendants moved for partial dismissal of the Amended Complaint.  *Id.*, D.I. 8-9.  On November 15, 2022, plaintiffs moved for a preliminary injunction barring the enforcement of the Statutes.  *Id.*, D.I. 10-11.

### B.    The Gray Action

On November 16, 2022, plaintiffs in *Gabriel Gray et al. v. Kathy Jennings*, C.A. No. 1:22-cv-01500-MN (the "Gray Action") filed a Complaint challenging HB 450.  Gray Action, D.I. 1.  On November 22, 2022, plaintiffs moved for a preliminary and permanent injunction barring the enforcement of that statute.  *Id.*, D.I. 4-5.

### C.    Consolidation

On December 4, 2022, defendants moved to consolidate the two actions.  DSSA Action, D.I. 15-16; Gray Action, D.I. 6-7.  After briefing and a hearing, on December 20, 2022, the Court granted the motions to consolidate.  DSSA Action, D.I. 24; Gray Action, D.I. 12.  On December 23, 2022, defendants filed an Answer in the DSSA Action.  D.I. 28.

### D.  Preliminary Injunction Briefing and Argument

At the December 20, 2022 hearing, the Court set a briefing schedule for the preliminary injunction motions.  This is defendants' consolidated Opposition.  Plaintiffs' reply brief(s) are due February 13, 2023.  D.I. 25.  A live evidentiary hearing is scheduled for February 24, 2023.  *Id*. Following the completion of briefing, defendants are to submit a letter to the Court on February 14, 2023 stating the witnesses they intend to call and the subject matters of the witnesses' testimony.  *Id*.  The Court has indicated that it will then decide whether to proceed with the evidentiary hearing.  12/20/2022 Tr. of Mot. to Consol. Hr'g at 24-25.

### E.  Partial Motion to Dismiss in DSSA Action

The DSSA plaintiffs' opposition to defendants' partial motion to dismiss is due today.  *Id*. at 27.  Defendants' reply brief is due February 13, 2023.  *Id*.  No argument date has been set.

### F.  Trial

Trial in this consolidated action has been set for November 13-17, 2023.  D.I. 25.

## SUMMARY OF THE ARGUMENT

On May 24, 2022, the Nation became transfixed on Uvalde, Texas after a gunman with an AR-15 style semi-automatic rifle and thirty-round magazines killed nineteen children and two teachers at an elementary school.  Reese Oxner, *Uvalde gunman legally bought AR rifles day before shooting, law enforcement says*, THE TEXAS TRIBUNE (May 25, 2022).  That unspeakable tragedy occurred in the midst of the Nation mourning the murder of ten people in Buffalo ten days earlier, by a shooter who also chose an AR-15 style semi-automatic rifle, with a thirty-round magazine, because it was especially "effective at killing."  Cameron McWhirter, *Accused Buffalo Gunman Describes Why He Chose His Firearms, Body Armor*, WALL ST. J. (May 15, 2022).

Approximately one month later, citing these and the "dozens" of other "mass shootings during the last decade," Delaware enacted two statutes to further the State's "compelling interest

2

to ensure the safety of Delawareans." HB 450 at Preamble. One statute regulates certain semi-automatic firearms, including the weapons used in Buffalo and Uvalde. The other regulates gun magazines that hold more than seventeen rounds of ammunition, like those used in Buffalo and Uvalde. Both statutes are subject to several exceptions.

In the months that followed, plaintiffs filed two actions challenging the Statutes. Four-and-a-half months after the Statutes became effective, plaintiffs sought to preliminarily enjoin their enforcement. Neither motion explains the delay in doing so.

Plaintiffs ask the Court to find a constitutional right to own weapons and accessories that were designed for use by the military in combat. Plaintiffs' core argument is that assault weapons and LCMs are so numerous that they warrant unqualified protection under the Second Amendment. But *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), which plaintiffs cite repeatedly, "decide[d] nothing about … the kinds of weapons that people may possess." *Id.* at 2157 (Alito, J., concurring). And despite bearing a "heavy burden," *United States v. Salerno*, 481 U.S. 739, 745 (1987), as a result of bringing a "disfavored" facial challenge, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), plaintiffs offer no evidence concerning the analysis mandated by *Bruen* to determine whether the Second Amendment applies and, if so, whether the Statutes are permissible.

Defendants, in contrast, present a robust evidentiary record, including declarations from five expert witnesses. This evidence makes clear that plaintiffs are not likely to prevail on the merits for multiple reasons. *First*, while plaintiffs assume that LCMs are constitutionally protected, historical evidence demonstrates that ammunition holders were understood in the founding era to be "accoutrements," separate from "arms." As such, LCMs are not protected by either the United States Constitution or the Delaware Constitution. *Second*, plaintiffs' challenges

3

under the United States Constitution fail because assault weapons (and LCMs, even if "arms") are not protected by the Second Amendment.  Neither is "in 'common use' for self-defense today." *Bruen*, 142 S. Ct. at 2143 (citing *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008) ("*Heller I*")).  Moreover, the overwhelming evidence demonstrates that they are "dangerous and unusual" and thus not entitled to protection under the Second Amendment.  *Heller I*, 554. U.S. at 627.  And even if assault weapons (and LCMs, even if "arms") are entitled to protection under the Second Amendment, the Statutes are "consistent with the Nation's historical tradition" of regulating dangerous firearms and weapons.  *Bruen*, 142 S. Ct. at 2130.  *Third*, plaintiffs' challenges under the Delaware Constitution fail because the Statutes, which do not totally ban either assault weapons or LCMs, satisfy intermediate scrutiny in light of:  (i) the compelling interest they advance (safety); (ii) their substantial relation to achieving those objectives (in light of the numerous dangers posed by the regulated products); and (iii) the minimal burdens that they impose (in light of the exceptions and available alternatives).  And for those same reasons, the Statutes would satisfy a more onerous standard, even if one applied.

The remaining factors also weigh heavily against issuing a preliminary injunction. Plaintiffs, whose decision to wait months to seek relief undermines their claim of irreparable harm, assert that the potential denial of Second Amendment rights constitutes *per se* irreparable harm. But not all potential denials of Constitutional rights constitute *per se* harm, and neither the Third Circuit nor the Supreme Court has found that to be the case in the Second Amendment context. Plaintiffs' other claimed injuries fare no better.  Any injury from the inability to purchase covered assault weapons and LCMs while the cases are pending is too speculative, particularly in light of available alternatives.  And plaintiffs' claimed harm from restrictions on their ability to sell assault weapons and LCMs fails both because (i) there is no constitutionally protected right to sell arms,

and (ii) any such injury is a compensable, economic injury.  In contrast, Delaware and its citizens will be irreparably harmed by the continued proliferation of assault weapons and magazines and the dangers that they pose.

In short, Plaintiffs do not meet the heavy burden required to obtain the "extraordinary remedy" of a preliminary injunction.  And the request by the Gray plaintiffs to forgo a trial and issue an immediate permanent injunction is foreclosed by the Federal Rules of Civil Procedure.

For all of these reasons, plaintiffs' motions should be denied.

## STATEMENT OF FACTS

### A.    The Challenged Laws

On June 30, 2022, two laws enacted in the immediate aftermath of the Buffalo and Uvalde mass shootings took effect in Delaware.

**Assault Weapon Statute.**  HB 450 makes numerous "assault weapons" illegal, subject to certain exceptions.  The General Assembly observed that assault-style weapons, with their "immense killing power," were "designed solely for military use … and … were not intended for sport or self-defense."  HB 450 at Preamble.  That, combined with the role of assault weapons in mass shootings, led the General Assembly to conclude "that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this State," and that the risk of death or injury resulting from these weapons "substantially outweigh[s]" any utility as sports or recreational firearms.  11 *Del. C.* § 1464.  The General Assembly made clear, however, that it did not intend to restrict "the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities."  *Id.*

"Assault weapon[s]" include (i) forty-four enumerated semi-automatic "assault long gun[s]," including the AR-15, AK-47, and Uzi, 11 *Del. C.* § 1465(2), (ii) nineteen specifically identified semi-automatic "assault pistol[s]," *id.* § 1465(3), and (iii) "copycat weapon[s]," *id.*

§ 1465(4). "Copycat weapon[s]" include semi-automatic, centerfire rifles that can accept a detachable magazine which have one of five military features, semi-automatic pistols with certain enhanced features, and certain other semi-automatic weapons. *Id.* § 1465(6). "Assault long gun[s]" and "assault pistol[s]" share numerous common military features, as do those that meet the definition of "copycat weapon." Yurgealitis Decl. ¶¶ 29-36, 44-46, 58, 65-75.

HB 450 prohibits the manufacture, sale, offer to sell, purchase, receipt, transfer, possession or transportation of assault weapons, subject to certain exceptions, including for military and law-enforcement personnel (including qualified retired law-enforcement personnel). *Id.* §§ 1466(a), (c). People who possessed or purchased assault weapons before the statute became effective can continue to possess and transport them under certain conditions, including (i) at their residence and place of business, (ii) at a shooting range, (iii) at gun shows, and (iv) while traveling between any permitted places. *Id.* § 1466(c). They can also transfer them to family members. *Id.*

**LCM Statute.** SS 1 for SB 6 makes it illegal "to manufacture, sell, offer for sale, purchase, receive, transfer, or possess a large-capacity magazine." *Id.* § 1469(a). "Large-capacity magazine[s]" are those "capable of accepting, or that can readily be converted to hold, more than 17 rounds of ammunition." *Id.* § 1468(2). The statute exempts many of the same individuals as HB 450, along with individuals with a valid concealed carry permit. *Id.* § 1469(c).

Unlike HB 450, SS 1 for SB 6 does not grandfather any magazines. It does, however, require the State to implement a buy-back program. *Id.* § 1469(d).

### B.    The Historical Regulation Of Weapons

"[T]he right secured by the Second Amendment is not unlimited." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller I*, 554 U.S. at 626). "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*

6

Throughout its history, this Nation has consistently regulated weapons.  As the expert declarations submitted with this Opposition demonstrate, this historical tradition follows a recurring pattern: first, the development of new weapons technologies, then, their spread into society, followed by government regulation to protect the public.  Spitzer Decl. ¶ 8.

**Colonial and Founding Era America**

In the eighteenth century, most gun owners in the British American colonies and the newly independent republic possessed and used single shot, muzzle-loading, flintlock firearms.  Sweeney Decl. ¶ 5.  Americans' preference for these firearms continued well into the 1800s.  *Id*. ¶ 6.

Compared to modern guns, muzzle-loading long arms took considerable time to load and fire, and were less accurate, especially at long ranges.  *Id*. ¶¶ 8-9.  Loading required ready access to gunpowder, wadding, and a ball.  *Id*. ¶ 9.  If all those materials were accessible, the shooter poured black powder down the barrel, crammed in wadding and the ball with a ramrod, and then recovered and secured the ramrod under the barrel.  *Id*.  The firearm was then raised, placed on full cock, aimed, and fired.  *Id*.  Wind could dislodge and rain could dampen the black powder, affecting the gun's ability to fire.  *Id*.

Multi-shot (or repeating) firearms were rare and viewed as curiosities.  Spitzer Decl. ¶¶ 36-42; Sweeney Decl. ¶ 20; Baron Decl. ¶ 4.  For example, the Girandoni multi-shot air rifle taken on the Lewis and Clark expedition, which plaintiffs claim was in "common use" at the time, DSSA Br. at 9 n.6, was in fact an anomaly.[1]  The Girandoni was brought to impress Native Americans

---

[1] The DSSA plaintiffs cite Meriwether Lewis's apparent carrying on the Lewis and Clark expedition of a single "Girandoni air rifle, with a 20 or 22-shot magazine capacity" as supposed evidence that "[a]mmunition magazines capable of holding more than seventeen rounds" have been "in common use … for centuries."  DSSA Br. at 9 n.6.

In fact, the DSSA plaintiffs' own source states that the Austrian army equipped a limited number of soldiers with Girandoni air rifles in the Napoleonic Wars between 1796-1815; that "[t]here are

encountered during the expedition.  Spitzer Decl. ¶ 40; Sweeney Decl. ¶ 36.  Not surprisingly given their rarity, "repeaters" were not regulated in this era.  But other more common weapons were.

**Clubs, Bludgeons and Slungshots.**   Multiple states regulated or banned weapons preferred by criminals, including clubs, bludgeons, and slungshots.  Spitzer Decl. ¶¶ 14-20.  At least thirteen states barred the carrying of "clubs" generically; the oldest such passed in 1664, and states continued passing laws through the early 1900s.  *Id.* ¶ 17.  Between 1799 and the early 1900s, fifteen states barred bludgeon carrying.  *Id.* ¶ 15.  In addition, at least sixteen states passed anti-billy club laws between 1862 and the early 1900s.  *Id.* ¶ 16.  Anti-slungshot laws were enacted by forty-three states between 1850 and the early 1900s, with seventy-nine laws enacted in the nineteenth century and twelve laws enacted in the twentieth century.  *Id.* ¶ 18.  Finally, ten states enacted anti-sandbag laws between 1866 and the early 1900s.  *Id.* ¶ 20.

**Bowie Knives.**   During the antebellum nineteenth century, serious interpersonal violence became increasingly widespread in the U.S.  *Id.* ¶ 13.  In the 1830s, Americans widely relied on knives with thin, long blades for fights and duels.  *Id.* ¶ 22.  These fighting knives, including the famous Bowie knife, became increasingly popular and accounted for a rising number of homicides. *Id.* ¶¶ 22-23.  In response, multiple states prohibited or restricted the carry of Bowie knives and similar knives.  *Id.* ¶ 24.  Between 1837 and 1925, twenty-nine states enacted laws barring the concealed carry of Bowie knives; fifteen states categorically barred their carry whether concealed

---

stories that Napoleon had captured [Austrian] air riflemen shot as terrorists" as they were considered "not as soldiers, but as assassins"; that no evidence "has surfaced to explain exactly where or when [Lewis] acquired it" and "[t]here is no other good evidence for Girandoni-style air rifles having made it to the United States by the beginning of the nineteenth century"; that Lewis's air rifle was mostly "shot as a demonstration to impress various tribes" who were "astonished or surprised" as "they cannot comprehend it's shooting so often and without powder"; and that when Lewis's air rifle was auctioned at an estate sale in 1845 the catalogue described it as "[a] *great curiosity*."  Jim Garry, WEAPONS OF THE LEWIS & CLARK EXPEDITION 92-93, 96-97, 101-03 (Univ. of Okla. Press, Norman, Publ'g Div. of the Univ. 2012). Ex. 1.

or openly; seven states enacted enhanced criminal penalties for those who used the knives to commit a crime; and other states regulated Bowie knives through taxes or penalties. *Id.* ¶ 31.

**Civil War and Reconstruction**

The latter half of the nineteenth century saw major advancements in the design, lethality, manufacturing, marketing, and distribution of guns and other weapons. Before the Civil War, multi-shot weapons were not viable or available in meaningful numbers. *Id.* ¶ 74. But after the war, new technologies became available in the civilian market, leading to increased gun violence followed by gun regulation. *Id.* ¶ 48.

**Repeating Rifles.** In 1860, Benjamin Henry patented the first practical, lever action repeating rifle. *Id.* ¶ 46. Variations on the "Henry" rifle followed, first with the Winchester 1866 repeating rifle followed by the Winchester 1873. *Id.* The Henry and Winchester rifles held fifteen rounds and were easily reloadable. *Id.* Although the Winchester 1873 was designed for the federal government as a military weapon, the Union army used these new repeating rifles sparingly in the Civil War. *Id.* Only a limited number were available for civilian acquisition. *Id.* After the war, the Henry and Winchester rifles were not widely embraced by long gun users. *Id.* ¶¶ 47-48.

**Revolver Pistols, Sword Canes, and Daggers.** Although Samuel Colt invented the first practical and reliable multi-shot revolver pistol in the 1830s (*Id.* ¶ 45), the Colt revolver only became widely available and affordable after the Civil War. *Id.* The spread of cheaper pistols led to increased gun violence. *Id.* ¶ 48. In response, almost every state prohibited or severely restricted concealed gun carrying by the end of the nineteenth century. *Id.* At least a half-dozen states barred possession of multi-shot handguns outright. *Id.* And many states enacted or strengthened laws targeting other concealable weapons, like sword canes and daggers. *Id.* Exs. C & E.

**Early 20th Century**

In the early twentieth century, new weapon technologies continued to emerge, followed by new regulations. As the Supreme Court has stated, applying the Second Amendment to "unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132.

**Machine Guns and Semi-Automatic Weapons.** After the First World War, the Thompson submachine gun or "Tommy gun" entered the civilian market. Spitzer Decl. ¶ 50. The Tommy gun was the first commercially available handheld firearm with a detachable magazine that held more than ten rounds. *Id*. Before the early 1920s, fully automatic weapons (machine guns) were new to the civilian market and unregulated. As fully automatic weapons became increasingly common, regulation followed. *Id*. ¶¶ 59-61.

Between 1925 and 1934, at least 32 states and the District of Columbia enacted anti-machine gun laws. Spitzer Decl. ¶ 59. In 1934, Congress passed the National Firearms Act, which restricted civilian acquisition and circulation of fully automatic weapons. *Id*. ¶ 61. As the Supreme Court has noted, a suggestion that the National Firearms Act's restriction on machine guns could violate the Second Amendment would be "startling." *Heller I*, 554 U.S. at 624.

In addition, at least seven states and the District of Columbia passed laws restricting semi-automatic weapons. Spitzer Decl. ¶ 65. The National Firearms Act also included a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, and silencers, among others. *Id*. ¶ 61.

**Ammunition Feeding Devices.** From 1917 to 1934, roughly half of the states enacted laws that restricted ammunition feeding devices, or guns that could accommodate them, based on a set number of rounds. *Id*. ¶ 68. The numerical cap varied from more than a single round to up to eighteen. *Id*. at Table 1.

**Short-Barreled Shotguns.**  The National Firearms Act of 1934 also barred private citizens from possessing short-barreled shotguns (with a barrel length shorter than eighteen inches) without registering them with and paying a tax to the U.S. government.  *Id.* ¶ 61.  Like machine guns, short-barreled shotguns were targeted because of their use by criminals.  *Id.* ¶ 61.  Five years later, the United States Supreme Court held that short-barreled shotguns were not protected under the Second Amendment.  *United States v. Miller*, 307 U.S. 174, 178 (1939).

### C.  Assault Weapons And LCMs

**Assault Weapons**

**Assault Rifles.**  Assault rifles were invented during the Second World War to enable swift and effective attacks on the battlefield.  Their features—and ultimate purpose—remain the same today.

The "Father of all [of] today's assault rifles" is the German "Sturmgewehr."  Yurgealitis Decl. ¶ 28.  Nazi Germany developed the Sturmgewehr—"assault rifle" in English[2]—to aid in Blitzkrieg battlefield assaults.[3]  Allied powers took notice of the weapon's capabilities and started developing their own fully automatic assault rifles.  *Id.* ¶¶ 30-38, 43.

Assault rifles share several traits that increase their lethality, including pistol grips and barrel shrouds for maneuverability, use of detachable magazines to fire many rounds rapidly, and

---

[2]  The literal translation is "storm rifle."  Yurgealitis Decl. ¶ 63.  Translated lexically, it means "assault rifle."  *Id.*; *see also* Ex. 2 at 1 (J. David McFarland, AR-15, M16 ASSAULT RIFLE HANDBOOK (1985)).  Plaintiffs' claim that "'assault weapons' is a complete misnomer … 'developed by anti-gun publicists,'" Gray Br. at 5-6; DSSA Br. at 8, is incorrect.  Yurgealitis Decl. ¶ 63.  Moreover, the gun industry and government agencies regularly use the term.  *Id.* ¶¶ 63 (gun industry) & 88 (agencies); Spitzer Decl. ¶¶ 76-80.

[3]  *See generally* Hammad Junejo, University of Toronto, *The Birth of the World's First Assault Rifle: The Sturmgewehr 44* (last accessed Jan. 20, 2023), *available at* https://sites.utm.utoronto.ca/historyinternships/blog/03182019-0228/birth-world%E2%80%99s-first-assault-rifle-sturmgewehr-44; Yurgealitis Decl. ¶ 28; *Id.* Ex. C, at 243.

the use of intermediate-caliber rounds fired at a high velocity, which inflict severe wounds even over long distances. *Id.* ¶¶ 29, 39-42. In addition, many feature other characteristics designed to improve battlefield performance, including "flash suppressors, which are designed to help conceal a shooter's position by dispersing muzzle flash[, and] … folding and telescoping stocks …." *Kolbe v. Hogan*, 849 F.3d 114, 125 (4th Cir. 2017), *abrogated by Bruen*, 142 S. Ct. 2111.

In the United States, the development of the AR-15 in the 1950s marked a critical point in the development of assault rifles. After preliminary testing in the late 1950s, Yurgealitis Decl. Exs. G at 2 & D at 19, the Department of Defense "purchased more than 100,000 AR-15 rifles for the Army and the Air Force." *Kolbe*, 849 F.3d at 124-25; Yurgealitis Decl. ¶¶ 36-37. By the mid-1960s, both branches adopted the AR-15 as standard issue using the moniker "M16." *Id.* ¶ 43.

The AR-15 displayed a remarkable ability to inflict catastrophic wounds. *Id.* ¶¶ 37, 42. In field tests in Vietnam, one victim died when, after being shot at the bottom of his foot, his "leg … split from the foot to the hip." *Id.* ¶ 37 & Ex. G. Another round "took [the head] completely off" a soldier, while a second round "in the right arm, took it completely off, too." *Id.* Torso wounds caused "the abdominal cavity to explode." *Id.* "All confirmed casualties inflicted by the AR-15 … were fatal," including "extremity hits." *Id.* Ex. G, at 8. As the troops using AR-15s "chalk[ed] up serious body counts," *id.* Ex. D at 27, it became clear that the AR-15 was "a very lethal combat weapon," *id.* Ex. H, at 131, "superior in virtually all respects to … the Thompson Sub-machine gun" that, as noted above, had long been prohibited for civilian use, *id.* ¶ 38.

**Assault Pistols.** Like assault rifles, assault pistols were created for use by the military in combat. *Id.* ¶ 44. "Specifically, the modern assault pistol is based on submachinegun designs." *Id.*; *see, e.g.*, Yurgealitis Decl. Ex. C at 18 ("The [Steyr] SPP (Special Purpose Pistol) is a semi-automatic version of the TMP … submachine gun"); *id.* at 58 ("The Uzi pistol is simply a

shortened, lightened and simplified version of the same Uzi submachine gun."). These submachineguns—and by extension, their modern assault pistol derivatives—"share[d] many construction and design features with assault rifles," including pistol grips, detachable magazines, adjustable stocks, and barrel shrouds. *Id.* ¶¶ 46, 48. Following the Second World War, assault pistols—much like assault rifles—gained popularity in militaries and law enforcement agencies around the world. *Id.* ¶ 50 & Ex. C.

**Commercialization of Assault Weapons.** As the reputation of the AR-15/M16 grew, weapons manufacturers began producing versions for civilian purchase. *Id.* ¶ 57.[4] Manufacturers likewise created civilian "pistol versions" of their military submachine guns. *Id.* ¶ 59 & Ex. C.

These civilian versions retain nearly all the features of their military equivalents, and their components "are completely interchangeable." *Id.* ¶¶ 58, 65. Manufacturers tout them as nearly identical to the military versions. Early marketing of the civilian AR-15 described it as a "powerful, battle-proven rifle" that came "[o]ut of the jungles of Vietnam" and was an "exact duplicate of the military weapon except for one alteration": it could only fire in semi-automatic mode. *Id.* (quoting Yurgealitis Decl. Ex. L). Colt likewise marketed the AR-15 as a "semi-automatic version of the … rifle purchased by The United States Armed Forces," and then later as the "semi-automatic version of the U.S. Military M16A1." *Id.* ¶ 61 & Exs. M, N & O. Heckler & Koch advertises its HK 91 "semi-automatic assault rifle" as "derived directly from the G3," its fully automatic military version. Ex. 3. Daniel Defense advertises its AR-15 with the tagline "Use

---

[4] Much of the growth in sales of these products has occurred within the last decade. *See* Nat'l Shooting Sports Foundation, The Firearm Industry Trade Ass'n, Estimated Modern Sporting Rifles in the United States 1990-2020, https://www.nssf.org/wp-content/uploads/2022/07/EstMSR1990_2020.pdf; *see also* Yurgealitis Decl. ¶¶ 64-65 (explaining that the phrase "modern sporting rifles" is an invented term for assault rifles).

What They Use," featuring images of soldiers in battle. *See, e.g.*, Ex. 4.[5]  And Bushmaster

"describes its Adaptive Combat Rifle as "'the ultimate military combat weapons system' ... 'built

specifically for law enforcement and tactical markets.'"  *Kolbe*, 849 F.3d at 125 (citation omitted).

Plaintiffs make much of the lone difference between military assault weapons and their

civilian counterparts, calling any comparison of a semi-automatic weapon to an automatic weapon

"disingenuous."  Gray Br. at 6.  In fact, the Army views "rapid semi-automatic fire" as "[t]he most

important firing technique during modern, fast-moving combat" and, at times, "superior to

automatic fire."  Yurgealitis Decl. ¶ 99 (quoting Yurgealitis Decl. Ex. T, at 7-8).  As a result, forces

equipped with fully automatic versions regularly use them in semi-automatic mode.  Yurgealitis

Decl. Ex. U, at 8-17 to 8-22 (U.S. Army "rate of fire" standards often calling for semi-automatic

fire); *Kolbe*, 849 F.3d at 125 ("[S]oldiers and police officers are often advised to choose and use

semi-automatic fire, because it is more accurate and lethal than automatic fire in many combat and

law enforcement situations.").  Even in semi-automatic mode, a large-capacity magazine can be

emptied in seconds.  Yurgealitis Decl. ¶ 99; *Kolbe*, 849 F.3d at 125.

Moreover, numerous inexpensive products, like the Hellfire Trigger System[6], Alamo-15

Trigger[7], Graves Star-Fire AR 15 trigger,[8] and Wide Open Triggers Hard Reset Trigger[9] allow

---

[5]  *See* Violence Policy Center, *VCP Backgrounder on Daniel Defense*, https://vpc.org/vpc-backgrounder-on-daniel-defense/; Michael Daly, *Uvalde Shooter's Gunmaker Hypes 'Revolutionary' New Killing Machine, 'Light-Weight, Heavy Hitting,'* THEDAILYBEAST.COM (June 8, 2022), https://www.thedailybeast.com/uvalde-shooter-salvador-ramos-gunmaker-daniel-defense-hypes-revolutionary-new-killing-machine.

[6]  FireQuest, https://www.firequest.com/HE2000.html.

[7]  https://gunsforsale.tech/product/alamo-15/.

[8]  https://www.recoil-technology-systems.com/graves-v2-art.html#/.

[9]  Wide Open Triggers, https://wot15.com/.

semi-automatic assault weapons to fire at rates approaching fully automatic weapons.  Indeed, these products are marketed as providing fully automatic shooting capability,[10] and it is easy to see why.[11]  An AR-15 with one of these products can fire thirty rounds in less than three seconds.[12]  The power of these products surprises even experienced shooters.[13]  Although Delaware banned some rapid-fire conversion devices in 2022, *see* 11 *Del. C.* § 1444(a)(6), these remain available for purchase in most states, including those within a short drive.

Despite their recent proliferation, assault weapons remain a niche product.  According to plaintiffs, there are less than twenty million assault weapons "in circulation" today.  DSSA Br. at 7.  Because that number presumably includes weapons owned by law enforcement and criminals, it likely overstates the number owned by law-abiding civilians.  Even still, it is a small fraction of the more than 470 million guns in the United States.[14]  As a result, only a small portion of the

---

[10] *See* https://www.firequest.com/HE2000.html ("If you have ever considered converting to FULL AUTO SELECT FIRE and red tape or jail time got in the way, then the Hell-Fire Trigger System is for you.").

[11] Gefardino, Wide Open Triggers Hard Reset Trigger 100rnd Mag Dump, https://www.youtube.com/watch?v=9uCoj92PUnI.

[12] South Texas Guns, Binary Triggers Vs. Wide Open Force Reset Trigger! AR-15 .556 30 Round May Dump In Less Than 3 Second, https://www.youtube.com/watch?v=X8LO4ybIxHU.

[13] https://www.youtube.com/watch?v=nZ54pxX1nVU (Alamo-15); https://www.youtube.com/watch?v=LDnra3wW_G4 (Star-Fire).

[14] *See* NSSF, Firearm Production in the United States with Firearm Import and Export Data, Industry Intelligence Report, at 18 (2020), https://www.nssf.org/wp-content/uploads/2020/11/IIR-2020-Firearms-Production-v14.pdf (showing 433.9 million total firearms in civilian circulation in the United States through 2018), *plus* U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, National Firearms Commerce and Trafficking Assessment:  Firearms in Commerce, at 181, 188, 193 (2022), https://www.atf.gov/firearms/docs/report/national-firearms-commerce-and-trafficking-assessment-firearms-commerce-volume/download (showing 28.4 million firearms manufactured nationally, less 800,000 exported, plus 10 million imported, in 2019 and 2020).

population owns assault weapons.  *See* DSSA Br. at 6 (estimating that five million Americans, or 1.5% of the population at the time, own assault weapons).[15]

**LCMs**

Many modern semi-automatic firearms use detachable magazines.  Yurgealitis Decl. ¶¶ 24, 29.  But no single firearm "requires a large-capacity magazine" to operate.[16]  *Id.* ¶ 52.

LCMs were developed for military use and "serve specific, combat-functional ends." H. Rep. No. 103-489, at 18; 1998 ATF Report at 1-3, 36-38; Yurgealitis Decl. ¶ 53.  Beginning in the First World War, militaries used "[m]agazine fed light machine guns" with ammunition tubes. *Id.*  These magazines allow soldiers to "fire an increased quantity of cartridges without reloading," increasing their "lethality and effectiveness … in combat."  *Id.* ¶ 55.

---

[15] According to the census, there were more than 315 million citizens in 2015.  *See* https://www. census.gov/data/tables/2015/demo/age-and-sex/2015-age-sex-composition.html.

[16] DSSA argues that "common arms that come equipped with standard-capacity magazines of 17 rounds of ammunition or below are still banned under SS 1 for SB 6."  DSSA Br. at 9-10.  But DSSA never claims that any firearm requires a minimum magazine size to operate.  For good reason.  *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 118 & n.20 (3d Cir. 2018) ("Plaintiffs were unable to identify a single model of firearm that could not be brought into compliance with New Jersey's magazine capacity restriction"), *abrogated by Bruen*, 142 S. Ct. 2111.  Indeed, an owner can easily obtain a legally compliant magazine, which are equally "standard" and easy to purchase.  Many retailers offer magazines based on state restrictions.  *See, e.g.*, Rifle Supply, www.riflesupply.com (last visited Jan. 21, 2023).

Like assault weapons, LCMs are marketed to civilians, often as assault weapon "accessories."[17]  Magazines holding up to 100 rounds are available.[18]  One manufacturer touts its 60-cartridge magazine as providing "critical advantages in any firefight:  shoot more; reload less …, increase[ing] initial firepower in ambush situations.  Fewer reloads overall mean less downtime and target distraction…. *Twice the violence of action.  Half the reloads.  Win-win*."[19]

**Suitability for Various Purposes**

Given their origins, it is no surprise that assault weapons and LCMs offer relatively little utility in self-defense, hunting, and recreation.

**Assault Weapons and LCMs Are Not Well Suited for Self-Defense.**  The Supreme Court has recognized the utility of handguns for self-defense.  *See Heller I*, 554 U.S. at 628 (emphasizing

---

[17] *See, e.g.*, KRISS 2020 Product Catalog, at 32-33 (2020) (including magazines under "Accessories"), Ex. 5; Ruger 2020 Firearms Catalog, at 158-160 (2020) (advertising RUGER .COM/ACCESSORIES on "Ruger Rifle Magazines" pages), Ex. 6; Heckler & Koch - Civilian Products, at 22-23 (2016) (including magazines under "HK Accessories"), Ex. 7; Heckler & Koch - Weapons System Military & Law Enforcement Products, at 12, 18-19 (Cornell Publications, photo. reprt.) (similar), Ex. 8; Colt Military & Law Enforcement Catalog (2013), at 29 (similar), Ex. 9; Colt Defense - Assault Rifles & Carbines, at 21 (2010) (same), Ex. 10; Springfield Armory USA 2013 Catalog, at 80-82 (2013) (advertising magazines separately from firearms), Ex. 11; Sam's Firearms, www.samsfirearms.com (last visited Jan. 21, 2023) (selling "guns" and "gun accessories," including "magazines"); AAA Police Supply, www.aaapolicesupply.com (last visited Jan. 21, 2023) (selling "Firearm Accessories" including "magazines"); Magpul, www.magpul.com (last visited Jan. 21, 2023) (similar); Zahal, www.zahal.org (last visited Jan. 21, 2023) (similar); *see generally Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *13 (D.R.I. Dec. 14, 2022) (manufacturers showing magazines as accessories).

[18] *See*, *e.g.*, https://armsunlimited.com/kci-100-round-ar15/m4-drum-magazine/ (100 round magazine, "compatible with [the] AR-15 / M16 / M4" and available for $149.99); https://promagindustries.com/magazines/ar-15-m16-and-variant/ (offering numerous 50, 55 and 65 cartridge magazines for "AR-15 / M16 and variant").

[19] https://www.surefire.com/products/parts-accessories/high-capacity-magazines/mag5-60/ (emphasis added).

that handguns are "overwhelmingly chosen by American society for" self-defense).[20]  In contrast, assault weapons are not well-suited for self-defense for several reasons.

*First*, assault weapons are typically designed for long-range use.  "[A]ssault weapons were designed to be effective at battlefield ranges of up to 500 yards.  The typical muzzle velocity of a .223 caliber bullet is 3,200 feet per second …. Common muzzle velocities for 9mm or .38 caliber handgun bullets are less than half of that."  Yurgealitis Decl. ¶ 83.  This makes assault weapons dangerous for use in self-defense.  Assault rifles are difficult to control and pose a greater risk of bullets traveling through home materials and injuring a bystander.  *Id.*  Thus, contrary to the Gray plaintiffs' claim, the AR-15's .223 caliber is *not* "safer to use as a home-defense gun because [it] is less likely to travel through walls."  Gray Br. at 7 (quotation omitted).  In fact, assault weapon rounds easily pierce Level III body armor and can puncture 3/8" thick hardened steel from a nearly a quarter mile.  Yurgealitis Decl. ¶¶ 84, 98.

Assault weapons also require substantial experience to use properly.  That is why law enforcement and military undergo extensive training before using them.  For example, when the ATF transitioned to AR-type rifles, it required a 40-hour course and quarterly testing to requalify for firearm use.  Yurgealitis Decl. ¶ 86.  Even having "performed them repeatedly under stress" in training, agents "ma[d]e errors" during the tests.  *Id.*  A civilian with no training can easily endanger others when trying to use assault weapons.  "[W]hen inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders."  *Kolbe*, 849 F.3d at 127.

---

[20] *See also* Allen Decl. ¶ 21; Gary Kleck & Marc Gertz, *Armed Resistance to Crime:  The Prevalence and Nature of Self-Defense with a Gun*, 86 J. CRIM. L. & CRIMINOLOGY 150, 173, 175 (Fall 1995) (study cited by Gray plaintiffs explaining that handguns are used in roughly 80% of gun-defense incidents).

Unsurprisingly, assault weapons are rarely utilized in defense situations.  Analysis of an FBI database indicates that assault weapons were used for protective purposes in 0.2% of active shooter incidents between 2000 and 2021.  Allen Decl. ¶ 21.  Similarly, the Heritage Foundation's "Defensive Gun Uses in the U.S." database reflects that rifles of any type were only used defensively in 4% of incidents with a known gun type.  *Id.* ¶ 27.

LCMs containing more than seventeen rounds are also unnecessary for self-defense.  Self-defense situations rarely, if ever, involve lengthy shootouts with extensive gunfire.  Yurgealitis Decl. ¶ 83.  It is rare for a person using a firearm in self-defense to fire even ten rounds.  Allen Decl. ¶ 9.  Indeed, an analysis of multiple databases found no incidents where the defender fired more than seventeen rounds.  *Id.* ¶¶ 9, 17.  Instead, defenders fired an average of 2.2 shots.  *Id.* ¶ 9.

**Assault Weapons and LCMs Are Not Well Suited for Hunting.**  Assault weapons and LCMs also have limited utility for hunting and recreation.

Hunting prioritizes limited, precise shots over a high volume of shots or shots that are especially damaging to tissue.  Yurgealitis Decl. ¶ 88.  As a result, rifles designed specifically for hunting are typically bolt-action rifles with magazines that hold less than ten bullets.  *Id.* ¶ 52.[21]  Moreover, they typically lack the telescoping stocks, protruding grips, and flash suppressors that plaintiffs claim make assault rifles useful for hunting.  Gray Br. at 8.[22]  The ammunition fired at

---

[21] In 1989, the ATF determined that assault rifles are not "generally recognized as particularly suitable or readily adaptable to sporting purposes," such as hunting.  Yurgealitis Decl. Ex. Q, at 12.

[22] *See also* Department of the Treasury, *Report and Recommendation on the Importability of Certain Semiautomatic Rifles* ("1989 ATF Report"), at 6 (July 6, 1989) (telescoping stocks "predominant advantage is for military purposes, and it is normally not found on the traditional sporting rifle"); *id.* at 7 (finding that a flash suppressor does not have any benefit for sporting purposes); Bureau of Alcohol, Tobacco, Firearms & Explosives, *ATF Study on the Importability of Certain Shotguns*, at 8-14 (January 2011) (finding that folding, telescoping or collapsible stocks, flash suppressors, magazines over five rounds and forward pistol grips "offer little or no advantage to a sportsman").

high velocities by assault weapons (5.56mm/.223) is particularly poor for hunting, given the damage it causes upon impact.  Yurgealitis Decl. ¶ 88; see *id.* ¶¶ 41-42.

There are, however, numerous lawful firearms and magazines that are more suitable for hunting.  *Id.* ¶¶ 18, 52, 88.

**Assault Weapons and LCMs Are Not Well Suited for Recreation.**  For these same reasons, assault weapons and LCMs are not well-suited for recreation.  In its 1998 study, the ATF found that while assault rifles "may be used and sometimes are used for organized competitive target shooting …, their suitability for this activity is limited.  In fact, there are some restrictions and prohibitions on their use."  1998 ATF Report at 30.  As to LCMs, the 1998 ATF Report found no "information demonstrating that [the] … ability to accept large capacity military magazines was necessary for its use in practical shooting competitions."  *Id.* at 29.  Indeed, some shooting organizations prohibit assault weapons.  *See* International Sports Shooting Federation Rifle Rules § 7.4.1.1 ("Only single shot rifles that must be manually loaded before each shot may be used, except" in one event).[23]

And, as with hunting, there are lawful options that can be used for recreational use and competitions, including some that are better for competitions as a result of their focus on accuracy, not volume or velocity of fire.  *See generally* Yurgealitis Decl. Exs. Q & R.

**Public Safety Risks of Assault Weapons and LCMs**

While not well suited for the lawful purposes of self-defense, hunting, or recreation, assault weapons and LCMs pose substantial public safety risks due to their ability to inflict unusually

---

[23]  Available at  https://www.issf-sports.org/getfile.aspx?mod=docf&pane=1&inst=460&file=1.Rifle-Rules.pdf.

devastating injuries, penetrate materials (including body armor), and use in mass shootings, among other things.

**Capacity to Inflict Catastrophic Wounds.**   The devastating wounds that the Army observed in Vietnam have continued as assault weapons have migrated into civilian hands. Doctors who treat victims of assault weapons encounter "unimaginable" wounds.  Gina Kolata and C.J. Chivers, NY TIMES, *Wounds From Military-Style Rifles? 'A Ghastly Thing to See*' (Mar. 4, 2018) (quoting former military doctors: "The tissue destruction is almost unimaginable.  Bones are exploded, soft tissue is absolutely destroyed.  The injuries to the chest or abdomen — it's like a bomb went off"; "'The energy imparted to a human body by a high velocity weapon is exponentially greater' than that from a handgun"; "You will see multiple organs shattered.  The exit wounds can be a foot wide," and people can have "entire quadrants of their abdomens destroyed."), Ex. 12; Mary Kekatos, *Surgeon who treated kids shot in Uvalde describes assault weapons' extreme trauma to victims' bodies*, ABC NEWS (May 27, 2022) (describing "large destructive wounds"; "When a high-velocity firearm enters a body, it basically creates a wave and a blast ….  So it looks like a body part got blown up ... A handgun may create one small hole, whereas a high-velocity firearm will create a giant hole in the body that is with missing tissue.  By that, I mean that there were not only a small hole in the body part, but large areas of tissue missing in various body parts that sustained injuries from the firearm."), Ex. 13; Jason Hanna, *'Those Are Wartime Injuries':  Doctor Describes the Horrific Scene at the Highland Park Shooting*, CNN (July 5, 2022) (victims "were blown up by that gunfire … blown up"), Ex. 14; Jennifer Henderson, '*There's Nothing to Repair': Emergency Docs on Injuries From Assault Weapons*, MEDPAGETODAY.COM (May 31, 2022) (doctor who treated Columbine victims; "You have to see the damage that these weapons do to really respect and understand how dangerous these weapons

are.… There's no way to cause the type of havoc that these people are looking to cause without something of the power and speed of an assault weapon."), Ex. 15. *See also* Yurgealitis Decl. ¶¶ 42, 97-99 & Ex. I.

**Threat to Law Enforcement.** Assault weapons and LCMs also pose unique threats to police officers. Yurgealitis Decl. ¶ 98. Assault weapons can penetrate the bullet-resistant vests typically worn by officers, as well as materials that other types of ammunition are less likely to pierce, including bullet-resistant vests—making them more dangerous to police. *Id.* ¶¶ 84 & 98; *see supra* at 18. Assault weapons also "allow criminals to effectively engage law enforcement officers from great distances." *Kolbe*, 849 F.3d at 127 (citation omitted). This combination of factors has led to multiple incidents in which criminals outgun police. *See*, *e.g.*, *Connecticut candidates debate crime after police ambush*, AP NEWS (Oct. 19, 2022) (widow of police officer: "His revolver carries 13 rounds. There's no chance for a police officer against someone who can fire 80 rounds in a matter of minutes …. There is no reason for those weapons of war to be in our communities")[24]; Neetish Basnet, *Phoenix chief tells Senate resources, reform needed to fight gun violence*, CASA GRANDE DISPATCH (July 27, 2022) (Phoenix police chief requesting funding for "out-gunned" police departments)[25]; *Kolbe*, 849 F.3d at 127 & n.6 ("Tragic events involving assault weapons continue to occur. On July 7, 2016, a shooter armed with a semiautomatic assault rifle killed five law enforcement officers and injured nine others, plus two civilians, in Dallas, Texas. Just ten days later, on July 17, 2016, another shooter armed with a semiautomatic assault rifle shot six police officers in Baton Rouge, Louisiana, killing three of them.").

---

[24] https://apnews.com/article/crime-police-shootings-gun-politics-connecticut-26c911da2dc34a5bf1f38e1190f15cd5.

[25] https://www.pinalcentral.com/arizona_news/phoenix-chief-tells-senate-resources-reform-needed-to-fight-gun-violence/article_9f19514d-7c01-5b0f-a4c1-52623eb19f3c.html.

**Mass Shootings.**  Assault weapons "equipped with LCMs have [also] been the weapons of choice in many of the deadliest mass shootings in recent history, including horrific events in Pittsburgh (2018), Parkland (2018), Las Vegas (2017), Sutherland Springs (2017), Orlando (2016), Newtown (2012), and Aurora (2012)."  *Worman v. Healey*, 922 F.3d 26, 39 (1st Cir. 2019), *abrogated by Bruen*, 142 S. Ct. 2111.[26]  *See also Kolbe*, 849. F.3d at 126-27 ("One study of sixty-two mass shootings between 1982 and 2012 … found that the perpetrators were armed with assault rifles in 21% of the massacres and with large-capacity magazines in 50% or more ….").  An analysis of 179 mass shootings across four databases through October 2022 concluded that assault weapons were used in 24% of the incidents for which the type of weapon could be determined. Allen Decl. ¶ 33.  And the same analysis showed that a significant number of mass shootings involved LCMs.  *See id.* ¶¶ 35, 38.[27]

Mass shooters using semi-automatic assault weapons with LCMs fire twice as many bullets as other mass shooters.  H.R. Rep. No. 117-442, at 42 (July 2022); *see also* Allen Decl. ¶¶ 39-40. As a result, "casualties [a]re higher in the mass shootings that involve[] weapons with Large-Capacity Magazines than in other mass shootings."  *Id.* ¶ 36.

Smaller magazines force shooters to change magazines more often.  Those reprieves can provide important opportunities for potential victims to escape.  *See Kolbe*, 849 F.3d at 128 (citation omitted) (the use of ten-round magazines at issue "would for every 100 rounds fired afford

---

[26] Just last week, a shooter used a MAC-10, one of the prohibited assault pistols, to kill eleven people in Monterey Park, California.  Jeremy White & K.K. Lai, *What We Know About the Gun Used in the Monterey Park Shooting*, N.Y. TIMES (Jan. 26, 2023), Ex. 16.

[27] *See also* Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, OFFICE OF JUSTICE PROGRAMS, at 87 (June 2004), https://www.ojp.gov/pdffiles1/nij/grants/204431.pdf ("[Assault weapons] account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.").

'six to nine more chances'" for bystander or police intervention, magazine malfunction, and opportunities for victims to flee).

**Regulation of Assault Weapons**

In 1989, California became the first state in the country to pass legislation banning assault weapons. Spitzer Decl. ¶¶ 11, 85-87. In 1994, Congress passed the Federal Assault Weapons Ban, which banned for ten years the sale, transfer, manufacturing, and importation of assault weapons manufactured after enactment and ammunition feeding devices capable of accepting more than ten rounds. Spitzer Decl. ¶¶ 11, 91. While the Federal Assault Weapons Ban was in effect and after its sunset, multiple states banned assault weapons and LCMs. *Id.* ¶¶ 11, 92.

### D.      Plaintiffs' Challenges

Both motions rely on the same fundamental argument: Eschewing analysis of the history of regulating arms (including a longstanding tradition of analogous regulations), plaintiffs argue that under *Bruen*, because millions of assault weapons and LCMs have been sold, they cannot be regulated by the states. DSSA Br. at 5-7; Gray Br. at 4-6.

A few plaintiffs offered declarations in support of the motions. Those declarations indicate that multiple plaintiffs own weapons covered by the statute that they may keep provided they acquired them before the Statutes became effective. Some plaintiffs also own LCMs, but do not provide enough information to determine whether they qualify for an exception. Plaintiffs purportedly wish to purchase covered assault weapons and LCMs, but do not explain why they did not purchase them before the enactment of the Statutes. Nor do they explain why their existing firearms are inadequate for self-defense, hunting or recreation, or why they waited to seek relief.

And while the DSSA plaintiffs make claims about the purported effect of the Statutes on the economically disadvantaged, DSSA Br. at 12, no plaintiff claims to be so affected.[28]

## ARGUMENT

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)). "This type of remedy is available only when the plaintiff establishes: (1) a likelihood of success on the merits; (2) irreparable harm if the injunction is denied; (3) the balance of the equities tips in the plaintiff's favor; and (4) the public interest favors the requested relief." *Knights of Columbus Star of Sea Council 7297 v. City of Rehoboth Beach, Del.*, 506 F. Supp. 3d 229, 233 (D. Del. 2020). "The first two factors – likelihood of success on the merits and irreparable harm – are 'gateway factors.'" *Id.* (citing *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017)).

Because plaintiffs bring "disfavored" facial challenges, *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008), rather than as-applied challenges, they bear a "heavy burden," *United States v. Salerno*, 481 U.S. 739, 745 (1987). Outside the First Amendment context, plaintiffs "can only succeed in a facial challenge by 'establish[ing] that *no* set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449 (emphasis added) (quoting *Salerno*, 481 U.S. at 745).

---

[28] While the plaintiffs imply that the Statutes have racist motivations, DSSA Br. at 12 & n.7, because gun violence disproportionately affects minorities, they will benefit from the Statutes. *See, e.g.*, Grace Kena & Jennifer L. Truman, *Trends & Patterns in Firearm Violence, 1993-2018*, OFFICE OF JUSTICE PROGRAMS, at Tables 6 & 7 (Apr. 2022), https://bjs.ojp.gov/content/pub/pdf/tpfv9318.pdf.

Although the "occasional case" may require a court to entertain a facial challenge, the Court should "neither want nor need to provide relief to nonparties when a narrower remedy will fully protect the litigants." *United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995) (citing *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 485 (1989)).

## I.  PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS.

### A.  Plaintiffs' LCM Challenges Fail Because LCMs Are Not Arms.

To obtain a preliminary injunction with respect to LCMs, plaintiffs must first show that LCMs are entitled to constitutional protection. Plaintiffs assume that is the case. They are wrong. Both historical definitions and historical evidence demonstrate that LCMs are not "arms" within the meaning of the Second Amendment and, as such, are not constitutionally protected.

In *Bruen* and *Heller I*, the Supreme Court recognized that the Second Amendment's protections only extend to an individual's right to bear "arms," and that "the Second Amendment's definition of 'arms' is fixed according to its historical understanding." *Bruen*, 142 S. Ct. at 2132; *Heller I*, 554 U.S. at 581. Citing dictionaries from the eighteenth and nineteenth centuries, *Heller I* identified the historical definition of "arms" as "[w]eapons of offence, or armour of defence," and "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581 (citations omitted).[29]

LCMs are not "weapons of offence." Indeed, they are not weapons at all. While one could "take[]" a magazine "into his hands," it is not "useth in wrath to cast at or strike another."[30]

---

[29] *Heller I* did not delve any deeper into the meaning of "Arms" because there was little question that the handguns at issue in that case were "weapons of offence."

[30] While one could hit a person with an LCM, that is not its intended use. One could also hit a person with a frying pan or tire iron, but nobody claims that those are protected "arms."

This conclusion is confirmed by examining the "normal and ordinary" meaning of the term "arm" during the founding era. *Bruen*, 142 S. Ct. at 2127; *Heller I*, 554 U.S. at 576-77. As explained by Professor Dennis Baron, a review of several historical databases confirms that through the period following the ratification of the Fourteenth Amendment, there was a clear distinction between "*arms*," or weapons, and "*accoutrements*," the ancillary equipment associated with military service (including ammunition, ammunition containers, flints, scabbards and holsters).[31] Baron Decl. ¶ 2. Indeed, the historical evidence demonstrates that "despite a handful of exceptions [], in literally hundreds of cases, 'arms' and 'accoutrements' are treated as separate items of military gear." *Id.* ¶ 38.

The historical evidence further shows that when the term "arms" occurred alone, as it does in the Second Amendment, it typically did not include accessories. *Id.* ¶ 10. And while "accoutrement" when used alone could include both arms and accessories, typically phrases such as "arms and ammunition," "arms and accoutrements," and "arms, ammunition, and accoutrements" were used when referring to arms and their accessories. *Id.*

Other courts have recently held that LCMs are not "arms" within the meaning of the Second Amendment. In *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. Dec. 14, 2022), the District of Rhode Island denied a motion to enjoin application of a law prohibiting the possession of LCMs. After engaging in the extensive historical analysis required under *Bruen*, the court found that plaintiffs "failed in their burden to demonstrate that LCMs are 'Arms' within the meaning of the Second Amendment's text." *Id.* at *2.

---

[31] During the founding era, "magazine" meant "storehouse," and did not come to mean a compartment holding ammunition until the late 19th Century. Baron Decl. ¶ 24. In the 18th Century, bullets were kept in what was referred to as "cartridge boxes" or "cartridge cases." *Id.*

In reaching this conclusion, the court examined the plain text of the Second Amendment and historical context. The court found silencers, which fall outside the Second Amendment's ambit, to be analogous to LCMs, noting: "What one judge has said of silencers is equally apt when applied to LCMs: they 'generally have no use independent of their attachment to a gun' and 'you can't hurt anybody with [one] unless you hit them over the head with it.'" *Id.* (quoting *United States v. Hasson*, 2019 WL 4573424, at *2 (D. Md. Sept. 20, 2019), *aff'd*, 26 F. 4th 610 (4th Cir. 2022)).[32] Because LCMs are mere "*holders* of ammunition, as a quiver holds arrows, or a tank holds water for a water pistol, or a pouch probably held the stones for David's sling," *Ocean State Tactical*, 2022 WL 17721175, at *13, they are not "arms" under *Bruen*.

The court next examined historical use. Relying on Dr. Baron's analysis, the court found a "clear distinction between 'Arms' and 'accoutrements' from the founding era through the period following ratification of the Fourteenth Amendment." *Id.* The court noted Dr. Baron's findings that "[t]he word 'Arms' was a general term for weapons such as swords, knives, rifles, and pistols, but it did not include ammunition, ammunition containers, flints, scabbards, holsters, or 'parts' of weapons such as the trigger, or a cartridge box." *Id.* The court further noted that "in the 18th Century, bullets were kept in cartridge boxes or cases, called 'accoutrements.'" *Id.*

That distinction continues today. As discussed above, *see supra* at 17 n.17, manufacturers and dealers regularly list magazines as "accessories," separate from firearms.[33]

---

[32] As noted above, in *Doe* the Supreme Court of Delaware identified the State's restriction on silencers, which the *Ocean State Tactical* court analogized to LCMs, as evidence that the right to bear arms under the State's Constitution "is not absolute." *Doe v. Wilmington Hous. Auth.*, 88 A.3d 654, 667 (Del. 2014) (citing *Griffin v. State*, 47 A.3d 487, 488 (Del. 2012)).

[33] *Oregon Firearms Federation, Inc. v. Brown*, 2022 WL 17454829 (D. Or. Dec. 6, 2022), reached the same conclusion for a different reason. Citing evidence showing that "all firearms that can accept a detachable large-capacity magazine can also accept a magazine that holds 10 or fewer rounds and function precisely as intended," the court concluded that "[p]laintiffs have failed to

A contrary conclusion is not required by *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("*ANJRPC*"), *abrogated by Bruen*, 142 S. Ct. 2111.  In this pre-*Bruen* case, there was no evidence or argument presented regarding the historical definition of "arms."  Moreover, that decision rested upon the conclusion that the ban on smaller magazines could "make it impossible to use firearms for their core purpose."  *Id.* (citation omitted).  Plaintiffs make no such claim here.

Having not attempted to establish that LCMs are "arms" within the meaning of the Second Amendment or Article I, Section 20 of the Delaware Constitution, and in light of the overwhelming evidence that they are not, plaintiffs' motion with respect to LCMs can be denied on that basis alone.

**B.**     **Plaintiffs' Challenges Under The Federal Constitution Fail.**

      **i.**     **Assault Weapons (And LCMs, Even If "Arms") Are Not Protected By The Second Amendment.**

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  "Like most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller I*, 554 U.S. at 626).

Only if plaintiffs show that "the Second Amendment's plain text covers an individual's conduct, [will] the Constitution presumptively protect[ ] that conduct."  *Id.* at 2129-30.  To meet

---

show that magazines capable of accepting more than ten rounds of ammunition are covered by the plain text of the Second Amendment."  *Id.* at *9 (citation omitted).  *See also Duncan v. Bonta*, 19 F.4th 1087, 1104, 1107 (9th Cir. 2021) (en banc) ("The law at issue here does not ban any firearm at all.  It bans merely a subset (large-capacity) of a part (a magazine) that some (but not all) firearms use.").

this threshold burden, plaintiffs must demonstrate that the "textual elements" of the Second Amendment's operative clause apply to the conduct being restricted. *Id.* at 2134 (quoting *Heller I*, 554 U.S. at 592). Thus, plaintiffs must show that the regulated item fits within the category of "bearable arms," *id.* at 2132, and that it is "commonly used" for self-defense, *id.* at 2138. *See, e.g.*, *id.* at 2134-35 (citation omitted) (before determining whether restriction was "consistent with this Nation's historical tradition of firearm regulation," Supreme Court confirmed that plaintiffs were "part of 'the People' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense").

The relevant question is whether the arm is "in 'common use' for self-defense today." *Id.* at 2143 (citing *Heller I*, 554 U.S. at 627). At the time of the founding, "[t]he traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense." *Heller I*, 554 U.S. at 624. But "weapons that are most useful in military service—M-16 rifles and the like—may be banned." *Id.* at 627.

Assault weapons and LCMs are not "quintessential self-defense weapon[s]." *Heller I*, 554 U.S at 629. Rather, like fully automatic weapons including machine guns, they were designed for military use. Spitzer Decl. ¶¶ 85-86. And assault weapons and LCMs are not commonly used for self-defense today. *Supra* at 17-19. As such, they are not protected by the Second Amendment.

Further, the Second Amendment does not create a right to keep and carry "dangerous and unusual weapons." *Heller I*, 554 U.S at 627 (citation omitted). The test to determine whether a weapon is "dangerous and unusual" is part of the test to determine whether a weapon is in common use today. *Id.* (cleaned up) ("[A]s we have explained, [] the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition

of prohibiting the carrying of dangerous and unusual weapons.").   The Court thus must also consider whether assault weapons and LCMs are "dangerous and unusual."

In *Heller I*, the Supreme Court cited Blackstone for the idea that "dangerous and unusual" weapons were regulated historically.   *Id*.   Blackstone directly addressed the regulation of "dangerous *or* unusual weapons":

> The offence of *riding* or *going armed*, with dangerous *or* unusual weapons, is a crime against the public peace, by terrifying the good people of the land; and is particularly prohibited by the statute of Northampton, upon pain of forfeiture of the arms, and imprisonment during the king's pleasure: in like manner as, by the laws of Solon, every Athenian was finable who walked about the city in armour.

4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769) (second emphasis added) (internal citation omitted).   While the Supreme Court paraphrased Blackstone as permitting the prohibition of "dangerous and unusual" weapons (*Heller I*, 554 U.S at 627; *see also Kolbe*, 849 F.3d at 131 n.9), it makes no sense to read this as a re-writing of Blackstone.   From the originating text, the phrase "dangerous or unusual" appears to be a hendiadys—a figure of speech like "cruel and unusual" and "necessary and proper," involving "two terms, separated by a conjunction, [that] are melded together to form a single complex expression."   Samuel L. Bray, "*Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 VA. L. REV. 687, 695 (2016).   Properly read as a hendiadys, Blackstone's Commentaries permit regulation of weapons that are "dangerous or unusual," in the sense that they are "unusually dangerous."

Assault weapons and LCMs (to the extent LCMs are "weapons") are "dangerous and unusual."   Their military origin and features present grave threats to both law enforcement and the general public.   *See supra* at 20-24.   As such, assault weapons and LCMs are not protected by the Second Amendment.

31

Contrary to plaintiffs' foundational argument, the fact that a weapon is commonly owned, used, or sold, by itself, is insufficient to prevent its regulation. *See, e.g.*, Gray Br. at 10-11. Rather, plaintiffs must first establish that assault weapons and LCMs are in "common use" today for the lawful purpose of self-defense. Plaintiffs fail in several respects.

First, plaintiffs do not establish that assault weapons are in "common use." Even crediting plaintiffs' figures, assault weapons make up only around 1.5% of guns in the United States. *See supra* at 15. Second, plaintiffs certainly do not establish—because they cannot—that assault weapons and LCMs are actually in common use for self-defense. *See* DSSA Br. at 5-10, 15; Gray Br. at 6-12. And even if plaintiffs had made such a showing, they still must establish that assault weapons are not "dangerous and unusual"/"unusually dangerous." This they cannot do.

Indeed, the Supreme Court has made clear that the Second Amendment does not protect weapons simply because they are common. In the decade before adoption of the National Firearms Act, the National Conference of Commissioners on Uniform State Laws noted that "the infant industry of racketeering grew to monstrous size, and with it the … revolver [was ultimately] displaced by a partly concealable type of machine gun-the Thompson .45 inch caliber submachine gun … equipped with either 100 or 50 shot drum magazine[s], or 20 shot clip magazine[s]." Unif. Machine Gun Act of 1932, prefatory note. Today, there are over 741,000 registered machine guns in the United States—more than the populations of three states and the District of Columbia. U.S. Dep't of Justice, Bureau of Alcohol, Tobacco, Firearms & Explosives, Firearms Commerce in the United States: Annual Statistical Update, at 16 (2021).[34] Yet the Supreme Court called the suggestion that machine gun restrictions "might be unconstitutional" "startling". *Heller I*, 554 U.S. at 624; *see also United States v. One (1) Palmetto State Armory PA-15 Machinegun*

---

[34] https://www.atf.gov/resource-center/data-statistics.

*Receiver/Frame*, 822 F.3d 136, 142 (3d Cir. 2016) (applying *Heller I* and holding that "the Second Amendment does not protect the possession of machine guns").

In sum, plaintiffs misconceive *Bruen*.  A nonsensical rule that protects a weapon because of how many exist would upend settled law, including the National Firearms Act.  It would allow manufacturers to avoid regulation by immediately flooding the market.  *Kolbe*, 849 F.3d at 141.

For the foregoing reasons, this Court should find that assault weapons and LCMs are not protected by the Second Amendment.

> ### ii.    The Regulation Of Assault Weapons (And LCMs) Is Analogous To Burdens Imposed Historically.

Even if a plaintiff meets that initial burden, the government may nonetheless "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.  And 1868 is not a cutoff.  *Heller I* instructs that "examination of a variety of legal and other sources to determine *the public understanding* of a legal text in the period *after* its enactment or ratification" is "a critical tool of constitutional interpretation."  554 U.S. at 605 (second emphasis added); *see also Bruen*, 142 S. Ct. at 2127-28 (quoting same).  In conducting this historical inquiry, "[c]ourts are … entitled to decide a case based on the historical record compiled by the parties."  *Id.* at 2130 n.6.

In *Bruen*, the Supreme Court explained that "history guide[s] our consideration of modern ['arms'] regulations that were unimaginable at the founding."  *Id.* at 2132.  "[C]ases implicating unprecedented societal concerns or dramatic technological changes," like the instant case, "may require a more nuanced approach."  *Id*.  Under *Bruen*, this Court's historical inquiry should be guided by "reasoning by analogy."  *Id.* at 2133.  *Bruen* does not require a historical "twin."  Rather, "analogical reasoning requires only …. a well-established and representative historical *analogue*."

*Id.* (cleaned up and emphasis in original). "[E]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*

"[W]hether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are '*relevantly similar.*'" *Bruen*, 142 S. Ct. at 2132 (emphasis added). *Bruen* identifies two "central" "metrics": "[1] whether modern and historical regulations impose a comparable burden on the right of armed self-defense and [2] whether that burden is comparably justified." *Id.* at 2133 (cleaned up).

With respect to the challenged Statutes, there are multiple "relevantly similar" analogues. As detailed in the accompanying expert declarations, American history is replete with regulations of arms viewed as presenting a particular threat to society from violence and crime.

**Clubs, Bludgeons, Bowie Knives.** Early in the Nation's history, firearms— technologically quite different from modern-day guns—were not seen as a concern for violence and crime. Spitzer Decl. ¶ 33. Single-shot muskets were complicated and time-consuming to load and fire. Sweeney Decl. ¶¶ 9-10; Spitzer Decl. ¶ 33. Single-shot pistols were unreliable and inaccurate. Spitzer Decl. ¶¶ 22, 33.

As such, concern with violent crime focused on more rudimentary weapons such as clubs, bludgeons, fighting knives, and slungshots. *Id.* ¶ 14-24. As violent crime began to surge in the early 1800s, states increasingly regulated these weapons. *Id.* ¶¶ 13-24. Indeed, various states enacted prohibitions on these weapons throughout the nineteenth century. *See id.* Ex. C.

A notable example is the Bowie knife. Popularized by the adventurer Jim Bowie in the notorious "Sandbar Duel" in 1827, the Bowie knife, along with similar long, thin-bladed knives, became a weapon used for fights and duels in the nineteenth century. Spitzer Decl. ¶¶ 21-22. Use of Bowie knives became widespread in homicides in the early nineteenth century, and state

governments reacted with anti-knife legislation.  *Id.* ¶¶ 23-24.  Between 1837 and 1925, twenty-nine states enacted laws to bar the concealed carry of Bowie knives and fifteen states categorically barred their carry outright.  *Id.* ¶ 31.

These laws are a historical analogue to the Statutes here.  In fact, many of the nineteenth-century laws prohibiting clubs, fighting knives, and slungshots were *more restrictive* than the Statutes, which are not blanket prohibitions.  That said, like the nineteenth-century laws, the Statutes impose a burden on the individual's ability to carry certain types of arms or accoutrements.  In the case of the nineteenth-century laws, that burden was directed at a concern with the threat of violence and crime associated with the weapons at issue.  So too here.  While assault weapons are of course many times *more* dangerous than clubs, bludgeons, Bowie knives, and the like, legislatures in early America repeatedly imposed restrictions and prohibitions on those weapons based on concerns with the threat of violence and criminality analogous to the Delaware General Assembly's modern-day concern with assault weapons.

**Revolver Pistols, Sword Canes, and Daggers.**  After the Civil War, revolver pistols entered the civilian market following years of increased wartime production.  Spitzer Decl. ¶ 45.  Their rise in circulation contributed to escalating interpersonal violence.  *Id.* ¶ 48.  Between 1865 and the end of the nineteenth century, many states enacted or strengthened laws targeting pistols, sword canes and daggers.  *See* Spitzer Decl. Exs. C & E.

These regulations burdened, to an extent, individuals' rights to armed self-defense.  But individuals could utilize other arms not viewed as presenting the same risk.  These regulations were thus in keeping with the Nation's history of regulating or banning certain categories of weapons to protect public safety.

**Machine guns.**  After World War I, the public availability of new weapons technologies in the form of submachine guns—notably the Tommy gun—was associated with a relatively small number of egregious mass shootings and homicides by gangsters and other criminals.  Spitzer Decl. ¶¶ 52, 58.   States reacted decisively with anti-machine gun laws; some states also passed laws restricting semi-automatic weapons.  *Id.* ¶¶ 59, 65.  Finally, in 1934, Congress enacted the National Firearms Act restricting and regulating civilian acquisition and circulation of machine guns.  *Id.* ¶ 61.  In addition, from 1917 to 1934 roughly half of the states enacted laws that restricted various ammunition feeding devices, or guns that could accommodate them, based on the number of rounds, ranging from one to eighteen rounds.  Spitzer Decl. ¶ 83, Table 1.

State and federal laws restricting fully automatic and semi-automatic weapons and ammunition feeding devices are another historical analogue to the Statutes.  The Supreme Court found "startling" the suggestion that the National Firearms Act's restriction on machine guns could violate the Second Amendment.  *Heller I*, 554 U.S. at 624; *see also One (1) Palmetto State Armory*, 822 F.3d at 142 (holding that "the Second Amendment does not protect the possession of machine guns").  That is because it is within this country's historical tradition to regulate and restrict particular arms based on a concern that they present threats of outsized harm.  Such regulations, of course, leave citizens free to defend themselves with arms that do not present the same concerns.  And with respect to LCMs, the early twentieth century analogue restricted ammunition feeding devices with less than the seventeen rounds at issue here.  Spitzer Decl. ¶ 83, Table 1.

Moreover, the concern the Statutes seek to *address*—the threat of inordinately violent crime caused by military weapons technologies—is "relevantly similar" to the dangers addressed by the government's restrictions in the early twentieth century on fully automatic weapons, semi-automatic weapons, and ammunition feeding devices.

36

**Short-barreled shotguns.**  The National Firearms Act of 1934 also regulated shotguns with a barrel less than 18 inches in length.  Spitzer Decl. ¶ 61.  Delaware also criminalizes possession of "sawed-off shotgun," defined in similar terms.  11 *Del. C.* § 1444(a)(4), (c)(3).  Shortening the barrel of a standard shotgun widens the spray of the fire, resulting in devastating effects at close range.  Spitzer Decl. ¶ 61.  In *United States v. Miller*, 307 U.S. 174, 178 (1939), the Supreme Court upheld the National Firearms Act's regulation of short-barreled shotguns, holding that they were not protected under the Second Amendment.  There is no question that short-barreled shotguns are "not eligible for Second Amendment protection." *Heller I*, 554 U.S. at 622.

***

Because the Nation's historical tradition of weapons regulation provides multiple "relevantly similar" analogues, plaintiffs' challenges under the United States Constitution fail.

### C.     Plaintiffs' Challenges Under The Delaware Constitution Fail.

Article I, Section 20 of the Delaware Constitution provides:  "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." DEL. CONST. art. I § 20.  In light of the facial differences between Section 20 and the Second Amendment, "the interpretation of Section 20 is not dependent upon the federal interpretations of the Second Amendment." *Doe*, 88 A.3d at 665.

"Although the right to bear arms under the Delaware Declaration of Rights is a fundamental right … it is not absolute." *Id.* at 667.  Indeed, "[t]he General Assembly that enacted Article I, Section 20 left in place a series of statutes affecting the right to keep and bear arms." *Id.* (citing 11 *Del. C.* §§ 1444 (prohibiting the possession of "a bomb, bombshell, firearm silencer, sawed-off shotgun, machine gun or any other firearm or weapon which is adaptable for use as a machine gun"), 1446A (prohibiting the possession of undetectable knives), 1448 (prohibiting the possession

and purchase of deadly weapons by persons prohibited), 1459 (prohibiting the possession of a weapon with an obliterated serial number)).  Likewise, "prior cases … found no legislative intent (for example) to invalidate laws prohibiting felons from possessing deadly weapons or prohibiting (with certain exceptions) the carrying of a concealed deadly weapon outside the home without a license."  *Id.* (citing *Smith v. State*, 882 A.2d 762, 2005 WL 2149410, at *3 (Del. Aug. 17, 2005) (Table); *Short v. State*, 586 A.2d 1203, 1991 WL 12101, at *1 (Del. Jan. 14, 1991) (Table)).

> **i.      The Court Should Review Plaintiffs' Delaware Constitutional Challenge Using Intermediate Scrutiny.**

In *Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632 (Del. 2017), the Delaware Supreme Court explained that intermediate scrutiny applies where the challenged statute does not act as a total ban on the right to keep and bear arms.  *Id.* at 654 ("We applied intermediate scrutiny in *Doe* because it *did not* involve a total ban[.]") (emphasis in original); *see also Doe*, 88 A.3d at 666-67 (similar).  This is true even when a statute "largely restrict[s] the fundamental right to bear arms" in certain contexts.  *Bridgeville*, 176 A.3d at 654.

The Statutes are not total bans.  There are numerous guns of all types, including handguns, shotguns, and long guns that are not covered by the Statutes.  Indeed, not even all semi-automatic weapons are covered.  Likewise, not all magazines are affected.  And even with respect to covered assault weapons and LCMs, exceptions permit individuals to continue to possess them.

As such, the Statutes are unlike the "total ban of possession of firearms … in Delaware's State Parks and Forests" at issue in *Bridgeville*.  176 A.3d at 652.  This fundamental difference means that the Statutes are subject to different standards of review.[35]

---

[35] Because Article I, § 20 does not need to "be interpreted coextensively with the Second Amendment," *Doe*, 88 A.3d at 665, there is no reason to believe that *Bruen* changed the test under the Delaware Constitution, particularly since federal courts "are not free to overrule existing state

Intermediate scrutiny is therefore the proper standard to analyze plaintiffs' claims.

>    **ii.    The Assault Weapon Statute Readily Survives Intermediate Scrutiny.**

"To survive intermediate scrutiny, governmental action must serve important governmental objectives and [be] substantially related to [the] achievement of those objectives. The governmental action cannot burden the right more than is reasonably necessary to ensure that the asserted governmental objective is met." *Doe*, 88 A.3d at 666-67 (internal quotation marks and citation omitted).

HB 450 serves a critical government objective: "ensur[ing] the safety of Delawareans." HB 450 at Preamble. The statute was passed in light of several findings, including that assault weapons "are exceptionally lethal weapons of war that have no place in civilian life," "have been used disproportionately to their ownership in mass shootings," and "have immense killing power which amplifies the deadly will of a person seeking to kill others." HB 450 at Preamble.

HB 450 is "substantially related to achieving those objectives." The affected assault weapons are very powerful, and the bullets they typically fire can cause greater harm both intentionally and inadvertently. *See supra* at 12, 21-23; Yurgealitis Decl. ¶¶ 83-84, 98. It is therefore not surprising that assault weapons have been used in many of the deadliest mass shootings. Allen Decl. ¶ 34; *see also supra* at 23.

Nor does HB 450 impose a greater burden than is reasonably necessary. *Bridgeville*, 176 A.3d at 656. Not only does the statute contain exceptions, but these weapons were not designed for, and have limited utility for, self-defense, hunting, and recreation. *See supra* at 17-20; HB 450

---

precedent or chart the future course of state law." *Kohr v. Raybestos-Manhattan, Inc.*, 552 F. Supp. 1070, 1072 (E.D. Pa. 1981).

at Preamble.[36]  *See also Worman v. Healey*, 922 F.3d 26, 37 (1st Cir. 2019) ("[S]emi-automatic assault weapons do not share the features that make handguns well suited to self-defense in the home.").  And numerous firearms remain available to serve all constitutionally protected purposes.  *See supra* at 20, 38.  *See generally Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) ("*Heller II*") (finding prohibition on semi-automatic rifles and LCMs valid under intermediate scrutiny because, among other things, it "does not effectively disarm individuals or substantially affect their ability to defend themselves.")

Indeed, many comparable statutes have been upheld under intermediate scrutiny.  Most notably, HB 450 is derived from the Maryland statute which was at issue in *Kolbe*.  *See* DSSA Br. at 15.  There, the Fourth Circuit, sitting *en banc*, affirmed the lower court's grant of summary judgment in favor of the state, finding that, if the Second Amendment applied, the statute was "reasonably adapted to a substantial governmental interest."  *Kolbe*, 849 F.3d at 138-41.

The Fourth Circuit's analysis is instructive.[37]  It first explained that the law was prompted by "Maryland's interest in the protection of its citizenry and the public safety," a "compelling" public interest.  *Kolbe*, 849 F.3d at 138-41.  The court also found the statute substantially related to achieving its stated objective.  The court noted that "the primary goal of the [law] is to reduce the availability of assault long guns and large-capacity magazines so that when a criminal acts, he does so with a less dangerous weapon and less severe consequences," and that "the State has shown

---

[36] The utility of assault weapons for hunting and recreation is only relevant to the analysis under the Delaware Constitution.  Plaintiffs cite no authority suggesting a right to bear arms for such purposes under the Second Amendment.  *See also, e.g.*, *Hunters United for Sunday Hunting v. Pa. Game Comm'n*, 28 F. Supp. 3d 340, 346 (M.D. Pa. 2014) (finding that Second Amendment protections do not extend to recreational hunting).

[37] The DSSA plaintiffs' claim that *Kolbe* was "reversed and remanded." DSSA Br. at 14-15.  While *Bruen* abrogated *Kolbe* and other federal cases applying intermediate scrutiny to analyze assault weapon and LCM bans in light of the new standard, that in no way suggests that the Fourth Circuit's analysis of the Maryland law under intermediate scrutiny was flawed.

all that is required: a reasonable, if not perfect, fit between the [statute] and Maryland's interest in protecting public safety." *Id.* at 140-41.

The Courts of Appeals for the First, Second, and District of Columbia Circuits have all found similar assault weapon statutes or ordinances constitutional under an intermediate scrutiny analysis. *See Worman*, 922 F.3d at 38-40; *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261-63 (2d Cir. 2015) ("*NYSRPA*"); *Heller II*, 670 F.3d at 1262-64. These courts all concluded the state had "substantial" "interests in public safety and crime prevention." *NYSRPA*, 804 F.3d at 261; *see also Worman*, 922 F.3d at 39 ("[F]ew interests are more central to a state government than protecting the safety and well-being of its citizens.") (citation omitted). Each court also found the challenged law "substantially related" to that important interest, relying upon the widespread evidence of the "unique dangers posed by the proscribed weapons." *Worman*, 922 F.3d at 39. For example, the District of Columbia Circuit noted that "it is difficult to draw meaningful distinctions between the AR-15 and the M-16," which *Heller II* suggested are "dangerous and unusual." *Heller II*, 670 F.3d at 1263; *see also NYSRPA*, 804 F.3d at 262 ("At least since the enactment of the federal assault-weapons ban, semi-automatic assault weapons have been understood to pose unusual risks. When used, these weapons tend to result in more numerous wounds, more serious wounds, and more victims. These weapons are disproportionately used in crime, and particularly in criminal mass shootings like the attack in Newtown. They are also disproportionately used to kill law enforcement officers."); *Worman*, 922 F.3d at 39-40 (similar).

### iii.   Even If LCMs Are "Arms," The LCM Statute Readily Survives Intermediate Scrutiny.

The LCM statute is also constitutional under an intermediate scrutiny analysis, for many of the same reasons. Like HB 450, the LCM statute promotes public safety. By reducing the number of shots that can be fired before a criminal needs to reload, the statute will reduce the effect

of crime, including reducing the number of fatalities in mass shootings.  *See supra* at 23-24; *see also* Allen Decl. ¶¶ 35-38.  And given the lack of need to be able to fire more than seventeen shots before reloading for defense, hunting or recreation, the statute does not unduly burden the rights of Delawareans.  *See supra* at 19-20; *cf. ANJRPC*, 910 F.3d at 118 ("The record here demonstrates that LCMs are not well-suited for self-defense."); *Duncan*, 19 F.4th at 1105 & n.4 ("Plaintiffs have not pointed to a single instance—in California or elsewhere, recently or ever—in which someone was unable to defend himself or herself due to the lack of a large-capacity magazine"); *id.* at 1104 ("Plaintiffs do not point to any evidence that a short pause after firing ten bullets during target practice or while hunting imposes any practical burden on those activities ….").  This is particularly true since citizens may possess magazines that hold up to seventeen rounds, and the Statute "imposes no limit on the number of firearms or magazines or amount of ammunition a person may lawfully possess."  *ANJRPC*, 910 F.3d at 122.

Numerous Courts of Appeals have upheld statutes banning magazines holding fewer rounds under an intermediate scrutiny analysis.  *See Worman*, 922 F.3d at 38-40; *ANJRPC*, 910 F.3d at 119-24; *Duncan*, 19 F.4th at 1108-11; *Kolbe*, 849 F.3d at 138-41; *NYSRPA*, 804 F.3d at 263-64; *Fyock v. Sunnyvale*, 779 F.3d 991, 1000-01 (9th Cir. 2015); *Heller II*, 670 F.3d at 1262-64.  In doing so, they have stressed the frequent use of LCMs in mass-shootings and that bans on LCMs "reduce[s] the number of shots fired and the resulting harm, [and] present[s] opportunities for victims to flee and bystanders to intervene."  *ANJRPC*, 910 F.3d at 119; *see also, e.g.*, *Kolbe*, 849 F.3d at 128 (noting ban "could mean the difference between life and death for many people"); *Duncan*, 19 F.4th at 1109-10 (detailing evidence that "[m]any mass shootings involve large-capacity magazines, and large-capacity magazines tragically exacerbate the harm caused by mass shootings"); *Heller II*, 670 F.3d at 1263-64 (explaining that the evidence, including testimony that

"the threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines," "demonstrates that large-capacity magazines tend to pose a danger to innocent people and particularly to police officers, which supports the District's claim that a ban on such magazines is likely to promote its important governmental interests"). And, because "[a]pproximately three-quarters of mass shooters possessed their weapons, as well as their large-capacity magazines, lawfully," restrictions on "the ability of potential mass shooters to possess those magazines legally … reasonably supports [the government's] effort to reduce the devastating harm caused by mass shootings." *Duncan*, 19 F.4th at 1110; *see also* Allen Decl. ¶ 41.

### iv. Even If The Court Applies Strict Scrutiny, Or The Test Articulated In *Bruen*, The Statutes Are Constitutional.

Even when examined under different standards, the Statutes are constitutional.

Per *Doe*, "[a] governmental action survives strict scrutiny … where the state demonstrates that the test is narrowly tailored to advance a compelling government interest." 88 A.3d at 666. Preserving public safety is a "compelling government interest," as many federal courts have recognized. *See supra* at 39-41. And, for the reasons discussed above, including the continuing availability of scores of other firearms (including handguns, shotguns, and long-guns (including other semi-automatic weapons)) and magazines with seventeen rounds or less, the lack of utility of assault weapons and LCMs for self-defense, hunting, and recreation, and the effectiveness of these restrictions in reducing violence and mass shootings, these limitations are narrowly tailored.

And even if the Court adopts the test articulated in *Bruen* for the analysis under Delaware's constitution, the Statutes are permissible for the reasons discussed above. *See supra* at 26-37.

### D.    Plaintiffs' Inapposite Authority Does Not Compel A Different Result.

None of the post-*Bruen* authority cited by plaintiffs supports the issuance of an injunction.

Only two decisions pertain to assault weapons or LCMs.  In one of those cases, the court granted an *ex parte* injunction and, as a result, had no evidence as to the historical tradition of regulation—"only the Ordinance itself."  *Rocky Mountain Gun Owners v. Town of Superior*, C.A. No. 22-cv-01685-RM, at 9 (D. Colo. July 22, 2022).  In the other case, the defendant was preparing for the preliminary injunction and did "not contest the motion."  *Rocky Mountain Gun Owners, N.A. v. Bd. of Cnty. Comm'rs*, 2022 WL 4098998, at *1 (D. Colo. Aug. 30, 2022).

*Rigby v. Jennings*, 2022 WL 4448220 (D. Del. Sept. 22, 2022), is equally unhelpful to plaintiffs.  For starters, this Court did not preliminarily enjoin the entirety of the statute at issue, which criminalized the possession, manufacture, and distribution of unserialized (*i.e.*, untraceable) firearms and unfinished firearm components.  In fact, this Court permitted the statute to remain in place as to the "distribution" of untraceable firearms and unfinished firearm components because, among other things, "significant federal statutes addressing" firearms sales "date back almost one hundred years."  *Id.* at *1, *6.  With respect to the portion that it did enjoin, the Court could not conclude that that the statute was "'consistent with the Nation's historical tradition of firearm regulation.'"  *Id.* at *8 (quoting *Bruen*, 142 S. Ct. at 2130).  As discussed above, that is not the case with the Statutes.  *See supra* at 33-37.[38]

---

[38] Plaintiffs also identify three one-paragraph orders remanding cases for further consideration in light of the new analytical framework, without any analysis.  DSSA Br. at 14.

Plaintiffs rely upon two orders partially enjoining a concealed carry statute that does not regulate assault weapons or LCMs.  *See Antonyuk v. Hochul*, 2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022); *Antonyuk v. Hochul*, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).  And after the Second Circuit stayed the preliminary injunction pending appeal, *Antonyuk v. Hochul*, 2022 WL 18228317 (2d Cir. Dec. 7, 2022), the Supreme Court declined to vacate that stay.  *See Antonyuk v. Nigrelli*, 143 S. Ct. 481 (Mem) (Jan. 11, 2023).

## II.      THE REMAINING FACTORS WEIGH HEAVILY AGAINST AN INJUNCTION.

### A.      Plaintiffs Have Not Established That They Will Suffer Irreparable Harm.

As a threshold matter, plaintiffs' delay in seeking a preliminary injunction undermines their claims of irreparable harm.  "[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction."  *Chestnut Hill Sound Inc. v. Apple Inc.*, 2015 WL 6870037, at *4 (D. Del. Nov. 6, 2015) (quoting *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1557 (Fed. Cir. 1995)).  Both plaintiffs waited more than four months after the Statutes became effective to seek a preliminary injunction.  Particularly given the shortcomings in plaintiffs' claims of irreparable injury, this weighs heavily against granting an injunction.

Plaintiffs claim that a deprivation of their Second Amendment rights constitutes *per se* irreparable harm.  DSSA Br. at 18; Gray Br. at 11.  But the Third Circuit has made clear that "[c]onstitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction."  *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989).  And neither the Supreme Court nor the Third Circuit has so held.  *See Or. Firearms Fed'n*, 2022 WL 17454829, at *18 (denying preliminary injunction in case challenging LCM regulation and noting the Supreme Court has never held that a deprivation of Second Amendment rights constitutes *per se* irreparable harm); *Walters v. Kemp*, 2020 WL 9073550, at *11 (N.D. Ga. May 5, 2020) ("[N]either the Eleventh Circuit nor the Supreme Court has held that the Second Amendment's protections are of the sort that, when violated, trigger a presumption of irreparable harm.").

Plaintiffs' remaining claims fare no better.  "A plaintiff must demonstrate a likelihood—not just a possibility—of irreparable harm in the absence of an injunction."  *GOLO, LLC v. Goli*

---

Plaintiffs' reliance upon *Frein v. Pennsylvania State Police*, 47 F. 4th 247 (3d Cir. Aug. 30, 2022), is equally misplaced, as that concerned a Takings claim under the Fifth Amendment.

*Nutrition Inc.*, 2020 WL 5203601, at *13 (D. Del. Sept. 1, 2020).   To do so, plaintiffs must demonstrate that any injury "cannot adequately be compensated by monetary damages."  *Id.*

Plaintiffs claim the Statutes are irreparably harming them by (i) preventing them from buying assault weapons and LCMs for "self-defense and other lawful purposes" (Clements Decl. ¶¶ 11, 13; Hague Decl. ¶¶ 9, 14; Taylor Decl. ¶ 8), and (ii) restricting their ability to sell assault weapons and LCMs (Hague Decl. ¶¶ 12–13, 17–18; DJJAMS Decl. ¶¶ 8-9).  Both arguments fail.

Any injury resulting from plaintiffs' inability to purchase covered assault weapons or LCMs while this case is pending is too remote to constitute irreparable harm.  Of the three plaintiffs that have claimed this alleged injury (Clements, Hague, and Taylor), two own assault weapons and LCMs (Clements Decl. ¶¶10, 12; and Hague ¶¶ 8, 14), and the third is a gun-owner applying for concealed carry permits in Maryland and Delaware (Taylor Decl. ¶ 5).  And these plaintiffs never explain how the firearms and magazines they own, along with other available options, are inadequate for "self-defense and other lawful purposes" pending resolution of this case.  *See Or. Firearms Fed'n*, 2022 WL 17454829, at *19 ("Plaintiffs provide no evidence … to show that the firearms available to Plaintiffs under Measure 114 would be so ineffective for use in self-defense as to constitute immediate and irreparable harm.").

This is particularly true in light of the evidence that assault weapons are poorly suited for self-defense purposes, and the average number of shots fired in self-defense situations is 2.2.  *See supra* at 19.  Plaintiffs' claims thus reduce to a speculative claim that is insufficient to constitute irreparable harm.  *See, e.g., Or. Firearms Fed'n*, 2022 WL 17454829, at *18 (plaintiffs failed to show LCM regulations imposed "non-speculative, immediate risk of irreparable harm"); *Fitz v. Rosenblum*, 2022 WL 17480937, at *2 (D. Or. Dec. 6, 2022) (similar).

Likewise, the economic injuries plaintiffs allege are not irreparable.  As an initial matter, the Third Circuit has stated that "[w]e know of no court, modern or otherwise, to hold that the Second Amendment secures a standalone right to *sell* guns."  *Drummond v. Robinson Twp.*, 9 F.4th 217, 230 (3d Cir. 2021) (emphasis in original).  And in any event, because the "loss of customers" is "a purely economic harm that can be adequately compensated with a monetary award following adjudication on the merits," *Checker Cab of Phila. Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016), it is not irreparable.

### B.      The Balance Of The Equities And Public Policy Disfavor An Injunction.

The balance of the equities and public policy "merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs claim, without explanation, that defendants will suffer "little harm in the event that preliminary injunctive relief is granted."  Gray Br. at 12.  To the contrary, the Supreme Court has made clear that "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."  *Md. v. King*, 567 U.S. 1301, 1303 (2012) (citation omitted).  Here, that harm is undermining public safety, as an injunction will allow even greater proliferation of these dangerous arms and accessories.  *See Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1193-94 (E.D. Cal. 2015) (denying preliminary injunction and noting that where potential harm involved gun violence, that "the implications of being mistaken in this case indicate it is in the public interest to deny the injunction, and the balance of the equities tips in the Government's favor."), *aff'd*, 637 F. App'x 401 (9th Cir. 2016).

As a result, these factors favor denying plaintiffs' requests for preliminary relief.

## III.    ENTRY OF A PERMANENT INJUNCTION IS INAPPROPRIATE.

The Gray plaintiffs, but not the DSSA plaintiffs, ask the Court to enter a permanent injunction, contending that "the claims in this case require not further factual development" and do not "turn on disputed facts." Gray Br. at 12.  This request should be denied.

"[T]he Supreme Court has held that 'it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.'"  *Anderson v. Davila*, 125 F.3d 148, 157 (3d Cir. 1997) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  This case requires substantial factual development. As discussed above, the standard set forth in *Bruen* involves fact-intensive inquiries which will require fact and expert evidence.  Indeed, Defendants have submitted five declarations from expert witnesses previewing the evidence that they will submit more fully at trial.

Nor does Federal Rule of Civil Procedure 65(a)(2) permit such relief under these circumstances.  Not only has the requisite notice not been provided, but parties must have an opportunity to present all their evidence in connection with the injunction.  *Anderson*, 125 F.3d at 157-58 (3d Cir. 1997).  Beyond the evidence that defendants intend to develop through discovery, much of their experts' work is still ongoing, defendants are considering additional witnesses for trial, and it seems unlikely that all of their current experts could testify fully in the one day allocated for the upcoming hearing.  As such, defendants cannot present all of their evidence at the upcoming preliminary injunction hearing.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully submit that plaintiffs' motion for a preliminary injunction should be denied.

| ROSS ARONSTAM & MORITZ LLP | STATE OF DELAWARE DEPARTMENT OF JUSTICE |
|---|---|
| */s/ David E. Ross* | */s/ Kenneth L. Wan* |
| David E. Ross (#5228) | Kenneth L. Wan (#5667) |
| Bradley R. Aronstam (#5129) | Caneel Radinson-Blasucci (#6574) |
| Garrett B. Moritz (#5646) | Deputy Attorneys General |
| S. Reiko Rogozen (#6695) | Carvel State Office Building |
| Roger S. Stronach (#6208) | 820 N. French Street, 6th Floor |
| Holly Newell (#6687) | Wilmington, DE 19801 |
| Elizabeth M. Taylor (#6468) | (302) 577-8400 |
| Thomas C. Mandracchia (#6858) | kenneth.wan@delaware.gov |
| 1313 North Market Street, Suite 1001 | caneel.radinson-blasucci@delaware.gov |
| Wilmington, DE 19801 | |
| (302) 576-1600 | |
| dross@ramllp.com | |
| baronstam@ramllp.com | |
| gmoritz@ramllp.com | |
| rrogozen@ramllp.com | |
| rstronach@ramllp.com | |
| hnewell@ramllp.com | |
| etaylor@ramllp.com | |
| tmandracchia@ramllp.com | |

*Attorneys for Defendants*

Dated:  January 31, 2023

49