**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC; BRIDGEVILLE RIFLE & PISTOL CLUB, LTD.; DELAWARE RIFLE AND PISTOL CLUB; DELAWARE ASSOCIATION OF FEDERAL FIREARMS LICENSEES; MADONNA M. NEDZA; CECIL CURTIS CLEMENTS; JAMES E. HOSFELT, JR; BRUCE C. SMITH; VICKIE LYNN PRICKETT; and FRANK M. NEDZA, | ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; NATHANIAL MCQUEEN JR. in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and COL. MELISSA ZEBLEY in her official capacity as superintendent of the Delaware State Police, | ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |
| GABRIEL GRAY; WILLIAM TAYLOR; DJJAMS LLC; FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| KATHY JENNINGS, Attorney General of Delaware, | ) ) ) |
| Defendant. | ) |

C.A. No. 1:22-cv-00951-RGA
(Consolidated)

## DECLARATION OF ROBERT J. SPITZER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

I, Robert J. Spitzer, the undersigned, declare as follows:

1.      I have been asked to render an opinion on the history of firearms and firearm accessory restrictions, including those enacted in the early twentieth century, addressing machine guns (fully automatic firearms), semiautomatic firearms, and ammunition feeding devices, and tracing weapons regulations back to earlier hardware and use restrictions on other types of weapons enacted in the nineteenth century and earlier.

2.      This declaration is based on my own personal knowledge, research, and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

3.      I have been retained by the Delaware Department of Justice to render expert opinions in this case.  I am being compensated at a rate of $500 per hour.

**BACKGROUND AND QUALIFICATIONS**

4.      I am a Distinguished Service Professor of Political Science Emeritus at the State University of New York at Cortland.  I was also a visiting professor at Cornell University for thirty years.  I earned my Ph.D. in Government from Cornell University.  I reside in Williamsburg, Virginia.  A copy of my curriculum vitae is attached to this Declaration.

5.      I have been studying, teaching, and writing about gun policy for over thirty years. My first publication on the subject appeared in 1985.  Since then, I have published six books and over one hundred articles, papers, and essays on gun policy.  My expertise includes the history of gun laws, gun policy in American politics, and related historical, legal, political, and criminological issues.  My book, *The Politics of Gun Control,* has been in print since its initial publication in 1995.  It examines firearms policy in the United States through the lenses of history, law, politics, and criminology.  The eighth edition of the book was published in 2021 by Routledge Publishers.  My two most recent books on gun policy, *Guns across America* (Oxford University Press, 2015) and *The Gun Dilemma* (Oxford University Press, 2023), both deal extensively with the study of historical gun laws.  I am frequently interviewed and quoted in the national and

international media on gun-related matters.  For over twenty years, I have been a member of the National Rifle Association and of Brady (formerly, the Brady Campaign to Prevent Gun Violence).

6.  I have provided written testimony as an expert witness in *Worman v. Healey*, No. 1:17-10107-WGY (D. Mass.), which concerned the constitutionality of Massachusetts' restrictions on assault weapons, *Hanson v. District of Columbia*, Civil Action No. 1:22-cv-02256-RC (D.D.C.), which concerned the constitutionality of large capacity magazine restrictions enacted by the District of Columbia, *Brumback v. Ferguson*, No. 22-cv-3093 (E.D. Wash.), which concerned the constitutionality of large capacity magazine restrictions enacted by the State of Washington, and *National Association for Gun Rights v. City of Highland Park*, No. 1:22-cv-04774 (N.D. Ill.), which concerned the constitutionality of assault weapons and large capacity magazine restrictions enacted by the City of Highland Park, Illinois.  I have also been invited to submit written testimony and serve as an expert witness in the following cases:  *Sullivan v. Ferguson*; *Miller v. Bonta*, No. No. 3:19-cv-1537 (S.D. Cal.); *Duncan v. Bonta*, No. 17-cv-1017 (S.D. Cal.); *Fouts v. Bonta*; *Rupp v. Bonta*; *Gates et al. v. Polis; Oakland Tactical Supply LLC v. Howell Township*, Case No.: 18-cv-13443; *State v. Misch*, No. 173-2-19 Bncr (Bennington County Criminal Case) in Vermont Superior Court; *National Association for Gun Rights & Capen v. Healey*, U.S. District Court No. 22-cv-11431-FDS; *Abbott et al. v. Connor*, Civil Action No. 20-00360 (RT), U.S. District Court District of Hawaii; *National Association for Gun Rights v. Shikada*, U.S. District Court District of Hawaii, CIVIL DOCKET FOR CASE #: 1:22-cv-00404-DKW-RT; *Santucci v. Honolulu*, U.S. District Court District of Hawaii, CIVIL DOCKET FOR CASE #: 1:22-cv-00142-DKW-KJM; *Yukutake v. Shikada*, U.S. District Court District of Hawaii, CIVIL DOCKET FOR CASE #: 1:22-cv-00323-JAO-KJM; *Nat'l Ass'n for Gun Rights v. Lopez*, Civil No. 1:22-CV-00404-DKW-RT, *Abbot v. Lopez*, Civil No. 20-00360 RT; *Santucci v. City & County of Honolulu*, Civil No. 1:22-cv-00142-DKW-KJM; *Yukutake v. Lopez*, Civil No. 1:22-cv-00323-JAO-KJM.   I have co-authored amicus briefs in numerous cases, including *Nordyke v. King*, U.S. Court of Appeals, Ninth Circuit, 319 F.3d 1185 (2003); *Republic of Iraq et al. v. Beaty et al.,* U.S. Supreme Court, 556 U.S. 848 (2009); *McDonald v. Chicago*, U.S. Supreme Court, 561 U.S. 742 (2010); *Ezell v.*

2

*Chicago,* U.S. Court of Appeals for the Seventh Circuit, 651 F.3d 684 (2011); and *People of the State of Illinois v. Aguilar,* Illinois Supreme Court, No. 08 CR 12069 (2012).

7.     I have also presented written testimony to the U.S. Congress on "The Second Amendment: A Source of Individual Rights?" submitted to the Judiciary Committee, Subcommittee on the Constitution, Federalism, and Property Rights, U.S. Senate, Washington, D.C., September 23, 1998; "Perspectives on the 'Stand Your Ground' Movement," submitted to the Judiciary Committee, Subcommittee on the Constitution, Civil Rights and Human Rights, U.S. Senate, Washington, D.C., October 29, 2013; and "The Hearing Protection Act to Deregulate Gun Silencers," submitted to Committee on Natural Resources, Subcommittee on Federal Lands, the U.S. House of Representatives, Hearings on the Sportsmen's Heritage and Recreational Enhancement Act (SHARE Act), Washington, D.C., September 12, 2017.

**SUMMARY OF OPINIONS**

8.     Gun ownership is as old as America, but so are gun laws. From the 1600s through the early twentieth century, the colonies, states and localities enacted literally thousands of gun laws of every imaginable variety. As detailed below, an historical relationship exists between the development of new weapons technologies, their spread into society, and regulation by the government.  Such regulation is a part of a centuries-long effort to promote public safety, protect the public from harm, and limit weapons-related criminality and violence. The pattern of criminal violence and concerns for public safety leading to weapons restrictions, as seen in contemporary restrictions on assault weapons and large capacity magazines, is not new; in fact, it can be traced throughout the Nation's history.

9.     I examine a number of specific examples of weapons that, when they were invented or developed and then made their way into civil society, were subject to governmental restriction. The cases examined here include: the Bowie knife and similar long-bladed fighting knives; various clubs and other blunt weapons; pistols; trap guns; early multi-shot firearms technologies; fully automatic (most famously the Tommy gun) and semi-automatic firearms; relevant recent

3

developments in firearms regulations; regulation of accessories like detachable ammunition feeding devices; and the lessons of these cases.

10.     Throughout American history, firearms and accessories, along with other dangerous weapons, were subject to remarkably strict and wide-ranging regulation when they entered society, proliferated, and resulted in violence, harm, or contributed to criminality.  This historical record is particularly notable given that in the eighteenth and nineteenth centuries, the United States was an evolving and developing nation-state that could not claim to have reached maturity until the twentieth century.  The historical record summarized here makes clear that contemporary restrictions among the states pertaining to assault weapons and large capacity ammunition magazines are merely the latest iteration of a centuries-long tradition of weapons regulations and restrictions.

## I.     INTRODUCTION

11.     The current controversy surrounding legislative efforts to restrict semi-automatic assault weapons and large capacity magazines is not a purely contemporary matter in response to the modern phenomenon of mass shootings.  The initial effort to restrict such weapons was sparked in part by a shooting at an elementary school in Stockton, California in 1989, when a man armed with an AK-47 and a handgun killed five children and wounded thirty-three others.  Later that year, California enacted the first assault weapons ban in the country.  Five years later, Congress enacted a ten-year ban.[1]  As of this writing, nine states plus the District of Columbia have similar bans in place, as do various localities around the country.[2]  These jurisdictions represent

---

[1]     Robert J. Spitzer, *The Politics of Gun Control*, 8th ed. (NY: Routledge, 2021), 25-26, 205-11.

[2]     Giffords Law Center, Assault Weapons, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/; Robert J. Spitzer, *The Gun Dilemma* (NY: Oxford University Press, 2023), 14-15.  The ten American jurisdictions with assault weapons bans are: California, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, and New York.  Delaware enacted its assault weapons and large-capacity magazine restrictions in June 2022.  *See* Governor Carney Signs Package of Gun Safety Legislation (June 30, 2022), https://news.delaware.gov/2022/06/30/governor-carney-signs-package-of-gun-safety-legislation/.  Illinois enacted its law in early 2023: C. Mandler, "Illinois

4

approximately 101 million people, or approximately 30.3% of the U.S. population.[3]   Fourteen states plus the District of Columbia restrict large capacity magazines (LCMs).[4]   These jurisdictions represent more than 115 million individuals, or approximately 34.5% of the U.S. population.[5]

12.     These recent efforts to restrict assault weapons and LCMs are simply the latest chapter in a centuries-long effort to protect the public from harm, promote public safety, and dampen weapons-related criminality.  The pattern of criminal violence and concerns for public safety leading to weapons restrictions is not new; in fact, it can be traced back to the Nation's beginnings.  While the particular weapons technologies and public safety threats have changed over time, governmental responses to the dangers posed by certain weapons have remained constant.  Current restrictions on assault weapons and detachable ammunition magazines are historically grounded in a pattern of America's legislative restrictions on particular weapons stretching back centuries.

---

governor signs ban on assault weapons and high-capacity magazines," *CBS News,* January 10, 2023, https://www.cbsnews.com/news/illinois-governor-signs-ban-on-assault-weapons-and-high-capacity-magazines/.

[3]     See U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates).  The total population in these jurisdictions is estimated to be about 101,000,000 out of a U.S. total of 333,000,000.

[4]     Giffords Law Center, Large Capacity Magazines, https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/; Spitzer, *The Gun Dilemma*, 30.  The fifteen jurisdictions are California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.  With three exceptions (Colorado, Delaware, and Vermont), all of these restrictions impose a ten-round limit on magazines, as did the 1994 federal law. Hawaii's restrictions apply to only handguns. Oregon voters approved by referendum a ten-round LCM limit in November 2022, but that law is under court challenge: Jonathan Levinson, "Oregon's new gun laws remain blocked, won't go into effect early Thursday," *Oregon Public Broadcasting,* December 7, 2022, https://www.opb.org/article/2022/12/07/oregon-measure-114-new-gun-laws-remain-blocked-court-challenges/

[5]     U.S. Census, National Population Totals and Components of Change: 2020-2022, https://www.census.gov/data/tables/time-series/demo/popest/2020s-national-total.html#par_textimage_2011805803 (2022 state population estimates).  The total population in these jurisdictions is estimated to be 115,000,000 out of a U.S. total of 333,000,000.

## II.   HISTORICAL RESTRICTIONS ON BLUNT WEAPONS, KNIVES, PISTOLS, AND TRAP GUNS IN THE EIGHTEENTH AND NINETEENTH CENTURIES

13.     As discussed later in this document, serious interpersonal violence became more widespread in the U.S. in the early 1800s.  But specific crime-related concerns that involved dangerous weapons led to legislative enactments in the late 1700s and early 1800s.  For example, from 1780-1809, at least four states (Connecticut, Ohio, New Jersey, Maryland) enacted measures that increased the penalties for burglaries or other crimes if the perpetrators were armed.[6]  At least three states (New York, Ohio, Maryland) enacted laws to punish the discharge of firearms near populated areas.[7]  At least four states (Virginia, Massachusetts, North Carolina, Tennessee) criminalized public arms carrying.[8]  In all, at least nine states acted legislatively up to 1809, representing a majority of the seventeen states that had joined the Union as of that year.[9]

---

[6]     1783 Conn. Acts 633, An Act For The Punishment of Burglary And Robbery; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; Charles Nettleton, Laws of the State of New-Jersey Page 474, Image 501 (1821) available at The Making of Modern Law: Primary Sources. 1799 [An Act to Describe, Apprehend and Punish Disorderly Persons (1799)], § 2; The Laws Of Maryland, With The Charter, The Bill Of Rights, The Constitution Of The State, And Its Alterations, The Declaration Of Independence, And The Constitution Of The United States, And Its Amendments Page 465, Image 466 (1811) available at The Making of Modern Law: Primary Sources, 1809.

[7]     James Kent, Laws of the State of New-York Page 41-42, Image 44-45 (Vol. 1, 1802-1812) available at The Making of Modern Law: Primary Sources, 1785; An Act of April 22, 1785, An Act to Prevent the Firing of Guns and Other Fire-Arms within this State, on certain days therein mentioned; 1788-1801 Ohio Laws 42, An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4. 1788; 1792 Md. Laws 22, A Supplement To An Act Entitled, An Act to Improve and Repair the Streets in Elizabethtown, in Washington County, and For Other Purposes Therein Mentioned, chap. 52, § 4.

[8]     1786 Va. Laws 33, ch. 21, An Act forbidding and punishing Affrays; 1786 Mass. Sess. Laws An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof; Francois Xavier Martin, A Collection of Statutes of the Parliament of England in Force in the State of North Carolina, 60-61 (Newbern 1792); Judge Edward Scott, Laws of the State of Tennessee: Including Those of North Carolina Now in Force in this State: From the Year 1715 to the Year 1820, Inclusive Page 710, Image 714 (Vol. 1, 1821) The Making of Modern Law: Primary Sources. 1801, An Act for the Restraint of Idle and Disorderly Persons § 6.

[9]     https://www.sos.arkansas.gov/education/arkansas-history/history-of-the-flag/order-of-

### A.     Historical Restrictions on Clubs and Other Blunt Weapons

14.     Among the most widely and ubiquitously regulated weapons in U.S. history are clubs and other blunt weapons. (See Exhibits C and E.)  Most laws regulating such weapons were anti-carry laws, which also generally encompassed pistols and specific types of knives, although some of the laws extended prohibitions to these weapons' manufacture, possession, sale, or use in crime.[10]  As the table in Exhibit C shows, at least five distinct types of clubs and blunt objects were regulated in the United States.  Notably, every state in the nation had laws restricting one or more types of clubs.  According to a detailed reference book on the subject of these blunt instruments by Robert Escobar, they were considered "objectionable objects, once feared but now forgotten."[11] Escobar provides what he calls "a family history" of these blunt weapons, but added that "[i]t's a disreputable family to say the least, black sheep even within the study of weaponry."[12]  They have been described as "wicked, cowardly, 'Soaked in blood and cured in whiskey.'"[13]  Those who carried them (excluding police) "were called vicious, devils and lurking highwaymen."[14]  These club-type blunt objects compose a family of objects used for striking others, and while they vary in name and construction, the categories are "somewhat fluid."[15]

15.     Among the six types of clubs regulated in U.S. laws, 15 states barred bludgeon carrying.  A bludgeon is a short stick with a thickened or weighted end used as a weapon.[16]  The earliest state anti-bludgeon law was in 1799; 12 such state laws were enacted in the 1700s and 1800s, and 4 in the early 1900s (as with each of these chronological categories, the state law total

---

states-admission

[10]     E.g. see 1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695.

[11]     Robert Escobar, Saps, Blackjacks and Slungshots: A History of Forgotten Weapons (Columbus, OH: Gatekeeper Press, 2018), 1.

[12]     Escobar, Saps, Blackjacks and Slungshots, 2.

[13]     Escobar, Saps, Blackjacks and Slungshots, 2.

[14]     Escobar, Saps, Blackjacks and Slungshots, 2.

[15]     Escobar, Saps, Blackjacks and Slungshots, 1.

[16]     https://www.merriam-webster.com/dictionary/bludgeon.

exceeds the total number of states because some states enacted the same or similar laws in multiple centuries).

16.     A billy (sometimes spelled billie) club is a heavy, hand-held rigid club,[17] usually made of wood, plastic, or metal,[18] that is traditionally carried by police, often called a nightstick or baton.[19]  Escobar cites an early reference to the billy club in an 1854 New Orleans newspaper article in the *Daily True Delta* that referred to "police armed with batons,"[20] a synonym for a billy club.  As this reference suggests, police have long adopted the billy club, or similar striking implements, as part of their on-duty weaponry.  At least 16 states had anti-billy club laws, totaling 44 laws; the earliest law appears to have been enacted in Kansas in 1862,[21] followed by a New York law in 1866.[22]  Fourteen states enacted such laws in the 1800s; 11 states did so in the early 1900s.

---

[17]     Some versions were made to have some flexibility to increase their striking power. See Escobar, *Saps, Blackjacks and Slungshots*, 118-19.

[18]     https://www.merriam-webster.com/dictionary/billy%20club.  Escobar discusses a Civil War veteran and later police officer, Edward D. Bean, who experimented with various types of billy clubs to improve their striking power and durability by utilizing leather, often adhered to wood, to reduce the likelihood that the club would break on use. *Saps, Blackjacks and Slungshots*, 118. One of the earliest references to a "billy" was an 1857 newspaper article describing "an indiscriminate attack with slung-shot, billies, clubs, &c."  "Local Intelligence," *Delaware Republican*, June 15, 1857, https://bit.ly/3V9nVO7.

[19]     Escobar, *Saps, Blackjacks and Slungshots,* 2, 69-70, 105, 113-30.

[20]     Escobar, Saps, Blackjacks and Slungshots, 105.

[21]     C. B. Pierce, Charter and Ordinances of the City of Leavenworth, with an Appendix Page 45, Image 45 (1863) available at The Making of Modern Law: Primary Sources, 1862.

[22]     Montgomery Hunt Throop, The Revised Statutes of the State of New York; As Altered by Subsequent Legislation; Together with the Other Statutory Provisions of a General and Permanent Nature Now in Force, Passed from the Year 1778 to the Close of the Session of the Legislature of 1881, Arranged in Connection with the Same or kindred Subjects in the Revised Statutes; To Which are Added References to Judicial Decisions upon the Provisions Contained in the Text, Explanatory Notes, and a Full and Complete index Page 2512, Image 677 (Vol. 3, 1882) available at The Making of Modern Law: Primary Sources, 1866.

17.    At least 13 states barred the carrying of "clubs" more generically, without specifying the type.  The oldest anti-club law was 1664; 7 states enacted these laws in the 1600s-1700s, 7 states in the 1800s, and 2 in the early 1900s.

18.    Anti-slungshot laws were enacted by 43 states, with 79 laws enacted in the 1800s and 12 in the 1900s.  A slungshot (or slung shot), also referred to as "a type of blackjack,"[23] is a hand-held weapon for striking that has a piece of metal or stone at one end attached to a flexible strap or handle that was developed roughly in the 1840s (the first "known use" of slungshot was 1842[24]).  By one account, "[s]lungshots were widely used by criminals and street gang members in the 19th Century.  They had the advantage of being easy to make, silent, and very effective, particularly against an unsuspecting opponent.  This gave them a dubious reputation, similar to that carried by switchblade knives in the 1950s, and they were outlawed in many jurisdictions. The use as a criminal weapon continued at least up until the early 1920s."[25]  Escobar concurs that slungshots and blackjacks "were a regular part of criminal weaponry. . .and gangsters could be merciless in their use."[26]

19.    These weapons were viewed as especially dangerous or harmful when they emerged in society, given the ubiquity of state laws against carrying them enacted after their invention and their use by criminals and as fighting implements.  These devices were invented and appeared in society during an identifiable period of time in the mid-nineteenth century, sparking subsequent wide-ranging prohibitions.  The earliest anti-slungshot law was enacted in 1850.  43 states legislated against them in the 1800s (including the District of Columbia), and 11 states in the early 1900s (note this incorporates multiple laws enacted in more than one century by a few states).

---

[23]    Escobar, Saps, Blackjacks and Slungshots, 228.

[24]    See  https://www.merriam-webster.com/dictionary/slungshot Escobar agrees with this rough date. See *Saps, Blackjacks and Slungshots*, 67.

[25]    "Slungshot," https://military-history.fandom.com/wiki/Slungshot.

[26]    Escobar, Saps, Blackjacks and Slungshots, 86.

20.     Sandbags, also known as sand clubs, were also a specific focus in anti-carry laws as well.  Consisting of nothing more than sand poured into a bag, sack, sock, or similar tube-shaped fabric (although the weight could also be something dense and heavy, like a lock in the end of a sock),[27] their particular appeal was that they could be dispensed with by simply pouring the sand out, leaving nothing more than an empty cloth bag.  (Alternately, they could be made heavier by adding water to the sand.)  The first anti-sandbag law was enacted in 1866, with 10 total states enacting such laws—7 in the 1800s and 7 in the early 1900s. Only 4 states did not have any prohibitions in any of these six categories, but 3 of those 4 (Montana, Ohio, and Washington State) had blanket legislative provisions against the carrying of any concealed/dangerous/deadly weapons.  One state, New Hampshire, may not have enacted such a law during this time but did at some point.[28]

**B.     Historical Restrictions on the Bowie Knife and Similar Long-Bladed Knives**

21.     The Bowie knife is generally credited with having been invented by Rezin Bowie, the brother of adventurer Jim Bowie.  The knife was named after Jim Bowie, who reputedly killed one man and wounded another using a "big knife" given to him by Rezin in the alternately

---

[27]     https://www.ferrislawnv.com/criminal-defense/weapons-offenses/dangerous-weapons/; Escobar, *Saps, Blackjacks and Slungshots*, 20-22. Escobar dates the earliest reference to sandbags as weapons to the 1600s (22).

[28]     Up until 2010, New Hampshire had this law on the books: "159:16 Carrying or Selling Weapons.  Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state."  In 2010, the law was amended when it enacted HB 1665 to exclude stilettos, switch knives, daggers, and dirk-knives.  Compare N.H. Rev. Stat. § 159:16 with 2010 New Hampshire Laws Ch. 67 (H.B. 1665).

notorious or celebrated "Sandbar Duel" in 1827.[29]  This fight, by itself, "received nationwide attention," helping spread Bowie's reputation and that of the knife he used.[30]

    22.    The "Bowie knife" rapidly became known beginning in the 1830s for the distinctive type of long-bladed and usually single-edged knife with a hand guard identified with Bowie, the man after whom the knife was named. While Bowie knives initially "came in a variety of forms— with or without guards, with differently shaped blades," they eventually became more standardized as "a large knife with a cross guard and a blade with a clipped point."[31]  The distinctive traits of the Bowie knife are revealed in Robert Abels' book, *Bowie Knives*, which includes pictures of nearly one hundred such knives made between 1835 and 1890.[32]  The Bowie legend, the explosive growth and spread of Bowie-related mythology (only magnified by his death at the Alamo in 1836), and the knife's distinctive features, encouraged its proliferation,[33] referred to by one historian as "the craze for the knives."[34]  As was true of other knives with long, thin blades,[35] they were widely used in fights and duels, especially at a time when single-shot pistols were often

---

[29]    "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/; William C. Davis, *Three Roads to the Alamo* (NY: HarperCollins, 1998), 207-8.  Davis persuasively dismisses the claim of a blacksmith, James Black, that he invented or styled the distinctive knife for Rezin Bowie (676–77), though he played a role in making the knife. David Kopel says, erroneously, that "Jim Bowie used a traditional knife at a famous 'sandbar fight' on the lower Mississippi River in 1827." Rezin Bowie had just developed the distinctive knife his brother used in the fight, so it could not have been "traditional." David Kopel, "Bowie knife statutes 1837-1899," *The Volokh Conspiracy*, November 20, 2022, https://reason.com/volokh/2022/11/20/bowie-knife-statutes-1837-1899/

[30]    Paul Kirschner, *Bowie Knife Fights, Fighters, and Fighting Techniques* (Boulder, CO: Paladin Press, 2010), 8.

[31]    "Bowie Knife," *Encyclopedia of Arkansas*, n.d., https://encyclopediaofarkansas.net/ entries/bowie-knife-2738/.

[32]    Robert Abels, *Bowie Knives* (NY: Abels, 1979).

[33]    Virgil E. Baugh, *Rendezvous at the Alamo* (Lincoln, NE: University of Nebraska Press, 1985), 39–63.

[34]    Davis, Three Roads to the Alamo, 583.

[35]    Other such long-bladed, thin knives of varying configurations typically named in laws barring their carrying included the Arkansas toothpick, the Spanish stiletto, dirks, daggers, and the like.

unreliable and inaccurate.[36]   Indeed, such knives were known as "fighting knives"[37] that were "intended for combat."[38]  In the early nineteenth century "guns and knives accounted for a growing share of the known weapons that whites used to kill whites."[39]  In 1834, for example, a grand jury in Jasper County, Georgia deplored

> the practice which is common amongst us with the young the middle aged and the aged to arm themselves with Pistols, dirks knives sticks & spears under the specious pretence of protecting themselves against insult, when in fact being so armed they frequently insult others with impunity, or if resistance is made the pistol dirk or club is immediately resorted to, hence we so often hear of the stabbing shooting & murdering so many of our citizens.[40]

23.    Homicide rates increased in the South in the early nineteenth century, as did laws restricting concealed weapons carrying.   Dueling also persisted during this time, even as the practice was widely outlawed and deplored by religious and other groups, in newspapers, by anti-dueling societies and political leaders.[41]  Bowie knife writer Norm Flayderman provides abundant and prolific evidence of the early criminal use of Bowie knives (including but not limited to duels) in the 1830s, quoting from dozens of contemporaneous newspapers and other accounts, and referencing hundreds of additional articles and accounts attesting to the widespread use of Bowie knives in fights, duels, brawls and other criminal activities.[42]  Flayderman concludes that, as early

---

[36]     Davis, *Three Roads to the Alamo*, 164, 208; Baugh, *Rendezvous at the Alamo*, 42; Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," *Oldwest*, n.d., https://www.oldwest.org/bowie-knife-history/; Norm Flayderman, *The Bowie Knife* (Lincoln, RI: Andrew Mowbray, 2004), 485.

[37]     Randolph Roth, *American Homicide* (Cambridge, MA: Belknap Press, 2012), 218.

[38]     Flayderman, *The Bowie Knife*, 59.

[39]     Roth, American Homicide, 218.

[40]     Quoted in Roth, *American Homicide*, 218–19.

[41]     Baugh, Rendezvous at the Alamo, 51.

[42]     Flayderman, *The Bowie Knife*, 25–64; 495–502.

as 1836, "most of the American public was well aware of the Bowie knife."[43]  (Notably, the Bowie knife's notorious reputation also, if perversely, fanned its sale and acquisition.[44])

24.     The ubiquity of the concern about the criminological consequences of carrying Bowie knives and other, similar long-bladed knives is seen in the widespread adoption of laws barring or restricting these weapons.[45]  In the 1830s, at least six states enacted laws barring the carrying of Bowie knives by name.[46]  From then to the start of the twentieth century, every state plus the District of Columbia (with the sole exception of New Hampshire) restricted Bowie knives. A total of at least 42 states (including the District of Columbia) barred or restricted Bowie knives by name; and another 8 states enacted laws barring the category or type of knife embodied by the Bowie knife but without mentioning them by name (see Exhibits C and E) totaling 49 states plus the District of Columbia.[47]  These concerns also contributed to widespread enactment of laws prohibiting dueling in the states.[48]  In 1839, Congress passed a measure barring dueling in the District of Columbia.[49]  Both pistols and knives were prominently used in such affairs.[50]

25.     At least four state court cases dealt in some manner with fighting knives like the Bowie knife.  In the 1840 case of *Aymette v. State*[51] the Supreme Court of Tennessee upheld the

---

[43]     Ibid., 43.

[44]     Flayderman, *The Bowie Knife*, 46.

[45]     The near-immediate effort in the states to restrict Bowie knives was noted, for example, in Davis, *Three Roads to the Alamo*, 582, and in Flayderman, *The Bowie Knife*, 53–54.

[46]     A seventh state, Massachusetts, criminalized the carrying of fighting knives using labels that would have included the Bowie knife in an 1836 law. See Exhibit H.

[47]     Bowie law enactment by decade: 1830s: 6 states; 1840s: 4 states; 1850s: 11 states; 1860s: 13 states; 1870s: 19 states; 1880s: 20 states; 1890s: 21 states; 1900s: 13 states.  See Exhibits C and E.

[48]     A search for the word "duel" in the Duke Center for Firearms Law database of old gun laws yields 35 results.  See https://firearmslaw.duke.edu/repository/search-the-repository/.

[49]     H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838, https://history.house.gov/Records-and-Research/Listing/lfp_032/.

[50]     Roth, *American Homicide*, 180–83, 210–17.

[51]     *Aymette* was cited in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

13

conviction of William Aymette for wearing a Bowie knife concealed under his clothes under a state law of 1837–1838, ch. 137, sec. 2, providing "that, if any person shall wear any bowie-knife, or Arkansas toothpick, or other knife or weapon that shall in form, shape, or size resemble a bowie-knife or Arkansas toothpick, under his clothes, or keep the same concealed about his person such person shall be guilty of a misdemeanor, and, upon conviction thereof, shall be fined in a sum not less than two hundred dollars, and shall be imprisoned in the county jail not less than three months and not more than six months."[52]  In its decision, the court concluded that the prohibition against wearing the named weapons was well justified in that they "are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin."[53]  The court continued, "The Legislature, therefore, have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens. . . ."[54]  Further, the court added that the state law existed "to preserve the public peace, and protect our citizens from the terror which a wanton and unusual exhibition of arms might produce, or their lives from being endangered by desperadoes with concealed arms. . . ."[55]

26.    Four years later, the Tennessee Supreme Court again dealt with a Bowie knife law violation and challenge. In the case of *Haynes v. Tennessee* (1844),[56] Stephen Haynes was indicted for carrying a concealed Bowie knife. He was convicted of wearing a knife that resembled a Bowie knife but appealed his conviction on the grounds that he was actually carrying a "Mexican pirate knife," which reputedly had a shorter, narrower blade. (At the trial, witnesses disagreed as to the proper name for the knife in question.) He also argued that the state law, in listing various types of knives including those "similar" to Bowie knives, was "too indefinite" and could therefore lead

---

[52]    *Aymette v. State*, 21 Tenn. 152, 153 (Tenn. 1840).

[53]    Ibid., 156.

[54]    Ibid., 157.

[55]    Ibid.

[56]    *Haynes v. Tennessee*, 24 Tenn. 120 (1844).

14

to "absurd consequences" that "must follow its enforcement. . . ."[57] On appeal, the court upheld his conviction and commended the Tennessee state legislature's enactment: "The design of the statute was to prohibit the wearing of bowie knives and others of a similar description, which the experience of the country had proven to be extremely dangerous and destructive to human life; the carrying of which by truculent and evil disposed persons but too often ended in assassination."[58] The court continued: "The design, meaning, and intent was to guard against the destruction of human life, by prohibiting the wearing [of] heavy, dangerous, destructive knives, the only use of which is to kill. . . ."[59] The court noted that the state law "wisely provides against bowie knives, Arkansas tooth picks, or any other weapon in form, shape or size, resembling them."[60]

27.     Two other state court cases are arguably relevant to the legal status of Bowie knives, *Nunn v. State* (1846)[61] and *Cockrum v. State* (1859).[62] *Nunn*, however, involved a man who was prosecuted for carrying a pistol (apparently openly, not concealed), not a knife.  A vagary in the state law criminalized concealed carry of various named weapons, including pistols and Bowie knives, whereas a different provision of the law allowed for open carrying of named weapons, including Bowie knives, but failed to include pistols on that list.  Noting the "great vagueness" in the statute's wording, the court reversed the man's conviction and affirmed the constitutionality of open carry "for the important end to be attained: the rearing up and qualifying a well-regulated militia, so vitally necessary to the security of a free State."  The court also upheld the constitutionality of the concealed carry restrictions.  It did not single out or offer any specific comment on Bowie knives, beyond noting in passing that the Georgia law in question was enacted

---

[57]     *Haynes v. Tennessee*, 122.

[58]     *Haynes v. Tennessee*, 122.

[59]     *Haynes v. Tennessee*, 123.

[60]     *Haynes v. Tennessee*, 122.

[61]     *Nunn v. State*, 1 Ga. 243 (1846), https://cite.case.law/ga/1/243/.

[62]     *Cockrum v. State,* 24 Tex. 394 (1859), https://constitution.org/1-Constitution/2ll/2ndcourt/state/177st.htm

"to guard and protect the citizens of the State against the unwarrantable and too prevalent use of *deadly weapons*."[63]

28.     The *Cockrum* case involved John Cockrum, who was charged with the murder of his brother-in-law, William Self, with a Bowie knife.[64]   Under Texas law, "a homicide, which would otherwise be a case of manslaughter, if committed with a bowie-knife or dagger, shall be deemed murder and punished as such. . . ."[65]   The court upheld the added penalty provision of the law relating to use of a Bowie knife, despite the court's very expansive interpretation of the right to bear arms, but reversed and remanded the man's conviction because of an error related to statutory changes and jury instructions.[66]

29.     In short, courts recognized Bowie knives were dangerous and pervasively used for nefarious purposes, and thus the courts treated Bowie knives in the same restrictive and prohibitory manner in law as other dangerous, deadly weapons including pistols and various named clubs.

30.      Concealed-carry restrictions were designed to push dangerous weapons out of public spaces and places, improving public safety through the deterrent and punishment effects of such laws, and also discouraging the settlement of private grievances and disputes in public through weapons-fueled violence.

31.     States relied on a variety of regulatory techniques to suppress Bowie knife carrying: 29 states enacted laws to bar their concealed carry; 15 states barred their carry whether concealed or openly; 7 states enacted enhanced criminal penalties for those who used the knives to commit a crime; 4 states enacted regulatory taxes attached to their commercial sale; 3 states imposed a tax

---

[63]     *Nunn v. State*, 246. Italics in original.

[64]     https://www.genealogy.com/ftm/p/i/l/Karen-Pilgrim-TX/WEBSITE-0001/UHP-0254.html

[65]     *Cockrum v. State*, 394.

[66]     *Cockrum v. State*, 404. Kopel says, incorrectly, that "Bowie knives. . . were regulated the same as a butcher's knife." According to the Duke Center for Firearms Law Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/search-the-repository/) six states had laws that restricted butcher knives by name, whereas 42 states restricted Bowie knives by name. See Exhibits C and E. Kopel, "Bowie knife statutes 1837-1899."

for those who owned the knives; 10 states barred their sale to specified groups of people; and 4 states enacted penalties for brandishing the knives (see Exhibit H).

32.     The extensive and ubiquitous nature of these Bowie knife prohibitions raises a further question: given the universal agreement that these knives were dangerous, why not simply ban their possession outright?  The answer is two-fold. First, America was a developing nation-state in the nineteenth century.  During most of this time the federal and state governments did not yet possess the maturity, powers, tools, or resources to enact, much less implement, any measure as sweeping as a knife ban, especially since knives are technologically very simple to produce. After all, the front-line administrative entity on which we today rely for law enforcement, the police, barely existed (in the way we think of policing today) in the early-to-mid nineteenth century (up to this time policing fell to a haphazard mix of the watch system, constables, militias, and vigilantes).  Modern police forces only came in to being in a handful of large cities before the Civil War.[67] Second, the chief remedy enacted by the states to address the problem of knife fighting was far more focused and feasible: to bar the carrying of knives, along with the other two categories of weapons that also threatened public safety, clubs and pistols. The fact that all three types of weapons were consistently treated together is conclusive evidence that all were considered so dangerous and inimical to public safety that they were subject to anti-carry laws and bundled together in legislative enactments.

### C.     Historical Restrictions on Pistol and Gun Carrying

33.     Carry restriction laws were widely enacted from the 1600s through the start of the twentieth century, spanning over three centuries.  As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."  Massachusetts followed

---

[67]     Chris McNab, *Deadly Force* (Oxford, Great Britain: Osprey Publishing, 2009), 13-24. Boston created a police force in 1838, New York City created a standing police force in 1845, followed by Chicago in 1851, Philadelphia in 1854, and Baltimore in 1857 (23). Jill Lepore, "The Invention of the Police," *The New Yorker,* July 13, 2020, https://www.newyorker.com/magazine/2020/07/20/the-invention-of-the-police. Both McNab and Lepore emphasize the role of slavery and slave suppression as key to the development of policing.

in 1750.  In the late 1700s, North Carolina and Virginia passed similar laws.  In the 1800s, as interpersonal violence and gun carrying spread, forty-three states joined the list; three more did so in the early 1900s (see Exhibit B).[68]  The enactment of laws restricting concealed weapons carrying followed the rise of homicides and interpersonal violence in the early-to-mid 1800s. This was described by historian Randolph Roth who noted that restrictions on firearms from the colonial period to the start of the Revolution were few because homicide rates were low. When homicides did occur, guns were seldom used, in large part because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy.  After the Revolutionary period the spread of violence tied to concealable percussion cap pistols and fighting knives led to the enactment of anti-concealed carry weapons laws.[69] Concealed carry laws normally targeted pistols as well as the types of fighting knives and various types of clubs discussed here (see Exhibit E). In addition, at least three-fourths of the states enacted laws that penalized public weapons brandishing or display. At least four states did so in the 1600s, two in the 1700s, twenty-eight states in the 1800s, and two more in the early 1900s.[70]

> ### D.    Historical Restrictions on Trap Guns

34.    Many states have historically regulated "trap guns."  Not to be confused with firearms used in trapshooting, trap guns were devices or contraptions rigged in such a way as to fire when the owner need not be present.  Typically, trap guns could be set to fire remotely (without the user being present to operate the firearm) by rigging the firearm to be fired with a string or

---

[68]    Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80 (2017): 63-67.

[69]    Roth, *American Homicide*, 61-144, 216-21; Randolph Roth, "Why Guns Are and Aren't the Problem: The Relationship between Guns and Homicide in American History," in Jennifer Tucker, Barton C. Hacker, and Margaret Vining, eds., *Firearms and the Common Law: History and Memory* (Washington, D.C.: Smithsonian Institution Scholarly Press, 2019), 116; Roger Lane, *Murder in America* (Columbus, OH: Ohio State University Press, 1997), 344-45.

[70]    Spitzer, *The Gun Dilemma*, 77-80.

wire which then discharged when tripped.[71]  This early law from New Jersey in 1771 both defines and summarizes the problem addressed by this law:

> Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-payment thereof shall be committed to the common Gaol of the County for Six Months.[72]

Also sometimes referred to as "infernal machines,"[73] the term trap gun came to encompass other kinds of traps designed to harm or kill those who might encounter them, including for purposes of defending property from intruders.  Those who set gun traps typically did so to defend their places of business, properties, or possessions.  An 1870 newspaper account from an incident in New York City detailed an incident wherein a burglar was killed by a gun-trap set by a shopkeeper, who was then prosecuted under a statute prohibiting the "infernal machines."[74]

35.     In all, at least 16 states had anti-trap gun laws (see Exhibits B and F).  The earliest such law encountered was the 1771 New Jersey law (above).  Nine laws were enacted in the 1700s-1800s, and 9 in the early 1900s (counting states that enacted multiple laws across the centuries).

---

[71]     See Spitzer, "Gun Law History in the United States and Second Amendment Rights," 67.

[72]     1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

[73]     E.g. 1901 Utah Laws 97-98, An Act Defining an Infernal Machine, and Prescribing Penalties for the Construction or Contrivance of the Same, or Having Such Machine in Possession, or Delivering Such Machine to Any Person . . . , ch. 96, §§ 1-3.

[74]     "The Man Trap," *The Buffalo Commercial*, November 1, 1870; from the *N.Y. Standard*, October 29, 1870, https://bit.ly/3yUSGNF.  See Exhibit G.

## III.   REGULATORY HISTORY OF FIREARMS

### A.        Pre-Twentieth Century Firearms Technologies

36.    The standard, ubiquitous firearm in early America, well into the nineteenth century, was the single-shot muzzle-loaded firearm: "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . . then ignite the gunpowder and send the projectile on its way."[75]  As researchers and experts of gun history have noted, experimental multi-shot guns existed in the eighteenth century (with multi-shot experimental designs dating back as much as two centuries earlier).  For example, a firearm from the late 1500s that could fire up to sixteen rounds is described in a book titled, *Firearms Curiosa* ("curiosa" meaning something that is rare or unusual).  True to its name, and as the book's author notes, *Firearms Curiosa* is about "oddity guns" and "peculiar guns."[76]  As such, the referenced sixteen-round firearm was anything but common, ordinary, or found in general circulation.  With the sixteen shot gun from the 1500s,  "the first pull of the trigger" fires "nine Roman candle charges, a second pull will release the wheel on the rear lock and set off six more such charges, and finally a third pull will fire the one remaining shot."[77]  A "Roman candle charge" was defined by Lewis Winant as one where "the operator had no control of the interval between shots; he could not stop the firing once he had started it."[78]  In other words, this firing process was more like lighting the fuse of a string of firecrackers, where their ignition occurs in a manner that cannot be controlled by the operator once the initial charge is ignited. Winant concludes: "Of all the ideas for producing multishot firearms the scheme of superimposing

---

[75]      Jim Rasenberger, *Revolver: Sam Colt and the Six-Shooter That Changed America* (NY: Scribner, 2021), 3-4.

[76]      Lewis Winant, *Firearms Curiosa* (NY: Bonanza Books, 1955), 8, 9.

[77]      Ibid., 168.

[78]      Ibid., 166.

loads in one barrel is probably the oldest, the most discredited, the most frequently recurring, and also the most readily accepted as new."[79]

37.     An early multi-shot gun, the "Puckle Gun," patented in 1718 in London by James Puckle, could fire nine rounds per minute (hardly comparable to the firing capabilities of semi- and fully automatic weapons of the twentieth and twenty-first centuries).  The patent drawing of this weapon shows it sitting on a tripod on the ground.[80]  It was not a hand-held weapon.  In the patent, Puckle described it as "a portable Gun or Machine (by me lately invented) called a DEFENCE."[81]  It was indeed a military weapon, as Winant says: "Of the oddities among military weapons none has received more publicity than the Puckle gun. . . . The Puckle invention was probably the first crank-operated machine gun.  It embodied several elements that closely resemble construction features of Gatling, Hotchkiss and other manually-operated machine guns."  Winant continued, "It is doubtful that any of the Puckle guns that may have been actually produced ever saw service."[82]  A different account of this weapon says: "There is in fact no record of such a gun ever having been built,"[83] although there are claims to the contrary.  A contemporaneous poet, commenting on 'Puckle's Machine Company', wrote "'Fear not, my friends, this terrible machine. They're only wounded who have shares therein.'"[84]  Another source indicates this weapon "never advanced beyond the prototype stage."[85]

38.     In short, it was an experimental weapon designed for military use, and the patent's reference to "DEFENCE" was clearly a reference to military defense, not personal defense.  As

---

[79]     Ibid., 166.

[80]     Ibid., 220.

[81]     Ibid., 219.

[82]     Ibid., 219-20.

[83]     John Ellis, *The Social History of the Machine Gun* (NY: Pantheon, 1975), 13.

[84]     Winant, *Firearms Curiosa*, 219-21.  See also "The Puckle Gun: Repeating Firepower in 1718," December 25, 2016, https://www.youtube.com/watch?v=GPC7KiYDshw.

[85]     Rasenberger, *Revolver*, 3.

this account confirms, it was likely never even manufactured beyond the prototype stage. It was a failed effort, even though later gun inventors learned from its failure.

39.     The Jennings multi-shot flintlock rifle from 1821, capable of firing up to twelve "superposed" shots before reloading,[86] is also cited as an early multi-shot gun. Yet according to *Flayderman's Guide to Antique American Firearms,* its production quantity was so small as to be "unknown" and therefore is "extremely rare," unsurprising since it utilized fatally defective "superposed" firing (discussed earlier) relying on twelve individual touchholes.[87] Similar problems plagued or doomed multi-shot flintlock pistols of the early nineteenth century. According to Carl P. Russell: "Flintlock revolving pistols had been given trials and some practical use very early in the nineteenth century, but the loose priming powder in the pan of each cylinder constituted a hazard that was never eliminated."[88]

40.     Another example often cited is the Girandoni (or Girardoni) air rifle, a military weapon developed for the Austrian army that was capable of firing up to 20 rounds. One of these was taken along on the Lewis and Clark expedition of 1804-1806.[89] But these guns were a rarity, as they were extremely expensive, fragile, and complex, and few were made—no more than a total of about 1,500 worldwide.[90] In fact, Girandoni air rifles never caught on as they proved to be

---

[86]     David Kopel, "The History of Firearm Magazines and Magazine Prohibitions," *Albany Law Review* 78 (2014-2015): 853.

[87]     Norm Flayderman, *Flayderman's Guide to Antique American Firearms*, 9th ed. (Iola, IA: Gun Digest Books, 2007), 683.

[88]     Carl P. Russell, *Guns on the Early Frontier* (Lincoln, NE: University of Nebraska Press, 1957), 91.

[89]     David Kopel, "The history of magazines holding 11 or more rounds: Amicus brief in 9th Circuit," *Washington Post,* May 29, 2014, https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/05/29/the-history-of-magazines-holding-11-or-more-rounds-amicus-brief-in-9th-circuit/. The Girandoni air gun taken by Lewis and Clark was never used in combat or battle, but to impress the Native Americans they encountered. Whenever they planned to fire the gun, they were careful to prepare it before encountering Native Americans so that they were not aware of the extensive pre-fire preparations needed. See Stephen E. Ambrose, *Undaunted Courage* (NY: Simon and Schuster, 1996), 158, 160, and passim.

[90]     Mike Markowitz, "The Girandoni Air Rifle," *DefenseMediaNetwork*, May 14, 2013,

impractical on the battlefield, and even more so for civilian use.  To wit: "Leather gaskets needed to be constantly maintained and swelled with water to sustain pressure.  Once empty the reservoirs required a significant effort and 1500 strokes to restore full power.  A supply wagon was subsequently outfitted with a mounted pump to readily supply soldiers but this negated one of the key features—mobility.  The rudimentary fabrication methods of the day engineered weak threading on the reservoir neck and this was the ultimate downfall of the weapon.  The reservoirs were delicate in the field and if the riveted brazed welds parted the weapon was rendered into an awkward club as a last resort."[91]  It was pulled from military service by 1815.[92]

41.     To take another example, the Volcanic repeating pistol, patented in 1854, was said to have the ability to fire up to "ten or greater rounds."[93]  The Volcanic Repeating Arms Company was founded in 1855, and it experimented with a number of design innovations.  But the company was "short-lived" and went "defunct" in 1866, even though its partners included Horace Smith, Daniel B. Wesson, and Courtlandt Palmer.[94]  Its patent and technological work were important for subsequent developments, especially for Smith and Wesson's later work, but the actual weapons produced by Volcanic were few, flawed, and experimental,[95] dubbed "radical defects" by Winchester himself.[96]  In 1857 and 1858, Volcanic produced 3,200 "flawed" repeaters, most of which "collected dust for many decades" until the company finally sold them for fifty cents each to employees.[97]

---

https://www.defensemedianetwork.com/stories/the-girandoni-air-rifle/.

[91]     John Paul Jarvis, "The Girandoni Air Rifle: Deadly Under Pressure," *GUNS.com,* March 15, 2011, https://www.guns.com/news/2011/03/15/the-girandoni-air-rifle-deadly-under-pressure.

[92]     Markowitz, "The Girandoni Air Rifle."

[93]     Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 6 (Plaintiffs' Trial Exhibit 2).

[94]     Pamela Haag, *The Gunning of America* (NY: Basic Books, 2016), 51-52.

[95]     "Volcanic                 Repeating                 Arms,"                 https://military-history.fandom.com/wiki/Volcanic_Repeating_Arms, n.d.; Flayderman, *Flayderman's Guide to Antique American Firearms,* 303-5.

[96]     Quoted in Haag, *The Gunning of America*, 56.

[97]     Haag, *The Gunning of America*, 60.

42.     Another account laboring to establish early gun firing provenance asserts that "[s]emi-automatic technology was developed in the 1880s" with the "Mannlicher rifle . . . generally attributed to be the first semi-automatic rifle."[98] Yet this "development" was initially a failure: "Ferdinand von Mannlicher's Model 1885 self-loading rifle design" was "a failure, never seeing anything even resembling mass production."[99] The true semi-automatic weapon did not become feasible and available until the beginning of the twentieth century, and the primary market was the military.[100]

43.     The more well-known "pepperbox," a multi-shot firearm where the number of shots capable of being fired repeatedly coincided with the number of barrels bundled together, found some civilian market popularity in the early 1800s, but it was rapidly eclipsed by the superior Colt revolver. The reason: pepperboxes were "heavy, lumpy, and impractical."[101] By another account, "because of its small bore, short range, and lack of accuracy, the pepperbox was by no means as satisfactory as a revolver for military use."[102] Further, "[t]hey also had a nasty habit of discharging all their barrels at once. No shooter could be certain he would not get two or three innocent bystanders, as well as his intended victim."[103] Indeed, the Colt revolver was "the first widely used multishot weapon,"[104] although it took decades for this and similar revolvers to catch on.

44.     Colt's technological developments notwithstanding, single shot guns were the ubiquitous firearm until after the Civil War, although some long gun repeaters appeared late in the

---

[98]     Declaration of Ashley Hlebinsky, *Miller v. Becerra*, 8 (Plaintiffs' Trial Exhibit 2).

[99]     Ian McCollum, "Mannlicher 1885 Semiauto Rifle," *Forgotten Weapons*, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/.

[100]     Philip Schreier, "A Short History of the Semi-Automatic Firearm," *America's 1st Freedom,* July 2022, 32-39.

[101]     Rasenberger, *Revolver*, 54.

[102]     Lewis Winant, *Pepperbox Firearms* (New York: Greenberg Pub., 1952), 30.

[103]     Larry Koller, *The Fireside Book of Guns* (NY: Simon and Schuster, 1959), 154. By another account, "it was a disconcerting but not uncommon experience to have all six barrels go off in unison." Winant, *Pepperbox Firearms,* 32.

[104]     Rasenberger, *Revolver*, 401.

Civil War.[105]  Even so, the "standard infantry weapon [in the Civil War] remained the single-shot, muzzle-loaded weapon."[106]  Historian James M. McPherson concurred that, even though some repeating rifles appeared in the Civil War as early as 1863, single-shot muzzle-loaders "remained the principal infantry weapons throughout the war."[107]

45.     As noted, the idea of an available, affordable, reliable multi-shot firearm did not arise until the development of Colt's multi-shot revolver in the 1830s.  Indeed, Colt biographer Jim Rasenberger says that Colt's pistol was the first practical firearm that could shoot more than one bullet without reloading.[108]  Even then, Colt could not readily manufacture multi-shot weapons for many years because he could find no market for them, either from the government or the public. The government, in fact, dismissed such firearms as mere "novelties."[109]  After an 1837 test of Colt's gun and others, the government concluded that it was "entirely unsuited to the general purposes of the service."[110]  The government also rejected the weapon after tests in 1836, 1840, and 1850.  Colt's early failure to cultivate either a military or a civilian market in the U.S. drove him to bankruptcy and then to market his guns to European governments in the 1840s.  The gun made appearances in the pre-Civil War West, yet even during the Civil War, "Colt's revolver was a sideshow through most of the war. . . ."[111]  And though the Colt-type revolver "had proved itself, the official sidearm of the United States Army [in the Civil War] remained a single shot pistol."[112]

---

[105]     Kopel, "The history of magazines holding 11 or more rounds"; Lee Kennett and James LaVerne Anderson, *The Gun in America* (Westport, CT: Greenwood Press, 1975), 112-13.

[106]     Donald M. Snow and Dennis M. Drew, *From Lexington to Desert Storm: War and Politics in the American Experience* (Armonk, NY: M.E. Sharpe, 1994), 90.

[107]     James M. McPherson, *Battle Cry of Freedom* (NY: Oxford University Press, 1988), 475.

[108]     Rasenberger, *Revolver*, 3-5, 401.

[109]     Haag, *The Gunning of America*, 24.

[110]     Rasenberger, *Revolver*, 136.

[111]     Ibid., 390.

[112]     Kennett and Anderson, *The Gun in America*, 91.

It took the Colt's limited use during the Civil War to finally spur the post-Civil War proliferation of the Colt-type revolver and similar firearms into society.[113]

46.     While inventor Benjamin Henry claims credit for developing the first practical, lever action repeating rifle (patented in 1860), his competitor Winchester "deftly gutted" the Henry Arms Company, coopting it to form the Winchester Arms Company in 1866, paving the way for Winchester's dominance.[114]  The Winchester rifle could fire up to fifteen rounds without reloading, as could the Henry repeater.[115]  Yet the widely known Winchester 1873, "was designed for sale to the Government as a military arm."[116]  A gun whose legendary status wildly outdistanced its actual production and impact, it was nevertheless an important firearm in the late nineteenth century, although this supposedly "quintessential frontier rifle flourished later, in the 'post-frontier' early 1900s.  Its celebrity biography backdated its diffusion and even its popularity."[117]  In fact, the slogan stating that the Winchester "won the West" was invented by a Winchester executive as a marketing ploy in 1919.[118]  An analysis of production runs of Henrys and Winchesters from 1861-1871 concluded that they produced a total of 74,000 guns. Most of them—about 64,000—were sold to foreign militaries, leaving about 9,200 for domestic American sales. Of those, 8,500 were acquired by Union soldiers, leaving a small supply of guns for domestic civilian acquisition.[119] Additionally, the Winchester was not a semi-automatic firearm; it was a lever-action rifle that

---

[113]     Haag, *The Gunning of America,* 34-37, 46-64.  As Haag said, "the Civil War saved" the gun industrialists (65).

[114]     Haag, *The Gunning of America*, 96.

[115]     "Henry Model 1860," Military Factory, https://www.militaryfactory.com/smallarms/detail.php?smallarms_id=356.

[116]     Koller, *The Fireside Book of Guns*, 112.

[117]     Haag, *The Gunning of America*, 179.

[118]     Ibid., 353.

[119]     Herbert G. Houze, *Winchester Repeating Arms Company: Its History & Development from 1865 to 1981* (Iola, WI: Krause Publications, 2004), 21, 36–41, 51, 59, 65–66, 71, 73, 75; Tom Hall to D. C. Cronin, New Haven, May 18, 1951; Box 8, folder 16, Winchester Repeating Arms Company, Office files (MS:20), McCracken Research Library, Cody, WY.

required the shooter to manipulate a lever in a forward-and-back motion before each shot.  And when the gun was emptied, it had to be manually reloaded, one round at a time.[120]  The Winchester Model 1905, then called a "self-loading" rifle, was a true semi-automatic firearm and could receive a five or ten round box magazine.  From 1905 to 1920, only about 30,000 of the guns were made.  Even in World War I, soldiers primarily used bolt-action one-shot rifles that could fire about twelve rounds per minute.[121]

47.     The Winchester was by no means universally embraced by long gun users.  Indeed, "a good many westerners would have nothing to do with the early Winchesters or other repeaters, for reasons they considered very sound, and not until the 1880s did the repeating rifle assert its dominance over the single-shot breechloader."[122]  According to A.C. Gould, writing in 1892, single-shot rifles were: "less complicated, and less liable to get out of order; will shoot a greater variety of ammunition; will shoot uncrimped ammunition, patched or unpatched bullets; will permit the use of a longer barrel; an explosive bullet can be used; a greater range of rear sights on tang can be used."[123]

48.     The rise in the circulation of multi-shot handguns in society was accompanied by the rapid spread of concealed carry restrictions (see Exhibits B-E), especially in the post-Civil War period, precisely because of their contribution to escalating interpersonal violence.[124]  By the end of the nineteenth century, virtually every state in the country prohibited or severely restricted

---

[120]     Normally, a Remington-type rifle is loaded from a feed ramp on the side of the rifle.

[121]     Robert Johnson and Geoffrey Ingersoll, "It's Incredible How Much Guns Have Advanced Since The Second Amendment," *Military & Defense,* December 17, 2012, https://finance.yahoo.com/news/incredible-much-guns-improved-since-174927324.html;     Phil Bourjaily, "Blast From the Past: Winchester Model 1905," *Field & Stream,* January 11, 2019, https://www.fieldandstream.com/blast-from-past-winchester-model-1905/.

[122]     Louis A. Garavaglia and Charles G. Worman, *Firearms of the American West, 1866-1894* (Albuquerque, NM: University of New Mexico Press, 1985), 129.

[123]     Quoted in Garavaglia and Worman, *Firearms of the American West, 1866-1894*, 131.

[124]     Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979); Roth, *American Homicide*, 218-19.

concealed gun and other weapons carrying.[125]  In addition, in the late 1800s and early 1900s at least a half-dozen states barred possession of such weapons (including but not limited to handguns) outright, regardless of other circumstances.[126]  It was only in the post-World War I era when multi-shot semi-automatic and fully automatic long guns began to circulate appreciably in society and came to be associated with criminal use that they became a regulatory and public policy concern.

### B.   Fully Automatic and Semi-automatic Firearms

49.   A clear example of the historical pattern of American weapons regulation is provided by early twentieth-century restrictions related to fully automatic firearms.  The first weapons capable of firing numerous rounds in rapid succession can be traced to guns of the late nineteenth and early twentieth centuries, like the hand-cranked, multi-barreled Gatling gun which could fire up to 200 rounds per minute.[127]   The Gatling gun and its successors were military weapons designed to be used in combat and fired from a tripod or similar supporting apparatus, owing to the Gatling gun's size and weight.  Strictly speaking, guns like the Gatling gun were not fully automatic as they did not fire a continuous stream of bullets while depressing a gun trigger.

---

[125]   Spitzer, "Gun Law History in the United States and Second Amendment Rights," 63-67.

[126]   1917 Cal. Sess. Laws 221-225; 1923 Cal. Stat. 695; Illinois Act of Apr. 16, 1881, as codified in Ill. Stat. Ann., Crim. Code, chap. 38 (1885) 88; Geoffrey Andrew Holmes, Compiled Ordinances of the City of Council Bluffs, and Containing the Statutes Applicable to Cities of the First-Class, Organized under the Laws of Iowa Page 206-207, Image 209-210 (1887) § 105; William H. Baily, The Revised Ordinances of Nineteen Hundred of the City of Des Moines, Iowa Page 89-90, Image 89-90 (1900) § 209; 1883 Kan. Sess. Laws 159, §§ 1-2; George R. Donnan, Annotated Code of Criminal Procedure and Penal Code of the State of New York as Amended 1882-5 Page 172, Image 699 (1885) § 410; 1913 N.Y. Laws 1627-30, vol. III, ch. 608, § 1; 1931 N.Y. Laws 1033, ch. 435, § 1; 1915 N.D. Laws 96, ch. 83, §§ 1-3, 5; 1923 S.C. Acts 221. Not included in this list are other state laws that barred weapons possession to specific groups (Native Americans, enslaved persons, minors) or that criminalized weapons possession by individuals if they committed a crime with the listed weapons.

[127]   The Gatling gun, a manually operated, hand-cranked machine gun, was adopted by the U.S. Army in 1866, and was utilized in warfare against Native Americans and in the Spanish-American War of 1898.  Richard W. Stewart, *American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917* (Washington, D.C.: Center of Military History, 2008), 367-68; "Gatling Gun," *History.com,* September 9, 2021, https://www.history.com/topics/american-civil-war/gatling-gun.

A fully automatic machine gun for battlefield use, capable of firing all of its rounds from a single barrel and with a single trigger pull, entered the scene during World War I. These tripod-mounted military guns, like the Maxim, operated to devastating effect on the battlefield. They initially fired 200-400 rounds per minute but later 400-600 rounds per minute from a gun weighing roughly 100 pounds.[128]

50.     Out of World War I came the first practical, lighter-weight, reliable, hand-held, fully automatic weapon:  the Thompson submachine gun, widely known as the Tommy gun. Though it was developed for use in World War I as "purely a military weapon,"[129] it came too late in the war to have much effect.  Its inventor, John Thompson, patented his .45 caliber gun in 1920.[130]  The Tommy gun was initially unregulated after World War I and was made available for civilian purchase in order to boost anemic sales, typically with either a 20–30 round stick magazine or a 100-round drum magazine.  (The U.S. military showed little interest in acquiring the weapon, as the military largely demobilized and contracted sharply in size after the war.[131])  It was only at this point—in the early 1920s—that such hand-held weapons operated reliably, were made available to civilians, and began to circulate in society,[132] though sales in the early 1920s were few and sluggish.  By 1925, Thompson's marketing company, Auto-Ordnance, had sold only about

---

[128]    Snow and Drew, *From Lexington to Desert Storm*, 127; "How The Machine Gun Changed Combat During World War I," Norwich University Online, October 15, 2020, https://online.norwich.edu/academic-programs/resources/how-machine-gun-changed-combat-during-world-war-i.

[129]    William J. Helmer, *The Gun That Made the Twenties Roar* (Highland Park, NJ: The Gun Room Press, 1969), 75.

[130]    Matthew Moss, "From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun," *Military History Now,* January 16, 2015, https://militaryhistorynow.com/2015/01/16/from-gangland-to-the-battlefield-15-amazing-facts-about-the-thompson-submachine-gun/.

[131]    Ellis, *The Social History of the Machine Gun*, 149–52; Helmer, The Gun That Made the Twenties Roar, 161-64.

[132]    Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" *The National Interest*, July 3, 2020, https://nationalinterest.org/blog/reboot/thompson-submachine-gun-made-us-postal-service-164096.

3,000 of the 15,000 it had manufactured up to this point, including to police forces, government agencies, and individuals.[133]  This pattern of anemic sales typified the gun's commercial trajectory: "Despite its initial publicity and later notoriety, the Thompson submachine gun was a failure from the start."[134]  This was especially true for police forces, to whom Thompson and his company marketed the gun aggressively, even when criminals found the gun appealing. "As a criminal's weapon, the Tommygun was an unqualified success. As a police weapon, it was such a flop that many law-enforcement officials wished sincerely that it has never come off the drawing board."[135]  Poor military and law enforcement sales forced the company to "peddle the new gun in peacetime" by trying "to think up something else it might be good for."  Their conclusion was to market the gun as "good for anything."[136]

51.     After 1926, sales began to rise, primarily because of newfound interest by the American military, which started to use the weapon in foreign military operations, especially in Nicaragua, and by the Belgian military.[137]  In 1930, the Auto-Ordnance company shuttered its sales department because of escalating concerns about its weapons falling into criminal hands, and the attendant bad publicity.  All commercial sales were discontinued except to the military and law enforcement.[138]  By 1932, sales had fallen to fewer than ten per month.  Through 1938, the company reported total sales of 10,300. The company's revival came thanks to World War II.[139]

---

[133]     Kennett and Anderson, *The Gun in America*, 203. Helmer confirms the number of 3,000 guns sold by 1925. *The Gun That Made the Twenties Roar*, 74. Helmer says that "sales declined steadily" after 1921; see 130.

[134]     Helmer, *The Gun That Made the Twenties Roar*, 129.

[135]     Helmer, *The Gun That Made the Twenties Roar,* 126. Helmer quotes numerous police officials denouncing the weapon as useless for the police; see 126-28.

[136]     Helmer, *The Gun That Made the Twenties Roar*, 75.

[137]     Helmer, *The Gun That Made the Twenties Roar*, 130-45.

[138]     Helmer, *The Gun That Made the Twenties Roar*, 143-44.

[139]     Helmer, *The Gun That Made the Twenties Roar*, 167-79.

52.     Before the early 1920s, these fully automatic weapons were unregulated for the obvious reason that they did not exist or were not circulating widely in society.  When they did begin to circulate, however, their uniquely destructive capabilities rapidly became apparent, especially to the emergent Prohibition-fueled gangster organizations of the 1920s.  Another automatic weapon developed for World War I was the Browning Automatic Rifle (BAR).  It fired a .30-06 caliber round, could receive a 20-round box magazine, and could fire up to 650 rounds per minute.  The BAR first appeared on the battlefield in 1918.[140]  It was "a heavy machine rifle weighing nearly twenty pounds with bipod and loaded magazine. . . ."[141]  Like the Tommy gun, the BAR also made its way into civilian life and found favor among criminals and gangsters in the 1920s and early 1930s.[142]  Although guns like the Tommy gun and the BAR were actually used relatively infrequently by criminals, when they were used, they exacted a devastating toll and garnered extensive national attention, such as their use in the infamous St. Valentine's Day massacre in Chicago in 1929.[143]

53.     I conducted a search of Newspapers.com from 1920-1930 using the search terms "Tommy Gun," "Thompson submachine" and "machine gun."  The term "Tommy Gun" essentially returned no hits until 1928, a clear indication that this particular term did not come into wide use until fairly late in the decade.  The search for "machine gun" had more hits, but many of them referenced the weapons owned or used by the military (including many stories about World

---

[140]     Paul Richard Huard, "Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?" *The National Interest*, November 19, 2019, https://nationalinterest.org/blog/buzz/browning-automatic-rifle-most-dangerous-machine-gun-ever-97662; "Browning automatic rifle," *Britannica,* September 8, 2022, https://www.britannica.com/technology/Browning-automatic-rifle.

[141]     Helmer, *The Gun That Made the Twenties Roar*, 37.

[142]     Derek Avery, *Firearms* (Hertfordshire, England: Wordsworth Editions, 1995), 12.  The BAR was a favorite of the notorious outlaws Bonnie and Clyde, for example.  Christian Oord, "The Weapons of Bonnie & Clyde & the Guns That Stopped Them," *War History Online,* April 26, 2019, https://www.warhistoryonline.com/history/weapons-of-bonnie-and-clyde.html?A1c=1.

[143]     Chris McNab, *Deadly Force: Firearms and American Law Enforcement* (NY: Osprey Publishing, 2009), 97–98.

War I). The search for "Thompson submachine" was much more successful, yielding many articles from across the country.  Starting in the fall of 1920, a few newspaper articles described regular reports of demonstrations of the gun for police and other government officials and agencies, and reports of local police forces sometimes purchasing a few of the guns.  Based on my research, starting in 1921 and continuing throughout the 1920s, I observed that reports of demonstrations of the gun to police forces and other state and local officials and of gun purchases started occurring regularly, as did numerous articles describing the gun's development and capabilities by inventor John Thompson.  These articles also repeated standard accounts of the Tommy gun's weight, size, firing capabilities and possible uses by law enforcement.  Despite this degree of coverage, however, relatively few of the guns were actually purchased in the 1920s, as noted earlier.

54.     To cite a few examples of early news coverage, an account in the Western Sentinel from December 3, 1920 reported on a demonstration of the Tommy gun, saying that it weighed about seven pounds, fired .45 caliber rounds, could fire up to 1500 rounds per minute, could receive a box magazine holding 20 rounds, or a drum magazine with either 50 or 100 rounds.[144]  The article went on to say that the Tommy gun was "without equal for riot use and for the police chasing thieves and other lawbreakers who attempt to escape in automobiles, for with this little weapon it is a very easy thing to rip the tires off of an escaping car, and the gun is so light and simple that an inexperienced man can fire with the effect of an expert marksman and moving targets can be hit with the ease that a fireman sprays a hose or on flame."  Other articles touted the gun's usefulness in controlling riots and mobs.  An account from the Jamestown Weekly Alert reported that state and county officials were provided with ten of the guns for "hunting down whiskey runners in the northern part of the state."[145]

---

[144]     "New Type of Gun is Demonstrated Here," Winston-Salem, North Carolina; https://www.newspapers.com/image/89498556/?terms=%22Thompson%20submachine%22&match=1.

[145]     "New Submachine Guns Received," Jamestown, North Dakota, May 12, 1921; https://www.newspapers.com/image/465633429/?terms=%22Thompson%20submachine%22&match=1.

55.     Starting in roughly late 1921 and early 1922, a handful of small news items reported thefts of Tommy guns from armories or police stations.  The one notable crime-related case to receive enormous press attention was a major seizure of about 600 Tommy guns with ammunition and magazines, first reported about June 16, 1921, from a ship docked at the port of Hoboken, N.J. bound for Ireland for use by the IRA in the ongoing Irish rebellion (Ireland won its independence from Britain in 1922).

56.     Newspaper reports of criminal use of Tommy guns were few, small, and spare until 1926, when a few sensational news reports of their criminal use received widespread and extensive attention in newspapers across the country.  Most of these initial stories were reports of Chicago gangster use (notably one "Al Caponi" in an early account) along with stories from the New York City-New Jersey area.  For example, an AP story from October 16, 1926 with the dateline Somerville, N.J. reported on "the advance of 500 city, state and volunteer police on the mountain stronghold of New Jersey's machine gun mail bandits."[146]  According to the account, eight men robbed a truck of over $100,000 and were holed up at the stronghold.  The authorities were also armed with weapons that included machine guns and were contemplating the expansion of the search party with 2,000 militiamen.

57.     Coinciding with these news stories were articles, editorials, and exposés calling for changes in the law to address this growing gun crime problem.  For example, an article from the Boston Herald  began by quoting a magazine story from Collier's Weekly that observed: "The police authorities are powerless to interfere with the sale and distribution of the highest powered instrument of destruction that has yet been placed at the convenience of the criminal element in this country."[147]  The Herald sent out a man to see if an average person could buy a machine gun

---

[146]    "Use     Expert     Riflemen     to     Hunt     Robbers,"     Ithaca     Journal,     N.Y., https://www.newspapers.com/image/254505945/?terms=%22Thompson%20submachine%22&match=1

[147]    "Machine Guns for All," Kennebec Journal, Augusta, Maine, December 4, 1926, https://www.newspapers.com/image/857617757/?terms=%22Thompson%20submachine%22&match=1

"without trouble."  The buyer's conclusion: "He had no trouble" purchasing the gun, which the article labeled "a diabolical engine of death."  The article detailed that for the prospective gun purchaser, "Pistols would not be shown unless the customer exhibited a permit, but machine guns could be had over the counter with no such formalities."  The article concluded this way: "Here is a case where it seems that 'there ought to be a law.' This weapon . . . was designed for war . . . . a machine gun is the greatest aid to crime that yet has been placed within the reach of criminals."

58.     Reports and exposés, juxtaposed with lurid and sensational accounts of Tommy gun criminality, built pressure on the states to enact anti-machine gun laws (at least 32 states did so between 1925 and 1933; see Exhibits B and D), and also put pressure on Congress to act.  A long-stalled bill in Congress to restrict the interstate shipment of guns received renewed interest and support in 1926, eventually leading to congressional enactment of the Mailing of Firearms Act of 1927, a limited measure that failed to restrict interstate handgun shipment because it did not affect non-Postal Service shipments.  From 1926 on, news stories were filled with the kind of sensational gangster-related stories that led to the Tommy gun being labeled the weapon that "made the Twenties roar," and that also led to many anti-machine gun laws.  For example, an article dated November 27, 1928 reported that "Chicago's war on gangsters and racketeers was reopened tonight with the drafting of a law to prohibit the sale of machine guns. 'Tommy guns,' the bullet spitting little Thompson submachine guns which are inseparable from gang fights, bank robberies, assassinations and other major crimes . . . could be purchased as easily and legally in Chicago as a pound of meat . . . . practically every sporting goods establishment in Chicago carried the firearms and sold them readily. State Senator Arthur Huebsch will introduce the bill."[148]  (Illinois adopted an anti-machine gun law in 1931.)

---

[148]     "Machine Gun Ban Plan of Chicago," The Salt Lake Tribune, https://www.newspapers.com/image/542285510/?terms=%22Thompson%20 submachine%22&match=1.

59.     In response to the wider availability of firearms like the Tommy gun and the BAR, between 1925 and 1934, at least 32 states enacted anti-machine gun laws (see Exhibits B and D). These state (and eventually federal) enactments were anticipated, justified, and promoted by the National Conference of Commissioners on Uniform State Laws, a national organization formed in 1892 to provide "non-partisan, well-conceived and well-drafted legislation that brings clarity and stability to critical areas of state statutory law."[149]  In 1923, the Commission organized a special committee to draft a "Uniform Act to Regulate the Sale and Possession of Firearms."  In 1928, it issued a model law calling for the prohibition of the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[150]  In 1930, it issued a model firearms act focusing on "guns of the pistol type."  In 1932, it issued a model act "intended not only to curb the use of the machine gun, but to make it unwise for any civilian to possess one of the objectionable type."  The Commission explained that, between 1923 and 1930, "the infant industry of racketeering grew to monstrous size, and with it the automatic pistol replaced the revolver, to be in turn displaced by a partly concealable type of machine gun—the Thompson .45 inch caliber submachine gun becoming most popular. . . ."[151]

60.     Congress enacted a machine gun ban for the District of Columbia in 1932 which defined a machine gun as "any firearm which shoots automatically or semiautomatically more than twelve shots without reloading."[152]  The National Rifle Association endorsed D.C.'s ban, stating "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can

---

[149]     Uniform Law Commission, About Us, https://www.uniformlaws.org/aboutulc/overview.

[150]     Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

[151]     "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., October 4-10, 1932, http://www.titleii.com/bardwell/1932_uniform_machine_gun_act.txt.

[152]     "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932).

then be used as a guide throughout the states of the Union."[153]  In his testimony before Congress in 1934 on the bill that became the National Firearms Act, NRA vice president Milton A. Reckord extolled his organization's role in passing the 1932 D.C. law, saying, ". . . the association I represent is absolutely favorable to reasonable legislation.  We are responsible for the uniform firearms act. . . . in the District of Columbia.  It is on the books now."[154]

61.     In 1934, Congress enacted the National Firearms Act, which imposed a series of strict requirements on the civilian acquisition and general circulation of fully automatic weapons, like the Tommy gun.  The National Firearms Act imposed a tax on the manufacture, sale, and transfer of listed weapons, including machine guns, sawed-off shotguns and rifles, silencers, and "any other weapons" with certain firing capabilities.  Sawed-off shotguns were defined as those with a barrel less than 18 inches in length.  Criminals found these modified shotguns especially lethal because the act of shortening that barrel of a standard shotgun widened the spray of the fire, resulting in its having a "devastating effect at close range."[155]  All of the listed weapons had to be registered with the Treasury Department, and the owners fingerprinted and subject to a background check, with the payment of a $200 tax (the equivalent of several thousand dollars in today's currency).[156]  The early models of the Tommy gun could fire "an astounding 1,500 rounds per minute.  A Tommy gun could go through a 100-round drum magazine in four seconds.  Later versions fired 600 to 700 rounds per minute."[157]

62.     In his opening statement to the Ways and Means Committee of the U.S. House of Representatives on what would become the 1934 law, Attorney General Homer Cummings made

---

[153]     S. Rep. No. 72-575, at 5–6 (1932).

[154]     "Hearings Before the Committee on Ways and Means," 36.

[155]     Kennett and Anderson, *The Gun in America,* 202.

[156]     48 Stat. 1236.

[157]     Moss, "From Gangland to the Battlefield."

clear that the bill under consideration was designed to fight the epidemic of gun crime where criminals could evade capture by crossing state lines:

> The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. . . . there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. . . . In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.[158]

63.     As one member of the committee observed, "The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as [John] Dillinger and others."[159]

64.     To address the problem, the original version of the bill proposed regulating both semi-automatic and fully automatic firearms, as it defined restricted machine guns as did the 1932 D.C. law, with its emphasis on outlawing guns that could fire rapidly and repetitively without reloading, whether semi-automatically or fully automatically: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[160]  The final version of the bill limited restrictions to fully automatic firearms.

65.     In addition to the National Firearms Act's restrictions on fully automatic weapons, during this same time period at least seven states plus the District of Columbia, and as many as ten states plus D.C., enacted laws restricting semi-automatic weapons (see Exhibit B).[161]   These

---

[158]     "Hearings Before the Committee on Ways and Means," 4.  The version of the bill that appears on page 1 of the Hearings had this definition of machine gun:  "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading."

[159]     "Hearings Before the Committee on Ways and Means," 42.

[160]     Ibid., 52.

[161]     *See also* Spitzer, "Gun Law History in the United States and Second Amendment Rights," 68–71.  The language of the restrictions in Illinois, Louisiana, and South Carolina was ambiguous regarding whether they applied to semi-automatic weapons.

restrictions on semi-automatic firearms all appeared in the same statutes as those restricting fully automatic weapons, which utilize the same fundamental firearms technology:  an action that automatically loads a new round into the chamber after each shot is fired, potentially with the use of detachable ammunition magazines or similar feeding devices, and is capable of firing numerous rounds without reloading.[162]  During the time that Thompson and his company were developing and marketing the Tommy gun (which could fire in semi- or full-auto modes[163]), they were also developing the Thompson Autorifle, a "strictly semiautomatic rifle" for which the military showed greater interest than it did for the Tommy gun.[164] The Autorifle was also promoted to police and military organizations, though it was overshadowed by the Tommy gun.

66.    As the prior discussion reveals, the regulation of automatic and semi-automatic weapons in the 1920s and 1930s was closely tied to the enhanced firing capacity of these weapons and the attractiveness (and use) of these weapons by criminals at that time.  By that time, gun technology had become available that made it possible for ammunition to be reliably fired in rapid succession and guns to be reloaded through interchangeable ammunition magazines or similar devices.  Once these technologies began to spread in civil society and be used for criminal or other dangerous purposes, regulatory efforts ensued.

### C.    State Regulation of Ammunition Feeding Devices

67.    Restrictions on fully automatic and semi-automatic firearms were closely tied to restrictions on firearm accessories, such as ammunition magazines or their equivalent.  State laws enacted early in the twentieth century imposed firearms restrictions based on the number of rounds that could be fired without reloading, ranging from more than one (Massachusetts and Minnesota) up to a high of eighteen (Ohio).

---

[162]    Spitzer, *The Gun Dilemma*, 32–33.  While an automatic weapon fires a continuous stream of bullets when the trigger is depressed, a semi-automatic weapon fires a single shot with each pull of the trigger.

[163]    Helmer, *The Gun That Made the Twenties Roar*, 48-49, 255-56.

[164]    Helmer, *The Gun That Made the Twenties Roar*, 37, 50.

68.    From 1917 to 1934, magazine capacity/firing limits were imposed in three categories of state laws (see Table 1 below): ten states plus the District of Columbia regulating semi-automatic and fully automatic weapons (California, District of Columbia, Massachusetts, Michigan, Minnesota, New Jersey, North Carolina, Ohio, Rhode Island, South Dakota, and Virginia[165]); eleven states regulated fully automatic weapons only, where the regulation was defined by the number of rounds that could be fired without reloading or by the ability to receive ammunition feeding devices (Illinois, Louisiana, Minnesota, New Jersey, North Dakota, Oregon, Pennsylvania, South Carolina, Texas, Vermont, and Wisconsin[166]); and four states restricted all guns that could receive any type of ammunition feeding mechanism or round feeding device and fire them continuously in a fully automatic manner (California, Hawaii, Missouri, and Washington State).[167]

---

[165]    1933 Cal. Stat. 1169; Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (District of Columbia); 1927 Mass. Acts 413, 413-14; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888; Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.  Two of these states enacted early laws focused on such weapons' use in hunting.  New Jersey had a 1920 law making it "unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading."  1920 N.J. Laws 67, ch. 31, Section 9.  North Carolina made it "unlawful to kill quail with any gun or guns that shoot over two times before reloading" in 1917.  1917 N.C. Sess. Laws 309, ch. 209, Sec. 1.

[166]    1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2; Act of July 7, 1932, no. 80, 1932 La. Acts 336; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2; 1931 N.D. Laws 305-06, An Act to Prohibit the Possession, Sale and Use of Machine Guns, Sub-Machine Guns, or Automatic Rifles and Defining the Same . . . , ch. 178, §§ 1-2; 1933 Or. Laws 488, An Act to Amend Sections 72-201, 72-202, 72-207; 1929 Pa. Laws 777, §1; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6; 1923 Vt. Acts and Resolves 127, An Act to Prohibit the Use of Machine Guns and Automatic Rifles in Hunting, § 1; 1933 Wis. Sess. Laws 245, 164.01.

[167]    1927 Cal. Stat. 938; 1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

**TABLE 1**

AMMUNITION MAGAZINE RESTRICTIONS IN 23 STATES, 1917-1934[168]

| Semi-automatic and Fully Automatic Firearms (barred firearms holding more than the listed number of rounds or more without reloading) | Fully Automatic Firearms (barred firearms capable of firing the listed number of rounds or more without reloading or that could receive ammunition feeding devices) | All Firearms (any weapon capable of receiving rounds through certain named round-feeding devices) |
|---|---|---|
| -California (10 rounds; 1933)<br><br>-District of Columbia (12 rounds; 1932)<br><br>-Massachusetts (1 round; 1927)<br><br>-Michigan (16 rounds; 1927)<br><br>-Minnesota (1 round; 1933)<br><br>-New Jersey (2 rounds; hunting only; 1920)<br><br>-North Carolina (2 rounds; hunting only; 1917)<br><br>-Ohio (18 rounds; 1933)<br><br>-Rhode Island (12 rounds; 1927)<br><br>-South Dakota (5 rounds; 1933)<br><br>-Virginia (7 rounds; 1934) | -Illinois (8 rounds; 1931)<br><br>-Louisiana (8 rounds; 1932)<br><br>-Minnesota (12 rounds; 1933)<br><br>-New Jersey (any removable device holding rounds; 1927)<br><br>-North Dakota (loadable bullet reservoir; 1931)<br><br>-Oregon (2 rounds; 1933)<br><br>-Pennsylvania (2 rounds; 1929)<br><br>-South Carolina (8 rounds; 1934)<br><br>-Texas (5 rounds; 1933)<br><br>-Vermont (6 rounds; 1923)<br><br>-Wisconsin (2 rounds; 1933) | -California (1927)<br><br>-Hawaii (1933)<br><br>-Missouri (1929)<br><br>-Washington State (1933) |

See Exhibit D for statutory text.

69.     A 1927 California law, for example, prohibited the possession of any "machine gun," where that term was defined to include:

---

[168]     Including the District of Columbia.  Note that California, Minnesota, and New Jersey appear twice in this table.  The dataset from which this information is drawn ended in 1934, so it does not include any states that might have enacted similar restrictions after 1934.  See Duke Law Center for Firearms Law, "Repository of Historical Gun Laws," https://law.duke.edu/gunlaws/.

> all firearms known as machine rifles, machine guns or submachine
> guns capable of discharging automatically and continuously loaded
> ammunition of any caliber in which the ammunition is fed to such
> gun from or by means of clips, disks, drums, belts or other
> separable mechanical device.[169]

The other three states in this category (Hawaii, Missouri, Washington[170]) utilized this same description.  In all, at least twenty-three states enacted twenty-six gun restrictions based on the regulation of ammunition magazines or similar feeding devices, and/or round capacity (see Table 1).  The original version of the legislation that became the National Firearms Act of 1934, as noted earlier, included this definition of machine gun that encompassed both semi-automatic and fully automatic firearms: "The term 'machine gun' means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading."[171]  (This text was derived from the law enacted by Congress for the District of Columbia in 1932, which also stipulated a 12 round limit, as noted previously.[172]  The final version of the 1934 bill was limited to fully automatic firearms only and did not include any limitation by number of rounds fired.)  Regulations concerning removable magazines and magazine capacity were thus common as early as the 1920s—the period of time when machine guns and removable magazines began to make their way into civilian life and also contributed to violence and criminality, as illustrated by the Tommy gun narrative and other weapons discussed here.  These regulations were adopted by nearly half of all states, representing approximately 58% of the American population at that time.[173]

---

[169]    1927 Cal. Stat. 938.

[170]    1933 Haw. Sess. Laws 117; 1929 Mo. Laws 170; Wash. 1933 Sess. Laws 335.

[171]    "National Firearms Act," Hearings Before the Committee on Ways and Means, House of Representatives, on H.R. 9066, April 16, 18, and May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 52.

[172]    Ibid., 45.

[173]    U.S. Census, Historical Population Change Data (1910-1920) (using 1920 census data),

### D.   Lessons from the Regulation of Automatic and Semi-Automatic Firearms and Ammunition Feeding Devices in the Early Twentieth Century

70.   Changes in gun policy followed a series of steps that respond to developments in firearms technologies and their subsequent threat to public order, each dependent on the previous step.  *First*, a new gun or gun technology is invented.  *Second*, it may then be patented, though the patenting of a design or idea by no means assures that it will proceed beyond this point.  *Third*, it is often developed with a focus on military applications and supplying military needs, not directly for civilian acquisition or use.  *Fourth*, some military-designed weapons may then spread to, or be adapted to, civilian markets and use.  *Finally*, if such weapons then circulate sufficiently in society to pose a safety, violence, or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  New gun laws are not enacted when firearm technologies are invented or conceived.  They are enacted when those technologies circulate sufficiently in society to spill over into criminal or other harmful use, presenting public safety concerns that governments attempt to address through their police and policy-making powers.

71.   Some erroneously argue that the absence of government gun regulations in history—at the time of the invention of various weapons or weapons developments—means that regulations now are unjustifiable or have no historical basis.  For example, David Kopel argues that "[m]agazines of more than ten rounds are older than the United States."[174]  Drawing on examples like a firearm "created around 1580" capable of firing sixteen "'superposed' loads" (with each round stacked on top of the other); the Puckle gun said to fire eleven shots and patented in 1718; the Girandoni air rifle, invented in the late 1700s; and the Pepperbox pistol of the early 1800s,[175]  Kopel suggests that "magazines of more than ten rounds are older than the Second Amendment."[176]  Therefore, by Kopel's reckoning, since these weapons existed early in (or even

---

https://www.census.gov/data/tables/time-series/dec/popchange-data-text.html.

[174]   Kopel, "The History of Firearm Magazines and Magazine Prohibitions," 851.

[175]   Ibid., 852-54.

[176]   Ibid., 849.

before) the country's existence, and were not specifically regulated, ipso facto, today's federal and state governments are unable to regulate assault weapons, like AR-platform rifles, or magazines exceeding certain capacities.  More to the point, Kopel's claim that ammunition magazines holding "more than ten rounds" were "very commonly possessed in the United States since 1862" and were "owned by many millions of law-abiding Americans" dating back to the "mid-nineteenth century"[177] is simply false, as this Declaration demonstrates.

72.     More broadly, Kopel's and similar arguments[178] fail for two sets of reasons.  First, as explained in the following section, this narrative misrepresents the availability and capabilities of these early weapons.  Second, the account fails to understand the relationship between firearms' technological development, their spread into civil society, and government gun policy.  As one gun history expert noted, "the guns of 1830 were essentially what they had been in 1430: single metal tubes or barrels stuffed with combustible powder and projectiles" where "after every shot, the shooter had to carry out a minimum of three steps: pour powder into the barrel; add a projectile. . . then ignite the gunpowder and send the projectile on its way."[179]

73.     The firearms and firearm feeding devices regulated in the early twentieth century in the previous account represented a dramatically different type of firearm, capable of reliable, rapid fire utilizing interchangeable ammunition feeding devices.

### E.     The Sequence from Gun Technology to Law

74.     Historical multi-shot weapons were not viable or available in meaningful numbers before the late nineteenth century.  Characterizations to the contrary misrepresent the actual past of the weapons cited, and fail to understand the connection between gun technology developments

---

[177]     Ibid., 871. Kopel insists "that [10-round] magazines" have been "'in common use' and 'typically possessed by law-abiding citizens for lawful purposes'" for "a century and a half" (871-72). This claim is both false and unverified by his article.

[178]     Declaration of Ashley Hlebinsky in Support Of Plaintiffs' Motion for Preliminary Injunction, *Miller v. Becerra,* Case No. 3:19-cv-01537-BEN-JLB, United States District Court For The Southern District Of California, filed September 27, 2019 (Plaintiffs' Trial Exhibit 2).

[179]     Rasenberger, *Revolver*, 3-4.

and the steps leading up to changes in gun-related public policy to regulate threats posed by those developments.  As discussed previously, that process has occurred, both historically and in the modern era, through a series of sequential steps.

75.     First, a new gun or gun technology must be invented.  Second, it is then normally patented, noting that there are many steps between a patent, actual gun production, distribution and dissemination.  As Lewis Winant sardonically observed, "Many patents are granted for arms that die a-borning."[180]   And as gun expert Jack O'Connor wrote, "many types of guns were invented, produced and discarded through the early years of the development of the United States."[181]   Third, weapons development is historically tied to military need and military acquisition, not directly for civilian use or self-defense applications.   Military weaponry is developed without consideration of potential civilian use and the consequences of dissemination in the civilian market.[182]   Fourth, some military-designed weapons may then spill over into, or be adapted to, civilian markets and use.  Fifth, if such weapons then circulate sufficiently to cause concerns, pose a public safety or criminological problem or threat, calls for government regulation or restriction then may lead to gun policy/law changes.  This general sequence is echoed in works like the *Buyer's Guide to Assault Weapons,* a standard reference work on assault weapons.[183]

---

[180]     Winant, *Firearms Curiosa*, 36.

[181]     Jack O'Connor, *Complete Book of Rifles and Shotguns* (NY: Harper & Row, 1961), 42.

[182]     Note that the third step, and perhaps the second, do not apply to non-firearms weapons discussed here—in particular the Bowie knife and various clubs.  These weapons were mostly not developed for military use, though Bowie knives, for example, were carried by some soldiers during the Civil War.  Knives and clubs are far simpler technologically compared to firearms (and of course do not rely on ammunition) and thus were much more easily made, reproduced, and circulated.

[183]     Phillip Peterson, *Buyer's Guide to Assault Weapons* (Iola, IA: Gun Digest Books, 2008), 4-7. Peterson's Foreword summarizes a similar relationship between weapons development and subsequent calls for regulation.

F.      Clarifying Terms and Concepts about Assault Weapons and LCMs

76.     The DSSA Plaintiffs' Complaint asserts that "the designation 'assault weapons' is a complete misnomer, 'developed by anti-gun publicists' in their crusade against lawful firearm ownership."[184]

77.     This assertion is incorrect. The terms "assault weapon" and "assault rifle" were the very terms used by the gun companies that first produced, marketed, and sold such weapons to the public. As a standard buyer's guide on assault weapons noted, the "popularly-held idea that the term 'assault weapon' originated with anti-gun activists, media or politicians is wrong. The term was first adopted by the manufacturers, wholesalers, importers and dealers in the American firearms industry . . . ."[185]  The more expansive phrase "assault weapon" is generally used over "assault rifle" because "weapon" also includes not only rifles but some shotguns and pistols that were also subject to regulation in the federal 1994 assault weapons ban and subsequent laws.

78.     The gun industry's use of the terms "assault weapons" and "assault rifles" appeared in the early 1980s (and even earlier), before political efforts to regulate them emerged in the late 1980s and early 1990s.[186]  A study of the marketing strategies employed by gun manufacturers and gun publications from the time that such weapons emerged in the American civilian market in a significant way in the early 1980s verifies this. The study reports on and quotes directly from gun company advertisements and gun magazines. Examples include: Heckler and Koch selling its "HK 91 Semi-Automatic Assault Rifle"; ads for the "Bushmaster assault rifle"; the AKM "imported assault rifle"; the Beretta M-70 that "resembles many other assault rifles"; the AR-

---

[184]    Plaintiffs' Complaint, Delaware State Sportsmen's Association, Inc. et al., Case: 1:22-cv-00951-UNA Document 1, Filed 07/20/22, 19.

[185]    Peterson, *Gun Digest Buyer's Guide to Assault Weapons*, 11.

[186]    Violence Policy Center, *The Militarization of the U.S. Civilian Arms Market*, June 2011, http://www.vpc.org/studies/militarization.pdf#page=33; also Violence Policy Center, *Assault Weapons and Accessories in America*, 1988, http://www.vpc.org/studies/awacont.htm; http://www.vpc.org/studies/thatintr.htm. An ad for a "semi-auto assault rifle" appeared in the American Rifleman magazine in June 1961: https://twitter.com/drewmckevitt/status/1374484156701241344

45

10/XM-10 (made by Paragon S&S Inc.) advertised as a "Famous Assault Rifle [that] is Now Available in a Semi Auto Civilian Legal Form!" (see Exhibit J);"; the "AMT 25/.22 Lightning Carbine" that was advertised as an "assault-type semi-auto"; Intratec extolling its TEC-9 as one that "clearly stands out among high capacity assault-type pistols" (see Exhibit I); and the after-market supplier Assault Systems that appealed to civilian owners of "assault weapons," among many other examples. The use of military terminology, and the weapons' military character and appearance, were key to marketing the guns to the public.[187]  *Guns & Ammo* magazine described the "success of military assault rifles in the civilian market" in its July 1982 issue.[188]  In 1984, *Guns & Ammo* advertised a book called *Assault Firearms* that the magazine extolled as "full of the hottest hardware available today."[189]

79.  An article in *Outdoor Life* belied the claim that assault weapons are limited only to those that fire fully automatically.  That article urged its readers to share its information with non-shooting friends to dispel "myths" about "assault weapons." In its account, it correctly noted that "the term 'assault weapon' . . . generally referred to a type of light infantry firearm initially developed in World War II; a magazine-fed rifle and carbine suitable for combat, such as the AK-47 and the M16/M4.  These are selective-fire weapons that can shoot semi-auto, full-auto, or in three-round bursts."[190]

80.  The effort to rebrand "assault weapons" as something more benign and severed from its military origins was seen in the publication struggles of Phillip Peterson, whose book,

---

[187]  Tom Diaz, *Making a Killing* (NY: The New Press, 1999), 124–128, 230–231; Tom Diaz, *The Last Gun* (New York: The New Press, 2013), 142–43.

[188]  "Wooters Chooses the 10 Best Gun Designs," *Guns & Ammo*, July 1982, 58, 68; Diaz, *Making a Killing,* 126.

[189]  Erica Goode, "Even Defining 'Assault Rifles' Is Complicated," *New York Times*, January 17, 2013, A1, https://www.nytimes.com/2013/01/17/us/even-defining-assault-weapons-is-complicated.html

[190]  John Haughey, "Five Things You Need to Know About 'Assault Weapons'," *Outdoor Life*, March 19, 2013, http://www.outdoorlife.com/blogs/gun-shots/2013/03/five-things-you-need-know-about-assault-weapons

titled as recently as 2008, *Gun Digest Buyer's Guide to Assault Weapons*,[191] is a well-known reference work on the subject.  As Peterson explained, the gun industry "moved to shame or ridicule" those who used the phrase "assault weapons," insisting that the term should now only apply to fully automatic weapons.  Peterson noted that the origin of the term "assault weapon" was the industry itself.[192]  He found that the NRA refused to sell his book until he changed the title, which in 2010 he renamed *Gun Digest Buyer's Guide to Tactical Rifles*.[193]  The very same pattern played out in Canada, where gun companies also used the term "assault rifle" in the 1970s and 1980s until political pressure began to build to restrict such weapons in the aftermath of a mass shooting in Montreal in 1989.  By the 1990s, gun companies marketing guns in Canada and their allies also changed to using terms like "modern sporting rifles."[194]

81.     One of Plaintiffs' briefs asserts that the definition of a "large capacity magazine," defined by Delaware's statute as one holding more than seventeen rounds, is a "mislabeling"[195] and a "hyperbolic label."[196]  The large capacity magazine (LCM) designation is neither of these things.

82.     First, the idea of defining LCMs based on their holding more than a set number of rounds is one that dates back in federal law to at least 1991.[197]  In an early 1991 version of the law

---

[191]     Peterson, *Gun Digest Buyer's Guide to Assault Weapons*.

[192]     Goode, "Even Defining 'Assault Rifles' Is Complicated."

[193]     Phillip Peterson, *Gun Digest Buyer's Guide to Tactical Rifles* (Iola, WI: Gun Digest Books, 2010).

[194]     According to Blake Brown, Canadian newspapers ran ads from gun companies selling weapons like the "AR-15 semi-automatic assault rifle," the "Colt AR-15 Semi Auto Assault Rifle," and the "SKS Assault Rifle" among others, in 1976, 1982, 1983, 1985, and 1986 from dealers and companies including MilArm, Colt, and Ruger. "Gun Advocates' Changing Definition of 'Assault Rifles' is Meant to Sow Confusion," *Toronto Globe and Mail*, May 21, 2020, https://www.theglobeandmail.com/opinion/article-gun-advocates-changing-definition-of-assault-rifles-is-meant-to-sow/

[195]     Brief in Support of Plaintiffs' Motion, Delaware State Sportsmen's Association, Inc., Civil Action No.: 1:22-cv-00951-RGA, Document 11, Filed 11/15/22, 2.

[196]     Brief in Support of Plaintiffs' Motion, Delaware State Sportsmen's Association, Inc., 9.

[197]     Violent Crime Control and Law Enforcement Act of 1994, H.R. REP. 103-489, H.R. Rep.

Congress eventually passed in 1994, the term "large capacity ammunition feeding device" was defined in the law as "a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition. . . ."[198] Since that time, ten states plus the District of Columbia have adopted an LCM limit of ten rounds (see earlier discussion). Three states have adopted higher LCM limits: Colorado (fifteen), Vermont (fifteen for handguns), and Delaware (seventeen).[199]

83.    Second, the definition of LCMs based on a set round-limit has been and is widely accepted and used in the scholarly literature in criminology and other fields examining such devices.[200]  Third, as Table 1 and the accompanying discussion in this document shows, from 1917 to 1934 roughly half of the states in the U.S. enacted laws that restricted various ammunition feeding devices, or guns that could accommodate them, based on a set number of rounds, though the numerical cap for gun firing without reloading varied at that time from more than a single round up to eighteen. Thus, the idea of restricting removable magazines by capping the number of rounds (noting variations in the number set), with such limits adopted commonly, dates back a century.

No. 489, 103RD Cong., 2ND Sess. 1994, 36.

[198]    Violent Crime Control and Law Enforcement Act of 1994, 6.

[199]    https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/large-capacity-magazines/.

[200]    For example: Jaclyn Schildkraut and Gregg Lee Carter, eds., *Guns in American Society,* 3 vols. (Santa Barbara, CA: ABC-CLIO, 2023), I, 426-29; Jaclyn Schildkraut and Tiffany Cox Hernandez, "Laws That Bit The Bullet: A Review of Legislative Responses to School Shootings," *American Journal of Criminal Justice* 39, 2 (2014): 358-74; Luke Dillon, "Mass Shootings in the United States: An Exploratory Study of the Trends from 1982-2012," Mason Archival Repository Service, George Mason University, May 22, 2014, http://mars.gmu.edu/xmlui/handle/1920/8694; Jaclyn Schildkraut, "Assault Weapons, Mass Shootings, and Options for Lawmakers," Rockefeller Institute of Government, March 22, 2019, https://rockinst.org/issue-area/assault-weapons-mass-shootings-and-options-for-lawmakers/; Christopher Koper, et al., "Assessing the Potential to Reduce Deaths and Injuries from Mass Shootings Through Restrictions on Assault Weapons and Other High-Capacity Semiautomatic Firearms," *Criminology & Public Policy*, 19(February 2020): 157; Philip J. Cook and Kristin A. Goss, *The Gun Debate,* 2nd ed. (NY: Oxford University Press, 2020), 201.

84.     Finally, in a footnote, DSSA Plaintiffs' brief also claims that "Ammunition magazines capable of holding more than seventeen rounds are not only in common use today, they have been for centuries."[201] The brief cites as an example the Girandoni air rifle taken by Lewis and Clark on their 1804-1806 expedition. As the earlier discussion in this document demonstrates, the latter assertion that LCMs holding more than seventeen rounds having been in common use for centuries is false, and the actual history of the Girandoni, discussed here, does not support Plaintiffs' claim.

### G.     Recent Developments

85.     Modern guns available to civilians labeled assault weapons and assault rifles are derived from military weapons designed for use on the battlefield. The firearm known today as the assault weapon arose during World War II when the Germans developed the STG 44 or *Sturmgewehr* (literally translated as "assault rifle"). That soldier-carried weapon was studied by the Soviets, who produced the well-known Soviet AK-47 Kalashnikov in 1947, the most successful and prolific soldier-held battlefield weapon in modern times.[202] The AK-47 gave rise to the American AR-15, which then became the military M16. The AR-15 was eventually sold to the civilian market, and that led in turn to many copycat variations.

86.     The AR-15 was first produced by the ArmaLite Company in the late 1950s (the basis for the "AR" name). According to one of its designers, Jim Sullivan, the weapon was "designed for full automatic military use. It wasn't really designed as a sporting rifle."[203] Sullivan also said of the AR-15 in an interview that "Civilian sales was never the intended purpose."[204]

---

[201]     Brief in Support of Plaintiffs' Motion, Delaware State Sportsmen's Association, Inc., 9, fn. 6.

[202]     Larry Kahaner, AK-47: The Weapon That Changed the Face of War (New York: Wiley, 2007).

[203]     "America's Gun – the Rise of the AR-15," *CNBC,* April 25, 2013, http://www.youtube.com/watch?v=OCvjoFPD5Kg

[204]     Laura Bult, "Inventor of the AR-15 Would be 'Sickened' By Its Use in Mass Shootings, Family Says," *New York Daily News,* June 16, 2016, https://www.nydailynews.com/news/national/inventor-ar-15-sickened-mass-shootings-article-

ArmaLite sold the rights to the gun to the Colt Company in 1959. A few years later, the weapon was adopted by the American military and produced as the M16, where it came in to use during the Vietnam War in the 1960s. These military weapons came to have three firing capabilities: fully automatic, semi-automatic, and (sometimes) "selective fire" or three-round bursts.[205] Civilian versions could and can fire only in a semi-automatic fashion.

87.     Colt received permission to market a semi-automatic version of the AR-15 to the civilian market, but these weapons did not catch on in the American market in a significant way until the late 1980s,[206] when the Chinese flooded the market with cheap weapons, including their own semi-automatic version of the AK-47.[207] Today, the AR-15-type weapon is manufactured and sold by over thirty companies, including Smith and Wesson, Bushmaster, and Sig Sauer.[208]

88.     This shift to greater firepower is consistent with the fact that "from 1973 to 1993, the types of handguns most frequently produced" were "pistols rather than revolvers. Pistol production grew from 28% of the handguns produced in the United States in 1973 to 80% in 1993."[209] Pistols "generally contain cartridges in a magazine located in the grip of the gun.  When the semiautomatic pistol is fired, the spent cartridge that contained the bullet and propellant is

---

1.2676028. The family of the man credited with the original design of the AR-15, Eugene Stoner, who died in 1997, said that he "would have been horrified" at its appeal to mass shooters and that "he designed it as a military rifle."

[205]     Kyle Mizokani, "The Army's M4 Carbine Can Fire Even If You Don't Pull the Trigger," *Popular Mechanics,* June 1, 2018, https://www.popularmechanics.com/military/weapons/a21052857/army-m4-carbine-firing-defect/

[206]     According to Phillip Peterson the first assault weapon marketed to civilians was the Colt AR-15, introduced in 1964. *Buyer's Guide to Assault Weapons*, 4. Peterson says that the poor sales of these weapons, along with imported versions, was attributable at least in part to the fact that they were "too expensive to appeal to the average shooter."

[207]     Jay Mathews, "AK47 Rifles Flood Into U.S. from Chinese Sales War," *Washington Post,* February 2, 1989, A1.

[208]     Diaz, Making a Killing, 125.

[209]     Marianne W. Zawitz, "Guns Used in Crime," *Bureau of Justice Statistics,* July 1995, 3, https://bjs.ojp.gov/content/pub/pdf/GUIC.PDF

ejected, the firing mechanism is cocked, and a new cartridge is chambered"[210] whereas a revolver is defined as a "handgun that contains its ammunition in a revolving cylinder that typically holds five to nine cartridges. . . ."[211]

89.    A profound change in firepower occurred in the U.S. in the 1980s, when semi-automatic handguns, and a new generation of more expensive and more deadly guns, entered the criminal market.[212]  According to criminologists Alfred Blumstein and Richard Rosenfeld, writing in the 1990s about the period from 1985-1993 and the dramatic rise in gun crime and homicides during that period, "[o]ver the last decade the weapons involved in settling juveniles' disputes have changed dramatically from fists or knives to handguns, with their much greater lethality."[213]  More specifically, Blumstein attributed this deadly crime spike in the 1980s to "the advent of crack cocaine, semiautomatic handguns and gangs" which "sparked the surge in killings by teen-agers."[214]  Blumstein noted that "[b]eginning in 1985, there was steady growth in the use of guns by juveniles in committing murder, leading to a doubling in the number of juvenile murders committed with guns, with no shift in the number of non-gun homicides."[215]

---

[210]    Zawitz, "Guns Used in Crime," 2.

[211]    Zawitz, "Guns Used in Crime," 2.

[212]    The prevailing crime handguns of the 1970s and early 1980s were so-called "Saturday night specials," cheap, smaller caliber, short-barreled, easily concealable revolvers that accounted for much gun crime. "Hot Guns," *Frontline,* PBS, aired June 3, 1997, https://www.pbs.org/wgbh/pages/frontline/shows/guns/etc/script.html; also Interview with Garen Wintemute, "Hot Guns," PBS, https://www.pbs.org/wgbh/pages/frontline/shows/guns/interviews/wintemute.html

[213]    Alfred Blumstein and Richard Rosenfeld, "Explaining Recent Trends in U.S. Homicide Rates," *Journal of Criminal Law and Criminology* 4 (Summer 1998): 1191, https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=6976&context=jclc

[214]    Fox Butterfield, "Guns Blamed for Rise in Homicides by Youths in 80's," *New York Times,* December 10, 1998, https://www.nytimes.com/1998/12/10/us/guns-blamed-for-rise-in-homicides-by-youths-in-80-s.html

[215]    Alfred Blumstein, "Violence by Young People: Why the Deadly Nexus?" *National Institute of Justice Journal,* August 1995, 5, https://www.ojp.gov/pdffiles/nijj_229.pdf

90.     In testimony before Congress on what became the assault weapons ban of 1994, law enforcement representatives discussed the rise in criminal firepower they witnessed in the 1980s.   For example, the executive vice president of the National Association of Police Organizations, Tony Loizzo, offered this testimony:

> In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased. . . dramatically. . . . The six-shot .38 caliber service revolver, standard law enforcement issue for years, it [is] just no match against a criminal armed with a semi-automatic assault weapon.[216]

91.     John Pitta, executive vice president of the Federal Law Enforcement Officers Association testified similarly with respect to the 1994 bill: "[t]he TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals.  Cities across the country confiscate more TEC–9s than any other assault pistol."[217]   The ultimate result was congressional enactment of a ten-year restriction on assault weapons and also on ammunition magazines capable of holding more than ten rounds.[218]

92.     After the federal assault weapons/LCM law lapsed in 2004, Maryland and New York both strengthened their state assault weapons bans and LCM limits in 2013; Delaware enacted a ban in 2022, and Illinois did so in early 2023.[219]  This brought the number of American states with assault weapons bans to ten, representing approximately 101 million people, or approximately 30.3% of the U.S. population:  California, Connecticut, Delaware, the District of

---

[216]    H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess. 1994, 1994 WL 168883, 1994 U.S.C.C.A.N. 1820 (Leg.Hist.), Violent Crime Control and Law Enforcement Act Of 1994, 32.

[217]    H.R. REP. 103-489, H.R. Rep. No. 489, 32.

[218]    Spitzer, *The Politics of Gun Control*, 205-11.

[219]    "Assault     Weapons,     *Giffords*,     https://giffords.org/lawcenter/gun-laws/policy-areas/hardware-ammunition/assault-weapons/#footnote_24_5603

Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, and New York.[220] And it brought the number of American states that restrict LCMs to fourteen plus the District of Columbia, representing 115 million people, or approximately 34.5% of the U.S. population: California, Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Illinois, Maryland, Massachusetts, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.[221]

*[Signature page appears on following page]*

---

[220] *Supra* notes 2-3.

[221] *Supra* notes 4-5.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 25, 2023

Robert J. Spitzer