IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| DELAWARE STATE SPORTSMEN'S ASSOCIATION, INC; BRIDGEVILLE RIFLE & PISTOL CLUB, LTD.; DELAWARE RIFLE AND PISTOL CLUB; DELAWARE ASSOCIATION OF FEDERAL FIREARMS LICENSEES; MADONNA M. NEDZA; CECIL CURTIS CLEMENTS; JAMES E. HOSFELT, JR; BRUCE C. SMITH; VICKIE LYNN PRICKETT; and FRANK M. NEDZA, | ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 1:22-cv-00951-RGA (Consolidated) |
| DELAWARE DEPARTMENT OF SAFETY AND HOMELAND SECURITY; NATHANIAL MCQUEEN JR. in his official capacity as Cabinet Secretary, Delaware Department of Safety and Homeland Security; and COL. MELISSA ZEBLEY in her official capacity as superintendent of the Delaware State Police, | ) ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) ) |  |
| GABRIEL GRAY; WILLIAM TAYLOR; DJJAMS LLC; FIREARMS POLICY COALITION, INC. and SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| KATHY JENNINGS, Attorney General of Delaware, | ) ) ) |  |
| Defendant. | ) ) |  |

**PLAINTIFFS' JOINT REPLY BRIEF IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

LEWIS BRISBOIS
    BISGAARD & SMITH LLP

Francis G.X. Pileggi, Esquire (#2624)
Sean M. Brennecke, Esquire (#4686)
500 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Sean.Brennecke@LewisBrisbois.com

OF COUNSEL:
Alexander D. MacMullan, Esquire
LEWIS BRISBOIS
    BISGAARD & SMITH LLP
550 E. Swedesford Road, Suite 270
Wayne, Pennsylvania 19087
Alexander.MacMullan@LewisBrisbois.com

*Attorneys for DSSA Plaintiffs*

GELLERT SCALI BUSENKELL
& BROWN LLC

Bradley P. Lehman, Esquire (#5921)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
(302) 425-5800
BLehman@gsbblaw.com

*Attorney for FPC Plaintiffs*

Dated: February 13, 2023

2

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT ........................................................................................................................2

I.    So-Called "Assault Weapons" Are Protected by the Second Amendment.........................2

     A.    The Arms at Issue Are in Common Use for Lawful Purposes ...............................2

     B.    Bearable Arms May Not be Banned Unless They Are Both Dangerous and Unusual ...............................................................................................................5

     C.    "Common Use" Does Not Require the Arms to be Actually Fired or Actively Employed in Self-Defense ...................................................................8

     D.    Historical Regulation of Firearms in Common Use for Lawful Purposes Today is Immaterial ...........................................................................................11

II.    So-Called "Large-Capacity Magazines" Are Protected by the Second Amendment ........12

     A.    Ammunition Magazines are Common Arms Protected by the Second Amendment......................................................................................................12

     B.    Ammunition Magazines Capable of Holding Seventeen or More Rounds of Ammunition are in Common Use for Lawful Purposes .......................................15

     C.    The State Provides No Historic Analogue for SS 1 for SB 6 ...............................17

III.    HB 450 and SS 1 for SB 6 Violate Article I, § 20 of the Delaware Constitution............19

IV.    Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction........21

V.    Public Interest and Balance of Hardships Strongly Favor Plaintiffs ...............................24

CONCLUSION....................................................................................................................25

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Almeida-Sanchez v. United States,*
413 U.S. 266 (1973) ............................................................................... 6

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey,*
910 F.3d 106 (3d Cir. 2018) ................................................................... 13

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.,*
710 F.3d 99 (3d Cir. 2013) ................................................................. 22, 24

*Bella Vista United v. City of Phila.,*
2004 U.S. Dist. LEXIS 6771 (E.D. Pa. Apr. 15, 2004) ......................... 23

*Bridgeville Rifle & Pistol Club, Ltd. v. Small,*
176 A.3d 632 (Del. 2017) ................................................................. 19, 20

*Caetano v. Massachusetts,*
577 U.S. 411 (2016) ................................................................... 5, 7, 9, 17

*Chestnut Hill Sound, Inc. v. Apple Inc.,*
2015 U.S. Dist. LEXIS 150715 (D. Del. Nov. 6, 2015) ......................... 21

*Colorado Outfitters Ass'n v. Hickenlooper,*
24 F. Supp. 3d 1050 (D. Colo. 2014), *vacated in part on other grounds,* 823
F.3d 537 (10th Cir. 2016) ..................................................................... 10

*Cowgill v. Raymark Indus., Inc.,*
832 F.2d 798 (3d Cir. 1987) ................................................................... 13

*District of Columbia v. Heller,*
554 U.S. 570 (2008) .......................................................................... *passim*

*Doe v. Wilmington Housing Authority,*
88 A.3d 654 (Del. 2014) ......................................................................... 19

*Friedman v. City of Highland Park,*
577 U.S. 1039 (2015) ........................................................................... 7,9

*Fyock v. Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ................................................................. 13

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,*
49 F.3d 1551 (Fed. Cir. 1995) ............................................................... 21

ii

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir. 1989)...........................................................................22, 23

*Ezell v. City of Chicago*,
   651 F.3d 684 (7th Cir. 2011) .........................................................................20, 23

*Jones v. Bonta*,
   34 F.4th 704 (9th Cir. 2022) *vacated on other grounds,* 47 F.4th 1124 (9th
   Cir. 2022) .....................................................................................................................7

*Kolbe v. Hogan*,
   849 F.3d 114 (4th Cir. 2017) ........................................................................10, 15

*Lewis v. Kugler*,
   446 F.2d 1343 ...............................................................................................................22

*Luis v. United States*,
   578 U.S. 5 (2016) .........................................................................................................13

*McCahon v. Pa. Tpk. Comm'n*,
   491 F. Supp. 2d 522 (M.D. Pa. 2007)...........................................................................23

*New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015)...........................................................................10, 15

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   142 S. Ct. 2111 (2022).......................................................................... *passim*

*Ocean State Tactical, LLC v. State of Rhode Island*,
   2022 WL 17721175 (D.R.I. Dec. 14, 2022) .........................................................13

*Staples v. United States*,
   511 U.S. 600 (1994)...................................................................................................2, 5

*Walters v. Kemp*,
   2020 WL 9073550 (N.D. Ga. May 5, 2020)...........................................................23

**Other Authorities**

11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL
   PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022) ..................................... 22

Delaware Constitution, Article I, § 20 .............................................................4, 19, 22

*Expanded Homicide Data Table 8, Murder Victims by Weapon, 2015-2019,*
   available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-
   2019/tables/expanded-homicide-data-table-8.xls (last accessed February 7,
   2023) ..........................................................................................................................6

Jim Garry, *Weapons of the Lewis & Clark Expedition* (2012) ..................................... 18

NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (2013).............................................................................................................................10

Noah Webster, *An Examination of the Leading Principles of the Federal Constitution* (Philadelphia: Prichard & Hall, 1787) .................................14

2021 National Firearms Survey: *Updated Analysis Including Types of Firearms Owned* (May 13, 2022), https://bit.ly/3yPfoHw ........................................9

NSSF, Modern Sporting Rifle Comprehensive Consumer Report, available at https://bit.ly/3GLmErS.....................................................................................16

Randy J. Holland, *The Delaware State Constitution* (2d ed. 2017) ............................20

Robert Rutland,1 *George Mason, The Papers of George Mason*, Robert Rutland ed., (Chapel Hill, N.C.: University of North Carolina Press, 1970) .......................14

Webster, An American Dictionary of the English Language (1828)............................14

WILLIAM ENGLISH, 2021 National Firearms Survey: Updated Analysis Including Types of Firearms Owned at 1 (May 13, 2022), https://bit.ly/3yPfoHw..................................................................................9

## INTRODUCTION

Following the Supreme Court's seminal decision in *New York State Rifle & Pistol Association, Inc. v. Bruen,* 142 S. Ct. 2111 (2022), this Court must determine whether the arms and their components banned by Delaware are "in common use" for lawful purposes and, therefore, protected by the Second Amendment's "unqualified command."[1] 142 S. Ct. at 2126, 2128. The State cannot meet its heavy burden to prove otherwise. Indeed, likely realizing that it cannot prevail in defiance of controlling law clarified in *Bruen*, it attempts to complicate this case and muddy the waters with irrelevant evidence and by playing semantic games with pre-*Bruen* precedent. "[T]he Second Amendment protects the possession and use of weapons that are 'in common use….' " 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). The arms and components thereof banned by Delaware are indisputably covered by this command. Plaintiffs are entitled to an injunction preventing the enforcement of unconstitutional restrictions imposed by HB 450 and SS 1 for SB 6.

---

[1] The complete standard mandated by the Supreme Court requires: (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right. See *Heller*, 554 U.S. 570. Once the first test is met, it becomes the burden of the State to demonstrate that the burdensome restrictions upon the right to own common arms are consistent with "this Nation's historical tradition" so as to fall outside of the Second Amendment's "unqualified command." *Bruen*, 142 S. Ct. at 2126 (*citing Konigsberg v. State Bar of Cal.,* 366 U.S. 36, 50 n.10 (1961)). The *Bruen* Court further held that "[t] he Second Amendment protects the possession and use of weapons that are "'in common use at the time.'" *Id*. at 2128. Therefore, such weapons cannot and do not fall outside of the Second Amendment's "unqualified command." In the context of bans on entire categories of arms, the Supreme Court has already done the relevant historical analysis and has held that despite "the historical tradition of prohibiting the carrying of dangerous and unusual weapons," firearms cannot be banned if they are "in common use" today. *Id*. (quoting *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008)).

## ARGUMENT

**I.      So-Called "Assault Weapons" Are Protected by the Second Amendment**

Plaintiffs only have to show that the restricted arms are "bearable arms" and that they are in common use today for lawful purposes. Once they make that showing, the arms are presumptively protected under the Second Amendment. Semiautomatic arms such as those proscribed under Delaware's Ban "traditionally have been widely accepted as lawful possessions." *See Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle); *see also Heller v. Dist. of Columbia,* 670 F.3d 1244, 1269-70 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("There is no meaningful or persuasive constitutional distinction between semi-automatic handguns and semi-automatic rifles."). It is beyond dispute that the firearms banned by Delaware are bearable arms that are in common use today for lawful purposes by law-abiding persons, and that they are therefore plainly protected by the Second Amendment. In an effort to avoid that inescapable conclusion, the State engages in some sleight-of-hand with Supreme Court precedent.

**A.      The Arms at Issue Are in Common Use for Lawful Purposes**

First, the State attempts to steer the Court toward the incorrect conclusion that arms are only protected by the Second Amendment if they are in "common use for self-defense" and that, because the State and its declarants contend that, in their view, an AR-15 is not ideal for self-defense, the AR-15 and its ilk are not protected. But that materially misstates the relevant inquiry.[2] The U.S. Supreme Court has never set forth such a requirement, although the State's brief nonetheless includes carefully selected quotations to suggest that conclusion. Rather, in order to

---

[2] Of course, this argument also ignores the much broader right to use firearms beyond self-defense recognized in the Delaware Constitution.

be presumptively protected by the Second Amendment, arms need only to be in common use for "lawful purposes," of which self-defense is but one of many.

As the Supreme Court has said, "We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for *lawful purposes*, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right...." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008) (emphasis added). "Miller said, as we have explained, that the sorts of weapons protected were those in common use at the time. We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of dangerous and unusual weapons." *Id*. at 627 (emphasis added) (internal citation and quotations omitted). Moreover, following the *Heller* decision in 2008, the D.C. Circuit, mistakenly applying intermediate scrutiny under the since-rejected two-step approach, nonetheless stated: "We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity.... Of course, the [U.S. Supreme] Court also said the *Second Amendment protects the right to keep and bear arms for other lawful purposes, such as hunting*, but self-defense is the core lawful purpose protected." *Heller v. District of Columbia*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) (emphasis added) (*citing Heller*, 554 U.S. at 630). "As to bans on categories of guns, the Heller Court stated that the government may ban classes of guns that have been banned in our historical tradition — namely, guns that are dangerous and unusual and thus are not the sorts of lawful weapons that citizens typically possess at home." *Id*. at 1271-1272 (Kavanaugh, J., dissenting). Naturally, the *Heller* and *Bruen* decisions repeatedly referenced self-defense, both because that is the "core" of the Second Amendment right and because carrying handguns for that purpose was at issue in those cases (and, of course, a concealed handgun is not generally carried for purposes of

3

hunting or recreation), but the Supreme Court has certainly never suggested that self-defense is the *only* lawful purpose protected by the Second Amendment.[3]  In fact, as demonstrated above, it has clearly recognized exactly the opposite.

Further, the State's novel position concerning self-defense as the only lawful purpose protected by the Second Amendment immediately falls to pieces when applied to the broader universe of lawfully owned firearms. There are many collectible antique firearms, certain hunting or competition target shooting rifles, and even some handguns that are virtually useless or at least relatively impractical for use as self-defense weapons, yet their protection under the Second Amendment is not at all in question. The Supreme Court plainly did not envision that lower courts in the wake of *Heller* and *Bruen* would decide on a case-by-case basis whether individual firearms, in those lower courts' views, were "legitimate" or "ideal" self-defense weapons or not. Instead, bearable arms are presumptively protected so long as they are in common use for any lawful purpose.[4]

---

[3] Notably, the Delaware Constitution at Article 1, § 20, expressly protects the right to bear arms for hunting and recreation, as well as defense of one's family—far beyond simple self-defense.

[4] *Heller* left no doubt that the people choose what is useful for self-defense and whatever reason they have for it is good enough:

> "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629.

**B.      Bearable Arms May Not be Banned Unless They Are Both Dangerous and Unusual**

In another effort to rewrite applicable Second Amendment precedent, the State takes another curious and novel position. Rather than accepting the plain language of the Supreme Court's (and other courts') repeated references over the years to "dangerous *and* unusual" weapons, the State urges this Court to instead view that language as some sort of obscure semantic anomaly which results in the "unusual" part of the test having no meaning at all. In doing so, the State ignores the great weight of authority to the contrary while citing no case law supporting its newly invented, subjective, and completely unworkable "unusually dangerous" interpretation.

There is no tradition of banning dangerous arms – just a tradition of banning "*dangerous and unusual*" arms. *See Bruen*, 142 S. Ct. at 2128 (emphasis added). Indeed, all arms are dangerous or else they would not be arms; a weapon that poses no danger is useless. Further, "that an item is 'dangerous,' in some general sense, does not necessarily suggest, as the Government seems to assume, that it is not also entirely innocent." *Staples*, 511 U.S. at 611. In 2016, Justice Alito wrote, concurring with the majority: "As the per *curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is both dangerous and unusual. Because the Court rejects the lower court's conclusion that stun guns are unusual, it does not need to consider the lower court's conclusion that they are also dangerous." *Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) (emphasis in original). If the Supreme Court had intended lower courts to consider whether various arms were dangerous or unusual and uphold bans based solely on one or the other, it would have said so. It did not.

Undeterred, the State asserts that the banned arms in this case are "unusually dangerous" and may be banned on that basis, boldly pronouncing that the banned arms are not subject to Second Amendment protection simply because they allegedly pose a special threat to law

enforcement[5] and the general public. First, this assertion seeks subtly to prod the Court back into the forbidden territory of interest-balancing. The fact that the legislature may be particularly concerned with the potential dangerousness of the banned arms is immaterial and entitled to no deference from this Court under *Bruen*, and the State continues to ignore the "and unusual" part of the conjunctive test. Second, what do they mean by "unusually dangerous"--compared to what? The only reasonable comparison is with arms in common use for lawful purposes, but these arms are in common use for lawful purposes and cannot be relatively dangerous in comparison with themselves. Further, while it is beside the point, the State and its declarants casually ignore the numerous non-banned firearms that are just as or even more "dangerous" in the sense that they fire projectiles with greater kinetic energy and are capable of causing relatively more devastating wounds. The notion that the banned arms are "unusually dangerous," even if that were the test (it is not), is fiction. Notably, substantially more people are killed each year in the U.S. with bare hands, knives, or blunt objects (individually, not collectively) than are killed by rifles of *any* kind. See Federal Bureau of Investigation (2019), *Expanded Homicide Data Table 8, Murder Victims by Weapon, 2015-2019*, available at https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/tables/expanded-homicide-data-table-8.xls (last accessed February 7, 2023).

Moreover, as Justice Alito has explained: "[T]he court below held that a weapon is 'dangerous per se' if it is 'designed and constructed to produce death or great bodily harm' and 'for the purpose of bodily assault or defense.' That test…cannot be used to identify arms that fall outside the Second Amendment. …[T]he relative dangerousness of a weapon is irrelevant when

---

[5] The Supreme Court  rejected this argument in the Fourth Amendment context. *See*, *Almeida-Sanchez v. United States*, 413 U.S. 266, 273 (1973) ("The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards.")

the weapon belongs to a class of arms commonly used for lawful purposes." *Caetano*, 577 U.S. at 418 (Alito, J. concurring); *see also Bruen*, 142 S. Ct. at 2143 ("the Second Amendment protects only the carrying of weapons that are those 'in common use at the time,'[6] as opposed to those that 'are highly unusual in society at large.' "); *Jones v. Bonta,* 34 F.4th 704, 716 (9th Cir. 2022) *vacated on other grounds,* 47 F.4th 1124 (9th Cir. 2022)  ("Here, the district court held that both long-guns and semi-automatic centerfire rifles are commonly used by law abiding citizens for lawful purposes such as hunting, target practice, and self-defense, and thus that they are not dangerous and unusual weapons under *Helle*r, 554 U.S. at 627…. We agree: long guns and semiautomatic rifles are not dangerous and unusual weapons.") (internal quotations and citations omitted); *Friedman v. City of Highland Park*, 784 F.3d 406, 415 n.2 (7th Cir. 2015) ("All weapons are presumably dangerous. To say that a weapon is unusual is to say that it is not commonly used for lawful purposes."). *Heller's* distinction, reiterated by *Bruen*, between protected weapons "in common use at the time" and those that are "dangerous and unusual" loses all meaning if a state can ban a weapon in common use merely because the legislature concludes that the weapon is potentially more dangerous relative to some other weapon.

The State briefly points to a purported tradition of banning "dangerous weapons," identifying laws targeting clubs, Bowie knives, sword canes, daggers, Tommy guns, etc., which were perceived to be weapons of criminals and gangsters, as historical restrictions analogous to its "assault weapons" ban. Notably, the State has not identified a single law that would permit a State to outlaw possession of a "dangerous" weapon that was among the most popular contemporary

---

[6] By this, the Supreme Court means the Second Amendment protects the right to own weapons that are in common use for lawful purposes today. *See id*. ("Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

choices of citizens lawfully seeking to exercise their fundamental Second Amendment rights. None of the laws cited by the State are "relevantly similar" under *Bruen. See Bruen*, 142 S. Ct. at 2132 ("…determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation requires a determination of whether the two regulations are 'relevantly similar.' "). Further, while the State appeals to emotion concerning the issues "the Statutes seek to address" – including declarations needlessly recounting tales of gore and of the exceedingly rare instances in which "assault weapons" are used to perpetrate mass shootings – these considerations implicate the sort of interest-balancing, means-end analysis that the Supreme Court has directed this Court not to undertake. [7]

### C.    "Common Use" Does Not Require the Arms to be Actually Fired or Actively Employed in Self-Defense

The State contends, without citing any authority on point, that "the fact that a weapon is commonly owned, used, or sold, by itself, is insufficient to prevent its regulation." This is an unusual assertion given that the Supreme Court has repeatedly and unequivocally stated that weapons in common use for lawful purposes are protected. *See, e.g., Bruen*, 142 S. Ct. at 2128 ("the Second Amendment protects the possession and use of weapons that are 'in common use at the time.' " (quoting *Heller*, 554 U.S. at 627)). The Second Amendment protects the rights of Americans to "keep and bear Arms." By its plain terms then, it contemplates ways of "using" firearms other than just shooting them. In construing the word "bear," *Heller* explained the term meant "being armed and ready for offensive or defensive action in a case of conflict with another person." *Heller*, 554 U.S. at 584 (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998)

---

[7] Pages 17-23 of the State's Answering Brief consist of nothing but fodder for improper interest-balancing, citing in numerous instances to news articles, and could safely be ignored entirely by the Court. They also rely on the faulty logic of appealing to emotion instead of legal reasoning based on case law.

(Ginsburg, J., dissenting)) (emphasis added). Similarly, in *Bruen* the Court explained that "[a]lthough individuals often 'keep' firearms in their home, a*t the ready for self-defense*, most do not 'bear' (i.e., carry) them in the home beyond moments of actual confrontation. To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections." *Bruen*, 142 S. Ct. at 2134–35 (emphasis added). Importantly, the Court in *Heller* recognized that the Second Amendment protects those firearms "typically *possessed* by law-abiding citizens for lawful purposes…." 554 U.S. at 625 (emphasis added). The Supreme Court has repeatedly construed "common use" broadly to include possession (i.e., to "keep").

Other notable opinions also make clear that possession is indeed sufficient. In *Caetano*, Justice Alito did not ask how often stun guns were actually discharged to prevent an attack. Instead, he explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been *sold* to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. at 420 (Alito, J., concurring) (emphasis added). And when analyzing an "assault weapons" ban, Justice Thomas said the "ban is thus highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly five million Americans own AR-style semiautomatic rifles. The vast majority of citizens who own and use such rifles do so for lawful purposes, including self-defense and target shooting." *Friedman v. City of Highland Park*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting from the denial of certiorari) (emphasis added). In both cases the touchstone for "common use" was ownership, and the sale of approximately 200,000 stun guns was enough for them to be considered in common use by Justice Alito in *Caetano*. Tens of millions of so-called "assault weapons" are presently owned by millions of Americans. *See, e.g.,* WILLIAM ENGLISH, 2021 National Firearms Survey: *Updated Analysis Including Types of Firearms Owned* at 1 (May 13, 2022), https://bit.ly/3yPfoHw (finding in a

recent survey of gun owners that approximately 24.6 million Americans have owned up to 44 million AR-15 or similar rifles); NAT'L SHOOTING SPORTS FOUND., INC., *Firearms Retailer Survey Report* (2013) at 11 (even ten years ago, one out of every five firearms sold in the US was a rifle of the type banned by Delaware).

Additionally, when confronted with a similar question in the pre-*Bruen* context during his tenure on the D.C. Circuit Court of Appeals, now-Justice Kavanaugh stated: "We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use,' as the plaintiffs contend. Approximately 1.6 million AR-15s alone have been manufactured since 1986, and in 2007 this one popular model accounted for 5.5 percent of all firearms, and 14.4 percent of all rifles, produced in the U.S. for the domestic market." *Heller*, 670 F.3d at 1261 (emphasis added); see *also  Kolbe v. Hogan*, 849 F.3d 114, 153 (4th Cir. 2017) (Traxler, J., dissenting) ("Between 1990 and 2012, more than 8 million AR- and AK- platform semiautomatic rifles alone were manufactured in or imported into the United States. In 2012, semiautomatic sporting rifles accounted for twenty percent of all retail firearms sales. In fact, in 2012, the number of AR- and AK- style weapons manufactured and imported into the United States was more than double the number of the most commonly sold vehicle in the U.S., the Ford F-150.");[8] *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) ("This much is clear: Americans own millions of the firearms that the challenged legislation prohibits. . . . Even accepting the most conservative estimates cited by the parties and by amici, the assault weapons and large-capacity magazines at issue are 'in common use' as that term was used in *Heller*."); *Colorado Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1068 (D. Colo.

---

[8] These firearms, now banned by Delaware, are no more a "niche product," as the State suggests, than the most popular vehicle sold in the United States over the past few decades is a niche vehicle.

2014) (concluding that statute "affects the use of firearms that are both widespread and commonly used for self-defense," in view of the fact that "lawfully owned semiautomatic firearms using a magazine with the capacity of greater than 15 rounds number in the tens of millions"), *vacated in part on other grounds*, 823 F.3d 537 (10th Cir. 2016).

Thus, it remains settled that possession and ownership are indeed sufficient, and the firearms now banned by Delaware are plainly in common use for lawful purposes today. When a substantial number of law-abiding citizens own a type of firearm with the intent to use it for lawful purposes should the need or opportunity arise, then such firearms are in "common use" within the meaning of the Second Amendment and cannot be banned. The Supreme Court has told us in plain terms what the law is, and the majority opinion of the justices of the Court would surely have addressed the possibility of the State's highly improbable doomsday scenario if it were of any real concern.

**D.   Historical Regulation of Firearms in Common Use for Lawful Purposes Today is Immaterial**

As discussed above, *Heller* and *Bruen* make clear that arms in common use for lawful purposes today are protected by the Second Amendment's "unqualified command" and cannot be banned. Although the State has not offered any relevant historical analogues for its ban on so-called "assault weapons," it would not matter if they had. When a category of arms is in common use today, historical regulations are immaterial. *Bruen*, 142 S. Ct. at 2143 ("Thus, even if these colonial laws prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today.").

## II.     So-Called "Large-Capacity Magazines" Are Protected by the Second Amendment

The State employs virtually the same flawed approach to opposing Plaintiffs' challenge to SS 1 for SB 6's so-called "large-capacity magazine" ban as they do to the challenge to HB 450, often treating SS 1 for SB 6 as an afterthought in their opposition. As noted, the State has introduced five separate voluminous expert declarations that are nothing more than an irrelevant effort to obfuscate the required basic analysis to decide this issue that the United States Supreme Court established first in *Heller* and now in *Bruen*.

The Supreme Court's standard  requires: (1) determining, through textual analysis, that the Second Amendment protected an individual right to armed self-defense; and (2) relying on the historical understanding of the Amendment to demark the limits on the exercise of that right. See *Heller*, 554 U.S. 570. Once the first test is met, it becomes the burden of the State to demonstrate that the burdensome restrictions upon the right to own common arms are consistent with "this Nation's historical tradition" so as to fall outside of the Second Amendment's "unqualified command." *Bruen*, 142 S. Ct. at 2126 (*citing Konigsberg v. State Bar of Cal*., 366 U.S. 36, 50 n.10 (1961)). The State has failed to meet its burden. Regardless of the immaterial and numerous declarations they provide, the State cannot and has not demonstrated that common ammunition magazines are not protected by the Second Amendment, and they cannot and have not demonstrated that the burdens of SS 1 for SB 6 are consistent with this Nation's historical tradition of regulation of magazines.

### A.     Ammunition Magazines are Common Arms Protected by the Second Amendment

Perhaps the only manner in which the State's opposition to the challenge to SS 1 for SB 6 differs from its opposition to the challenge of HB 450 is via its preposterous and unfounded argument that ammunition magazines, and even ammunition itself, are not included within the

12

constitutional concept of "arms" and are thus not protected by the Second Amendment. This distorted argument defies textual analysis of the Second Amendment, precedent, and basic logic. The concept that ammunition or ammunition magazines, as components of arms, are not included within the constitutional protection of arms is nonsensical at best and disingenuous at worst.

Judicial support for the State's position is found only in a single, unexplainable, outlier decision from the District of Rhode Island, *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175 (D.R.I. Dec. 14, 2022). The State conveniently ignores all other precedent, including Supreme Court precedent that contradicts their position. Constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment).

Importantly, the Third Circuit has already held, before *Bruen*, that ammunition magazines are arms, "[b]ecause ammunition magazines feed ammunition into certain guns, and ammunition is necessary for such a gun to function as intended, magazines are 'arms' within the meaning of the Second Amendment." *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 116 (3d Cir. 2018) ("ANJRPC").[9] The Ninth Circuit has also previously recognized that "caselaw supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable." *Fyock v. Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). Despite citation to a single outlier, trial court ruling, federal appellate courts have often recognized the basic, logical fact that the Second Amendment's right

---

[9] The Third Circuit's ruling that ammunition magazines are arms in common use survived remand in *ANJRPC*, as that matter was remanded so that the state could establish its historical record in the district court. This remand does not affect the finding that ammunition magazines were arms. *See, e.g., Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 (3d Cir. 1987).

13

to bear arms protects the components of those arms that are required to render them operable. Therefore, ammunition magazines are protected under the Second Amendment.

At the textual level, this semantic smokescreen attempts to isolate a certain definition of "arms" and divorce it completely from the remainder of the text of the Second Amendment and the full scope of the right it protects. The Second Amendment prescribes that the right of the people to keep and bear arms shall not be infringed. The dictionary publisher, Noah Webster, who the State and its expert Dennis Barron  largely eschew despite its Founders' Era origins, included within the definition of "keep" "[t]o have in custody for security or preservation…" *Webster, An American Dictionary of the English Language* (1828). In turn, Webster defines "security" as "protection; effectual defense or safety from danger of any kind…" *Id*. (emphasis added).[10] Exactly what "effectual defense" do Defendants suggest Delawareans will be afforded by way of common arms stripped of ammunition, magazines, and other essential component parts? Webster's definition of infringe is perhaps even more essential as it includes "[t]o destroy or hinder; as, to infringe efficacy." *Id.* Rendering a common arm incapable of firing is a quintessential example of hindrance and/or infringement of efficacy of such an arm.[11]

---

[10] When the Constitution was being debated, Noah Webster himself asserted that the people were sufficiently armed to defeat any standing army that could be raised, implying that they had similar arms including ammunition. Noah Webster, *An Examination of the Leading Principles of the Federal Constitution* (Philadelphia: Prichard & Hall, 1787), 43.

[11] There are, no doubt, countless Founding Era primary sources that can illustrate the folly of isolating a single definition of "arm" out of context in the manner the State has here. One such example comes from founder George Mason, author of the Virginia Declaration of Rights, the first to be adopted by a colony in convention on June 12, 1776. Virginia's Declaration stated that "a well regulated Militia, composed of the Body of the People, trained to Arms, is the proper, natural and safe Defense of a free State…" Va. Declaration of Rights, Art. I (1776). A year earlier, Mason had helped George Washington organize the Fairfax Independent Militia Company to counter the Royal Militia. Its members pledged to "constantly keep by us" a firelock, **six pounds of gunpowder, and twenty pounds of lead.** 1 *George Mason, The Papers of George Mason, Robert Rutland ed.*, 210-211 (Chapel Hill, N.C.: University of North Carolina Press, 1970) (emphasis added)

The State's argument is contrary to the plain text of the Second Amendment because they suggest that the Second Amendment is only required to protect the right to bear an inoperable arm. Just as the government would be prevented from banning the ink used to print newspapers to avoid a First Amendment challenge, banning triggers, barrels, magazines, ammunition, or any other component integral to an operable firearm cannot be allowed to infringe upon Second Amendment rights. The State likens a magazine to a "frying pan" absent its connection to what they consider to be an arm, but an arm itself could just as easily be likened to a frying pan without the ammunition and magazines necessary to make that arm operable.

### B.   Ammunition Magazines Capable of Holding Seventeen or More Rounds of Ammunition are in Common Use for Lawful Purposes

The State's opposition gives remarkably little attention to the critical issue of the common use of so-called "large-capacity" magazines capable of holding seventeen rounds or more. What little time it does spend on common use is devoted to addressing so-called "assault weapons" under a standard invented from whole cloth, addressed previously herein, and contrary to numerous precedents and plain facts outlined in cases such as *Heller*, 670 F.3d at 1261; *Kolbe*, 849 F.3d 114 (Traxler, J., dissenting), and *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255.

The State's silence on this issue as to ammunition magazines is fatal to carrying its ample burden of proof. It is fatal, first, because "common use" is the critical component of the analysis under *Heller* and *Bruen*. Drawing from historical tradition, the Supreme Court has made explicit that the Second Amendment protects the carrying of weapons "in common use at the time." *Bruen*, 142 S. Ct. at 2143; *see also Heller*, 554 U.S. at 573. As previously stated, by this, the Supreme Court means the Second Amendment protects the right to own weapons that are in common use *for lawful purposes today. See id.* ("Thus, even if these colonial laws prohibited the carrying of

handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today."). This silence is also fatal because when the Government restricts constitutionally protected conduct, "the Government bears the burden of proving the constitutionality of its actions." *Id.* at 2130 (citations omitted). The State has abdicated its core responsibility to meet its burden in response to Plaintiffs' challenge.

Despite this outcome-determinative failure, Plaintiffs still cite to public sources that confirm that the magazines at issue are undoubtedly in common use for lawful purposes today. There are currently tens of millions of rifle magazines that are lawfully possessed in the United States with capacities of more than seventeen rounds. The most popular rifle in American history, and to this day, is the AR-15 platform, a semiautomatic rifle with standard magazines of 20 or 30 rounds. Springfield Armory also introduced the M1A semi-automatic rifle in 1974, with a 20-round detachable box magazine. The next year, the Ruger Mini-14 was introduced, with manufacturer-supplied standard 5-, 10-, or 20-round detachable magazines. 2014 Standard Catalog of Firearms, 1102 (2014). Both the M1A and the Mini-14 are very popular to this day. Further, data from the firearm industry trade association indicates that 52% of modern sporting rifle magazines in the country have a capacity of 30 rounds. *See NSSF, Modern Sporting Rifle Comprehensive Consumer Report,* available at https://bit.ly/3GLmErS (last accessed Dec. 21, 2022). This data also does not even account for the fact that many popular magazines have variable capacities and that the existence of this variability means that common arms that come equipped with standard-capacity magazines of 17 rounds of ammunition or fewer may still be banned under SS 1 for SB 6. It bears repeating that all of the data provided above stands in the absence of any

countervailing data to the contrary, despite the State's burden to establish the constitutionality of its actions.[12]

In the absence of any true "common use" analysis, the State does contend, without citing any authority on point, that "the fact that a weapon is commonly owned, used, or sold, by itself, is insufficient to prevent its regulation." The core of this faulty argument is their unsupported assertion that "common use" does not refer to possession, and instead refers to the frequency and necessity with which an arm is fired in self-defense. In other words, the State believes that the standard for "common use" should be how necessary the State deems such firing. As previously discussed, this position has been directly and repeatedly rejected by the Supreme Court in *Heller*, *Caetano*, and *Bruen*. It is the People's business and right to determine what common arms they require, not the *Government's. See, e.g., Heller*, 554 U.S. at 629 (emphasis added) ("Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid;") *see also Caetano*, 577 U.S. at 420 (Alito, J., concurring) (emphasis added) (the "*relevant statistic* is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states.").

### C.     The State Provides No Historic Analogue for SS 1 for SB 6

As explained above, the "common use" test is the historical analysis called for in this case. Therefore, it is unnecessary to even consider the State's proffered historical analogues. With that

---

[12] As with HB 450, Defendants also attempt to defend SS 1 for SB 6 on the grounds of the purported dangerousness of so-called "large-capacity magazines." Here again, that defense is toothless in the absence of evidence that the banned magazines are also "unusual." *See Caetano*, 577 U.S. at 417 (Alito, J., concurring) (emphasis in original) ("As the *per curiam* opinion recognizes, this is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual. Because the Court rejects the lower court's conclusion that stun guns are unusual, it does not need to consider the lower court's conclusion that they are also dangerous.").

said, to the extent they are considered, they are unconvincing. With respect to SS 1 for SB 6, the State provides only a single table of irrelevant early 20th Century regulations regarding magazine capacity. Yet again, the State eschews the plain holding of the Supreme Court in offering this as a purported historical analogue.

In *Bruen*, the Supreme Court declined to entertain either late 19th of 20th Century faux-analogues, commenting, "[a]s we suggested in *Heller*, however, late-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 (citations omitted). The *Bruen* Court further noted, "[w]e will not address any of the 20th-century historical evidence brought to bear by respondents or their amici. As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id*. at 2154 n.28. In contrast, Plaintiffs' Complaints and Opening Briefs provide ample examples of the existence of multi-shot ammunition magazines at critical moments in the Nation's *relevant* history, and have highlighted the corresponding absence of regulation of such magazines.[13]  Further, in this purported historical analysis, for the first time, the State attempts to engage in true "common use" analysis, arguing that such multi-shot arms were not "in common use" in the 18th and 19th centuries. They miss the mark. The key point is not whether such multi-shot arms were in common use at the time of the Founding; the key point is that they are in common use today. The State's argument on this point is one that *Heller* called borderline frivolous. *Heller*, 554 U.S. at 582 ("Some have made the argument, bordering on the

---

[13] At around the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a 20 or 22-shot magazine capacity. For example, Meriwether Lewis carried one on the Lewis & Clark expedition. Jim Garry, *Weapons of the Lewis & Clark Expedition* 91-103 (2012).

frivolous, that only those arms in existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way."). They are certainly in common use for lawful purposes today, and the State again fails to meet its burden to demonstrate that the restrictions imposed upon the right to own common arms now infringed by SS 1 for SB 6 are consistent with "this Nation's historical tradition" so as to fall outside of the Second Amendment's "unqualified command." *Bruen*, 142 S. Ct. at 2126 (*citing Konigsberg*, 366 U.S. at 50 n.10).

### III.    HB 450 and SS 1 for SB 6 Violate Article I, § 20 of the Delaware Constitution

The State advances the shocking, untenable position that somehow the Delaware Constitution, contrary to recent interpretations by the Delaware Supreme Court, affords fewer fundamental rights than the United States Constitution--and that this Court should therefore ignore *Heller* and *Bruen*. The State's argument that the intermediate scrutiny test or a strict scrutiny test should continue to apply in this case is both uninformed, contrary to controlling authority, and demonstrates a lack of familiarity with Delaware Supreme Court decisions on this topic.

First, the *Bruen* Court held that intermediate scrutiny is one step too many and expressly rejected the use of that test in Second Amendment cases that had been applied by the Court of Appeals for many circuits. 142 S. Ct. at 2127. Next, the State ignores that Article I, Section 20 of the Delaware Constitution expressly articulates much broader rights than the more limited scope of the right to bear arms contained in the Second Amendment. *See Doe v. Wilmington Housing Authority*, 88 A.3d 654, 665 (Del. 2014); *see also Bridgeville Rifle & Pistol Club, Ltd. v. Small*, 176 A.3d 632, 644 (Del. 2017) ("…Section 20 protects the right to bear arms outside the home. Importantly, just as we found in *Doe* that the specific enumeration of 'self and family' in addition to the home provides an independent right to bear arms outside the home (and not just in it), the separation of 'defense of self and family' in the text of Section 20 creates a different right from

19

the right to bear arms 'for hunting and recreational use,' which is a separate clause of the provision and permitted under the Regulations in limited circumstances.").

In addition, and unabashedly, the State ignores the plain holding of the Delaware Supreme Court that "the Delaware Constitution may provide 'broader or additional rights' than the federal constitution, which provides a 'floor' or baseline rights." 88 A.3d at 642.[14]

*Bruen* announced a test that does not permit any levels of scrutiny—and specifically rejected intermediate scrutiny as a test in Second Amendment cases. It makes no sense, therefore, to suggest that the Delaware Constitution, which provides more rights than the Second Amendment, should be interpreted under a more restrictive standard of review that provides fewer rights than the Second Amendment—based on a test that the U.S. Supreme Court expressly rejected because it would provide fewer rights than even the Second Amendment affords.

The State also ignores that even prior to *Bruen*, the Delaware Supreme Court foresaw the forthcoming *Bruen* clarification of *Heller* when  it stated that " 'complete prohibition[s]' of Second Amendment rights are automatically invalid and need not be subjected to any tier of scrutiny." 176 A.3d at 653. The State also conveniently ignores that *Bridgeville* endorsed the Seventh Circuit's ruling in *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011), that "[b]oth *Heller* and *McDonald* suggest that broadly prohibitory laws restricting the core Second Amendment right . . . are categorically unconstitutional." *Id.* at 654. (quoting *Ezell*, 651 F.3d at 703). The State fails to meet its burden of demonstrating that the magazine ban passes muster under either Federal or Delaware law.

---

[14] In its holding, *Bridgeville* cited former Justice Holland's book, *The Delaware State Constitution* 36 (2d ed. 2017), which states, "[t]he provisions in the federal Bill of Rights set only a minimum level of protection." That is, Delaware cannot provide fewer rights than what the federal constitution provides, but can--and does--provide greater rights.

**IV.      Plaintiffs Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction**

The State argues that (1) a four-month delay between enactment of HB 450 and SS 1 for SB 6 should weigh heavily against granting an injunction; and (2) that deprivation of a fundamental constitutional right, as exists here, is not itself sufficient to demonstrate irreparable harm so as to favor an injunction. It is wrong on both counts. The argument for delay is supported only by citation to a patent dispute in which the party seeking the injunction delayed for over three years from the date of alleged injury before moving for an injunction and in which additional factors weighed against the existence of irreparable harm. *See Chestnut Hill Sound, Inc. v. Apple Inc*., 2015 U.S. Dist. LEXIS 150715, at *12 (D. Del. Nov. 6, 2015). The decision  which *Chestnut Hill Sound, Inc.* relied on, *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.,* 49 F.3d 1551, 1557 (Fed. Cir. 1995), also a patent case, involved both a 17-month delay and a determination from the Court that significant additional factors weighed against an injunction, such as evidence of the injunction seeker's inactivity in the market, its willingness to grant a license under its patent to the defendant in the matter, the absence of any indication that money damages would be unavailable to remedy any loss suffered, and the absence of any suggestion as to why relief pendente lite was needed. 49 F.3d at 1557.

The cases relied upon by the State bear no similarity to this matter. The State provides no authority for the proposition that a four-month "delay" between enactment of the comprehensive legislation and filing qualifies as a delay that weighs at all against irreparable harm and granting an injunction.

The State also entirely ignores that  Plaintiffs promptly sought injunctive relief  prior to the announced effective date--made public several months after the challenged legislation was passed--of the State's first ammunition magazine "buy-back" event. Even after enactment of HB 450 and SS 1 for SB 6 the "buy-back" program, scheduled dates of "buy-back" events, and the terms and

procedures of the "buy-back" program were not immediately disclosed by the State. While the mere enactment of HB 450 and SS 1 for SB 6 represented a deprivation of the fundamental rights of Delawareans on their own, the "buy-back" program--announced months after the enactment of the challenged statutes--and the terms and procedures under which they were enforced represented the first tangible representation of the State's intent to coerce Plaintiffs and other law-abiding Delawareans into surrendering their commonly used arms under threat of prosecution.

In consideration of the State's own delay and often veiled roll-out of enforcement of HB 450 and SS 1 for SB 6, the Plaintiffs moved swiftly to protect their fundamental Second Amendment and Article I § 20 rights.

Next, the State cherry-picks fragmented quotations from inapposite decisions to argue that HB 450 and SS 1 for SB 6's deprivation of the fundamental Second Amendment rights of Plaintiffs and other law-abiding Delawareans do not cause irreparable harm. This is incorrect, as stated in Plaintiffs' respective motions. *See, e.g., K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971; 11A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (3d ed. 2022).

The stark differences between the authority cited by the State and the instant matter demonstrate that its position is unsupportable. *Hohe v. Casey,* 868 F.2d 69 (3d Cir. 1989), the cornerstone of the State's argument, could not be more different than this matter. In *Hohe*, the Third Circuit held that the collection of "fair share fees" from non-Union members did not constitute irreparable harm in a matter that incidentally touched upon First Amendment rights. In its holding, the Court found that the irreparable harm standard was not met where the harm at issue

was incidental to the First Amendment and where monetary damages or restitution could remedy that ill. *Id*. at 73.

In contrast, HB 450 and SS 1 for SB 6 involve real, immediate, irreparable danger to Plaintiffs' and other law-abiding Delawareans' Second Amendment rights that cannot be remedied by monetary damages or restitution. *See, e.g., Ezell*, 651 F.3d at 699 ("Infringements of this [Second Amendment] right cannot be compensated by damages."); *see also McCahon v. Pa. Tpk. Comm'n,* 491 F. Supp. 2d 522, 528 (M.D. Pa. 2007) (distinguishing *Hohe*, finding irreparable harm and granting injunction where harm involved loss of full union dues and plaintiffs' continued association with the union, including susceptibility to union discipline, therefore demonstrating a "real or immediate danger" to their First Amendment right not to associate); *Bella Vista United v. City of Phila.*, 2004 U.S. Dist. LEXIS 6771, at *31 n.10 (E.D. Pa. Apr. 15, 2004) (distinguishing *Hohe* and finding irreparable harm where there was direct penalization of First Amendment rights rather than the incidental inhibition found in *Hohe*.).

The State also cites *Walters v. Kemp*, 2020 WL 9073550, at *11 (N.D. Ga. May 5, 2020), a case decided pre-*Bruen* under intermediate scrutiny, that aimed to make a distinction between the treatment afforded the First Amendment and the Second Amendment in assessing which direct constitutional violations trigger irreparable harm. But any suggestion that the First Amendment gets preferential treatment over the Second Amendment was put to rest with *Bruen*. *See Bruen,* 142 S. Ct. at 2130 ("This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment, to which *Heller* repeatedly compared the right to keep and bear arms.").

The State closes its advocacy on this point by invoking the same feckless argument it employed earlier in its brief on the issue of "common use." Here, they claim that there cannot be

irreparable harm because it is the State, not the People who, in their omniscient view, know best as to how Plaintiffs and other law-abiding Delawareans should arm and defend themselves. The fact that Plaintiffs may already own common arms banned under HB 450 and SS 1 for SB 6, or the State's contention that so-called "assault weapons" are ill-suited for self-defense, has no bearing on Plaintiffs' fundamental Second Amendment rights. Plaintiffs have demonstrated per se irreparable harm by showing that HB 450 and SS 1 for SB 6 directly deprive them of their fundamental Second Amendment rights.

## V.    Public Interest and Balance of Hardships Strongly Favor Plaintiffs

The State claims that the public interest weighs against entry of a preliminary injunction because it will be enjoined from effectuating a statute it has enacted. That is a tautology or circular reasoning. The State never had the right to enact these statutes in the first place, and the "enforcement of an unconstitutional law vindicates no public interest." *K.A. ex rel. Ayers*, 710 F.3d at 114 (*citing ACLU v. Ashcroft*, 322 F.3d 240, 251 n.11 (3d Cir. 2003) ("[N]either the Government nor the public generally can claim an interest in the enforcement of an unconstitutional law.")). The State further argues, without statistical support, that an injunction will undermine public safety through the greater proliferation of dangerous arms and accessories. First, there has been no support presented either by statistics or otherwise for the position  that HB 450 or SS 1 for SB 6 ensure or even contribute to public safety—which the State has the burden to establish. *See* Gary Kleck, Targeting Guns: Firearms and Their Control 112 (1997) (evidence indicates that "well under 1% of [crime guns] are 'assault rifles.' "). In any event, those statistics--even if they existed, and they do not--would suggest that the Court should conduct a prohibited "balancing test." Second, the State's position disregards the benefit to Plaintiffs and other law-abiding Delawareans of lawfully exercising their fundamental right to bear arms and defend themselves. *See Bruen*, 142 S. Ct. at 2161 (Alito, J. concurring) ("Today, unfortunately, many Americans have good reason to

fear that they will be victimized if they are unable to protect themselves. And today, no less than in 1791, the Second Amendment guarantees their right to do so.").

## **CONCLUSION**

In sum, the State has not carried its considerable burden, as articulated in *Bruen*--which does not require an evidentiary hearing—to demonstrate that outlawing the categories of firearms and magazines banned by the challenged statutes, both of which are commonly used for lawful purposes by law-abiding persons, is consistent with "this Nation's historical tradition" so as to fall outside of the Second Amendment's "unqualified command." As observed in *Bruen*, a review of historical, analogous regulations of firearms (if they were to exist) is the type of routine analytical exercise conducted by courts on a regular basis, as a matter of law, without the need for testimony or factual presentations.

For the reasons addressed in this Reply Brief, and those in Plaintiffs' respective Motions for Preliminary Injunction and Opening Briefs in support thereof, this Court should grant Plaintiffs' consolidated motions in their entirety and enter an order enjoining Defendants' enforcement of HB 450 and SS 1 for SB.

LEWIS BRISBOIS
BISGAARD & SMITH LLP

  _/s/ Francis G.X. Pileggi, Esquire_
Francis G.X. Pileggi, Esquire (#2624)
Sean M. Brennecke, Esquire (#4686)
500 Delaware Avenue, Suite 700
Wilmington, Delaware 19801
(302) 985-6000
Francis.Pileggi@LewisBrisbois.com
Sean.Brennecke@LewisBrisbois.com

OF COUNSEL:
Alexander D. MacMullan, Esquire
LEWIS BRISBOIS
    BISGAARD & SMITH LLP
550 E. Swedesford Road, Suite 270
Wayne, Pennsylvania 19087
Alexander.MacMullan@LewisBrisbois.com

*Attorneys for DSSA Plaintiffs*

GELLERT SCALI BUSENKELL
& BROWN LLC

  _/s/ Bradley P. Lehman, Esquire_
Bradley P. Lehman, Esquire (#5921)
1201 N. Orange Street, Suite 300
Wilmington, Delaware 19801
(302) 425-5800
BLehman@gsbblaw.com

*Attorney for FPC Plaintiffs*

Dated: February 13, 2023

26