```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4    DELAWARE STATE SPORTSMEN'S      :
      ASSOCIATION, INC., BRIDGEVILLE  :
 5    RIFLE & PISTOL CLUB, LTD,       :
      DELAWARE RIFLE AND PISTOL CLUB, :
 6    DELAWARE ASSOCIATION OF FEDERAL :
      FIREARMS LICENSEES, MADONNA M.  :
 7    NEDZA, CECIL CURTIS CLEMENTS,   :
      JAMES E. HOSFELT, JR., BRUCE C. :
 8    SMITH, VICKIE LYNN PRICKETT AND :
      FRANK M. NEDZA,                 :
 9                                    :
                     Plaintiffs,      :
10                                    :  C.A. No. 22-951-RGA
      v.                              :
11                                    :
      DELAWARE DEPARTMENT OF SAFETY   :
12    AND HOMELAND SECURITY,          :
      NATHANIEL McQUEEN, JR. in his   :
13    Official capacity as Cabinet    :
      Secretary, Delaware Department  :
14    Of Safety and Homeland Security;:
      and COL. MELISSA ZEBLEY in her  :
15    Official capacity as            :
      Superintendent of the Delaware  :
16    State Police,                   :
                                      :
17                     Defendants.    :
      - - - - - - - - - - - - - - - - -
18    GABRIEL GRAY, WILLIAM TAYLOR,   )
      DJJAMS LLC, FIREARMS POLICY     )
19    COALITION, INC., and SECOND     )
      AMENDMENT FOUNDATION,           )
20                                    )
                     Plaintiffs,      )
21                                    ) C.A. No. 22-1500-MN
      v.                              )
22                                    )
      KATHY JENNINGS, Attorney        )
23    General of Delaware,            )
                                      )
24                     Defendants.    )

25
```

```
 1                                    J. Caleb Boggs Courthouse
                                      844 North King Street
 2                                    Wilmington, Delaware

 3                                    Friday, February 24, 2023
                                      9:00 a.m.
 4                                    Oral Argument

 5

       BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.
 6

 7     APPEARANCES:

 8               LEWIS BRISBOIS BISGAARD & SMITH, LLP
                 BY:  FRANCIS G.X. PILEGGI, ESQUIRE
 9
                        -and-
10
                 GELLERT SCALI BUSENKELL & BROWN, LLC
11               BY:  BRADLEY P. LEHMAN, ESQUIRE

12                                    For the Plaintiffs

13
                 ROSS ARONSTAM & MORITZ LLP
14               BY:  DAVID E. ROSS, ESQUIRE
                 BY:  GARRETT MORITZ, ESQUIRE
15
                        -and-
16
                 DELAWARE DEPARTMENT OF JUSTICE
17               BY:  CANEEL RADINSON-BLASUCCI, ESQUIRE
                 BY:  KENNETH WAN, ESQUIRE
18
                                      For the Defendants
19

20
                        ***  PROCEEDINGS  ***
21

22               DEPUTY CLERK:  All rise.  Court is now in

23     session.  The Honorable Richard G. Andrews presiding.

24               THE COURT:  All right.  Good morning, everyone.

25     Please be seated.
```

09:01:58  1          All right.  So, we have argument at least on the

09:02:03  2    motion for preliminary injunction filed by the Plaintiff in

09:02:06  3    this case, which is *Delaware State Sportsmen's Association*

09:02:12  4    *vs. Delaware Department of Safety and Homeland Security*,

09:02:14  5    Number 22-951.

09:02:18  6          And you are Mr. Lehman or Lehman?

09:02:23  7          MR. LEHMAN:  Lehman, Your Honor.

09:02:23  8          THE COURT:  All right.  And Mr. Pileggi.

09:02:26  9          MR. PILEGGI:  Yes, Your Honor.

09:02:27 10          MR. LEHMAN:  Yes, Your Honor.

09:02:28 11          THE COURT:  And Mr. Moritz, and Mr. Wan and

09:02:33 12    Mr. Ross.  And you are, Mr. Ross?

09:02:36 13          MR. ROSS:  Yes, Your Honor.

09:02:37 14          THE COURT:  And so, who's making argument here,

09:02:39 15    is it Mr. Lehman and Mr. Ross?

09:02:45 16          MR. LEHMAN:  Your Honor, if it's all right with

09:02:47 17    the Court, I'm going to handle the assault weapons portion

09:02:49 18    of our argument, along with the injunctive relief factors

09:02:53 19    general, and then Mr. Pileggi was going to handle the

09:02:56 20    magazine issue and the Delaware Constitution issue, if that

09:02:59 21    meets with the Court's approval.

09:03:01 22          THE COURT:  Okay.  Mr. Ross.

09:03:02 23          MR. ROSS:  Your Honor, with the Court's

09:03:03 24    permission, we also plan to split the argument.  I was going

09:03:06 25    to discuss some of the factual background as well as the

09:03:09 1    argument as to why large-capacity magazines are not arms.

09:03:13 2    Mr. Moritz will discuss the Second Amendment, and I'll take

09:03:16 3    the remainder of the issues.

09:03:21 4              THE COURT:  All right.  So, fine.

09:03:22 5              So, I do have maybe just a couple questions that

09:03:25 6    it might be easier for me to just ask before you actually

09:03:28 7    get going.  And I guess the first question is for the

09:03:35 8    Plaintiffs.

09:03:35 9              I understand you don't think it's relevant, but

09:03:37 10   for present purposes, I should take every factual assertion

09:03:42 11   that's in the five Defendant declarations as being true;

09:03:45 12   right?

09:03:46 13             MR. LEHMAN:  We think if you do, Your Honor,

09:03:48 14   it's not going to make a difference, but --

09:03:50 15             THE COURT:  Well, so that's why I said if it's

09:03:52 16   relevant.  But if it appears to be relevant, I can take it

09:03:57 17   as true for purposes of the preliminary injunction; right?

09:04:00 18             MR. LEHMAN:  Yes.

09:04:01 19             THE COURT:  Okay.  Thank you.

09:04:03 20             I think this is probably obvious, but when the

09:04:08 21   parties talk about assault rifles and sporting rifles,

09:04:13 22   you're talking about the same thing; right?

09:04:16 23             MR. LEHMAN:  From our perspective, Yes, Your

09:04:18 24   Honor.  They're the same thing.

09:04:19 25             MR. ROSS:  Yes.  Yes, Your Honor.

09:04:21  1          THE COURT:  Okay.  So, are the parties keeping

09:04:25  2     track of similar litigation filed in other states?

09:04:30  3          MR. LEHMAN:  Yes, generally, Your Honor.  I

09:04:33  4     actually have litigation myself in other states on similar

09:04:36  5     issues.

09:04:36  6          THE COURT:  Well, and the reason I ask is

09:04:39  7     because my law clerk provided me with a decision from

09:04:44  8     Illinois about a week ago, and I would imagine you all are

09:04:53  9     familiar with it.  And, you know, that seems like the kind

09:04:59 10     of thing that would be useful for me to know about.

09:05:02 11          And so, the only point or the only point is,

09:05:04 12     because I don't actually expect to rule on this motion

09:05:07 13     today, is I would ask that if similar decisions that you

09:05:13 14     think are relevant come down between now and whenever I get

09:05:17 15     a decision out, which hopefully won't be very long, you

09:05:22 16     know, if you could send it to me with a cover letter that is

09:05:26 17     no more than one page, but you know, you can put why it's

09:05:31 18     relevant on the cover page.

09:05:35 19          Can you do that for me?

09:05:37 20          MR. PILEGGI:  Yes, Your Honor.

09:05:39 21          MR. ROSS:  Yes, Your Honor.

09:05:39 22          THE COURT:  Okay.  Thank you.

09:05:40 23          All right.  And Mr. Ross or Mr. Moritz, if the

09:05:52 24     laws that we're talking about here are constitutional, and

09:05:56 25     particularly the assault weapons one, or HB 450, which is

09:06:06  1    pretty much only prospective, would there be any reason why,

09:06:12  2    if there was the political will for it, Delaware couldn't

09:06:16  3    pass a law basically saying possession of these weapons are

09:06:26  4    criminal and start enforcing that law, you know, maybe with

09:06:31  5    a grace period or something?  But is there any reason why

09:06:36  6    the prospective aspect of this makes a difference

09:06:40  7    constitutionally?

09:06:41  8            MR. ROSS:  Not from a Second Amendment

09:06:44  9    perspective as we see it, Your Honor.

09:06:46 10            THE COURT:  Okay.  Thank you.

09:06:49 11            And I guess the other question I had was, you

09:07:00 12    know, you're in federal court, and part of this is arguing

09:07:02 13    about Delaware Constitution and the Delaware Supreme Court,

09:07:09 14    and the Delaware analog to the Second Amendment, which is

09:07:13 15    different for sure or different, I think, than the Second

09:07:21 16    Amendment.

09:07:21 17            And I'm just kind of wondering:  Have either of

09:07:27 18    you, either side, thought about certifying a question, you

09:07:33 19    know, maybe whether or not these statutes are facially

09:07:38 20    unconstitutional under the Delaware Constitution to the

09:07:41 21    Delaware Supreme Court or something like that?

09:07:45 22            MR. PILEGGI:  Your Honor, can I address that?

09:07:47 23            THE COURT:  Yes.

09:07:47 24            MR. PILEGGI:  Your Honor, that's something that

09:07:50 25    we did think about and might ultimately do, but based on

09:07:55  1    Bruen, we didn't think that was necessary based on the two

09:07:58  2    Delaware Supreme Court decisions that have interpreted

09:08:02  3    Article I Section 20.  We didn't think it was necessary.

09:08:04  4    But you may know the history of one of those Delaware

09:08:08  5    Supreme Court's decisions in *Doe vs. Wilmington Housing*

09:08:09  6    *Authority*, we actually start out in this court.  We went to

09:08:11  7    the Third Circuit.  And then when we were in the Third

09:08:13  8    Circuit, we asked the Third Circuit to certify a question to

09:08:16  9    the Delaware Supreme Court on that Delaware Constitutional

09:08:19 10    issue, which they did.  And that's how we got the *Doe vs.*

09:08:23 11    *Wilmington Housing Authority* decision.

09:08:25 12            So, the short answer to your question, Your

09:08:27 13    Honor -- I'm happy to give a longer answer.  The short

09:08:29 14    answer is we don't think there's enough ambiguity for that

09:08:31 15    to be necessary.  But if the Court thinks it's helpful,

09:08:34 16    we're certainly open to it.

09:08:35 17            THE COURT:  All right.  Thank you, Mr. Pileggi.

09:08:38 18    That's very helpful.

09:08:39 19            Any comment on your side?

09:08:40 20            MR. ROSS:  We basically wound up exactly where

09:08:43 21    Mr. Pileggi ended, Your Honor, which is we don't think it's

09:08:45 22    necessary, but obviously, we would defer to the Court.

09:08:49 23            THE COURT:  Okay.  So, on that issue, I would

09:09:03 24    like the parties to meet and confer and submit a -- you

09:09:22 25    know, as you all know better than me, there's a procedure

09:09:25 1   you have to go through to make it the kind of question you

09:09:32 2   can't actually certify.  Obviously, Mr. Pileggi has done it

09:09:35 3   before, but I would like you to try to propose to me -- you

09:09:46 4   don't have to say, We want to do it, but assume that I want

09:09:51 5   to do it and propose something hopefully that you could

09:09:57 6   agree upon.  But if not, separately as to what I would need

09:10:04 7   to do in order to make such a certification.

09:10:15 8            You know, I have seen the Third Circuit in a

09:10:19 9   different case of mine certify a question to the Delaware

09:10:24 10  Supreme Court, but, in some ways, it seems to me like if

09:10:28 11  you've got that sort of issue, maybe it's better to do it

09:10:31 12  sooner rather than later.  So, maybe if I could ask if you

09:10:39 13  could submit something by a week from Monday.

09:10:50 14            Okay.  Thank you.

09:10:51 15            And I guess I have two other questions.  One of

09:10:59 16  which is:  In terms of what the difference is between an

09:11:08 17  assault pistol and a semi-automatic pistol like a Glock 9

09:11:14 18  millimeter, maybe I read over that part of the declarations

09:11:20 19  too quickly or something.

09:11:22 20            Is there a real short and simple answer of what

09:11:24 21  the difference is?

09:11:26 22            MR. LEHMAN:  Our answer, Your Honor, would be

09:11:27 23  there's no material difference at all other than cosmetic

09:11:30 24  features.  They all function the same.

09:11:33 25            THE COURT:  Okay.  No difference.

09:11:36 1              And you, sir?

09:11:37 2              MR. ROSS:  Your Honor, we believe there are

09:11:39 3     fundamental differences.  I won't get into the details --

09:11:42 4              THE COURT:  No, save me the -- give me the short

09:11:44 5     answer.

09:11:45 6              MR. ROSS:  So, we believe there are significant

09:11:47 7     fundamental differences.  The assault pistols, among other

09:11:53 8     things, are derived from weapons of war, some machine guns.

09:11:58 9     I want to be very clear that the 9 millimeter, like a Glock,

09:12:02 10    is not covered by the statute, and there's no suggestion

09:12:05 11    that it is.

09:12:06 12             THE COURT:  No, I understand that, but, or I

09:12:09 13    wasn't suggesting it was.  I was trying to figure out how

09:12:13 14    much of a difference there was.  And just, you know, you

09:12:19 15    could derive something from a military weapon and get to an

09:12:25 16    end result.  And you could derive something from other some

09:12:29 17    other source and get to a pretty similar end result, because

09:12:34 18    it seems like it shouldn't really matter what the -- if you

09:12:41 19    get to the same result, it shouldn't matter, you know, what

09:12:44 20    the idea was 70 years ago.

09:12:48 21             Right?

09:12:48 22             MR. ROSS:  No, that's right, Your Honor.  And I

09:12:51 23    should be more clear that beyond sort of a derivation, it's

09:12:56 24    they share commonality of features.  It's not -- you know,

09:12:57 25    you could start from two different points and wind up in two

09:13:00 1    very different places.  I take Your Honor's point well, but

09:13:02 2    we believe that banned assault pistols share a number of

09:13:07 3    features that are commonly found.

09:13:08 4            THE COURT:  And so, one of them, if I'm correct,

09:13:11 5    is what's called the shroud which is something that sticks

09:13:14 6    off; is that right or is that wrong?

09:13:18 7            MR. ROSS:  Yes, Your Honor.

09:13:19 8            THE COURT:  And the shroud is a little thing

09:13:21 9    that extends from the end of the barrel, so that, according

09:13:26 10   to the expert, when you bump into something, you don't hurt

09:13:29 11   the gun or, I'm not saying that right, but generally along

09:13:33 12   that gist; right?

09:13:33 13           MR. ROSS:  It's my understanding, Your Honor.

09:13:35 14           THE COURT:  But in terms of the sort of firing

09:13:41 15   function, is it pretty much the same?

09:13:44 16           MR. ROSS:  We'll get into this, Your Honor, but

09:13:47 17   there are actually significant differences with some of

09:13:50 18   these weapons, including velocity at which the bullets are

09:13:54 19   fired, which we will get to, that has a significant impact

09:13:57 20   on the destructive ability of the weapons, Your Honor.

09:14:00 21           THE COURT:  Okay.  So, for purposes of today's

09:14:13 22   proceeding, I would have said the briefing was -- maybe

09:14:33 23   that's not a fair characterization.  I guess I would say to

09:14:39 24   the Plaintiffs, it seemed to me your position is none of

09:14:44 25   these things really matter in terms of the number of

09:14:49 1    different guns that are listed for Second Amendment

09:14:53 2    purposes, the number of different guns that are listed, even

09:14:56 3    the definition of copycat, and is that right or am I wrong

09:15:02 4    there?

09:15:03 5          MR. LEHMAN:  If I understand you correctly, Your

09:15:06 6    Honor, I think that's right.  What the State has done is

09:15:09 7    taken semi-automatic weapons generally and said basically

09:15:13 8    these have features that we think are scary.  And so, this

09:15:19 9    smaller subset of semi-automatic firearms are banned now.

09:15:24 10    The list really doesn't make any difference.

09:15:27 11          THE COURT:  Okay.  All right.  So, thank you.

09:15:31 12          So, Mr. Lehman or Mr. Pileggi, whoever was going

09:15:36 13    first, why don't you go ahead.

09:15:40 14          MR. LEHMAN:  Good morning, Your Honor.  May it

09:15:43 15    please the Court, Bradley Lehman of Gellert Scali Busenkell

09:15:46 16    and Brown on behalf of the Plaintiffs from the now

09:15:48 17    consolidated Gray matter.

09:15:51 18          So, Your Honor, I'll just kind of proceed

09:15:53 19    through the injunctive relief elements and hit kind of major

09:15:56 20    points rather than rehashing all of the briefing.

09:15:59 21          THE COURT:  Well, yeah, so rehashing is not very

09:16:02 22    helpful.

09:16:02 23          MR. LEHMAN:  Right.

09:16:02 24          THE COURT:  And, I guess, to some extent, the

09:16:04 25    injunction, the points about irreparable harm, public

09:16:10  1    interest, burden, you know, relative burden, I wouldn't be

09:16:15  2    spending a lot of time on that.  I mean, the thing that's of

09:16:17  3    interest, and it's difficult, to me at least, is the Second

09:16:23  4    Amendment issues.

09:16:23  5              MR. LEHMAN:  Sure.  So, I'll certainly focus my

09:16:25  6    time on that, Your Honor.

09:16:26  7              So, under *Bruen*, Your Honor, the Court has to

09:16:28  8    determine whether the arms at issue are protected by the

09:16:32  9    Second Amendments or what they call the unqualified.  And

09:16:34 10    unquestionably in this case, they are.  These are bearable

09:16:38 11    arms, first of all.  And in addition to being bearable arms,

09:16:41 12    they're in common use for lawful purposes today.

09:16:44 13              THE COURT:  Well, so you say "in common use for

09:16:46 14    lawful purposes."  I counted up something like ten times in

09:16:50 15    *Bruen* where they said in common use for self-defense.

09:16:55 16              MR. LEHMAN:  Right.  So, the difference, Your

09:16:57 17    Honor, and in *Heller* and in many other cases, they referred

09:17:00 18    to lawful purposes.  In *Bruen* in particular, the issue was

09:17:03 19    in New York should people be able to get -- you know, do you

09:17:08 20    need to show some heightened standard of need in order to

09:17:11 21    have a concealed carry handgun.

09:17:14 22              And so, naturally the Court's discussion in that

09:17:17 23    case was about people's right to arm self-defense outside of

09:17:20 24    their homes because concealed carry handguns don't have a --

09:17:25 25    you don't carry a concealed handgun for a recreational or

09:17:28   1   hunting purpose.  So, that was the focus there.

09:17:31   2              But the focus in other cases has been on lawful

09:17:34   3   purposes.  And the Court has recognized that there are other

09:17:38   4   lawful purposes like hunting, or like recreational target

09:17:41   5   shooting or competitive target shooting, a variety of things

09:17:45   6   that can also constitute lawful use if you're not using it

09:17:49   7   to commit crimes.  Then, whatever else you're doing with it

09:17:51   8   is a lawful use.

09:17:53   9              And what the State did in that case was sort of

09:17:57  10   changed the test in two ways.  One of those ways --

09:18:00  11              THE COURT:  Well, so actually before you get to

09:18:02  12   the test --

09:18:03  13              MR. LEHMAN:  Sure.

09:18:04  14              THE COURT:  -- you said these are bearable arms.

09:18:09  15   And I'm just curious:  Knives are bearable arms, too; right?

09:18:16  16              MR. LEHMAN:  Yeah, I think the definition of

09:18:18  17   bearable arms goes back quite a long way to -- I'm not going

09:18:22  18   to be able to -- I'm paraphrasing, but anything that you

09:18:25  19   might pick up and use, you know, in defense of yourself.

09:18:29  20              THE COURT:  So, bearable arms, Bowie knives,

09:18:32  21   switchblades, these are all bearable arms?

09:18:34  22              MR. LEHMAN:  Well, the distinction with those

09:18:37  23   items was that they were perceived at the time --

09:18:39  24              THE COURT:  Well, so are they bearable arms or

09:18:43  25   not?

09:18:43  1          MR. LEHMAN:  Yes.  Yes, there's more to the test

09:18:44  2   than just being bearable arms, of course.  I mean, machine

09:18:47  3   guns are bearable arms and rocket launchers are bearable

09:18:50  4   arms.

09:18:50  5          THE COURT:  Tasers are bearable arms; right?

09:18:53  6          MR. LEHMAN:  Yes.

09:18:54  7          THE COURT:  Pepper spray?

09:18:55  8          MR. LEHMAN:  Yes.

09:18:55  9          THE COURT:  And you said machine guns?

09:18:58 10          MR. LEHMAN:  Right.

09:18:59 11          THE COURT:  Sawed-off shotguns are bearable

09:19:01 12   arms?

09:19:01 13          MR. LEHMAN:  Right.  All those things are

09:19:02 14   bearable arms.

09:19:03 15          THE COURT:  A bazooka would be a bearable arm?

09:19:05 16          MR. LEHMAN:  Absolutely.  So, then you move on

09:19:07 17   to whether it's dangerous and unusual.

09:19:08 18          THE COURT:  Do you think a silencer is a

09:19:10 19   bearable arm?

09:19:11 20          MR. LEHMAN:  I don't know whether you would

09:19:12 21   characterize that itself as an arm.  Certainly, as part of a

09:19:17 22   firearm, it serves a purpose.

09:19:21 23          THE COURT:  Okay.  All right.  So, go ahead.

09:19:23 24          MR. LEHMAN:  So, as Your Honor was just sort of

09:19:26 25   keying in on, the next step, obviously, is that not all

09:19:30 1    bearable arms are protected.  They're presumptively

09:19:33 2    protected, but then they move on to determine whether

09:19:36 3    they're dangerous and unusual.  You know, the State has some

09:19:40 4    focus about, Well, we need to conduct all this historical

09:19:43 5    analysis.  But if you read *Bruen*, the Supreme Court has done

09:19:46 6    the historical analysis when it comes to banning firearms

09:19:49 7    themselves.

09:19:50 8            Certainly, historical analysis can be useful in

09:19:53 9    analyzing other sorts of firearm regulations.  That's such

09:19:57 10   as what's going on right now in New Jersey with the

09:19:59 11   sensitive place restrictions.  You know, what sorts of

09:20:02 12   places can you bring your concealed handgun, those sorts of

09:20:06 13   things.

09:20:07 14           THE COURT:  And so, if you refer to what's going

09:20:09 15   on in other states, I have no knowledge of what's going on

09:20:11 16   in other states.

09:20:12 17           MR. LEHMAN:  So, New Jersey, in response to

09:20:14 18   *Bruen* passed a law saying, Okay, we're abandoning our

09:20:17 19   justifiable needs standard, because that's unconstitutional.

09:20:20 20   So, instead, everyone gets a license, but you can't really

09:20:22 21   carry anywhere.  So, that's their short-term solution to

09:20:26 22   that, which is being challenged now.

09:20:28 23           And so, in the context of those sorts of

09:20:30 24   regulations, we might look back through history and say,

09:20:33 25   Okay, well, around the time of the founding and shortly

09:20:35  1    thereafter, were people carrying guns into churches, and

09:20:38  2    schools and things like that?  And so, that sort of analysis

09:20:41  3    would be helpful.

09:20:42  4                But in the context of banning arms themselves,

09:20:45  5    the Supreme Court has already undertaken that analysis and

09:20:48  6    concluded that if you look back through the relevant

09:20:51  7    history, what's important is bearable arms can only be

09:20:56  8    banned if they're dangerous and unusual.  And naturally, as,

09:21:01  9    you know, Your Honor was sort of keying in upon, talking

09:21:03 10    about, you know, other sorts of bearable arms that are not

09:21:08 11    protected.  The question is not whether they're dangerous,

09:21:11 12    because any weapon or anything that you might use to defend

09:21:13 13    yourself has to be dangerous or it would be useless for that

09:21:17 14    purpose.

09:21:17 15                THE COURT:  So, the dangerous part of dangerous

09:21:20 16    and unusual or even dangerous or unusual, but the dangerous

09:21:24 17    part, how does that relate because the definition of arms

09:21:32 18    that you've, I think, cited, essentially all arms are

09:21:38 19    dangerous.  That's the point.

09:21:40 20                MR. LEHMAN:  Right.

09:21:40 21                THE COURT:  How would you distinguish one arm

09:21:44 22    from another in terms of dangerousness?

09:21:47 23                MR. LEHMAN:  It's not important that we do,

09:21:51 24    because the question and the distinction drawn in *Bruen* is

09:21:56 25    whether or not an arm is highly unusual in society at large.

09:22:00  1    So --

09:22:01  2                    THE COURT:  So, when they talk about dangerous

09:22:02  3    and unusual, the dangerous is just kind of redundant?

09:22:05  4                    MR. LEHMAN:  I think that in the context of the

09:22:09  5    discussion of weapons, of course the dangerous part goes

09:22:13  6    without saying because, you know, no one keeps a bag of

09:22:16  7    marshmallows by their nightstand in case a burglar breaks

09:22:19  8    in.  You want to have something that would conceivably cause

09:22:22  9    injury to somebody if it was necessary to defend yourself in

09:22:25 10    that way.  So, *Bruen's* true distinction said, Well, if

09:22:28 11    they're highly unusual in society at large, then they're

09:22:33 12    outside of that test.  They meet the dangerous and unusual

09:22:37 13    test essentially at that point.

09:22:40 14                    THE COURT:  So, the highly unusual, is that a

09:22:45 15    different way of saying not in common use?

09:22:48 16                    MR. LEHMAN:  I think that it's essentially the

09:22:50 17    same.  You know, if something is not in common use, it's

09:22:54 18    unusual enough that it's not protected.

09:22:58 19                    THE COURT:  Well, so does the Supreme Court in

09:23:00 20    *Bruen* or anywhere else, for that matter, give any kind of

09:23:05 21    explanation of what is in common use and what is not in

09:23:10 22    common use?  I mean, I think if you said, Are televisions in

09:23:16 23    common use, everyone would say, Yeah, agree with that.

09:23:20 24                    If you said are Teslas in common use?  I don't

09:23:25 25    know.

09:23:28 1          MR. LEHMAN:  Well, driving around Delaware, I

09:23:29 2   think it's safe to they are.  But, no, the Supreme Court

09:23:34 3   doesn't give us an absolute number or a fraction of a total

09:23:37 4   of anything and say, Beyond this threshold, you've hit

09:23:40 5   common use.

09:23:41 6          THE COURT:  And, of course, they didn't have to

09:23:43 7   because I think one could take judicial notice that handguns

09:23:48 8   are in common use.  You've got your statistical.  There's

09:23:51 9   400 million, give or take some amount, or at least that's

09:23:57 10  the number that sticks in my head of firearms in the

09:24:01 11  country.  And there's 300 million people, and, you know,

09:24:06 12  obviously, some have more than one.

09:24:09 13          But, you know, and we know that most -- I mean,

09:24:13 14  I don't know how we know, but we know most of the guns that

09:24:16 15  are out there or the large number of the guns that are out

09:24:19 16  there are handguns.  Right?  So, they -- so, in *Bruen*, it

09:24:24 17  was undisputed that they were in common use; right?

09:24:27 18          MR. LEHMAN:  Right.  I don't think anyone

09:24:29 19  questioned that they were.  The State didn't press that

09:24:31 20  issue.  It would have been a waste of time as --

09:24:34 21          THE COURT:  Right, right.  It would have been

09:24:35 22  frivolous.

09:24:36 23          MR. LEHMAN:  Right.

09:24:36 24          THE COURT:  But are the weapons that are banned

09:24:39 25  here, are they in common use in Delaware?

09:24:44  1          MR. LEHMAN:  Yes, absolutely.  You know, for

09:24:47  2     example, Your Honor -- well, first of all, it's important to

09:24:49  3     remember that *Heller* has been described as a hardware test.

09:24:51  4     And as we were talking about a little bit kind of more

09:24:53  5     informally before, there's no functional difference in terms

09:24:57  6     of firing rate or anything like that between this subset of

09:25:03  7     banned arms and semi-automatic arms in general.

09:25:06  8          THE COURT:  Well, how about with machine guns?

09:25:08  9          MR. LEHMAN:  Well, machine guns, the difference

09:25:10 10     there was that they were deemed to not be in common use.

09:25:13 11     And as we talked about in the briefing, I mean, they were

09:25:16 12     perceived to be the weapons of gangsters and other

09:25:20 13     criminals.  I think overwhelming if you ask --

09:25:22 14          THE COURT:  Well, and I think the gangsters and

09:25:24 15     the criminals, that was also sawed-off shotguns; right?

09:25:27 16          MR. LEHMAN:  Yes, right.  I mean, you imagine

09:25:29 17     basically when you ask people to envision what was going on,

09:25:32 18     you know, envision a Tommy gun, they're thinking of Al

09:25:36 19     Capone.

09:25:36 20          THE COURT:  But so, how would a sawed-off

09:25:38 21     shotgun be dangerous and unusual?  For that matter, how

09:25:42 22     would a Tommy gun be dangerous and unusual, because the

09:25:46 23     whole problem was there were lots of them?

09:25:48 24          MR. LEHMAN:  I think it was -- the issue was

09:25:50 25     that they were not in common use for lawful purposes.  They

09:25:52 1    were overwhelmingly put to use by criminals and gangsters,

09:25:56 2    you know, that the FBI was in pursuit of.  And --

09:25:59 3              THE COURT:  But the --

09:26:16 4              MR. LEHMAN:  -- the difference, I think, Your

09:26:17 5    Honor, is that here we're dealing with arms that are in

09:26:20 6    common use for lawful purposes, very, very rarely used in

09:26:23 7    crimes.  And the weapons you're talking about were most

09:26:28 8    often used in crimes and not really associated with

09:26:31 9    something that you would have in your home for your own

09:26:35 10   defense.

09:26:36 11             THE COURT:  Was there in the -- when some

09:26:40 12   machine guns or even sawed-off shotguns, and I remember

09:26:47 13   seeing somewhere, maybe it was in *Heller*, quoting something

09:26:50 14   else, you know, sawed-off shotguns are the weapons of

09:26:54 15   criminals or something like that.  Was that based on any

09:26:59 16   facts or was that just kind of common knowledge of the day?

09:27:03 17             MR. LEHMAN:  I'm not aware of specific facts

09:27:07 18   that the Court highlighted.  I think it was sort of the

09:27:09 19   common knowledge of the day that there wasn't really a

09:27:12 20   useful purpose for that other than hiding it and creating,

09:27:17 21   you know --

09:27:17 22             THE COURT:  But you would agree that, in fact, a

09:27:20 23   sawed-off shotgun would be a great weapon for self-defense;

09:27:23 24   right?

09:27:24 25             MR. LEHMAN:  I don't think so.  I think that

09:27:27 1  something else would be preferable.

09:27:29 2              THE COURT:  Well, no, but you criticize them for

09:27:31 3  saying something is preferable or not preferable.

09:27:34 4              MR. LEHMAN:  Well, that's true, although you did

09:27:36 5  ask me if it was great.

09:27:37 6              THE COURT:  Wouldn't a sawed-off shotgun, you

09:27:39 7  know, maybe not so much in the street, but in the home,

09:27:42 8  wouldn't that be right up at the top of the list, easy to

09:27:47 9  shoot, takes out whoever is at the door that you don't want?

09:27:51 10 I mean, it's a great self-defense weapon, it would seem to

09:27:56 11 me.  But it's just one that was banned or at least heavily

09:28:02 12 restricted, you know, 80 years ago or 90 years ago.

09:28:08 13             I mean, that's one of the things that's

09:28:17 14 difficult is that the -- really it seems to me the two main

09:28:26 15 Supreme Court cases are talking about handguns used for

09:28:31 16 self-defense.  One's in the home, one's outside the home.

09:28:40 17 And so, many of the arguments that are being made here,

09:28:52 18 they're far removed from the factual situations where the

09:28:57 19 Supreme Court was talking about things, and so they had

09:29:05 20 various hints about things.

09:29:10 21             And so, I think that's -- I mean, there's

09:29:20 22 really -- and I guess in a way, I mean, if in the 1930's

09:29:30 23 sawed-off shotguns were mostly in the hands of criminals, if

09:29:34 24 they were legalized today, would they be mostly in the hands

09:29:37 25 of criminals, or would everybody be getting a sawed-off

09:29:39  1    shotgun to keep next to their bed?

09:29:42  2                MR. LEHMAN:  They might, Your Honor, but it's --

09:29:44  3    you know, they were not in common use for lawful purposes

09:29:47  4    then, and they're not now, either.

09:29:48  5                THE COURT:  Well, but, of course, they've been

09:29:50  6    regulated ever since; right?

09:29:52  7                MR. LEHMAN:  That's true.  I mean, the arms at

09:29:53  8    issue here have not been, which is a major difference.

09:29:56  9                THE COURT:  Well, but then the -- well, go

09:29:59 10    ahead.

09:29:59 11                MR. LEHMAN:  Well, so, Your Honor, I think,

09:30:03 12    getting back to the common use, I mean, although in *Heller*

09:30:07 13    and *Bruen* the factual circumstances called for discussion of

09:30:12 14    self-defense, the Court, the Supreme Court and the Circuit

09:30:16 15    Courts have been clear that lawful purposes are protected,

09:30:19 16    whether it's for self-defense or not.  Although,

09:30:23 17    self-defense is the core of the Second Amendment, right.

09:30:25 18                THE COURT:  Yeah, yeah.  The Supreme Court said

09:30:27 19    core multiple times in italics, which I take it is extra

09:30:34 20    core.

09:30:34 21                MR. LEHMAN:  Right.  Yeah, and I think they

09:30:35 22    wouldn't say core if they weren't acknowledging that there

09:30:38 23    was something other than core, otherwise it would just be

09:30:41 24    the right.  And so, as far as common use is concerned, you

09:30:45 25    know, we had some examples, Your Honor, of where other

09:30:47  1    courts have taken notice of the fact that these exact arms

09:30:50  2    are in common use, and for that matter, that the magazines

09:30:53  3    at issue are in common use.  But by way of one example in

09:30:57  4    the *Caetano* case, the Court, and in particular Justice

09:31:01  5    Alito's concurrence found that the mere fact that 200,000

09:31:05  6    stun guns have been sold to Americans was enough to find

09:31:07  7    that they were in common use for lawful purposes at the time

09:31:11  8    and could not be banned.

09:31:12  9            And our position here, Your Honor, is the same.

09:31:15 10    There are millions and millions of these owned by millions

09:31:18 11    and millions of Americans overwhelmingly used for lawful

09:31:23 12    purposes, virtually never used in crimes.  Unfortunately,

09:31:27 13    they tend to get a lot of attention when they are, but it's

09:31:31 14    very rare.  And so, the State first sort of tries to change

09:31:43 15    the test by saying --

09:31:44 16            THE COURT:  Let me stop you for a second.

09:31:45 17            MR. LEHMAN:  Sure.

09:31:46 18            THE COURT:  You say rarely used in crime.  I

09:31:48 19    think the factual assertions of at least one of the State's

09:31:56 20    experts is they are significantly disproportionately used

09:32:04 21    for mass casualty events.  You know, your basic one drug

09:32:11 22    dealer shoots another drug dealer.  Yeah, the weapons that

09:32:17 23    are best for self-defense are usually best for offense, too,

09:32:22 24    but that there's a specific problem that the State was

09:32:27 25    concerned about or that the law was concerned about.

09:32:31  1          MR. LEHMAN:  Sure.  And, I mean, that would be

09:32:33  2    relevant if the Court were undertaking an interest-balancing

09:32:36  3    approach pre-*Bruen*.  You know, if the arms at issue are in

09:32:41  4    common use for lawful purposes, generally what criminals

09:32:45  5    rarely use them for, although it's, you know, horrific and

09:32:49  6    unfortunate is not relevant to the analysis of whether the

09:32:52  7    arms are protected by the Second Amendment or not.

09:32:55  8          And so, you know, the data provided by the

09:32:59  9    parties shows that, I mean, and I don't think the State

09:33:01 10    meaningfully disputes, that there are lots and lots of these

09:33:05 11    in circulation.

09:33:06 12          THE COURT:  Yeah, and I've seen the numbers,

09:33:08 13    though it's not right in the top of my head.  What would you

09:33:11 14    say the number is that are in circulation?

09:33:14 15          MR. LEHMAN:  Well, different surveys have come

09:33:17 16    out with different sort of answers.  And firearm production

09:33:21 17    numbers provided by the industry over time, I think,

09:33:24 18    suggests that, at the least, perhaps 10 million, possibly

09:33:30 19    quite a lot more.  Surveys can sometimes be unreliable

09:33:35 20    because -- well --

09:33:37 21          THE COURT:  And basically --

09:33:37 22          MR. LEHMAN:  -- unreliable in that they would

09:33:40 23    underestimate because some people are not excited about

09:33:43 24    revealing to whoever is on the phone what they have.

09:33:45 25          THE COURT:  But your ball park figure nationally

09:33:53  1   of the number of weapons that are out there that would fall

09:33:58  2   into the banned categories or banned classes is, you know,

09:34:07  3   10 million, plus or minus?

09:34:08  4          MR. LEHMAN:  Yes, Your Honor.  I think we

09:34:10  5   provided some figures demonstrating that in recent years

09:34:15  6   something like 20 percent of all firearms sold in the United

09:34:18  7   States would fit into the banned category.  AR-15 variants,

09:34:24  8   AK variants are extraordinarily popular.

09:34:31  9          So, where I would go from there, Your Honor, is

09:34:36 10   that the *Bruen* Court laid out a text in history test, and I

09:34:42 11   think we've moved beyond the text part.  And what the state

09:34:48 12   and what other states, frankly, have suggested post-*Bruen*

09:34:52 13   is, Well, we need a lot of time now to undertake a lot of

09:34:55 14   discovery to lay out this whole historical backdrop.  And as

09:35:01 15   I indicated earlier, that could be relevant in the context

09:35:04 16   of other sorts of regulations where we might look backward.

09:35:08 17   But here, where the Supreme Court has already done that work

09:35:11 18   and said, You know, if weapons are not dangerous and

09:35:15 19   unusual, you can't ban them.  And so, that really --

09:35:18 20          THE COURT:  But it seems to me that if that was

09:35:24 21   the case, they spent a lot of time in *Bruen*, that they could

09:35:27 22   have just said:  Handguns are ubiquitous.  They're not

09:35:33 23   dangerous and unusual.  End of story.

09:35:35 24          MR. LEHMAN:  I think they could have done that,

09:35:36 25   although I think that they probably felt it better to lay

09:35:42  1    out the reasoning and go through the historical analysis to

09:35:44  2    explain in sort of an unsalable way why, you know, the

09:35:49  3    dangerous and unusual test is the appropriate one going

09:35:54  4    forward for determining whether a particular arm, or a

09:35:59  5    subset of a category or an entire category like handguns

09:36:03  6    could be banned.  And to the extent if an arm is not both

09:36:08  7    dangerous and unusual, it can't be banned.  And that's the

09:36:11  8    end of the inquiry, regardless -- like the Court has said,

09:36:14  9    regardless of whether handguns were dangerous and unusual.

09:36:18 10             THE COURT:  Well, just to make sure that I've

09:36:19 11    got your point in the dangerous and unusual, bazooka --

09:36:24 12             MR. LEHMAN:  Unusual.

09:36:25 13             THE COURT:  Unusual, yes.  But dangerous, no.

09:36:28 14             MR. LEHMAN:  Absolutely.  Very dangerous.

09:36:30 15             THE COURT:  Or dangerous, yes.  Okay.  But the

09:36:35 16    banned guns are not dangerous.  The bazooka is dangerous,

09:36:39 17    and the banned guns are not or --

09:36:40 18             MR. LEHMAN:  No, they're all dangerous.

09:36:42 19             THE COURT:  Right.  They're all dangerous.

09:36:43 20             MR. LEHMAN:  Yes.  They're all extremely

09:36:44 21    dangerous.

09:36:44 22             THE COURT:  And, in fact, basically all the

09:36:46 23    things that we've described as arms or, I don't know, pepper

09:36:53 24    spray, maybe not, but they're all dangerous; right?

09:36:55 25             MR. LEHMAN:  Right.  That's the point of an arm.

09:36:57  1   If it were not dangerous, it wouldn't be an arm, which is

09:37:01  2   why you have to move on to determine whether it's unusual in

09:37:04  3   society.  And if it's in common use for lawful purposes, the

09:37:08  4   Court has said it's not unusual, and so it doesn't meet the

09:37:11  5   dangerous and unusual test and cannot be banned.

09:37:14  6          And, Your Honor, you sort of cautioned me not to

09:37:19  7   spend a whole lot of time on the other elements.  I'm happy

09:37:23  8   to address them very quickly or address any other questions

09:37:26  9   you have in the Second Amendment context, although I think

09:37:30 10   we've covered a lot of the ground.

09:37:33 11          THE COURT:  Let me just check my notes here.

09:37:36 12   Hold on a minute.

09:37:56 13          So, one of the things *Bruen* said, and I'm,

09:38:09 14   obviously, paraphrasing here, if we get to the question of

09:38:17 15   history, the Court said, "When a challenged regulation

09:38:24 16   addresses a general societal problem that has persisted

09:38:29 17   since the 18th Century, for lack of social similar

09:38:33 18   historical regulations addressing that problem, it is

09:38:34 19   relevant evidence that the challenged regulation is

09:38:37 20   inconsistent with the Second Amendment."

09:38:38 21          And it goes on to say in a later point, "Other

09:38:45 22   cases implicating unprecedented societal concerns or

09:38:49 23   dramatic technological changes may require a more nuanced

09:38:54 24   approach.  The regulatory challenges posed by firearms today

09:38:58 25   are not always the same as those that preoccupied the

09:39:02  1    founders in 1791 or the reconstruction generation in 1868."

09:39:08  2          What do you think that means in terms of the

09:39:20  3    ability to regulate firearms when there are unprecedented

09:39:28  4    societal concerns?  And in particular, I think, though,

09:39:45  5    maybe the State's evidence is short on this, I don't know,

09:39:49  6    but I don't think mass shootings in schools was a societal

09:39:55  7    concern in 1790, or 1868 or really for a long ways going

09:40:02  8    forward towards the present.

09:40:05  9          MR. LEHMAN:  Well, Your Honor, I don't think I

09:40:07 10    would draw the distinction that narrowly between gun

09:40:10 11    violence more generally, which has been a societal issue

09:40:14 12    probably since guns were invented.  I think Beretta was

09:40:19 13    founded in 15 something, so it's been going on for a while.

09:40:22 14    And certainly it was going on in the, you know, '20's and

09:40:25 15    '30's when, you know, Al Capone and friends were using Tommy

09:40:28 16    guns and --

09:40:30 17          THE COURT:  And the result was Tommy guns got

09:40:33 18    regulated and essentially banned; right?

09:40:36 19          MR. LEHMAN:  Right.  And semi-automatic weapons

09:40:38 20    have never undergone the same sort of regulation, I think,

09:40:43 21    until 1994 in the famously ineffective assault weapons ban

09:40:48 22    that expired.  Other than that, it's just been in the past

09:40:51 23    ten years or so that States have decided to take the sort of

09:40:55 24    measures that Delaware has.

09:40:58 25          THE COURT:  But isn't it also more or less in

09:41:00  1    the past 10 or 20 years that the punitive reason for this

09:41:08  2    legislation has surfaced?

09:41:13  3                MR. LEHMAN:  I don't think that mass shootings

09:41:16  4    have surfaced in the past 20 years.  But like we talked

09:41:21  5    about earlier and like we said in the briefing, whether the

09:41:26  6    State is hyper-focused on that issue is a little different

09:41:30  7    than whether it -- or I think it rises to the level that it

09:41:34  8    would imbalance that lawful use for a common purposes

09:41:39  9    requirement.  And as we noted in the briefing, not just

09:41:44 10    these banned rifles, but any rifles at all kill fewer people

09:41:49 11    in the United States every year than bare hands by

09:41:51 12    themselves do, knives by themselves do, or blunt objects by

09:41:56 13    themselves do.  And in most years, less than lightning does.

09:41:59 14                And so, you know, to the extent that's relevant,

09:42:06 15    we just don't feel that it creates the sort of issue that

09:42:10 16    would upset the requirement that the guns be dangerous and

09:42:18 17    unusual.  And because there are so many millions of these

09:42:19 18    that are owned by people who use them for purposely innocent

09:42:22 19    purposes and are very rarely used in crimes, I'm not sure

09:42:27 20    that really rises to the level of an unprecedented societal

09:42:31 21    concern that throws off that balance in a material way in

09:42:36 22    terms of a Second Amendment analysis.

09:42:38 23                THE COURT:  Well, so your position is that

09:42:41 24    unless you can say a weapon is dangerous and unusual,

09:42:49 25    essentially the State can't regulate it?

09:42:52  1          MR. LEHMAN:  Yes, I think that -- I think the

09:42:53  2     Supreme Court has made that pretty clear that in the context

09:42:56  3     of banning arms, the question is whether they're unusual in

09:43:02  4     society at large.  And to the extent they're in common use

09:43:05  5     for lawful purposes, the Court has told us they are not

09:43:09  6     unusual.  And so, they can't meet that test, and they can't

09:43:12  7     be banned.

09:43:17  8          THE COURT:  So --

09:43:23  9          MR. LEHMAN:  And I think in casting off that

09:43:25 10     interest balancing, the Court made it clear that it's not if

09:43:29 11     they're dangerous, they're not unusual, but you're extremely

09:43:32 12     worried about them, you know, is not the test.  It's a

09:43:37 13     purely dangerous and unusual test.  If they're in common use

09:43:40 14     for lawful purposes, they don't meet that test.

09:43:43 15          THE COURT:  So, let's assume as a fact that

09:43:47 16     semi-automatic rifles and assault pistols are based on the

09:44:00 17     evidence of Mr. Yurgealitis, not very good weapons for

09:44:06 18     self-defense.  I mean, I know your answer basically.  You

09:44:16 19     could have a weapon -- well, I haven't asked a question.

09:44:19 20          If you had a weapon that had no self-defense,

09:44:26 21     really no use for self-defense, let's say a hand grenade,

09:44:31 22     but it was useful for going out and hunting in a kind of

09:44:36 23     different style than most people hunt by blowing up animals,

09:44:43 24     if people had lots of grenades that had been handed down

09:44:49 25     from their grandfathers who fought in World War II, they

09:44:54  1    couldn't be regulated; is that right?

09:44:59  2         MR. LEHMAN:  I mean, I think that they would

09:45:02  3    have been dangerous and unusual even at the time of the end

09:45:06  4    of World War II --

09:45:07  5         THE COURT:  But we're --

09:45:08  6         MR. LEHMAN:  -- in that hypothetical.

09:45:09  7         THE COURT:  But it's not hypothetical, I think,

09:45:10  8    because I've seen movies.  Lots of people kept souvenirs of

09:45:14  9    the war.

09:45:15 10         MR. LEHMAN:  Mm-hmm.

09:45:16 11         THE COURT:  And I don't know, it's entirely

09:45:22 12    possible.  I mean, so just assume that enough people, let's

09:45:26 13    say 200,000 had hand grenades from World War II hanging

09:45:33 14    around their houses as essentially a collector's item, which

09:45:37 15    I would imagine is what most people would have it for.  They

09:45:45 16    would be, in your view, not dangerous and unusual; right?

09:45:49 17         MR. LEHMAN:  I don't know that they would be in

09:45:52 18    common use for lawful purposes if they're not serving any --

09:45:56 19         THE COURT:  But so, collection is a lawful

09:45:58 20    purpose; right?

09:45:58 21         MR. LEHMAN:  It is, yes.

09:46:00 22         THE COURT:  And --

09:46:01 23         MR. LEHMAN:  I think depending on -- certainly,

09:46:03 24    that would be something that if it came up, I guess the

09:46:05 25    Court would have to grapple with it.  I think it ties in a

09:46:08  1    little bit with what the State was sort of proposing with

09:46:11  2    sort of a doom's day scenario where the market is flooded

09:46:13  3    with something, and it automatically becomes in common use.

09:46:19  4            THE COURT:  But, I mean, leaving aside the

09:46:24  5    likelihood of that actually happening, if, you know,

09:46:33  6    somebody came up with a new weapon and had -- kind of the

09:46:38  7    way we used to imagine drug dealers did things, give away a

09:46:42  8    few hundred thousand for free and create a demand, and then

09:46:46  9    we'll raise our prices and start selling them for real.

09:46:48 10            Is there a temporal aspect in common use?  Is

09:46:57 11    that the in common use over the last "X" number of years, or

09:47:02 12    is it moment in time when the law is passed, we figure out

09:47:08 13    how many of them are out there?

09:47:10 14            MR. LEHMAN:  Well, what the Supreme Court has

09:47:13 15    told us is that the relevant inquiry is whether something is

09:47:17 16    a common use for lawful purposes today.  So, regardless of

09:47:20 17    whether it was in common use at some point in the past, as

09:47:24 18    Your Honor indicated, it's extraordinarily unlikely that

09:47:28 19    that would ever happen.  And I suppose if it did, maybe the

09:47:32 20    Court would have something slightly different to say about,

09:47:35 21    you know, an intentional effort to skirt that issue.  But

09:47:42 22    it's not what's happening here.

09:47:45 23            So, it's an interesting hypothetical, but not, I

09:47:47 24    think, relevant to the constitutionality of the bans that

09:47:51 25    are at issue -- the arms that are at issue in this case,

09:47:54 1    which, you know, indisputably have been very popular for,

09:47:56 2    you know, quite a while and are very popular today.

09:47:59 3              THE COURT:  So, let's assume for the sake of

09:48:03 4    argument that I don't agree with you that for, you know,

09:48:07 5    likelihood of success on the merits here that the fact that,

09:48:20 6    let's say, there's 10 million of these in the United States

09:48:26 7    means they can't be regulated anymore.

09:48:40 8              What was my thought here?  I forgot what my

09:48:50 9    thought is.

09:48:51 10             So, actually I do have a slightly different

09:48:54 11   question.  So, in Delaware, there's a crime called carrying

09:49:03 12   a concealed deadly weapon; right?  Does that mean that if

09:49:07 13   I'm, you know, a non-felon, non-illegal alien, non the

09:49:15 14   various other things that cause you to be a prohibited

09:49:18 15   person, and I strap on a holster and put a .45 pistol, a

09:49:25 16   non-banned gun in it, I can just walk around on the streets

09:49:29 17   with my gun; right?

09:49:31 18             MR. LEHMAN:  Yes, in Delaware, you can --

09:49:32 19             THE COURT:  So --

09:49:33 20             MR. LEHMAN:  -- assuming it's not concealed.

09:49:34 21   You need a permit to conceal it.

09:49:36 22             THE COURT:  Right, right.  That's the point.

09:49:38 23   And so, I must admit I don't see too many people walking

09:49:45 24   around like that.

09:49:45 25             MR. LEHMAN:  I've only ever seen one or two

09:49:47 1    myself, Your Honor.

09:49:48 2            THE COURT:  But the point is that, as the

09:49:52 3    Defendant's expert says, if you're going to walk around with

09:49:56 4    a gun or at least a handgun for self-defense, it's useful to

09:50:02 5    be able to carry it concealed.  And, you know, that's the

09:50:06 6    reason why we have a permitting process and that's the

09:50:08 7    reason why *Bruen* was in the Supreme Court to begin with.

09:50:11 8            I don't think I've ever seen anybody walking

09:50:15 9    around, you know, with a banned gun.  And I think they'd be

09:50:28 10   pretty hard to actually -- particularly the rifles, they

09:50:31 11   would be pretty hard to actually conceal on your person.

09:50:33 12           MR. LEHMAN:  They are.  I've frequently seen

09:50:36 13   people carry, usually at events, you know, sort of rallies

09:50:38 14   that were scheduled for that purpose.  I've never attended

09:50:42 15   one, but I --

09:50:43 16           THE COURT:  No, no, but that would be -- but

09:50:44 17   they're not carrying them for self-defense.  They're

09:50:48 18   carrying them for some other reason.

09:50:49 19           MR. LEHMAN:  Well, if they needed it for

09:50:51 20   self-defense, they have it.  I can't speak to why, in those

09:50:53 21   circumstances, they were.  Maybe it was both.  You know,

09:50:55 22   maybe they perceived the likelihood of, you know,

09:50:59 23   counter-protestors attacking them or something.  I have no

09:51:02 24   idea.

09:51:02 25           THE COURT:  All right.  Does it make any

09:51:08  1   difference -- let's assume there are 10 million of these

09:51:16  2   guns out there.  Does it make any difference whether there's

09:51:19  3   evidence about how many of the 10 million carry, or bear or

09:51:29  4   keep, I guess, the weapons for self-defense as to some other

09:51:37  5   purpose?

09:51:37  6            MR. LEHMAN:  No, it doesn't matter.

09:51:40  7   Constitutionally, you know, the Second Amendment gives you

09:51:42  8   the right to keep and to bear arms.  And the Court has

09:51:45  9   recognized that there are other lawful purposes besides

09:51:47 10   self-defense.  And so, you're perfectly entitled to keep a

09:51:53 11   protected arm in your home for whatever purpose you want.

09:51:56 12            THE COURT:  Is there --

09:51:57 13            MR. LEHMAN:  It's not illegal.

09:51:58 14            THE COURT:  -- any good evidence of the 10

09:52:03 15   million people or the 10 million firearms, how many of them

09:52:09 16   are kept or carried for self-defense, in part or in whole,

09:52:23 17   as opposed to some of the other purposes like, for example,

09:52:26 18   target shooting?

09:52:27 19            MR. LEHMAN:  There are, Your Honor.  And I don't

09:52:29 20   have the citation to that source right in front of me, but

09:52:34 21   there was, I think, either in the Gray Plaintiffs' opening

09:52:39 22   brief, or a Complaint or in the reply, we had citations to

09:52:44 23   surveys where people were asked specifically about the

09:52:47 24   ownership of AR-15 sorts of rifles and why they have them.

09:52:53 25   A substantial number of people said it was for personal

09:52:55 1    protection.  Another substantial percentage of people said

09:53:00 2    it's for recreational target shooting.  And I know that, you

09:53:06 3    know, at least one of the State's experts opined that

09:53:09 4    they're not ideal for hunting, although a substantial number

09:53:13 5    of people also indicated that they use them for that purpose

09:53:15 6    as well, partially because these sorts of rifles come in

09:53:20 7    different calibers.  And while this sort of most common .223

09:53:25 8    ammunition is not ideal in most hunting scenarios, there are

09:53:30 9    other calibers that are more suited to that.  So, it's the

09:53:33 10   same rifle, just shoots a different caliber of bullet.

09:53:36 11           THE COURT:  Do the assault pistols, do some of

09:53:41 12   the ones that are in the legislation use 9-millimeter

09:53:49 13   ammunition?

09:53:49 14           MR. LEHMAN:  Yes.  Yes.

09:53:50 15           THE COURT:  Okay.

09:53:51 16           MR. LEHMAN:  As my colleague indicated earlier,

09:53:56 17   the distinction seems to be, well, they bear a resemblance

09:54:01 18   or ostensibly derived from a military weapon.  And that's

09:54:07 19   really the -- seems to be the distinction, not that they

09:54:11 20   operate in a different way than any other semi-automatic.

09:54:16 21           THE COURT:  No.  I was just wondering because

09:54:18 22   you mentioned the caliber.

09:54:19 23           MR. LEHMAN:  Right.  Yeah.  Yeah, it varies.

09:54:20 24           THE COURT:  And my impression was, just an

09:54:23 25   impression, but my impression was that a lot of the weapons

09:54:30  1    in question were designed to or maybe do shoot a bigger

09:54:36  2    caliber ammunition.

09:54:38  3              MR. LEHMAN:  Some do, but, honestly, the

09:54:40  4    Government, the military uses 9-millimeter ammunition.  So,

09:54:44  5    it's not, you know, 9-millimeter ammunition was designed, I

09:54:48  6    think, for use by NATO countries.  So, it's not -- you know,

09:54:52  7    these pistols and rifles are not using any extra special,

09:54:56  8    you know, ammunition that's not common generally among

09:55:01  9    firearms.

09:55:01 10              THE COURT:  All right.  Mr. Lehman, thank you.

09:55:03 11              Maybe I'll hear from Mr. Pileggi.

09:55:05 12              MR. LEHMAN:  Sure.  I did have one housekeeping

09:55:07 13    matter very briefly.

09:55:09 14              THE COURT:  Yes.

09:55:09 15              MR. LEHMAN:  There was that *Graham* case that

09:55:11 16    also is a magazine case and is before Your Honor.  And as

09:55:15 17    you know, my friends here and I agreed amongst ourselves to

09:55:19 18    consolidate that one here.  And the idea was to have those

09:55:23 19    Plaintiffs just file a joinder with our motion.

09:55:26 20              THE COURT:  So, remind me:  Which case number is

09:55:27 21    that?

09:55:28 22              MR. LEHMAN:  I don't have the number right in

09:55:30 23    front of me, Your Honor, but that was *Graham vs. Jennings*.

09:55:34 24              THE COURT:  Graham, G-R-A-H-A-M?

09:55:37 25              MR. LEHMAN:  Yes, that was assigned to Your

09:55:39  1   Honor, and we entered a stipulation indicating our plan for

09:55:44  2   consolidating that one and for a joinder that was going to

09:55:46  3   be very simple, not any other argument that would complicate

09:55:49  4   the record, but just sort of standing facts.

09:55:52  5              THE COURT:  So, you already filed something.

09:55:55  6   Did I sign it?

09:55:56  7              MR. LEHMAN:  I think the stipulation was signed.

09:55:59  8   We've not done the joinder or anything.  I think we've all

09:56:02  9   been kind of preoccupied for preparing for this, but that

09:56:05 10   can be done very quickly to make sure it's not an awkward

09:56:08 11   procedural situation.

09:56:09 12              THE COURT:  So, what you're saying is there's a

09:56:10 13   stipulation saying we're going to do this, but we haven't

09:56:13 14   actually done that yet?

09:56:14 15              MR. LEHMAN:  Right --

09:56:14 16              THE COURT:  Okay.

09:56:15 17              MR. LEHMAN:  -- the act of stipulating to

09:56:16 18   consolidating it and submitting the joinder.

09:56:19 19              THE COURT:  And so, I was actually looking this

09:56:21 20   morning because I saw a case because I think I had -- I

09:56:28 21   either have four or five of these, I'm not sure how many

09:56:31 22   exactly, but there was one that I looked at it.  And it was,

09:56:35 23   you know, SS 1 for SB 6.  Is that the case you're talking

09:56:40 24   about?

09:56:40 25              MR. LEHMAN:  Yes.  It's a magazine challenge as

09:56:43  1    well.

09:56:43  2               THE COURT:  Yeah, yeah.  So, thank you for that

09:56:46  3    because I was wondering:  How is that going to be different

09:56:53  4    than this case?

09:56:54  5               MR. LEHMAN:  It's not.

09:56:55  6               THE COURT:  So, if it's joined to this one, that

09:56:57  7    would be great, as far as I'm concerned.

09:56:59  8               MR. LEHMAN:  That's the plan.  I just wanted to

09:57:00  9    update Your Honor about what was going on so you weren't

09:57:03 10    wondering why we hadn't done anything.

09:57:04 11               THE COURT:  Okay.

09:57:05 12               MR. LEHMAN:  Thank you.

09:57:06 13               THE COURT:  Let me ask just one other question.

09:57:09 14    I feel confident that if I deny the motion for preliminary

09:57:13 15    injunction, you're going to appeal to the Third Circuit.

09:57:16 16               MR. LEHMAN:  I think that's right.

09:57:18 17               THE COURT:  So, I also have this trial scheduled

09:57:23 18    in November, whenever it's scheduled.  Do you actually plan

09:57:28 19    to do any discovery for that or you basically -- maybe I'm

09:57:40 20    not asking the question very well.

09:57:43 21               You know, your argument to date has been

09:57:47 22    essentially, This is a pure legal question.  Look at the

09:57:52 23    statute.  It's unconstitutional.  It's over.

09:57:58 24               I'm just wondering, if I were to deny your

09:58:04 25    motion, I'm guessing it would take the Third Circuit a while

09:58:09  1   to figure out what they were going to do about it.  Are you

09:58:14  2   planning to -- would you be planning to engage in discovery

09:58:17  3   in the mean time or what, or is that something that you

09:58:22  4   figure -- that's a scenario that's not been contemplated

09:58:26  5   yet?

09:58:26  6          MR. LEHMAN:  It's not been contemplated yet,

09:58:29  7   although our position in this case and generally in these

09:58:32  8   sorts of cases post-*Bruen*, to the extent it involves a ban

09:58:36  9   on arms themselves, is that discovery is not necessary at

09:58:39 10   all.  And so, I think we would -- I don't anticipate that

09:58:43 11   that would change, although, I guess, you know, depending on

09:58:47 12   the basis upon which the motion was denied might factor into

09:58:53 13   that calculus, but I don't anticipate any discovery.

09:58:56 14          THE COURT:  So, one of the things is to the

09:58:58 15   extent that, either for the purposes of this motion or for

09:59:02 16   later on, that I'm concerned about the historical regulation

09:59:06 17   of arms, looking for what I believe the Supreme Court

09:59:14 18   described as relevantly similar regulation, for present

09:59:28 19   purposes, in other words for this motion, do you think Bowie

09:59:48 20   knives are relevantly similar?

09:59:50 21          MR. LEHMAN:  No.  No, Your Honor.  And as we

09:59:54 22   kind of -- we addressed somewhat in the reply brief, really

10:00:01 23   those regulations, number one, address arms that were not in

10:00:06 24   lawful -- you know, not in common use for lawful purposes.

10:00:10 25   They were perceived at the time to be overwhelmingly not

10:00:13 1    using -- not being used for lawful purposes and being used

10:00:15 2    instead for, you know, mob violence and things like that.

10:00:22 3            So, we don't think the State has proffered any

10:00:25 4    relevantly similar regulations, although we don't think it

10:00:28 5    would matter if they had, because what the Supreme Court has

10:00:32 6    said is if they're in lawful use for common purposes today,

10:00:35 7    we don't really care about what happened before.  And so, in

10:00:38 8    the context of handguns, they said, Well, who cares if they

10:00:42 9    thought they were dangerous and unusual several hundred

10:00:44 10   years ago.  They're not today, so it doesn't matter what

10:00:47 11   they thought before.

10:00:48 12           THE COURT:  All right.  And on kind of the same

10:00:51 13   general topic, my impression from something that I think was

10:01:00 14   hinted at in *Bruen*, and maybe it was said in *Heller*, I can't

10:01:02 15   remember.  It sticks in my head, but I couldn't place where

10:01:05 16   it was that I had seen it.  To the extent I get into

10:01:08 17   historical regulation, I don't have to go out and do my own

10:01:17 18   independent history.  I can rely -- I can basically take

10:01:20 19   whatever it is that the parties give me, which at this point

10:01:24 20   is the Defendant has given me stuff, and you haven't.

10:01:29 21           Right?

10:01:29 22           MR. LEHMAN:  Right.

10:01:30 23           THE COURT:  Okay.  Thank you, Mr. Lehman.  It's

10:01:32 24   all been very helpful.

10:01:33 25           MR. LEHMAN:  Just as a slight followup to answer

10:01:35 1    your question, if you were to do that, you could essentially

10:01:41 2    just, you know, reread *Bruen* for that purpose, because they

10:01:45 3    undertook the entire task of going back through the

10:01:48 4    historical record and in the context of banning arms

10:01:51 5    determining, you know, how it should be valued.

10:01:55 6        THE COURT:  Well, was there something in *Bruen*

10:01:57 7    about Bowie knives?

10:01:59 8        MR. LEHMAN:  They went through that discussion

10:02:00 9    of Bowie knives, sword canes, clubs, you know, a variety of

10:02:05 10   daggers, a variety of things that, you know, at the time

10:02:09 11   were perceived to be almost exclusively in use by criminals.

10:02:13 12       THE COURT:  All right.  Okay.  Thank you.

10:02:25 13       MR. LEHMAN:  Thank you.

10:02:25 14       THE COURT:  Mr. Pileggi.

10:02:27 15       MR. PILEGGI:  May it please the Court, good

10:02:36 16   morning, Your Honor.  Francis Pileggi of Lewis Brisbois for

10:02:40 17   the Plaintiffs, Your Honor.  I just have a logistical

10:02:44 18   question.  I think Your Honor assigned one hour for each

10:02:46 19   side, and we've already exceeded --

10:02:48 20       THE COURT:  Well, I used up the first

10:02:50 21   15 minutes --

10:02:50 22       MR. PILEGGI:  So, I just don't know how much

10:02:51 23   time I have.

10:02:52 24       THE COURT:  -- so that doesn't count.  Why don't

10:02:54 25   you go ahead.  I mean --

10:02:56  1          MR. PILEGGI:  Excuse me.

10:02:58  2          THE COURT:  -- you know --

10:03:00  3          MR. PILEGGI:  I'll try to be brief.

10:03:01  4          THE COURT:  -- for the magazine, I mean, I guess

10:03:04  5   it seems to me like one of the questions is:  Are they arms

10:03:11  6   or not, which is what -- the Defendant says they're not

10:03:15  7   arms.  And I guess, regardless of the answer to that

10:03:18  8   question, I guess, even if I were to agree with the

10:03:27  9   Defendants, they're not arms, I'm kind of wondering whether

10:03:31 10   that even makes any difference --

10:03:33 11          MR. PILEGGI:  Well, Your Honor --

10:03:36 12          THE COURT:  -- I mean, because of their

10:03:37 13   relationship to things that are arms.

10:03:40 14          MR. PILEGGI:  Right.  Well, Your Honor, I want

10:03:44 15   to be responsive to your question, so let me start out by

10:03:48 16   answering your question.  And then if I have a few extra

10:03:50 17   minutes, I'll go back --

10:03:51 18          THE COURT:  Yeah, yeah.  Don't worry about the

10:03:52 19   time.

10:03:53 20          MR. LEHMAN:  -- to the other ones.  Your Honor,

10:03:54 21   the Third Circuit has already found that ammunition fits

10:03:58 22   within the definition, the constitutional concept of arms.

10:04:01 23          THE COURT:  But we're not talking ammunition

10:04:04 24   here; right?

10:04:05 25          MR. PILEGGI:  Well, that's a very good point,

10:04:07 1    Your Honor.  But in terms of magazines, I'll answer it

10:04:11 2    another way.  Magazines have -- while we're specifically

10:04:18 3    talking about what they refer to as large-capacity magazines

10:04:22 4    as opposed to just any old magazines.  And magazines, these

10:04:27 5    large-capacity magazines have been determined by at least

10:04:34 6    one Federal Court -- actually, let me stick with the Third

10:04:37 7    Circuit.  The Third Circuit found that there's no

10:04:40 8    long-standing history of large-capacity magazine regulation.

10:04:45 9    So, I think whether or not they're --

10:04:48 10                THE COURT:  Which case was that?

10:04:50 11                MR. PILEGGI:  That's the *Association of New*

10:04:54 12   *Jersey Rifle & Pistol Clubs vs. The Attorney General of New*

10:04:56 13   *Jersey*, 910 F.3d. 106, Pages specifically 116 to 117 and

10:05:03 14   Footnote 18.  And that case has a very lengthy procedural

10:05:07 15   history, Your Honor --

10:05:08 16                THE COURT:  Right, right.  But I've seen --

10:05:09 17                MR. PILEGGI:  -- many, many --

10:05:10 18                THE COURT:  -- that case, but it was more for

10:05:12 19   procedural history.

10:05:13 20                MR. PILEGGI:  Right.  So, this particular

10:05:15 21   decision that said that, Your Honor, was in 2018, but you'll

10:05:19 22   see that subsequent to 2018, there were many other

10:05:23 23   iterations.  And I don't know if you want me to go through

10:05:26 24   the procedure.

10:05:27 25                THE COURT:  All right.  So, actually, just so at

10:05:28  1   least the one iteration of it was an appeal from a

10:05:31  2   preliminary injunction --

10:05:33  3             MR. PILEGGI:  Correct.

10:05:34  4             THE COURT:  -- was in 2018.  The appeal from the

10:05:37  5   preliminary injunction, was that some kind of final

10:05:39  6   decision?

10:05:39  7             MR. PILEGGI:  That was the first appeal from the

10:05:42  8   denial of the preliminary injunction.  And then there was

10:05:45  9   many other subsequent decisions, but I don't think that

10:05:48 10   particular finding was either changed or altered in the

10:05:53 11   subsequent history.

10:05:53 12             THE COURT:  And so, the finding was that a

10:05:55 13   large-capacity magazine was protected by the Second

10:05:59 14   Amendment?

10:05:59 15             MR. PILEGGI:  Well, let me give you the quote,

10:06:01 16   and then if I can answer the question after I give that

10:06:04 17   quote.

10:06:04 18             THE COURT:  Sure, that would be good.

10:06:05 19             MR. PILEGGI:  Part of my answer is the quote.

10:06:08 20   The quote is, "There is no long-standing history of

10:06:10 21   large-capacity magazine regulation."  And in further answer

10:06:15 22   of your question, Your Honor, they applied the pre-*Bruen*

10:06:18 23   intermediate scrutiny test.

10:06:20 24             So, our position would be if they were applying

10:06:24 25   the correct standard under *Bruen*, the result might be

10:06:28  1    different.  But at least it's relevant to the answer to your

10:06:31  2    question that at least in the context of that decision --

10:06:35  3         THE COURT:  Well, when you say the answer might

10:06:36  4    be different, the *Bruen* -- the analysis might be different,

10:06:48  5    but surely your position is the answer would be the same.

10:06:50  6         MR. PILEGGI:  Well, Your Honor, under *Bruen* the

10:06:53  7    test is:  Is it consistent with the nation's tradition of

10:06:57  8    firearm regulation?  And the Third Circuit found that

10:07:01  9    regarding large-capacity magazines, there was no history of

10:07:05 10    regulation.  There is no history of regulation of

10:07:09 11    large-capacity magazines.  So, if we're applying the *Bruen*

10:07:11 12    standard instead of the pre-*Bruen* intermediate standard, I

10:07:15 13    think the conclusion, based on that finding, would have to

10:07:17 14    be different.  And I'm not suggesting that's the only

10:07:21 15    analysis, but that's a very big part of the analysis.  Of

10:07:24 16    course, we also have the common use aspect and the other

10:07:29 17    aspects of it.

10:07:29 18         THE COURT:  Maybe I'm remembering things wrong,

10:07:31 19    because I haven't looked at this case for today's

10:07:35 20    proceedings, but I thought the denial of the preliminary

10:07:38 21    injunction was reversed.

10:07:39 22         MR. PILEGGI:  Your Honor, there's a very lengthy

10:07:42 23    history.  I think the net result was, and I apologize if I

10:07:47 24    don't have all this committed to memory, but I think

10:07:50 25    eventually it ended up being the case that was vacated

10:07:55 1    post-*Bruen*.  So, eventually after many years, it ended up

10:07:59 2    being appealed to the U.S. Supreme Court.  And one of the

10:08:02 3    things that was done, among several other Circuit Courts --

10:08:06 4              THE COURT:  Right, right.

10:08:07 5              MR. PILEGGI:  -- that were -- decisions were

10:08:09 6    vacated and remanded in light of *Bruen*.  And I think -- I

10:08:12 7    will double-check, Your Honor.  I'll be happy to submit

10:08:14 8    something later today, but I'm pretty sure that a final

10:08:17 9    iteration of that case ended up before the Supreme Court.

10:08:20 10   And that's one of the cases that was vacated --

10:08:22 11             THE COURT:  Okay.

10:08:23 12             MR. PILEGGI:  -- and then sent back.

10:08:26 13             MR. LEHMAN:  Your Honor, very briefly.  A case

10:08:27 14   that I have in New Jersey was just consolidated with that

10:08:29 15   case.  And most recently I think the Third Circuit remanded

10:08:32 16   it for proceedings consistent with *Bruen*.  And that's where

10:08:36 17   it stands today.

10:08:38 18             MR. PILEGGI:  It's a very long procedural

10:08:41 19   history.

10:08:41 20             THE COURT:  Okay.

10:08:42 21             MR. PILEGGI:  So, Your Honor, if I can just

10:08:44 22   summarize an answer to your question.  Of course it's an

10:08:48 23   important issue whether or not it's considered within the

10:08:52 24   constitutional concept of arms.  But the fact that the Third

10:08:55 25   Circuit's already, at least in one iteration of that case,

10:08:58  1   determined that there is no long-standing history of

10:09:01  2   regulation of large-capacity magazines, I think that's

10:09:05  3   helpful to the analysis.

10:09:13  4            Well, I'm going to be respectful of the Court's

10:09:17  5   time, so I'm just going to try to give a very abbreviated

10:09:20  6   discussion of some of the topics.  I'd like to, if I can

10:09:23  7   very briefly, just by way of background and context, mention

10:09:26  8   the timing of the legislative process where these challenged

10:09:31  9   statutes were passed.

10:09:32  10           THE COURT:  Although, my impression is they were

10:09:34  11  passed before *Bruen*.

10:09:36  12           MR. PILEGGI:  Well, Your Honor, with one caveat,

10:09:38  13  the legislature in the Senate and the House voted in favor

10:09:44  14  of it before *Bruen*.  Then, to be specific, it was June 19th

10:09:50  15  of 2022.

10:09:51  16           June 23rd, a week later, approximately a week

10:09:54  17  later, *Bruen* came out.  And then seven days later, the

10:09:59  18  Governor signed it.

10:10:00  19           The important point I'd like to make, Your

10:10:02  20  Honor, is that they had at least a week after *Bruen* to

10:10:08  21  consider *Bruen*, to determine if, based on *Bruen* the

10:10:13  22  legislation that they had voted on, but had not yet become

10:10:16  23  law, should be modified in any way.  But they didn't.

10:10:19  24           And in addition to that, after *Bruen*, two

10:10:24  25  decisions of the Court of Appeals that were on appeal to the

10:10:28 1    Supreme Court were vacated.

10:10:30 2                THE COURT:  And I guess, what's your point here?

10:10:32 3                MR. PILEGGI:  My point is that it's relevant in

10:10:34 4    terms of the legislature not caring whether or not this

10:10:39 5    statute complied with *Bruen*.  They had an opportunity to

10:10:42 6    read *Bruen* and consider, and it's possible that they read

10:10:46 7    *Bruen*, and said, You know what, it's still fine.  We

10:10:48 8    don't --

10:10:48 9                THE COURT:  This doesn't sound very relevant to

10:10:50 10   me because I don't recall seeing any of these cases turning

10:10:53 11   on whether or not the legislature cared about things or not.

10:10:56 12               MR. PILEGGI:  All right.  Then, Your Honor,

10:10:58 13   this, I think, might be -- I know it is in our briefs, and I

10:11:03 14   think it's worth emphasizing.

10:11:05 15               House Bill 450 was based -- the first, and we

10:11:09 16   have this in our briefs, and I'll just be very, very

10:11:12 17   abbreviated on this.  In the synopsis of the prior iteration

10:11:17 18   of HB 450, which was Senate Bill 68, it specifically said

10:11:21 19   that this is based on a Maryland statute.  And this statute

10:11:26 20   is constitutional because it's based on a Fourth Circuit

10:11:30 21   decision called *Kolbe* which upheld it.

10:11:33 22               Well, the point I'm trying to make, and I didn't

10:11:36 23   make it very good the first time.  I'm going to try this

10:11:39 24   time --

10:11:39 25               THE COURT:  But this one seems -- I think it is

10:11:41  1    probably a much more relevant point.

10:11:43  2             MR. PILEGGI:  Yes, so let me focus on this one.

10:11:46  3    So, after *Bruen* was decided -- well, let me back up.

10:11:52  4             THE COURT:  So, but I think I got this from the

10:11:54  5    briefing.  The Fourth Circuit approved whatever the Maryland

10:11:57  6    law was or said it wasn't unconstitutional.  And then when

10:12:02  7    the Supreme Court issued *Bruen*, they vacated and remanded a

10:12:06  8    lot of different Courts of Appeal cases, including the

10:12:09  9    Fourth Circuit one.

10:12:09 10             MR. PILEGGI:  Right.

10:12:10 11             THE COURT:  And I forget, but what I forget is

10:12:13 12    has the Fourth Circuit done something since then?

10:12:16 13             MR. PILEGGI:  I don't think any final decision

10:12:17 14    has been made on that, to my knowledge.  But the point is HB

10:12:23 15    450 was based on a Maryland statute very similar that banned

10:12:28 16    certain types of firearms and certain magazines.  And at

10:12:32 17    least in the synopsis of the bill, the first iteration of

10:12:36 18    the bill, they said, This is fine because it's been upheld

10:12:39 19    by the Fourth Circuit.  But that Fourth Circuit decision

10:12:41 20    that they relied on has been vacated.

10:12:44 21             THE COURT:  Right, but I didn't go to check

10:12:47 22    this, because in my general knowledge, which I hope is

10:12:51 23    correct, when the Supreme Court issues a decision, and it

10:12:55 24    has cert pending petitions of a similar nature, isn't it

10:13:03 25    general practice to vacate and remand them for consideration

10:13:06 1   in light of whatever decision is just decided, so that

10:13:09 2   the -- while the Fourth Circuit -- because it's been vacated

10:13:14 3   is not law.  The vacating and remanding doesn't really

10:13:18 4   indicate anything about whether or not the Fourth Circuit

10:13:20 5   was wrong or right or maybe it indicates they did the wrong

10:13:26 6   analysis because they used the two-step thing and the

10:13:29 7   Supreme Court has said, No, it's a one-step thing.

10:13:31 8            So, but that doesn't really -- I don't know.

10:13:39 9   That's what I would get out of that.

10:13:41 10            Am I missing something?

10:13:42 11            MR. PILEGGI:  Your Honor, I respect your

10:13:43 12   analysis, and I'm not going to disagree with it other than

10:13:46 13   to say the decision on which the legislation was originally

10:13:52 14   based saying that this is fine, has been vacated.  And now

10:13:56 15   what the result of a vacated decision is, maybe they'll go

10:13:59 16   back and apply the new standard and reach the same result.

10:14:02 17   Nobody knows, but I don't think it's the same as saying,

10:14:06 18   Okay, that's a sound analysis.

10:14:09 19            THE COURT:  Do you know what the -- because

10:14:19 20   *Bruen* was, you know, last June.  We're now, what, I don't

10:14:22 21   know, eight or nine months since then.  Is that case still

10:14:29 22   with the Fourth Circuit?

10:14:31 23            MR. PILEGGI:  Your Honor, I have to

10:14:33 24   double-check.  I've looked.  I didn't look before I came

10:14:37 25   here today, but I did look.  And my understanding is that a

10:14:41  1   lot of those similar cases that were vacated, at least two

10:14:46  2   that I know of, the Court remanded back to the District

10:14:49  3   Court for historical finding, although it's very much a

10:14:54  4   disputed issue whether it was necessary to remand it.  But I

10:14:58  5   don't know that any final decision has been made subsequent

10:15:01  6   to the case being vacated.

10:15:02  7                THE COURT:  So, hold on a second.  I think

10:15:04  8   Mr. Lehman might know, one way or another.

10:15:04  9                MR. LEHMAN:  Your Honor, I distinctly recall

10:15:07 10   listening to the oral argument that recently happened since

10:15:11 11   it came back down, so I think --

10:15:13 12                THE COURT:  So, it's under --

10:15:14 13                MR. LEHMAN:  The oral argument has happened, and

10:15:18 14   they just haven't issued their decision yet, I believe is

10:15:21 15   where that stands.

10:15:22 16                THE COURT:  Okay.

10:15:24 17                MR. PILEGGI:  I follow these things pretty

10:15:25 18   closely, and I think I would have heard if there was a

10:15:28 19   decision.

10:15:28 20                THE COURT:  Right.  So, that's the kind of

10:15:31 21   thing, you know, obviously, if the Fourth Circuit says

10:15:35 22   something before I say something, that's a very significant

10:15:41 23   data point.

10:15:41 24                MR. PILEGGI:  Yes.  If I find out about it, Your

10:15:44 25   Honor, I will promptly notify the Court.

10:15:46  1          THE COURT:  That's why we talked about this at

10:15:47  2    the beginning.

10:15:48  3          MR. PILEGGI:  So, a lot of things are happening

10:15:50  4    around the country on this, obviously.

10:15:52  5          THE COURT:  Right.  So, that's the reason why I

10:15:54  6    have lawyers to keep me advised of those things.

10:15:58  7          All right.  Go ahead.

10:15:59  8          MR. PILEGGI:  Your Honor, I think with the

10:16:00  9    limited time left, I'm just going to focus on the Delaware

10:16:03 10    Constitution, because I don't think my friend intentionally

10:16:06 11    did not -- he did not focus on that regarding --

10:16:08 12          THE COURT:  So, yeah.  So, limit yourself on

10:16:13 13    this, but go ahead.

10:16:14 14          MR. PILEGGI:  I'll try to be brief, but I will

10:16:15 15    limit myself to the Delaware Constitution for the applicable

10:16:20 16    standard of review.  Your Honor, I was fortunate to

10:16:23 17    successfully argue both Delaware Supreme Court decisions,

10:16:27 18    the only Delaware Supreme Court decisions that have defined

10:16:30 19    the scope of Article I Section 20 in terms of the right to

10:16:34 20    bear arms outside the home, which is the analog to the

10:16:37 21    Second Amendment, but which, by its terms and as it's been

10:16:40 22    defined by the Supreme Court, is much broader because --

10:16:44 23          THE COURT:  Well, so the much broader because

10:16:47 24    the Constitution says, and I forget exactly what, but it

10:16:50 25    says hunting and maybe it says sporting purposes or, I mean,

10:16:53  1     it has things other than self-defense --

10:16:56  2                    MR. PILEGGI:  Right.

10:16:57  3                    THE COURT:  -- expressly in it.

10:16:58  4                    MR. PILEGGI:  Right.

10:16:59  5                    THE COURT:  So, in that sense, even though

10:17:01  6     Mr. Lehman's argument is that's all covered by the Second

10:17:05  7     Amendment, too, so it makes you kind of wonder.  But I take

10:17:08  8     it that, yeah, having express purposes in the Delaware

10:17:13  9     Constitution certainly creates breadth, in my opinion.

10:17:17  10            The question more, though, is or the question

10:17:21  11    that I would have and part of the reason why I was thinking,

10:17:24  12    and this might be a good thing to get the Delaware Supreme

10:17:27  13    Court to address is how much a decision in *Bruen*, which I

10:17:38  14    take it is after these two Delaware Supreme Court decisions,

10:17:43  15    how much that creates uncertainty about what the Delaware

10:17:46  16    Supreme Court would say.  And so, that's my concern.

10:17:58  17                   MR. PILEGGI:  I'd like to address that, if I

10:18:00  18    may, Your Honor.  In both the *Doe vs. Wilmington Housing*

10:18:03  19    *Authority* and the *Bridgeville vs. Small* case, the Delaware's

10:18:07  20    high court emphasized the truism which was also observed in

10:18:11  21    the Late Justice Holland's book on the Delaware

10:18:15  22    Constitution.  The truism that the U.S. Constitution

10:18:17  23    provides the floor of minimum rights.  The States can't

10:18:21  24    provide fewer than those minimum rights, but they can

10:18:24  25    provide greater rights.

10:18:25  1          And that's what Article I Section 20 does.  It

10:18:28  2  creates greater rights than the Second Amendment.  And those

10:18:32  3  two cases establish beyond question that Article I

10:18:36  4  Section 20 provides greater rights.

10:18:38  5          Now, the State's argument is that the review

10:18:42  6  standard should provide fewer rights.  If I understand the

10:18:46  7  State's argument, they're suggesting that notwithstanding

10:18:49  8  *Bruen*, which got rid of the one step too many, got rid of

10:18:53  9  the intermediate scrutiny test, that even though the

10:18:55 10  Delaware Constitution provides greater rights, it should be

10:18:59 11  reviewed based on a more restrictive standard, which I don't

10:19:03 12  think is consistent with *Bruen*.  And it's not consistent

10:19:06 13  with the Delaware Supreme Court's view of Article I

10:19:09 14  Section 20 as being -- providing much broader rights.

10:19:12 15          THE COURT:  So, the standard review that the

10:19:14 16  Delaware Supreme Court gave in your two cases, how would you

10:19:17 17  describe that?

10:19:18 18          MR. PILEGGI:  Intermediate scrutiny.

10:19:20 19          THE COURT:  So, my understanding of State

10:19:29 20  Constitutions, generally, I mean, because there's a certain

10:19:32 21  truism to what Justice Holland said, which is if the U.S.

10:19:36 22  Supreme Court guarantees you certain rights, anything the

10:19:41 23  State does can't detract from that amount of protection.

10:19:46 24          MR. PILEGGI:  Right.  It provides a floor.

10:19:48 25          THE COURT:  It is a floor, but that doesn't

10:19:50 1  necessarily mean that, you know -- and I've seen this in the

10:19:56 2  Fourth Amendment context -- that doesn't necessarily mean

10:19:58 3  that every time the Supreme Court refines its mode of

10:20:07 4  analysis of a particular issue, that that now is a part of a

10:20:12 5  refining of the Delaware Constitution.

10:20:16 6          The Delaware Supreme Court historically, you

10:20:20 7  know, based on bits and pieces of information I have, has

10:20:23 8  been very assertive.  And I think Justice Holland, in

10:20:37 9  particular perhaps, that, you know, the Delaware

10:20:41 10 Constitution has a different history and, you know, they can

10:20:45 11 do things differently.

10:20:48 12         And so, one of the things that it seems to me is

10:20:52 13 they could continue to do intermediate analysis, say, Look

10:20:56 14 we cover hunting.  And what's the other thing?

10:20:59 15         MR. PILEGGI:  Recreation.

10:21:00 16         THE COURT:  Recreation and the home.  Yeah, we

10:21:03 17 cover hunting and recreation.  You know, we cover these

10:21:05 18 things that we think are broader because they're explicitly

10:21:09 19 called out, but that doesn't necessarily mean that we now

10:21:14 20 are going to adopt one -- you know, *Bruen* said the Court of

10:21:21 21 Appeals are wrong when they do the two-step analysis.

10:21:26 22         They didn't, because they couldn't, say the

10:21:29 23 Delaware Supreme Court is wrong when it does two-step

10:21:32 24 analysis; right?

10:21:33 25         MR. PILEGGI:  You are correct, Your Honor, but

10:21:34  1    maybe I can answer your question by focusing on the part of

10:21:38  2    Article I Section 20 that is identical, the right to bear

10:21:41  3    arms for the protection of self.

10:21:43  4                Based on *Doe* and *Bridgeville*, the Delaware

10:21:48  5    Supreme Court said, We should apply the intermediate

10:21:52  6    scrutiny to any challenges based on Article I Section 20,

10:21:57  7    including the right to bear arms for the protection of one's

10:22:01  8    self inside the home.  I think we can all agree that the

10:22:05  9    United States Supreme Court said, That's not the right

10:22:08 10    standard to determine the right to bear arms within the

10:22:11 11    home --

10:22:12 12                THE COURT:  So --

10:22:14 13                MR. PILEGGI:  -- under *Heller*.

10:22:15 14                THE COURT:  So, you would have me or the Third

10:22:26 15    Circuit basically overrule the Delaware Supreme Court?

10:22:28 16                MR. PILEGGI:  No, Your Honor.  The way I would

10:22:31 17    look at it is let's start with the truism that we all agree

10:22:34 18    with that the United States Supreme Court decides what the

10:22:36 19    floor of minimum rights are when you're --

10:22:39 20                THE COURT:  Based on the U.S. Constitution?

10:22:41 21                MR. PILEGGI:  Based on the U.S. Constitution.

10:22:43 22    That's the floor.  A state can't go below that floor.  A

10:22:45 23    state can provide greater rights, but can't provide fewer

10:22:49 24    rights.

10:22:49 25                So, if we start with the overlap of Article I

10:22:52 1    Section 20 with the Second Amendment, the right to keep and

10:22:55 2    bear arms within the home.  Let's keep it simple for this

10:22:58 3    purpose, for my purpose.  That's an identical right in the

10:23:04 4    Delaware Constitution and the U.S. Constitution.

10:23:07 5         The Delaware Supreme Court pre-*Bruen* said, When

10:23:11 6    we're reviewing these issues, we apply the intermediate

10:23:15 7    scrutiny test.  I think it's a fair conclusion after *Bruen*

10:23:19 8    that that would provide fewer rights applying intermediate

10:23:25 9    scrutiny to the right to keep and bear arms within the home.

10:23:28 10   Applying the intermediate scrutiny standard would be more

10:23:31 11   restrictive and would provide fewer rights than applying the

10:23:35 12   *Bruen* standard, which is essentially none of the three tiers

10:23:38 13   of scrutiny.  I think that's a fairly safe statement based

10:23:42 14   on *Bruen* and based on Article I Section 20.

10:23:46 15        THE COURT:  But you would require me to, I don't

10:23:53 16   know, predict that when the last thing the Delaware Supreme

10:23:58 17   Court has said is, We apply intermediate scrutiny, that in

10:24:01 18   the future they would not do that?

10:24:04 19        MR. PILEGGI:  Well, based on -- at least to the

10:24:06 20   extent that there's an overlap of Article I Section 20 to

10:24:10 21   keep --

10:24:11 22        THE COURT:  Okay.

10:24:12 23        MR. PILEGGI:  At least to that extent.

10:24:13 24        THE COURT:  We can quibble on how much it

10:24:15 25   applies to, but the point is you want me to take the last

10:24:20  1    word from the Delaware Supreme Court interpreting the

10:24:23  2    Delaware Constitution and say that the U.S. Supreme Court's

10:24:28  3    interpretation of the U.S. Constitution has changed how the

10:24:37  4    Delaware Supreme Court would analyze this particular

10:24:40  5    provision?

10:24:42  6              MR. PILEGGI:  Well, Your Honor, with all due

10:24:43  7    respect, the way I would say it is we're applying the truism

10:24:46  8    that the State cannot provide fewer rights than the U.S.

10:24:51  9    Constitution provides.  And by applying the old -- well, by

10:24:55 10    applying the *Doe vs. WHA* standard to that right, we -- the

10:24:59 11    State would be applying or providing fewer rights than the

10:25:03 12    U.S. Supreme Court said are the minimum rights.

10:25:06 13              THE COURT:  You know, Mr. Pileggi, the Delaware

10:25:21 14    Constitution doesn't have to have a Second Amendment analog

10:25:24 15    at all; right?

10:25:24 16              MR. PILEGGI:  That is correct, Your Honor.

10:25:26 17              THE COURT:  And so, if it didn't, they'd be

10:25:28 18    providing fewer rights.

10:25:30 19              MR. PILEGGI:  If the Delaware Constitution did

10:25:35 20    not have an analog to the Second Amendment, you wouldn't

10:25:39 21    have -- let's say there was no Article I Section 20.

10:25:42 22              THE COURT:  Yeah, yeah.  That's what I'm saying.

10:25:44 23              MR. PILEGGI:  And before 1987, which is

10:25:45 24    relatively recent for historical purposes, that's when

10:25:49 25    Article I Section 20 was passed, there was none.  So, let's

10:25:51  1   say we're in 1985.  There is no Article I Section 20.  And

10:25:55  2   let's say *Bruen* came out in 1985.

10:25:58  3           Well, or *Heller* came out in 1985.  At the very

10:26:03  4   least, Delaware residents would have the right to keep a

10:26:06  5   handgun in their home for self-defense.

10:26:08  6           THE COURT:  Sure.  Sure.  Yeah, yeah, because of

10:26:09  7   the U.S. Constitution, but not because of the Delaware

10:26:11  8   Constitution.

10:26:11  9           MR. PILEGGI:  Right, but to complete the

10:26:13 10   analogy, the Delaware Supreme Court couldn't come out in

10:26:16 11   1986 and say, You're not allowed to have a firearm in your

10:26:19 12   home for self-defense because there's nothing in the

10:26:21 13   Delaware Constitution.

10:26:22 14           THE COURT:  Right.  They would not be

10:26:24 15   interpreting the Delaware Constitution.  They'd just be

10:26:27 16   applying U.S. Constitutional law.

10:26:28 17           MR. PILEGGI:  Right.  So, let's fast forward to

10:26:30 18   1989, Article I Section 20.

10:26:32 19           THE COURT:  Yeah, yeah.  So, I don't think this

10:26:33 20   is --

10:26:34 21           MR. PILEGGI:  Okay.

10:26:34 22           THE COURT:  I understand what you're saying.

10:26:36 23   I'm pretty sure I disagree with it --

10:26:37 24           MR. PILEGGI:  Okay.

10:26:38 25           THE COURT:  -- so I don't think it's productive

10:26:41  1    to talk about this anymore.

10:26:43  2            So, what I'm thinking, Mr. Pileggi, is I'll give

10:26:47  3    you another five minutes, period, then we're going to take a

10:26:50  4    break, and then we'll switch over to the State.  Okay?

10:26:52  5            MR. PILEGGI:  Yes, Your Honor.  Fine.  Thank

10:26:54  6    you.

10:26:54  7            In the five minutes I have left then, I'd like

10:26:56  8    to talk about the difference between automatic and

10:26:59  9    semi-automatic.  In another case that I was successful in

10:27:03 10    arguing, the *Delaware State Sportsmen's Association vs.*

10:27:07 11    *Garvin*, there are two cases by that name.  There's a 2018

10:27:10 12    case and there's a 2020 case.  I'm referring to the 2020

10:27:10 13    case.

10:27:15 14            In the 2020 case that we won and the State did

10:27:18 15    not appeal, the Superior Court in that decision disagreed

10:27:21 16    with the State.  In that case, the State was trying to

10:27:25 17    conflate the difference between an automatic weapon and a

10:27:29 18    semi-automatic weapon.

10:27:31 19            And I respectfully suggest they're doing the

10:27:34 20    same thing in this case.  They're trying to blur the

10:27:36 21    distinction, the very important distinction, between an

10:27:39 22    automatic firearm and a semi-automatic firearm.  And the

10:27:43 23    best --

10:27:43 24            THE COURT:  And the firearms that we're talking

10:27:46 25    about here, they're all semi-automatic; right?

10:27:49   1          MR. PILEGGI:  Correct.  But in their briefing,

10:27:51   2     Your Honor, and it came up a little bit in your colloquy

10:27:54   3     with my friend, they keep referring to machine guns, which

10:27:59   4     everyone knows are banned, and nobody in this case is

10:28:02   5     arguing are covered under the Second Amendment.  We might as

10:28:05   6     well be talking about rocket-propelled grenades because that

10:28:09   7     is not something that is covered.  We're not arguing that

10:28:13   8     it's covered.

10:28:13   9          THE COURT:  Well, no, no.  So, part of the

10:28:15  10     reason, because I think I was the one who introduced machine

10:28:18  11     guns or, for that matter, sawed-off shotguns, you know, I

10:28:26  12     understand they are not at issue in this case.  But one of

10:28:31  13     the things that I'm trying to do is to, for lack of a better

10:28:43  14     word, try to consider the broader scope than just what's

10:28:48  15     exactly at issue in this case because I think -- you know, I

10:28:55  16     may change my mind about this -- but I think there's a lot

10:29:15  17     of uncertainty about exactly what the Supreme Court's

10:29:25  18     decisions, what the implications are of those for much of

10:29:31  19     anything other than handguns.

10:29:34  20          And I think there's a lot of things just in the

10:29:42  21     opinion that kind of go this way, kind of go that way or at

10:29:46  22     least maybe they don't, but there's suggestions.  And you

10:29:57  23     know, Justice Alito, Justice Cavanaugh, Chief Justice

10:30:09  24     Murray, Justice Cavanaugh.  You know, Justice Cavanaugh and

10:30:12  25     the Chief Justice said, Properly interpreted, the Second

10:30:16  1   Amendment allows a variety of gun regulations.  As we've

10:30:30  2   explained, the sorts of weapons protected were those in

10:30:33  3   common use at the time.  We think that limitation is fairly

10:30:42  4   supported by the historic tradition of prohibiting the

10:30:46  5   carrying of dangerous and unusual weapons.

10:30:48  6          Justice Alito said, Our holding today in *Bruen*

10:30:59  7   decides nothing about the kinds of weapons that people may

10:31:04  8   possess.

10:31:12  9          And so, that's the reason why I'm asking

10:31:19 10   questions, maybe all over the lot, because I'm interested in

10:31:25 11   more, though I don't really have any power to say anything

10:31:29 12   about it, than just the particular two pieces of legislation

10:31:34 13   that are what is the subject of today's hearing.

10:31:39 14          In any event, I'm sorry for that digression.  Go

10:31:42 15   ahead.

10:31:42 16          MR. PILEGGI:  No.  I'll just conclude with this,

10:31:44 17   Your Honor, because I don't want to extend -- I don't want

10:31:46 18   to use up more time than Your Honor has given me.  I'll just

10:31:50 19   close with one statement.

10:31:51 20          In that *Garvin* -- excuse me, in that *Delaware*

10:31:55 21   *State Sportsmen's Association vs. Garvin*, the 2022 case --

10:31:58 22   2020 case, the Superior Court disagreed with the State's

10:32:02 23   attempt to say there's no real important distinction between

10:32:06 24   automatic weapons and semi-automatic weapons.  They tried to

10:32:08 25   conflate the two.  And I think they're trying to do the same

10:32:11 1    thing here.

10:32:12 2                And my point is there's an extremely important,

10:32:15 3    well-established distinction.  And the best example of that

10:32:19 4    is automatic weapons, like machine guns, have been banned.

10:32:23 5    They're still banned.  And nobody in this case is suggesting

10:32:27 6    they shouldn't be banned.

10:32:28 7                Semi-automatic weapons have never enjoyed a

10:32:32 8    tradition of regulation consistent with *Bruen*.  And that's

10:32:37 9    why the distinction between semi-automatic and automatic

10:32:41 10   weapons for this case is an important distinction, as was

10:32:45 11   recognized in *Garvin*.

10:32:48 12               Thank you, Your Honor.

10:32:48 13               THE COURT:  Besides for machine guns, what other

10:32:51 14   kind of fully automatic weapon is there?

10:32:53 15               MR. PILEGGI:  Well, Your Honor, the best answer

10:32:56 16   to that question is there are a lot of modifications you can

10:33:00 17   make.  The machine gun is the best example.  But if Your

10:33:06 18   Honor wants, I can submit a long list of examples.  That's

10:33:11 19   the best example, but there are weapons -- there are

10:33:13 20   modifications you can make to a weapon to make it automatic,

10:33:17 21   but that's the most common example.

10:33:19 22               But none of the weapons that are banned here in

10:33:23 23   this legislation that we're challenging are anything other

10:33:26 24   than -- excuse me -- no one suggests they're anything other

10:33:29 25   than semi-automatic.

10:33:30  1                    THE COURT:  Right.

10:33:32  2                    MR. PILEGGI:  And the most common example --

10:33:34  3                    THE COURT:  Are there any other presently banned

10:33:39  4    weapons that are -- you said machine gun is the most common.

10:33:46  5    What's in second place; do you know?

10:33:48  6                    MR. PILEGGI:  Well, Your Honor, I think my

10:33:50  7    understanding is that the best way to -- instead of trying

10:33:53  8    to think of an example, whether it's a Tommy gun or

10:33:56  9    something, is to apply the definition.  As I understand it,

10:33:59 10    an automatic weapon is when you pull the trigger, bullets

10:34:04 11    will continue to fire as long as your finger is on that

10:34:06 12    trigger.  Semi-automatic, you have to pull the trigger each

10:34:09 13    time you want a bullet to fire.

10:34:12 14                    THE COURT:  Right.

10:34:13 15                    MR. PILEGGI:  That's the best and it's a

10:34:16 16    simplistic definition.

10:34:17 17                    THE COURT:  And so, maybe --

10:34:18 18                    MR. PILEGGI:  So, if you want a definition of

10:34:21 19    whether or not -- which one of those definitions applies as

10:34:24 20    opposed to the name of the firearm, because I think many

10:34:27 21    firearms can be modified and adapted to fit one or two of

10:34:31 22    those -- either one of those definitions.  I don't know if

10:34:35 23    that answers your question or not.

10:34:36 24                    THE COURT:  No, actually that's helpful.  Thank

10:34:38 25    you.

10:34:42  1          So, one of the things about the large-capacity

10:34:45  2     magazine that was in the briefing was because the cutoff

10:34:52  3     here is 17; right?

10:34:55  4               MR. PILEGGI:  Correct.

10:35:00  5               THE COURT:  If the large-capacity magazine ban

10:35:09  6     was upheld, would there be any firearms that could no longer

10:35:14  7     be used?

10:35:17  8               MR. PILEGGI:  Your Honor, that's a good

10:35:19  9     question.  And there are so many different types of firearms

10:35:22 10     out there, I'd hesitate to give you a definitive answer for

10:35:26 11     all firearms.  Excuse me.  I'll keep my hands in my pocket.

10:35:32 12     But I do think a statistic would be helpful.  It might help

10:35:36 13     to inform the answer to that question.

10:35:40 14               THE COURT:  But before you give me that, just in

10:35:43 15     terms of, Yes, Judge, here's one firearm that only works

10:35:49 16     with a magazine that's goes above 17, you can't name one

10:35:57 17     right now?

10:35:57 18               MR. PILEGGI:  I can't name one, but I'd be happy

10:36:00 19     to supplement by the end of the day the answer to that

10:36:03 20     question.

10:36:03 21               THE COURT:  Okay.  So, what were you going to

10:36:06 22     say?

10:36:06 23               MR. PILEGGI:  In Page 16 of our reply brief, we

10:36:09 24     cite to a 2022 report that indicates that 52 percent of

10:36:14 25     modern sporting rifles in this country have magazines with a

10:36:18 1    capacity of 30 rounds.  So, in partial response to Your

10:36:23 2    Honor's question, whether or not those firearms could be

10:36:26 3    used, somebody would have to go out and buy -- either buy a

10:36:30 4    new magazine or try to retrofit their firearm to find a

10:36:35 5    magazine, if they could, that would fit their firearm for a

10:36:40 6    majority of the modern sporting rifles in this country.

10:36:46 7    That's a pretty big statistic.

10:36:53 8              If you want, Your Honor, I can supplement to

10:36:55 9    make sure I get an answer --

10:36:56 10             THE COURT:  Well, I mean, if you've got -- so,

10:37:01 11   if you've got some example of a firearm that can't operate

10:37:10 12   unless it has a magazine that has at least 18 rounds, yeah,

10:37:17 13   if you'd send me a letter saying what that is and how we

10:37:20 14   know that's true, that would be helpful.  You don't have to

10:37:24 15   do it by the end of the day, but probably by the end of

10:37:31 16   Monday would be helpful.

10:37:32 17            MR. PILEGGI:  Okay, Your Honor.  I will make

10:37:34 18   sure I send you that letter, one way or another, based on --

10:37:37 19            THE COURT:  Okay.  That would be great.

10:37:39 20            MR. PILEGGI:  Okay.

10:37:40 21            THE COURT:  Hold on a second, Mr. Pileggi.

10:38:09 22   Mr. Lehman said there are 10 million plus or minus firearms

10:38:19 23   out there that probably meet the legislation's definition of

10:38:25 24   what's banned in the assault rifle, assault pistol

10:38:30 25   categories.

10:38:34  1          Is there any information about -- I think maybe

10:38:44  2     you just gave it to me.  Is half the magazines that are sold

10:38:50  3     each year for or I wrote down here, 50 percent of the

10:38:58  4     magazines sold in 2022, but I guess I'm missing what that

10:39:02  5     goes with, were 30 rounds or more.

10:39:07  6          MR. PILEGGI:  I can answer that in two parts,

10:39:10  7     Your Honor, just to make it clear.  On Page 16 of our reply

10:39:14  8     brief, we refer to a 2022 report that 52 percent of modern

10:39:19  9     sporting rifles have magazines with a capacity of 30 rounds.

10:39:23 10          THE COURT:  When you say "have," you mean are

10:39:24 11     sold sort of in conjunction with?

10:39:26 12          MR. PILEGGI:  In existence today based on sales

10:39:30 13     in the past.  But the other thing I want to point out in

10:39:33 14     answer to your question, Your Honor, is --

10:39:35 15          THE COURT:  So, if one were approximating, if

10:39:41 16     there's 10 million of these sorts of weapons out there,

10:39:47 17     maybe a reasonable estimate is 50 percent of them have a

10:39:51 18     large-capacity magazine within the meaning of the law?

10:39:55 19          MR. PILEGGI:  Based on that statistic, but there

10:40:00 20     are a lot of other statistics.  And if I can just refer to

10:40:03 21     our reply brief, Your Honor, at Pages 9 and 10 of our reply

10:40:08 22     brief, there are a lot of other statistics.  For example, we

10:40:11 23     cite to a National Shooting Sports Foundation Report that

10:40:18 24     ten years ago one out of every -- well, let me be more

10:40:23 25     specific.  We're talking about how many of these are out

10:40:25 1    there, and there are a lot of statistics in our reply brief.

10:40:29 2    I'm just trying, in the interest of time, to pick one

10:40:35 3    because I know that there are many statistics out there, and

10:40:40 4    I don't want to bore you with statistics.

10:40:42 5            But how about if I leave you with this:  In the

10:40:45 6    Ninth Circuit in *Duncan vs. Becerra*, and there are a lot of

10:40:48 7    cases with that name.  This is a 2020 decision.  In that

10:40:51 8    case, which was later vacated en banc, but not for this

10:40:55 9    purpose, a panel of the Ninth Circuit observed that one of

10:40:58 10   the banned rifles, the AR-15 is the most popular rifle in

10:41:03 11   America today and comes standard with a 30-round magazine.

10:41:07 12   So, that doesn't give you a specific number, but at least

10:41:10 13   according to a panel of the Ninth Circuit in that case, the

10:41:14 14   most popular rifle in America today comes standard with a

10:41:17 15   30-round magazine.  So --

10:41:19 16           THE COURT:  Okay.  Well, that's actually very

10:41:22 17   helpful.

10:41:22 18           MR. PILEGGI:  And I know you don't want me to

10:41:24 19   take up any more time, Your Honor, but our reply brief does

10:41:27 20   cite a lot of statistics about how many millions of rifles

10:41:30 21   are out there.

10:41:31 22           THE COURT:  Okay.  All right.

10:41:32 23           Thank you, Mr. Pileggi.

10:41:33 24           MR. PILEGGI:  Thank you, Your Honor.

10:41:34 25           THE COURT:  All right.  So, we'll take a 10 or

10:41:38  1    15 -- let's take a 15-minute break.

10:41:41  2              And, Mr. Ross, you know, I'm not going to limit

10:41:46  3    you to an hour here or your side to an hour because, for one

10:41:50  4    thing, I've given them probably an hour and a half already.

10:41:54  5    So, for what it's worth.

10:41:58  6              Okay?

10:41:59  7              MR. ROSS:  Thank you, Your Honor.

10:42:00  8              THE COURT:  All right.  We'll be in recess.

10:42:01  9              (A brief recess was taken.)

10:42:01 10              DEPUTY CLERK:  All rise.

10:59:30 11              THE COURT:  All right.  Mr. Ross.

10:59:36 12              MR. ROSS:  Thank you, Your Honor.  Two

10:59:38 13    housekeeping matters before we get into the substance.  If

10:59:40 14    Your Honor still needs the case number for *Graham*, we have

10:59:43 15    it handy for Your Honor.

10:59:44 16              THE COURT:  Just tell me what it is.  I don't

10:59:46 17    think it matters.

10:59:46 18              MR. ROSS:  23-00033.

10:59:49 19              THE COURT:  Okay.

10:59:51 20              MR. ROSS:  Secondly, Your Honor, we have some

10:59:52 21    slides.  I don't know that we'll get through all of them.

10:59:55 22    We'll have them up on the screen.  We also have a printout

10:59:57 23    of them if it would be helpful for Your Honor to have a

11:00:00 24    printout.

11:00:00 25              THE COURT:  Sure.

11:00:01 1                    MR. ROSS:  May I approach to hand up copies?

11:00:04 2                    THE COURT:  Sure.

11:00:15 3                    MR. ROSS:  Thank you, Your Honor.  May it please

11:00:16 4       the Court.

11:00:16 5                    After nearly 50 pages of briefing and about an

11:00:20 6       hour and a half of argument, it's clear that the Plaintiffs'

11:00:24 7       argument on the constitutional issue reduces to the

11:00:28 8       following proposition.  There are millions of assault

11:00:32 9       weapons and large-capacity magazines in the United States;

11:00:35 10      and therefore, they can't be banned under *Bruen*.

11:00:37 11                   You see it in a lot of places in the briefing.

11:00:40 12      We've heard it today.  And I think perhaps most clearly --

11:00:43 13                   THE COURT:  Right.  I think Mr. Lehman was

11:00:46 14      pretty clear if it's -- I think that is the -- obviously,

11:00:53 15      there's more to it, but yeah, if it's not dangerous and

11:00:58 16      unusual, and it's not unusual because there's 10 million of

11:01:03 17      them, it's over.

11:01:05 18                   MR. ROSS:  That's right, Your Honor.  We see

11:01:08 19      that in the briefing.  We've heard it today.  And we believe

11:01:11 20      that oversimplified approach fundamentally misconstrues the

11:01:16 21      relevant law.  We believe that this claim starts from that

11:01:19 22      faulty premise.  They've offered almost no evidence in

11:01:24 23      support of their position.  And the little evidence that

11:01:27 24      they've offered fails in comparison to our evidence.

11:01:30 25                   I would note there was discussion --

11:01:32  1          THE COURT:  I mean, it's fair to characterize

11:01:34  2  their view as the two pieces of legislation are facially

11:01:38  3  valid; right?

11:01:39  4          MR. ROSS:  Because, yes, for one reason, which

11:01:42  5  is that there are -- two reasons.  There are a lot of

11:01:46  6  assault weapons, and there are a lot of large-capacity

11:01:49  7  magazines.

11:01:50  8          THE COURT:  Right, right.  But, I mean, if

11:01:51  9  they're right, that's all that they need to do?

11:01:54 10          MR. ROSS:  Unquestionably, if that's all that's

11:01:56 11  relevant, they've gotten there.  But as we believe it's

11:02:00 12  clear from *Bruen*, and Mr. Moritz will talk in detail about

11:02:05 13  *Bruen*, that the analysis requires far more facts than that.

11:02:10 14          There was discussion during counsel's argument

11:02:13 15  about the motivation for the Bowie gun laws, the motivation

11:02:19 16  for the Tommy gun laws.  There's no evidence from the

11:02:24 17  Plaintiffs on any of that.  Their flawed analysis and

11:02:28 18  absence of evidence, we believe, means they're not entitled

11:02:31 19  to an injunction.

11:02:32 20          So, briefly, a roadmap on what we plan to do

11:02:34 21  today, Your Honor.

11:02:34 22          THE COURT:  Actually, they may not have, but

11:02:38 23  like the idea that the Bowie knife law was in response to

11:02:44 24  crime, isn't that what your expert said?

11:02:46 25          MR. ROSS:  Yes, but what he -- all counsel said

11:02:50  1    is it was done because it was perceived that it was used by

11:02:53  2    criminals.  That's the entirety of their facts.  We believe

11:02:56  3    there's --

11:02:58  4            THE COURT:  Yeah, but that seems to be -- the

11:03:02  5    sawed-off shotgun, that's what the Supreme Court said;

11:03:05  6    right?

11:03:06  7            MR. ROSS:  It is part of the analysis, Your

11:03:08  8    Honor.  It is not, however, the beginning and the end of the

11:03:11  9    analysis.  So, what we would plan to do today, and we're

11:03:14 10    going to tweak some of this, because we've heard Your Honor

11:03:17 11    is I'm going to talk about the factual record and the issue

11:03:19 12    of whether or not large-capacity magazines are arms.

11:03:22 13    Mr. Moritz is going to discuss the Second Amendment

11:03:24 14    framework and the arguments.  And I'll discuss the Delaware

11:03:28 15    Constitution.  And unless Your Honor has questions, we've

11:03:30 16    heard you, and we don't plan to discuss the other factors on

11:03:33 17    the preliminary injunction.

11:03:36 18            We believe that the questions before the courts

11:03:38 19    dealing with these types of cases is highly fact dependent.

11:03:41 20    It's why we submitted five declarations, nearly 200 pages,

11:03:45 21    39 exhibits for the experts and another 16 on our brief.  We

11:03:50 22    believe that sort of detailed factual analysis is required

11:03:52 23    by *Bruen*.  And, indeed, it's consistent with what other

11:03:57 24    courts around the country are doing.  And I'm not going to

11:03:59 25    spend time cataloging them, but I do think one very recent

11:04:02  1    Order is useful, and the exchange here is on Slide 3.

11:04:08  2              This is the case of *Cheeseman vs. Platkin*, which

11:04:11  3    is in the District of New Jersey.  The case number is

11:04:17  4    1:22-cv-4360.  Multiple cases are pending in the District

11:04:23  5    Court in New Jersey challenging New Jersey's assault weapon

11:04:27  6    statute, and the State moved to consolidate.

11:04:30  7              Mr. Cheeseman, represented by Plaintiffs'

11:04:32  8    counsel, opposed consolidation.  And on the left side, we

11:04:36  9    have an excerpt for why he didn't think consolidation was

11:04:39 10    necessary.  He said, Because there's really only two

11:04:41 11    questions.  One, are they bearable arms?  And two, are they

11:04:44 12    in common use?  It's the same basic two-part test we've

11:04:48 13    heard today.

11:04:48 14              On February 3rd, the Court rejected it, and we

11:04:53 15    have excerpts from the ruling on the right.  The historical

11:04:56 16    evidence, which is the central issue here, needed to be

11:05:00 17    developed in the case.  And the Court consolidated in order

11:05:04 18    to develop the historical evidence in discovery.

11:05:07 19              Now, this was issued ten days before the

11:05:09 20    Plaintiffs filed their reply brief, and yet they elected to

11:05:13 21    stay with the same argument that the Court found

11:05:16 22    unpersuasive there.

11:05:17 23              THE COURT:  Well, of course, I mean, with due

11:05:19 24    respect to my colleagues in New Jersey, they believe that

11:05:26 25    they are right.  They don't have to change just because a

11:05:28  1    District Court judge in New Jersey said otherwise.

11:05:32  2              MR. ROSS:  They're entitled to proceed as they

11:05:34  3    like.  We think, though, it is insightful and instructive on

11:05:38  4    the question of whether or not this argument is the extent

11:05:41  5    of the analysis.  It doesn't mean they have to change their

11:05:44  6    view.

11:05:45  7              THE COURT:  And, also, I mean, part of the

11:05:47  8    reason why -- because they essentially had the same issue at

11:05:50  9    some point ago in this case when we were talking about the

11:05:53 10    schedule.  And it seemed to me that being certain that if

11:06:01 11    they lost, they would appeal.  And thinking there was some

11:06:04 12    possibility if you lost, you would appeal.  That it would be

11:06:11 13    good to have a record, which I was in no position at the

11:06:17 14    time to definitively say one way or the other just because

11:06:22 15    the Court of Appeals might appreciate a record.

11:06:25 16              MR. ROSS:  Understood.  Of course.  And I

11:06:28 17    recognize the Court doesn't prejudge anything when, for

11:06:31 18    example, it orders consolidation.  If the Plaintiffs' theory

11:06:35 19    is correct, though, then the record of historical regulation

11:06:40 20    is actually basically irrelevant because for them the

11:06:42 21    entirety of the analysis is millions, it's over.

11:06:46 22              THE COURT:  No.

11:06:47 23              MR. ROSS:  I recognize no one has decided that

11:06:49 24    yet.

11:06:49 25              THE COURT:  I think they would agree with you on

11:06:51 1  that.

11:06:52 2          MR. ROSS:  Right.  And Mr. Moritz will explain,

11:06:53 3  when he's talking about the Second Amendment analysis, why

11:06:56 4  we think it's fundamentally different.

11:06:57 5          Now, because of that choice, which is obviously

11:06:59 6  their choice to make, substantially all of the factual

11:07:03 7  evidence, which we believe is important, is uncontested.

11:07:07 8  And there's not time today and I'm not going to go through

11:07:09 9  all of that.

11:07:10 10          THE COURT:  Well, I mean, I asked that question

11:07:12 11  at the beginning, and they concede that.

11:07:14 12          MR. ROSS:  Yeah.  Nevertheless, I think to

11:07:16 13  understand the Second Amendment analysis, we believe it is

11:07:19 14  highly fact dependent.  I do want to touch briefly on some

11:07:23 15  of the key undisputed facts.  And there are a few facts

11:07:26 16  where the parties do seem to join issue, and I would like to

11:07:29 17  spend a few minutes on this.

11:07:30 18          THE COURT:  All right.

11:07:30 19          MR. ROSS:  So, first, let's talk about the

11:07:32 20  statutes, what they are.  Your Honor has talked about HB 450

11:07:38 21  SS 1 for SB 6.  HB 450 bans the 44 semi-automatic assault

11:07:46 22  long guns, 19 semi-automatic assault pistols.

11:07:50 23          In response to Your Honor's question about the

11:07:52 24  pistols, we had time to do a little bit of additional

11:07:55 25  looking at the break.  And I know that at least one of the

11:07:58  1    articulated models also has a fully automatic version

11:08:02  2    available, but we don't have sort of full evidence on that.

11:08:05  3              What is uncontested is that there are numerous

11:08:09  4    handguns, rifles, shotguns, including semi-automatic ones,

11:08:14  5    that are not covered by the statute.  They're not banned,

11:08:18  6    including types of guns that have been referred to as

11:08:22  7    commonly used for self-defense like the handgun.  And

11:08:24  8    there's no claim to the contrary from the Plaintiffs.

11:08:27  9              THE COURT:  I mean, based on nothing other than

11:08:33 10    my own experience, I would estimate the number of

11:08:37 11    semi-automatic handguns to greatly exceed 10 million in this

11:08:43 12    country, but I have no idea what that is.  I mean, the ones

11:08:46 13    that are not banned.

11:08:47 14              MR. ROSS:  Right.  That's exactly right, Your

11:08:49 15    Honor.  There is a category that, specifically the

11:08:52 16    enumerated ones, and then those that meet the definition of

11:08:55 17    copycat which are banned.  But it is uncontested that there

11:08:58 18    are an enormous number of weapons that are not affected by

11:09:01 19    the statute.

11:09:03 20              With respect to SS 1 for SB 6 -- and I should

11:09:07 21    note before I move on, there are also certain exceptions in

11:09:10 22    the statute, including weapons that were owned before.

11:09:13 23    There's a qualified law enforcement officer exception.

11:09:15 24              With respect to the magazines, what are banned

11:09:18 25    are magazines that can hold more than --

11:09:20  1          THE COURT:  But while you note there are these

11:09:22  2    exceptions, whether or not there's a law enforcement officer

11:09:27  3    exception or whether or not there's a grandfather clause,

11:09:35  4    aren't they irrelevant to the constitutional issue?

11:09:38  5          MR. ROSS:  So, I don't believe they are

11:09:42  6    irrelevant for a few reasons.  First of all, at the federal

11:09:48  7    level, we believe the right that's at issue, the right with

11:09:51  8    respect to the Second Amendment, concerns weapons in common

11:09:54  9    use for the purpose of self-defense.  And we believe that,

11:09:58 10    as you think about that, we have not only shown through the

11:10:02 11    evidence in the record so far that these aren't those, but

11:10:05 12    we've explained that those weapons are unaffected.

11:10:09 13          With respect to the Delaware Constitutional

11:10:11 14    issue, which I'll get to, it's important to note that the

11:10:14 15    two cases that the Plaintiffs rely upon were both complete

11:10:19 16    and total ban cases.  No gun ownership whatsoever in the

11:10:23 17    common area of apartments.  And subject to a few hunting

11:10:26 18    licenses, no guns possessed in State Parks.  They were

11:10:30 19    referred to as total bans.

11:10:32 20          These statutes -- neither of these statutes is a

11:10:36 21    total ban.  And so, when you think about the appropriate

11:10:39 22    framework for Delaware, which we'll get to, it matters,

11:10:42 23    according to the Delaware Supreme Court, how you think about

11:10:45 24    the appropriate standard of review.

11:10:47 25          The large-capacity magazine statute bans

11:10:54  1    magazines that can hold more than 17 rounds.  It happens to

11:10:57  2    be higher than the limitations in many of the other statutes

11:11:00  3    around the country.  Importantly, no claim, and this goes to

11:11:06  4    a question that Your Honor had, and I'll get into it in a

11:11:09  5    little bit more in a couple minutes -- no claim that

11:11:14  6    upholding the large-capacity magazine ban would render any

11:11:19  7    weapon whatsoever inoperable.

11:11:21  8            THE COURT:  That's where things stand right now,

11:11:22  9    but I am giving Mr. Pileggi a chance to tell me otherwise.

11:11:27 10            MR. ROSS:  Understood.  And we'll take it up --

11:11:29 11    as of this morning when we walked in and to date, there's

11:11:32 12    been no claim.  If they want to make an argument, we will

11:11:35 13    deal with it.

11:11:35 14            But it's clear that neither of these is a

11:11:38 15    categorical ban.  And the Plaintiffs in Footnote 1 of the

11:11:41 16    reply talk about the analysis "in the context of bans."

11:11:46 17            THE COURT:  And I'm sorry, but you also say

11:11:48 18    there are no categorical bans, but I believe, either you or

11:11:53 19    Mr. Moritz, said when I asked at the beginning if the

11:11:57 20    legislature passed a categorical ban, would anything be

11:12:00 21    different, and the answer was no; right?

11:12:03 22            MR. ROSS:  I think I answered the question.  I'm

11:12:08 23    not sure.  If that was the question as to whether or not the

11:12:11 24    analysis would change if it's a categorical ban, I thought

11:12:14 25    there was a question about how the application of a broader

11:12:19  1    group of guns, but I didn't understand you to be talking

11:12:22  2    about a complete categorical ban of all guns.

11:12:24  3              THE COURT:  Well, no.  The question was, and

11:12:26  4    maybe I didn't frame it right, but it was:  The assault

11:12:36  5    weapons, 450, HB 450 is prospective.  And essentially, I

11:12:43  6    didn't use the word retroactive, but if you made it

11:12:46  7    retroactive and, you know, would that be a problem under the

11:12:49  8    Second Amendment?  And I thought the answer was no.

11:12:52  9              MR. ROSS:  Correct, because even going

11:12:54 10    backwards, it's not a category.  It doesn't change the fact

11:12:57 11    whether you're looking forwards or backwards.  This is not a

11:13:00 12    categorical ban.

11:13:01 13              THE COURT:  Well, actually I meant the

11:13:03 14    categories that are in the statute.

11:13:05 15              MR. ROSS:  Yes.  And the categories that are in

11:13:07 16    the statute are not categorical bans.  They're specifically

11:13:11 17    enumerated weapons, and then a definition of other guns that

11:13:16 18    may not have the name, but have the features.

11:13:20 19              THE COURT:  Right.  So, we're actually just

11:13:22 20    disagreeing on what it means to be categorical.

11:13:25 21              What I meant, and I'm thinking you're not

11:13:27 22    actually disagreeing with, is if those particular weapons

11:13:30 23    were banned retroactively, that would not present a

11:13:34 24    different issue.

11:13:35 25              MR. ROSS:  That is correct, Your Honor.

11:13:37  1                    THE COURT:  Okay.  Now, we understand each

11:13:39  2      other.

11:13:40  3                    MR. ROSS:  I'm sorry?

11:13:41  4                    THE COURT:  We understand each other.

11:13:42  5                    MR. ROSS:  Okay.  And what I was meaning to say

11:13:44  6      when I was talking about a categorical ban is that there is

11:13:48  7      no claim that, for example, unlike the Delaware cases, all

11:13:54  8      firearms or even all members of a category of firearms are

11:13:59  9      banned by the statute.  We're talking about specifically an

11:14:02 10      enumerated set with guns.  And it leaves many --

11:14:07 11                    THE COURT:  Well, so are there assault rifles

11:14:10 12      that are not banned by this statute?

11:14:12 13                    MR. ROSS:  So, there are semi-automatic weapons.

11:14:18 14      Long -- I don't want to avoid the question, but it would

11:14:22 15      depend upon how you define an assault rifle, but there

11:14:25 16      are --

11:14:26 17                    THE COURT:  Well, maybe a way to say this is:

11:14:33 18      Is there something that would fit within the definition -- I

11:14:37 19      can't remember now whether HB 450 has a definition or

11:14:40 20      whether it's just a list of particular manufacturers and

11:14:43 21      copycats.  Are there other "semi-automatic assault long

11:14:54 22      guns" that are not banned?

11:14:57 23                    MR. ROSS:  So, I want to be -- I want to answer

11:14:59 24      the question.  So, no, in the sense that semi-automatic

11:15:04 25      assault long gun is a defined term in the statute.  There

11:15:07  1    are -- if we move away from the statutory nomenclature,

11:15:11  2    there are long, like rifle, semi-automatic weapons.  Like

11:15:17  3    there can -- my understanding is semi-automatic hunting

11:15:20  4    rifle is a long -- you know, it would have a length that is

11:15:23  5    similar.  It would be semi-automatic.  It is not banned.

11:15:27  6            So, it is, as Your Honor suggested in his

11:15:32  7    question, a statute that doesn't say every gun that simply

11:15:36  8    meets these criteria are banned, and that's how we get

11:15:39  9    there.  It says, Here's a list of specifically enumerated

11:15:42 10    assault long guns, a list of specifically enumerated assault

11:15:46 11    pistols, and then copycat weapons which are specifically

11:15:50 12    defined as weapons which have the following characteristics.

11:15:53 13            So, let's talk a little bit more about the

11:16:00 14    banned guns.  It's uncontested on the record that what we're

11:16:04 15    talking about are guns that have military origins.  And I

11:16:07 16    understand from the discussion this morning, simply having

11:16:10 17    the origin there, you can go a lot of different ways.

11:16:12 18            Let's talk about the specific ways these guns

11:16:15 19    have gone.  What they have done is retained nearly all of

11:16:18 20    the features of the military weapons.  They have

11:16:21 21    interchangeable parts.  And the only difference that's been

11:16:25 22    identified is that they fire semi-automatically versus fully

11:16:30 23    automatically.

11:16:31 24            And I want to come back to that.  But what we're

11:16:34 25    going to see is that because of the similarity in features

11:16:38  1    with their military counterparts, they share features that

11:16:41  2    make these guns incredibly lethal.  It's uncontested, these

11:16:45  3    guns are actually marketed as being weapons of war.  We have

11:16:48  4    some of the advertisements in the record.  And actually, if

11:16:53  5    you look at the -- it's hard to read, but the Daniel Defense

11:16:58  6    advertisement on the right for a civilian weapon, the very

11:17:02  7    bottom talks about the fact that this gun is useful at home

11:17:06  8    or whether you're patrolling a foreign land -- and if we can

11:17:09  9    blow back out -- with a picture of a soldier.  This is how

11:17:13 10    they are marketed.

11:17:14 11            So, let's talk about the history of one of these

11:17:16 12    just to help better understand.  We can't get through all

11:17:19 13    63, and we'll use the one that Plaintiffs' counsel talked

11:17:22 14    about, the AR-15, which has been described by the Fourth

11:17:26 15    Circuit accurately as the semi-automatic version of the M16

11:17:30 16    developed for the military.

11:17:31 17            And if we could go to Slide 8.  This is a field

11:17:35 18    test.  It's formerly classified.

11:17:38 19            THE COURT:  I saw this stuff about, you know,

11:17:41 20    killing Vietnamese, and blowing their arms off and big holes

11:17:46 21    here and there.  I understand that they -- at least some of

11:17:50 22    these have a capacity to be more dangerous or more lethal,

11:18:02 23    maybe even unnecessarily more lethal than other guns.

11:18:09 24            THE COURT:  So, I don't know.  Go ahead, but I

11:18:12 25    don't -- I'm not sure how actually relevant this is.

11:18:18  1          MR. ROSS:  Sure.  So, I want to speak to the

11:18:22  2     record and answer Your Honor's question.  We don't need to

11:18:25  3     roll through these.

11:18:26  4          One of the limited areas where there is

11:18:28  5     disagreement between the parties is in the suitability and

11:18:32  6     relative validity of these weapons versus other weapons.

11:18:37  7     And we do believe it is relevant because we do think the

11:18:40  8     dangerousness question matters.

11:18:43  9          And what this evidence goes to is the fact that

11:18:45 10     these guns are more dangerous in comparison to other weapons

11:18:51 11     that are out there.  These weapons are more dangerous than,

11:18:55 12     for example, the handguns.

11:18:59 13          THE COURT:  Right.  And I think generally

11:19:02 14     speaking, yeah, you've kind of -- I forget what the name of

11:19:06 15     your expert was, but Mr. Yurgealitis, but whoever it was,

11:19:12 16     you know, that on the whole, the banned weapons or the

11:19:26 17     banned assault weapons have more fire power than non-banned

11:19:38 18     weapons generally.  I wouldn't say that was -- my impression

11:19:46 19     is that's not actually disputed.

11:19:48 20          MR. ROSS:  Okay.  Well, if it's not disputed,

11:19:52 21     we'll move on.  I will just note, so that we're clear, on

11:19:55 22     Page 7 of both of the opening briefs, there is a suggestion,

11:19:58 23     particularly because of the fact they say that when they're

11:20:01 24     used with .223-caliber ammunition, they're not particularly

11:20:04 25     dangerous.  They're well suited for home defense.  They are

11:20:09  1    incredibly dangerous.

11:20:10  2              It also goes to the risk they pose because it

11:20:12  3    goes to the risk, for example, that is present to police

11:20:15  4    when they're dealing with these.  The fact that these

11:20:18  5    weapons with .223 --

11:20:21  6              THE COURT:  Right.  I saw that --

11:20:22  7              MR. ROSS:  -- usually can fire through --

11:20:24  8              THE COURT:  -- they penetrate 2X4 studs in a

11:20:27  9    house.

11:20:27 10              MR. ROSS:  The three-eighths inch hardened

11:20:30 11    steel, Your Honor.  Yes, Your Honor.  So, I'm not going to

11:20:32 12    belabor that.  If there's no dispute on that, that's great.

11:20:35 13    But we do think that's a critical factor on the issue.

11:20:40 14              THE COURT:  And you were going to say -- let's

11:20:42 15    assume that's not disputed.  You were also going to explain

11:20:45 16    the relevance.

11:20:45 17              MR. ROSS:  Yes.  I think part of the relevance

11:20:47 18    is because part of the relevant analysis when you have --

11:20:50 19    and Mr. Moritz will speak to this in greater detail,

11:20:53 20    right -- one of the things -- we think dangerousness

11:20:56 21    matters.  We don't think you simply look at the numbers and

11:20:59 22    say, Well, they're not unusual, that's the end of the

11:20:59 23    analysis.

11:21:02 24              We think dangerousness matters.  We speak

11:21:04 25    directly to dangerousness, not only generally, because

11:21:07 1    certainly it's true all weapons are dangerous.  And it's

11:21:10 2    true that all guns when fired have the potential to kill.

11:21:13 3    That's not our argument, and we're not trying to ban all

11:21:16 4    guns.

11:21:16 5            But what is relevant for dangerousness is that

11:21:20 6    these weapons are uniquely dangerous even compared to other

11:21:25 7    guns.  And it goes to that component of the Second Amendment

11:21:30 8    analysis.

11:21:30 9            THE COURT:  And when you say "that component of

11:21:33 10   the Second Amendment analysis," you agree that all the guns

11:21:45 11   here that are in the bills, they are arms within the meaning

11:21:52 12   of the Second Amendment?

11:21:54 13           MR. ROSS:  No, we do not.  We do not believe

11:21:56 14   that -- because it goes to in common usage for self-defense,

11:21:59 15   and we don't believe that to be the case.

11:22:01 16           THE COURT:  Right.  And so the in common usage

11:22:03 17   or in common usage for self-defense, that is, in your

11:22:07 18   reading of the law, a question of whether or not something

11:22:10 19   is an arm or not?

11:22:12 20           MR. ROSS:  That goes -- that's part of the

11:22:13 21   threshold analysis, yes, Your Honor.

11:22:15 22           THE COURT:  So, hand grenades would not be an

11:22:18 23   arm?

11:22:18 24           MR. ROSS:  Based on my understanding, it's not

11:22:22 25   a -- it's not within the scope of protection by the Second

11:22:25 1    Amendment, not in common use for self-defense.  Yeah.

11:22:28 2    Correct.

11:22:28 3                    THE COURT:  Bazooka would not be an arm?

11:22:31 4                    MR. ROSS:  Correct.

11:22:31 5                    THE COURT:  But things like knives, tasers would

11:22:38 6    be arms?

11:22:38 7                    MR. ROSS:  Well, subject to the record, and I

11:22:41 8    will actually get to the tasers point in a minute, if I can

11:22:46 9    indulge, Your Honor?

11:22:46 10                   THE COURT:  Sure.

11:22:47 11                   MR. ROSS:  I do want to spend a couple minutes,

11:22:49 12   and I don't want to belabor it, but I do think given,

11:22:52 13   particularly what counsel said at the end about how we've

11:22:55 14   attempted to conflate semi-automatic and fully automatic, I

11:22:58 15   do want to talk about the firing nature of these weapons.

11:23:03 16   It's been suggested that to compare them to fully automatic

11:23:08 17   weapons is disingenuous.  That's at Page 8.  Six, excuse me,

11:23:12 18   of Gray's opening brief.

11:23:13 19                   And what they say on Page 6 is that they

11:23:17 20   distinguish these from machine guns which they say can fire

11:23:20 21   between 750 and in the thousand rounds.  And we have two

11:23:24 22   points we think are important on that, Your Honor.

11:23:27 23                   First of all, the suggestion that the inability

11:23:30 24   to naturally fire or fully automatic makes them less lethal

11:23:36 25   is simply inaccurate.  As the Fourth Circuit noted, the

11:23:40 1    difference between semi-automatic and fully automatic is, in

11:23:43 2    their words, slight and the uncontested record evidence --

11:23:46 3    Mr. Yurgealitis' Exhibit T is that from the military's

11:23:51 4    perspective, semi-automatic fire is often superior to

11:23:56 5    automatic fire in modern combat and has been described as

11:23:59 6    the most important firing technique.  So, the idea that

11:24:03 7    while if it just doesn't fire fully automatic, it's not

11:24:05 8    nearly as lethal, that's not true.

11:24:08 9          The other important note is it is uncontested

11:24:11 10   that there are numerous inexpensive products available that

11:24:15 11   allow these guns to fire at rates comparable to the

11:24:21 12   750-to-1,000-round-per-minute figure that we saw in their

11:24:24 13   briefing.  Here's --

11:24:26 14         THE COURT:  And just to go back to your first

11:24:28 15   point there that it's preferable to have a semi-automatic,

11:24:35 16   not fully automatic, I take it that that at least partly

11:24:40 17   fits in with the Plaintiffs' theory that these are useful

11:24:43 18   for self-defense?

11:24:44 19         MR. ROSS:  No, that's from the Army's

11:24:46 20   perspective in terms of armed combat.

11:24:48 21         THE COURT:  Well, but, I mean, self-defense

11:24:50 22   potentially is armed combat; right?

11:24:53 23         MR. ROSS:  Certainly one of the things that a

11:24:55 24   soldier in the theater of war is trying to do, one thing is

11:24:58 25   defend himself.  Another can be offensive.  What we don't

11:25:03  1    believe those features do is make them useful for

11:25:06  2    self-defense in the situations that civilians are regularly

11:25:11  3    involving themselves in.  And I would note there is not a

11:25:13  4    single example that the Plaintiffs have cited ever of any

11:25:19  5    individual ever using either one of the banned weapons, or a

11:25:26  6    substantially similar weapon or a large-capacity magazine in

11:25:30  7    a self-defense situation.  And for good reason.

11:25:34  8         You know, there are technical reasons that these

11:25:37  9    weapons are not well suited.  And with respect to the use of

11:25:40 10    large-capacity magazines in self-defense, the Plaintiffs'

11:25:43 11    evidence indicates that in 82 percent of situations, no

11:25:47 12    shots are fired.  And as Alice's statistical analysis of the

11:25:50 13    NRA's database indicates that the average number of shots

11:25:54 14    fired in a self-defense situation is 2.2.  So, we're not

11:25:58 15    talking about anyone that needs anywhere near 17 rounds

11:26:03 16    handy to be able to defend themselves.

11:26:05 17         THE COURT:  Well, so I looked at her

11:26:06 18    declaration, and I did see that her analysis was, I believe,

11:26:13 19    that no case that could be identified had ever involved more

11:26:18 20    than ten shots being fired.

11:26:19 21         MR. ROSS:  It's consistent with my recollection.

11:26:21 22    That's right, Your Honor.  Certainly well below the 17 that

11:26:24 23    we're talking about here.

11:26:26 24         And then beyond her analysis, no identification

11:26:30 25    of any incident ever where the Plaintiffs have said, This is

11:26:34 1   a situation where if a person didn't have access to anything

11:26:36 2   that's banned, their ability to defend themselves would be

11:26:40 3   compromised.

11:26:43 4        So, with respect to these modifications that

11:26:47 5   allow these to be shot at rates that are functionally

11:26:49 6   equivalent to fully automatic weapons, here's one example.

11:26:53 7   We discuss several of them in our brief.  It's a $49

11:26:57 8   adapter, the Hellfire Stealth.  It is advertised as

11:27:01 9   installing invisibly in the grip and touted for the fact

11:27:04 10  that it allows you to shoot at 900 rounds per minute, which

11:27:07 11  is towards the higher end of the 750 to 1,000 figure that

11:27:11 12  the Plaintiffs said.

11:27:13 13       THE COURT:  The legislation, either piece, do

11:27:22 14  either of them say one of the purposes was to, I don't know,

11:27:26 15  prevent the convention, the conversion, this kind of thing?

11:27:32 16       MR. ROSS:  No, Your Honor, but what they do talk

11:27:35 17  about is the importance of enacting a legislation, among

11:27:39 18  other things, to prevent mass shootings.  And the capacity

11:27:43 19  to take one of these and modify them where you can shoot at

11:27:46 20  the equivalent of 900 rounds per minute would be relevant to

11:27:51 21  that interest in protecting against those.

11:27:55 22       No need to go on -- to move the slides up, but

11:27:58 23  just to keep moving.  On the right side of the slide, you

11:28:02 24  see the handgun, the AR-15 is turned sideways, and towards

11:28:07 25  the bottom there's the handle.  Actually, let's just jump to

11:28:12  1    the next slide just to see.

11:28:14  2              So, where the finger is pointing, just to

11:28:16  3    contextualize this, we can call it out, that's an

11:28:19  4    enlargement of that bottom part of the handle, and that's

11:28:22  5    where it goes.  It's a little round knob that fits in there.

11:28:26  6    And we're not going to play the video.  We've cited to them

11:28:30  7    in our brief, but you know, features like this allow

11:28:33  8    somebody to take a hundred-round magazine and shoot it in

11:28:37  9    six seconds.  Plaintiffs ignore the modification available

11:28:43 10    for these products in their entirety.

11:28:46 11              I also want to talk briefly about the origin of

11:28:48 12    the term assault weapon because it's been suggested that it

11:28:51 13    was somehow --

11:28:52 14              THE COURT:  You know, I don't think it's

11:28:53 15    important --

11:28:54 16              MR. ROSS:  Fine.

11:28:55 17              THE COURT:  -- where the terms come from.  I

11:28:56 18    mean, I gather there's a public relations aspect to both

11:29:04 19    sides of it.  And I understand, you know, German, I can't

11:29:08 20    pronounce the word, but World War II, literally translates

11:29:12 21    more or less to assault weapon.

11:29:14 22              MR. ROSS:  Yeah, and I'm not going to belabor --

11:29:16 23    if you could just put the slide up for one second.  The Gun

11:29:22 24    Digest Book Assault Weapons from 1986, but let's take that

11:29:23 25    down.  I've already touched on this, but there is a critical

11:29:26  1    dispute between the parties, notwithstanding very limited

11:29:30  2    evidence from the Plaintiffs on this, on the design

11:29:34  3    features, making them useful for home defense.  They both

11:29:38  4    claim that at Page 7 of their opening briefs.

11:29:42  5            They don't have an expert declaration on it.

11:29:44  6    They actually cite a law review article by a Professor

11:29:47  7    Kopel, which I would invite the Court to read.  It's the

11:29:52  8    rationale basis analysis for the assault weapon prohibition.

11:29:56  9    And I just want to spend a minute, because this is the

11:29:58 10    foundation of their claim about the importance of these

11:30:01 11    weapons for defense, just to talk about what that argument

11:30:04 12    rests upon.

11:30:05 13            The first thing in the excerpt that we see on

11:30:09 14    Slide 15 is a suggestion by Professor Kopel that there's no

11:30:13 15    real utility in requiring shooters to have to change their

11:30:19 16    magazines, that it does nothing to enhance safety.  Both the

11:30:23 17    Third Circuit and Fourth Circuit and common sense, we would

11:30:28 18    suggest, make clear why that's not the case.  Those are

11:30:31 19    actually some of the most important times in a mass

11:30:34 20    shooting.

11:30:34 21            He goes on to say in this middle callout that

11:30:37 22    it's elementary ballistics that these weapons are not

11:30:41 23    unusually destructive.  And then they go on to say that

11:30:45 24    actually semi-automatic assault weapons are not designed to

11:30:49 25    kill.  And this is, this article with these claims, is

11:30:54  1    basically the entirety of the foundation for their argument

11:30:57  2    that these are useful for self-defense.

11:30:59  3         THE COURT:  Well, does it matter whether they're

11:31:04  4    useful or not because -- and it's been mentioned this

11:31:08  5    morning, but I do remember, you know, vaguely seeing this in

11:31:12  6    the briefing, that if people purchase it or possess it for

11:31:21  7    self-defense, does it matter whether it's the best -- and

11:31:31  8    Yurgealitis spent a lot of time on this, too.  Does it

11:31:33  9    matter that it's not, perhaps in most people's judgment, the

11:31:38 10    best self-defense weapon or maybe even not really a very

11:31:42 11    sensible self-defense weapon generally?

11:31:47 12         MR. ROSS:  We do think the evidence matters for

11:31:48 13    a few reasons, Your Honor.  First of all, we think that the

11:31:52 14    evidence that the Plaintiffs have is a retailer survey,

11:31:56 15    which if you actually read the survey itself, cautions

11:32:00 16    against actually relying upon it.  But put that to the side.

11:32:05 17         It goes to the weight to be given to that where

11:32:09 18    someone's claiming they're buying it for that reason.  It

11:32:11 19    also is relevant, Your Honor, because we acknowledge that

11:32:16 20    Supreme Courts held that a core -- the core of the Second

11:32:20 21    Amendment is self-defense.  And the utility of whether it is

11:32:24 22    actually useful for that purpose we believe is important to

11:32:28 23    considering whether you have infringed on a right that is

11:32:32 24    protected by the Second Amendment, if you get through all

11:32:34 25    the other aspects of the test.  But I think if you have

11:32:37  1   something clearly that's not useful in self-defense that is

11:32:40  2   relevant where the purpose of the Second Amendment is to

11:32:43  3   protect self-defense, to protect one's ability, excuse me,

11:32:47  4   to defense themselves.

11:32:48  5            THE COURT:  So, does this go into the question

11:32:50  6   of regulation, or is this a question of whether the things

11:32:53  7   are arms in the first place?

11:32:55  8            MR. ROSS:  So, I think it bears on the first

11:32:59  9   question, which is whether or not they're in common use for

11:33:02 10   self-defense.  So, it does bear on that threshold question.

11:33:07 11            And then it also bears upon, even if you were

11:33:09 12   within it, as you think about the scope of regulation and

11:33:14 13   the nature of the fact that it is relevant there, but it is

11:33:17 14   directly relevant to the question of whether or not these

11:33:19 15   products are in common use for these purposes.

11:33:23 16            And in multiple courts, including the First

11:33:26 17   Circuit in *Morman* and the D.C. circuit in *Heller II* have

11:33:29 18   found that they're not well suited for self-defense.  I have

11:33:34 19   slides.  You're going to see slides, but you don't have to

11:33:36 20   go through them, given what we discussed before on the

11:33:40 21   destructive power of these weapons.

11:33:41 22            I would note that the news reports of people who

11:33:46 23   have been -- from doctors who have been shot with these

11:33:48 24   weapons really mirrors what you see in the Vietnam field

11:33:51 25   test report because they shared the same destructive power.

11:33:55  1   If it would be useful, I'll just spend a minute very briefly

11:33:59  2   talking about why it is that there is such a fundamental

11:34:02  3   difference.  And it's due to something called cavitation,

11:34:05  4   which is that when the bullets that are shot by these

11:34:08  5   weapons traveling at, you know, 3,000 feet per second or

11:34:11  6   more compared to, say, one thousand --

11:34:13  7           THE COURT:  I don't think I really need to

11:34:15  8   understand the science of this --

11:34:16  9           MR. ROSS:  Okay.

11:34:17 10           THE COURT:  -- as my day job.

11:34:20 11           MR. ROSS:  Well, we'll move on.  We have a

11:34:22 12   video.  It's in the slides, if Your Honor cares to see it,

11:34:24 13   but we don't need to burden the Court with watching it here.

11:34:29 14           It is uncontested in this factual record that

11:34:33 15   these weapons are not well suited for hunting, not for

11:34:38 16   recreational.  That, in fact, their ability to use these in

11:34:42 17   shooting competitions is often regulated, that they are, in

11:34:45 18   fact, well suited --

11:34:48 19           THE COURT:  Well, so, Mr. Ross, the number that

11:34:53 20   I was using with the Plaintiffs that there's 10 million of

11:34:56 21   these out there already, you know, give or take a million or

11:35:00 22   two, do you disagree with that?

11:35:03 23           MR. ROSS:  No, we don't.  We're not --

11:35:05 24           THE COURT:  So, they're not suitable for

11:35:07 25   hunting.  They're not suitable for target shooting.  They're

11:35:10 1   not suitable for self-defense.  Why do 10 million people

11:35:13 2   have these?

11:35:15 3           MR. ROSS:  Well, people's perceptions as to what

11:35:18 4   they may want to do with them certainly is one thing.  And

11:35:21 5   it's not to suggest that someone might not buy it thinking

11:35:25 6   they want to use it for that purpose.  But the question

11:35:27 7   here, we believe, is suitability, not someone's subjective

11:35:32 8   belief as to I'd like to have it for this reason, but an

11:35:35 9   actual evidentiary question of their utility.

11:35:38 10          THE COURT:  Let me just think about that for a

11:35:42 11  minute.

11:35:50 12          MR. ROSS:  So --

11:35:51 13          THE COURT:  Hold on just a second.  So,

11:36:04 14  basically your position would be if lots of people purchased

11:36:07 15  firearms of one kind or another thinking they can use them

11:36:13 16  in self-defense, but essentially experts say they're not

11:36:18 17  good self-defense weapons, then they're not in common use

11:36:25 18  for self-defense?

11:36:26 19          MR. ROSS:  Well, I think that's -- so, I think

11:36:29 20  there's -- the question whether or not common use for self

11:36:32 21  defense has a number of factors.  One of which is:  Is there

11:36:34 22  evidence that they're actually being used for this?  And on

11:36:36 23  this record, there is none.

11:36:38 24          As to thinking about, you know, the effect of

11:36:42 25  regulation on one's ability to defend, we do think the

11:36:46  1    utility point here, which is from the evidentiary

11:36:49  2    perspective basically undisputed, is relevant.  And I would

11:36:52  3    also note, just thinking further about Your Honor's question

11:36:55  4    of, you know, well, why are people buying them, well, one

11:36:57  5    reason I think people are buying them, as we saw earlier,

11:37:00  6    they're being marketed as, You can own what soldiers own.

11:37:04  7              THE COURT:  So, that would be more like a

11:37:06  8    collection sort of purpose?

11:37:08  9              MR. ROSS:  It is like a collection or a desire

11:37:11 10    to own something similar to what soldiers own, either to

11:37:15 11    collect them or simply to feel like, you know, I want to be

11:37:19 12    like a soldier.  But that doesn't put it into one of the

11:37:24 13    enumerated categories.

11:37:26 14              With respect to the numbers that Your Honor's

11:37:29 15    asked about and that counsel talked about, what is

11:37:32 16    uncontested is that the number of assault weapons is a very

11:37:37 17    small fraction of all guns in circulation, that they're

11:37:41 18    owned by a very small percentage of people.

11:37:44 19              THE COURT:  So, roughly 2.5 percent?

11:37:46 20              MR. ROSS:  Roughly, give or take, something in

11:37:48 21    that low single digit, yes, Your Honor.

11:37:50 22              In terms of the -- that's in terms of the

11:37:55 23    fractions of guns that are represented by these.  It's, I

11:38:00 24    believe, an even smaller percentage, I believe it's in the

11:38:03 25    one-and-a-half percent on terms of the percentage of people

11:38:05  1    that own them, because many people own multiple weapons.

11:38:09  2            Also, undisputed that the growth in these

11:38:11  3    figures, much of it has occurred within the last decade or

11:38:16  4    so since the repeal of the assault weapons ban.  And

11:38:19  5    Mr. Moritz will talk about this, but the idea that there's

11:38:21  6    never been a regulation of these weapons, there was, in

11:38:24  7    fact, the assault weapons ban.

11:38:26  8            THE COURT:  Right.  But the fact that there was

11:38:32  9    an assault ban -- well, you said Mr. Moritz will talk about

11:38:36 10    it.  I'll let him talk about it.

11:38:38 11            MR. ROSS:  Okay.  I do want to talk about

11:38:40 12    another number that the Plaintiffs make much of in their

11:38:43 13    reply brief, and it's the 200,000.  And I just told Your

11:38:45 14    Honor I was going to get here, which Justice Alito talked

11:38:49 15    about it in his concurrence in *Caetano*.  And per the

11:38:53 16    Plaintiffs, that 200,000 is basically enough to say, You've

11:38:57 17    got a protected Second Amendment right.

11:38:59 18            Of course, the Supreme Court recognizes that you

11:39:01 19    can regulate machine guns.  And even today, the Plaintiffs

11:39:06 20    said they're not suggesting you can't regulate machine guns.

11:39:09 21    But if we look at what's on the right, this is a letter from

11:39:13 22    the Bureau of Alcohol, Tobacco and Firearms showing there

11:39:17 23    are literally hundreds of thousands of machine guns that are

11:39:21 24    out there.

11:39:21 25            And, therefore, if this basic numerical analysis

11:39:25  1  was enough, 200,000 is enough, the Plaintiffs can't

11:39:32  2  reconcile that with the idea that you can actually regulate

11:39:35  3  machine guns.

11:39:36  4          THE COURT:  I thought I saw in the briefing

11:39:40  5  somewhere that there were 800,000 machine guns.

11:39:43  6          MR. ROSS:  Well, so that is an overall figure.

11:39:47  7  The figure we see here, the 175 is -- and that larger figure

11:39:53  8  would include, for example, guns in law enforcement in the

11:39:56  9  United States.  The pre-1986 176,000 figure, until 1986 they

11:40:02 10  were not illegal to manufacture.  And so, this is a number

11:40:06 11  of legal civilian-owned machine guns in the United States.

11:40:12 12          And so, which, by the way, goes to another

11:40:15 13  important point, Your Honor, in terms of the figures and the

11:40:18 14  10 million.  That is a very general number, which we'll

11:40:21 15  assume for Plaintiffs' purposes.  It does not attempt to

11:40:24 16  differentiate those that are used by law enforcement.  It

11:40:27 17  doesn't attempt to differentiate those that are used by

11:40:29 18  criminals.  So, the number of those weapons that are

11:40:32 19  actually even owned and used by private civilians is

11:40:35 20  smaller.

11:40:36 21          THE COURT:  So, in a case of -- you know, you're

11:40:41 22  saying in common use for the lawful purposes.  Whose burden

11:40:54 23  is it to address that point?

11:40:56 24          MR. ROSS:  We believe it is the Plaintiffs'

11:40:57 25  burden, Your Honor, to establish that what we're talking

11:41:00 1    about is something that would fall within the protection of

11:41:02 2    the Second Amendment.  Once you're within that, then the

11:41:07 3    State has an obligation to find historically --

11:41:12 4              THE COURT:  All right.  *Bruen* makes that pretty

11:41:13 5    clear.

11:41:14 6              MR. ROSS:  Right, but I think to trip that wire,

11:41:16 7    the Plaintiffs have to get into the Second Amendment rights.

11:41:19 8    And so, it's their burden to establish they're talking about

11:41:22 9    a protected right.

11:41:25 10             Very briefly on large-capacity magazines, just

11:41:28 11   some context.  Uncontested that, like assault weapons, they

11:41:32 12   were developed for the military.  We're talking about things

11:41:34 13   like we see on the right here, magazines that hold a hundred

11:41:38 14   rounds.  They are marketed for their killing power.

11:41:43 15             Here's an example of advertising which offers a

11:41:46 16   60-round magazine, talks about their advantages in a fire

11:41:50 17   fight, twice the violence.  Critically, critically

11:41:54 18   uncontested that there are many legally compliant magazines

11:41:58 19   available.

11:41:59 20             Here's just one website.  And what I've done

11:42:02 21   here, you can see the red box about halfway down.  These are

11:42:04 22   just magazines available for the AR-15.  And they're

11:42:08 23   separated at the bottom by their capacity.  And what you see

11:42:11 24   is that this website alone has 105 different magazines

11:42:15 25   available for purchase for the AR-15, all of which would be

11:42:19 1   legally compliant.

11:42:21 2          So, whether a weapon was shipped originally with

11:42:24 3   a larger magazine, this goes back to Your Honor's question:

11:42:27 4   Does any weapon need any of these to function?  They do not.

11:42:30 5          Mr. Moritz -- the regulatory history is also

11:42:36 6   largely uncontested, and Mr. Moritz is going to deal with

11:42:39 7   that in the context of the Second Amendment.  I want to take

11:42:42 8   just a few minutes before handing it off to him to talk

11:42:45 9   about why large-capacity magazines are not arms.

11:42:48 10          It is, as we talked about, the Plaintiffs'

11:42:49 11   burden, we believe, to establish they are protected.  We

11:42:52 12   have submitted a declaration from Professor Dennis Baron,

11:42:56 13   who talks about how, from the founding through ratification,

11:43:00 14   arms were different from controls.  Accoutrements were

11:43:04 15   accessories like ammunition holders.

11:43:06 16          THE COURT:  Well, so I did look at that

11:43:09 17   declaration, too.  My impression was that, you know, in 1790

11:43:21 18   people carried their bullets in a pouch that they wore on a

11:43:25 19   belt.

11:43:26 20          MR. ROSS:  Yeah.

11:43:26 21          THE COURT:  This is the cartouche pouch, and I

11:43:29 22   forget what, cartridge, belt, pallet, whatever, is even like

11:43:34 23   all the westerns on TV where they all have the bullets.  I

11:43:38 24   mean, different kind of thing.

11:43:39 25          So, I was wondering, because now the pouch

11:43:51  1    attaches to the gun, which is not something that happened in

11:43:54  2    1790.  I'm kind of wondering:  So, how does that play out?

11:43:59  3            MR. ROSS:  Sure.  Certainly.  I think Professor

11:44:02  4    Baron's point is that in languages used at the time, the

11:44:06  5    reference to arms was something that was different, not only

11:44:11  6    from where you carried it, but a number of other accessories

11:44:14  7    that were used in connection with the gun.  And that the

11:44:17  8    term arm is focused on the weapon itself and not

11:44:22  9    accessories.

11:44:23 10            And it's not just in the 1790s that magazines

11:44:27 11    were thought of as accessories.  If we can go to Slide 30.

11:44:31 12    Here's the Heckler & Koch catalog.  We've blown up, because

11:44:36 13    I was having a hard time reading the heading on the right

11:44:39 14    "Accessories."  And what we see in this, and this is

11:44:43 15    Exhibit 7 to our brief, that the magazines are listed as

11:44:47 16    accessories, along with things like cases and weapons used

11:44:52 17    to maintain them.

11:44:53 18            And it was the *Ocean State Tactical* Court, also

11:44:57 19    relying on Professor Baron's expert declaration, which found

11:45:02 20    that these weapons -- that these magazines, excuse me, were

11:45:06 21    not arms protected by the Second Amendment.  It went through

11:45:10 22    the textual analysis.

11:45:11 23            THE COURT:  Would I be correct in thinking that

11:45:12 24    the *Ocean State* is on appeal to the First Circuit right now?

11:45:16 25            MR. ROSS:  That's my understanding.  Plaintiffs

11:45:19  1    call it an outlier.  It is, to our knowledge, the only case

11:45:22  2    that's considered this issue.  It is not, however, the only

11:45:26  3    case to have found that magazines are not protected by the

11:45:30  4    Second Amendment.  The *Oregon Firearms Foundation* case from

11:45:34  5    the District of Oregon in 2022, which is cited in our

11:45:37  6    briefing, found that in *Duncan v. Bonta* the Ninth Circuit's

11:45:42  7    2020 en banc opinion.

11:45:43  8         Now, the Plaintiffs say we ignore the contrary

11:45:46  9    precedent at Page 13 of the reply, but they haven't cited

11:45:49 10    any.  They haven't cited any cases saying that they fall

11:45:53 11    within the Second Amendment.

11:45:54 12         And I want to be clear about what the State's

11:45:56 13    position here is and is not.  The Plaintiffs say they're

11:46:01 14    implicitly protected because they're necessary to exercise

11:46:04 15    the Second Amendment right.  That's at Page 13 of the reply.

11:46:07 16    There's no evidence of that here, Your Honor.  There's no

11:46:10 17    evidence that these specific banned magazines are necessary.

11:46:16 18         THE COURT:  And that kind of comes from your

11:46:17 19    point that any firearm in existence can work with a

11:46:21 20    non-banned magazine?

11:46:22 21         MR. ROSS:  Yes, and it's critical -- that's

11:46:24 22    exactly right and critical.  In the reply brief, the

11:46:28 23    Plaintiffs suggest that the State's position is that the

11:46:29 24    Second Amendment only protects the right to bear an

11:46:33 25    inoperable arm, and that's not the case here.  There's no

11:46:36  1    evidence that any arm is rendered inoperable.

11:46:41  2             It also disposes of the argument at Page 15 of

11:46:44  3    the reply that the State can't ban magazines or other

11:46:46  4    components integral in an operating firearm.  There's no

11:46:50  5    evidence that any of these are.

11:46:52  6             And before I sit down, the last thing I wanted

11:46:54  7    to --

11:46:55  8             THE COURT:  And in that regard, silencers are

11:47:01  9    banned; right?

11:47:02 10             MR. ROSS:  They were banned.  And we believe --

11:47:05 11    thank you for returning me there, Your Honor, that the

11:47:08 12    silencer -- counsel, to anyone who's asked about it, said

11:47:14 13    we're not saying that's an arm.  And we think the analysis

11:47:17 14    is the same and, in fact, the *Ocean State Tactical* Court

11:47:20 15    made that very point.

11:47:21 16             THE COURT:  Okay.

11:47:22 17             MR. ROSS:  Lastly, I want to take a minute to

11:47:24 18    talk about the *Association of New Jersey*, the Third Circuit

11:47:28 19    case in 2018 where we acknowledge did find in that case that

11:47:33 20    magazines were protected by the Second Amendment.  Of

11:47:35 21    course, it predates by four years *Bruen*.  It didn't consider

11:47:41 22    the textual analysis.

11:47:43 23             THE COURT:  So, you know, one of the questions

11:47:46 24    that comes up sometimes when you're in my situation is when

11:47:51 25    the Court of Appeals says something, are they saying it in a

11:47:57 1   way that's binding, or are they saying it because, you know,

11:48:04 2   if something is an appeal from a preliminary injunction,

11:48:07 3   you're generally not having actual facts found.  You're

11:48:14 4   talking about probabilities.

11:48:20 5          Was what they said something that would be

11:48:23 6   binding unless *Bruen* has changed it?

11:48:26 7          MR. ROSS:  So, on the issue and the fact

11:48:29 8   presented, we think, yes, but we think as the U.S. Supreme

11:48:33 9   Court noted in *Cooper Industries* cited by the Middle

11:48:38 10  District of Pennsylvania in *Misja vs. Pennsylvania State*

11:48:43 11  *Educational Association* 2016 Westlaw 1165 1732 at 5, that

11:48:50 12  questions which merely lurk in the record, either brought to

11:48:53 13  the attention of the Court nor ruled upon are not to be

11:48:56 14  considered as having been so decided so as to constitute

11:48:59 15  precedence.  So, if we were simply getting up and saying,

11:49:02 16  Your Honor, we just don't think that the Second Amendment

11:49:04 17  should apply to magazines, that argument, we believe, is

11:49:08 18  foreclosed.

11:49:09 19         The question of whether or not, given the

11:49:12 20  textual analysis that was required four years after the

11:49:15 21  fact, how that is applied to those is a question that the

11:49:18 22  Third Circuit has not touched.

11:49:21 23         THE COURT:  But as I was earlier telling

11:49:27 24  Mr. Pileggi, you would have me say that I'm not bound by

11:49:38 25  what the Third Circuit said because the Supreme Court has

11:49:42 1   used a different mode of analysis subsequently, and that I

11:49:52 2   predict the Third Circuit would change its -- either not

11:49:59 3   regard itself -- well, probably not regard itself as bound

11:50:02 4   by it, something along those lines?

11:50:05 5           MR. ROSS:  Well, look, I think the outcome is

11:50:07 6   the same.  I think the way we would think about it is the

11:50:09 7   following, Your Honor, which is the Supreme Court has made

11:50:12 8   clear what needs to be considered.  It's just simply not

11:50:16 9   something that was ever presented to the Third Circuit.

11:50:18 10          So, the Third Circuit hasn't spoken on the

11:50:22 11  inquiry that is now mandated by the Supreme Court.

11:50:25 12          THE COURT:  Well, that sort of gets to a

11:50:27 13  different thing, which is in *Bruen*, I think maybe in Heller

11:50:35 14  II, but somewhere, the Supreme Court seemed to suggest that

11:50:44 15  things could be decided based on the record that the parties

11:50:47 16  presented; right?

11:50:49 17          MR. ROSS:  There is language to that effect.

11:50:51 18  Yes, Your Honor.

11:50:52 19          THE COURT:  And so, does that mean that the

11:50:57 20  parties, you-all, could present whatever it is you're

11:51:03 21  presenting.  A judge could make a ruling on that.  Then some

11:51:08 22  other Plaintiff comes along and says, you know what, I have

11:51:12 23  some different stuff I'd like to cite to you.  So, we can do

11:51:16 24  it again, and maybe the outcome will be different because

11:51:19 25  the record is different?

11:51:21 1          MR. ROSS:  So, I suspect neither the Supreme

11:51:23 2  Court nor any other Court would like a rule that says you

11:51:26 3  can say, well, I have one more fact; and therefore, you have

11:51:30 4  to --

11:51:30 5          THE COURT:  Not the same Plaintiff.  A different

11:51:32 6  Plaintiff.

11:51:33 7          MR. ROSS:  No, no.  I didn't mean that.

11:51:34 8  Plaintiff 2, I have one more fact.  You've done the type of

11:51:38 9  analysis.  I have one more fact, and I think it changes it.

11:51:42 10         And I think there's an interesting question as

11:51:44 11 to how it's going to play out, given some of that language.

11:51:47 12 But I think we're not anywhere near that scenario.  We're

11:51:49 13 dealing with an issue that simply wasn't on the table in

11:51:52 14 2018 in terms of the textual analysis.

11:51:54 15         And so, we're not in a World War coming in and

11:51:58 16 saying, Well, they gathered a bunch -- they had, you know

11:52:01 17 version one of Professor Baron's declaration, and we have

11:52:04 18 version two, and he's got way more stuff.  We have evidence

11:52:06 19 on points that simply were not considered and are now

11:52:10 20 directly relevant.

11:52:11 21         THE COURT:  Well, on that regard, maybe this is

11:52:14 22 Mr. Moritz's burden, but I do actually recall seeing in

11:52:22 23 *Bruen* lots of discussion about why Bowie knives and

11:52:27 24 slungshots, I think, were not carrying the day in that case.

11:52:37 25 And am I allowed to rehash that material?

11:52:41  1          MR. ROSS:  So, you are treading into

11:52:43  2   Mr. Moritz's, and so this is probably a nice point for me to

11:52:46  3   segue way to him, unless Your Honor has anything on what

11:52:49  4   I've covered.

11:52:50  5          THE COURT:  I would like to hear from him.

11:52:52  6          MR. ROSS:  Sure.

11:52:52  7          THE COURT:  Thank you, Mr. Ross.

11:52:54  8          MR. ROSS:  And then, I have, just at the end, a

11:52:56  9   minute or two on the Delaware Constitution, but we can save

11:53:00 10   that until the end.

11:53:03 11          MR. MORITZ:  Good morning, Your Honor.  Garrett

11:53:06 12   Moritz from Ross Aronstam on behalf of the Defendants.

11:53:09 13          THE COURT:  Good morning.

11:53:09 14          MR. MORITZ:  So, I'll try to start by going

11:53:15 15   right to your question, but what I'm going to spend the

11:53:17 16   first part of my presentation on is going through the legal

11:53:20 17   standard for Second Amendment challenges, where we are after

11:53:24 18   *Bruen* and what the State makes of it.

11:53:29 19          But to answer your question about Bowie knives

11:53:32 20   and slungshots, and it is, indeed, slungshots, not

11:53:35 21   slingshots.  They're different things.  The question, the

11:53:40 22   framework in *Bruen*, I'm going to go through this, is whether

11:53:43 23   historical regulations are relevantly similar.  For the

11:53:47 24   handgun restriction, the very broad handgun regulation that

11:53:51 25   was at issue in *Bruen*, the permitting, the may issue, it was

11:53:57  1   not relevantly similar, but it doesn't say that all of the

11:54:01  2   history and historical tradition of the United States is out

11:54:05  3   the window.  It says, That's the thing you have to look to,

11:54:09  4   and that's what we're going to try to do.

11:54:10  5           So, to walk through this, let's start on the

11:54:13  6   legal standard.  We'll start with Slide 32.  I'm not going

11:54:17  7   to read it to you, but we'll start with the text of the

11:54:20  8   Second Amendment.  And it provides that there's a right of

11:54:22  9   the people to keep and bear arms that shall not be

11:54:25 10   infringed.  And what *Bruen* says is that the Second Amendment

11:54:30 11   in that language codified a preexisting right, and that the

11:54:35 12   right is not unlimited, and it's not a right to keep and

11:54:38 13   carry any weapon whatsoever in any manner whatsoever and for

11:54:42 14   whatever purpose.

11:54:44 15           What was that preexisting right?  If you look at

11:54:48 16   *Heller*, *Heller* goes on for about ten pages, Pages 593 to 603

11:54:56 17   of the U.S. Reporter version, talking about that the

11:54:59 18   preexisting right, as of the time of the American Bill of

11:55:02 19   Rights, was a right of self-defense.  It talks about the

11:55:05 20   English Bill of Rights.  It was a right of self-defense, a

11:55:08 21   right of self preservation.  The State Constitutional

11:55:12 22   provisions put in place on the right to bear arms around the

11:55:15 23   time of the U.S. Bill of Rights, self-defense.

11:55:19 24           The ones immediately after, self-defense.  If

11:55:23 25   you read those ten pages of *Heller*, it's all about that

11:55:26  1    preexisting right being a fundamental basic right to defend

11:55:29  2    yourself before the authorities can arrive.

11:55:32  3                Let's go to Slide 3.  So, *Bruen* says the Second

11:55:37  4    Amendment presumptively protects conduct if it is within the

11:55:41  5    Second Amendment's plain text.  So, it creates this

11:55:44  6    presumption.  And that analysis, as *Bruen* does it, is to say

11:55:49  7    whether the regulated item fits within the category of

11:55:52  8    bearable arms, and whether the regulated item is in common

11:55:56  9    use today for self-defense.  That's *Bruen* at 2134.

11:56:02 10                And so, that analysis, whether something is

11:56:05 11    within the preexisting right, I want to be very clear here.

11:56:08 12    It's more than just is something an arm.  There was some

11:56:12 13    dialogue going back and forth.  Is a bazooka an arm?  Of

11:56:16 14    course a bazooka is an arm, but it's not an arm that's

11:56:19 15    within the preexisting right, as *Bruen* lays it out.

11:56:24 16                Now, there's some debate we've joined about this

11:56:26 17    step.

11:56:27 18                THE COURT:  And the reason why it's not a

11:56:29 19    preexisting right is what?

11:56:30 20                MR. MORITZ:  Because it's not something that is

11:56:32 21    in common use for self-defense.

11:56:35 22                THE COURT:  But the only reason it's not in

11:56:37 23    common use for or maybe not the only reason, but a reason

11:56:40 24    why it's not in common use for self-defense is because it's

11:56:43 25    already -- you know, you'd be arrested if you walked around

11:56:47  1     with a bazooka.

11:56:49  2                 MR. MORITZ:  Look, the Supreme Court says, Is it

11:56:51  3     in common use for self-defense?  Is it in common use today

11:56:53  4     for self-defense, those sorts of formulations?  And it's

11:56:56  5     just not.  And so, it's an extreme -- there's a reason, I

11:57:01  6     think, that that's where our society is is that it's an

11:57:05  7     extremely destructive, offensive military weapon.  And

11:57:09  8     military weapons, the Supreme Court has talked about that.

11:57:12  9                 THE COURT:  Yeah, in any event, I think it's

11:57:15 10     pretty crystal clear.

11:57:17 11                 MR. MORITZ:  Right.

11:57:17 12                 THE COURT:  The way you have this up here, two

11:57:23 13     questions from *Bruen*.

11:57:25 14                 MR. MORITZ:  Mm-hmm.

11:57:25 15                 THE COURT:  One is:  Does it fit within the

11:57:27 16     category of bearable arms?  And so, there is a wide range of

11:57:31 17     weapons that fit within the category of bearable arms --

11:57:35 18                 MR. MORITZ:  Right.

11:57:35 19                 THE COURT:  -- which would include a bazooka.

11:57:39 20                 MR. MORITZ:  Right.

11:57:39 21                 THE COURT:  But then the second question is

11:57:42 22     whether the item is in common use today for self-defense,

11:57:47 23     and you have to answer that question yes before you then

11:57:52 24     say, okay, it's an arm within the meaning of the Second

11:57:55 25     Amendment.

11:57:55 1          MR. MORITZ:  Yeah.  Well, the way I would put it

11:57:58 2     is:  Is it within the preexisting right of the Second

11:58:02 3     Amendment?  Yes.  Is it an arm within what's protected by

11:58:04 4     the Second Amendment?

11:58:06 5          THE COURT:  Well, so the majority opinions in

11:58:09 6     *Bruen* and maybe in *Heller II*, but I think in *Bruen*,

11:58:13 7     particularly say:  Is it within the plain text?  You've got

11:58:17 8     it up there.  Plain text.  How does common use today for

11:58:22 9     self-defense meet the plain text requirement?

11:58:26 10          MR. MORITZ:  You're absolutely right that it's a

11:58:29 11    really interesting question, and I've spent some time

11:58:31 12    reading it.  And I think this is exactly what *Bruen* and

11:58:35 13    *Heller* do.

11:58:35 14          And here's how they get there.  What does the

11:58:38 15    plain text say?  It says the right of the people to bear --

11:58:42 16    keep and bear arms shall not be infringed.  And then it

11:58:44 17    asks:  What is that right?  And it says that right is this

11:58:48 18    right to self-defense, to use weapons in common use for

11:58:53 19    self-defense.  And it's not -- I'm not making this up.

11:58:55 20          In part 3A of the *Bruen* decision, the plain text

11:58:59 21    analysis, that's at 2134, the Supreme Court analyzed this.

11:59:04 22    Are handguns in common use today for self-defense within the

11:59:07 23    plain text component?  There's a whole heading on that.

11:59:09 24    That's where *Bruen* does that part of the analysis.

11:59:11 25          Then it flips to the historical tradition of

11:59:15 1   weapons regulation, a separate heading.

11:59:17 2          THE COURT:  Can you just hold on one second?

11:59:19 3          MR. MORITZ:  Sure.

11:59:43 4          THE COURT:  So, I'm looking at the opinion and

11:59:47 5   I've got 3A, which is about six or seven paragraphs.

11:59:51 6          MR. MORITZ:  Mm-hmm.

11:59:51 7          THE COURT:  And by the end of that, it says, and

12:00:05 8   I'm quoting, "The Second Amendment's plain text, thus,

12:00:09 9   presumptively guarantees Petitioners Koch and Nash a right

12:00:12 10   to bear arms in public for self-defense."

12:00:16 11          MR. MORITZ:  Mm-hmm.

12:00:16 12          THE COURT:  What you're saying here is the

12:00:21 13   common use business is dealt with right at the beginning of

12:00:25 14   that section?

12:00:27 15          MR. MORITZ:  Right, the very first paragraph,

12:00:28 16   Your Honor.

12:00:29 17          THE COURT:  Is there more discussion about

12:01:03 18   common use for self-defense?  Because most of the references

12:01:07 19   to it that I marked in my copy of the opinion occur later.

12:01:12 20   Does that also impact any of the subsequent analysis or is

12:01:17 21   it once you've got to the end of 3A is that no longer --

12:01:22 22          MR. MORITZ:  Yeah.

12:01:22 23          THE COURT:  -- relevant?

12:01:23 24          MR. MORITZ:  Right.  So, when you do the

12:01:24 25   historical analysis, the next part of the historical

12:01:28 1   analysis looks heavily on to what is the impact on the

12:01:32 2   ability to self defend.  That's how the Court explained, or

12:01:36 3   it didn't say it was exhaustive, but it says two of the

12:01:38 4   considerations are to look at whether -- how the regulation

12:01:42 5   impacts self-defense.  And we'll get to that shortly as I

12:01:49 6   march through this.

12:01:50 7        If the Plaintiff succeeds in establishing that

12:01:53 8   the Second Amendment presumptively applies, then the *Bruen*

12:01:56 9   analysis requires the Government to prove that its firearms

12:01:59 10  regulation is consistent with the nation's historical

12:02:03 11  tradition.  If we go to Slide 34, we have some callouts of

12:02:06 12  that.  That's the Government's burden to prove that the

12:02:10 13  regulation is part of the historical tradition.  And I would

12:02:15 14  point out in Footnote 1 of the joint reply brief that the

12:02:20 15  Plaintiffs submitted -- we'll put that up on the screen.  If

12:02:22 16  you look at what the Plaintiffs say, this is Footnote 1 of

12:02:26 17  the joint brief, the complete standard mandated by the

12:02:29 18  Supreme Court requires, one, determining through textual

12:02:34 19  analysis that the Second Amendment protected an individual

12:02:37 20  right to armed self-defense; and two, relying on the

12:02:41 21  historical understanding of the amendment to demark the

12:02:45 22  limits of the exercise of that right.

12:02:47 23       And then it says, once that first test is met,

12:02:50 24  it becomes the burden of the State to demonstrate that the

12:02:53 25  burdensome restrictions upon the right to own common arms

12:02:56 1    are consistent with this nation's historical tradition so as

12:03:00 2    to fall outside of the Second Amendment's unqualified

12:03:03 3    command.

12:03:03 4          That's not our brief.  That's the Plaintiffs'

12:03:06 5    brief.

12:03:06 6          And so, how is a Trial Court judge to determine

12:03:10 7    what the historical tradition is?  *Bruen* speaks to this at

12:03:14 8    Footnote 6.  Your Honor alluded to this.

12:03:16 9          THE COURT:  Mr. Moritz, before you get there,

12:03:18 10   maybe this is what Mr. Ross said, but the State's position

12:03:26 11   is these are not arms protected by the Second Amendment.

12:03:32 12   End of story.  We go home.

12:03:34 13         MR. MORITZ:  I would say it this way:  These are

12:03:35 14   not arms that are presumptively within the scope of the

12:03:38 15   Second Amendment.  But then the second part is even if they

12:03:41 16   are presumably --

12:03:42 17         THE COURT:  But if they're not presumptively

12:03:44 18   within, that's the same thing as saying they're not within.

12:03:47 19         MR. MORITZ:  Correct.

12:03:47 20         THE COURT:  Presumably, you can't do something

12:03:49 21   later to overcome the presumption that they're not in.

12:03:53 22         MR. MORITZ:  Thank you, Your Honor.  Absolutely,

12:03:55 23   yes.  That's only part one of our argument, though.  We have

12:03:57 24   a historical piece, too.

12:03:59 25         THE COURT:  So, on part one, you're actually in

12:04:03 1    agreement with the Plaintiffs that that's essentially just a

12:04:12 2    legal question, or are you in agreement that, in fact,

12:04:15 3    that's a question you don't need any record for?

12:04:17 4              MR. MORITZ:  You do need a record for that.  You

12:04:19 5    do need a record for that because the question of common use

12:04:23 6    for self-defense is something that you can't find by looking

12:04:27 7    at a piece of paper in the Constitution.  You do need to

12:04:31 8    know something about what the reality is in the world.  And

12:04:34 9    so, that does require an evidentiary record of some kind.

12:04:38 10             So, but let's get to the historical tradition.

12:04:43 11   If something is within the scope of the preexisting right

12:04:50 12   presumptively protected by the Second Amendment, the

12:04:52 13   regulation could still be upheld if the Government meets its

12:04:56 14   burden to prove that it's consistent with historical

12:04:59 15   tradition.  Courts are permitted -- this is Footnote 6 of

12:05:02 16   *Bruen* -- or entitled to decide a case based on historical

12:05:05 17   record compiled by the parties.  There is a historical

12:05:09 18   record compiled here by the Defendants.

12:05:11 19             THE COURT:  Right.  This is the footnote I was

12:05:13 20   thinking about.

12:05:14 21             MR. MORITZ:  Exactly.

12:05:14 22             THE COURT:  I don't know why I couldn't remember

12:05:16 23   where I had seen it.

12:05:17 24             MR. MORITZ:  Yeah.  Straight from *Bruen*.  And

12:05:18 25   *Bruen* and *Heller* are clear that they do not -- oh, and by

12:05:21 1    the way, Mr. Lehman, I think he said that something along

12:05:24 2    the lines of *Bruen* already did all the historical analysis

12:05:28 3    that's needed.

12:05:28 4              That's not what *Bruen* said.  It said, Courts are

12:05:32 5    entitled to rely on the parties.  It said, We're not

12:05:35 6    deciding, you know, every issue of history.  In fact, *Bruen*

12:05:39 7    and *Heller* are clear that they do not exhaustively answer

12:05:43 8    all the questions about the historical tradition or how it

12:05:46 9    applies.  But *Bruen* does provide guidance, if we go to Slide

12:05:50 10   37.

12:05:51 11             *Bruen* talks about what you do when you're

12:05:54 12   dealing with modern arms regulations that couldn't really

12:05:58 13   have been -- anticipated the founding unprecedented societal

12:06:02 14   concerns or dramatic technological changes requiring a more

12:06:06 15   nuanced approach.  You do reasoning by analogy with more

12:06:11 16   modern arms and arms regulations.  And even if a modern-day

12:06:16 17   regulation is not a dead ringer for historical precursors,

12:06:19 18   it still may be analogous enough to pass constitutional

12:06:22 19   muster.

12:06:23 20             What does it mean for a regulation to be

12:06:26 21   analogous enough?  So, at Slide 38, we have the explanation

12:06:31 22   from *Bruen*.  It's whether the historical regulation is

12:06:35 23   relevantly similar to the modern firearm regulations.

12:06:40 24             What does that mean?  It's one layer after

12:06:43 25   another here, but we're getting close to the end of this.

12:06:48 1    Slide 39.  We have the explanation from *Bruen*.  Again, they

12:06:52 2    say we're not providing an exhaustive survey of everything

12:06:55 3    that would make a regulation relevantly similar, but we do

12:06:59 4    think *Heller* and *McDonald* point towards two metrics.  How

12:07:02 5    and why the regulations burden a law-abiding citizen's right

12:07:06 6    to self-defense.

12:07:07 7            So, that's where all the self-defense

12:07:08 8    regulations come in in historical analysis.  How and why the

12:07:13 9    regulations burden of law-abiding citizens, a right to

12:07:17 10   self-defense.  And that it's a central component --

12:07:19 11   individual self-defense is a central component of the Second

12:07:22 12   Amendment right.

12:07:23 13           So, we go to Slide 40.  And the Supreme Court

12:07:26 14   says that the central considerations engaging in the

12:07:31 15   analogical inquiry are:  One, whether modern and historical

12:07:35 16   regulations impose a comparable burden on the right of armed

12:07:39 17   self-defense; and two, whether that burden is comparably

12:07:44 18   justified.

12:07:44 19           That's what it says the historical analysis is.

12:07:48 20   And that is why in the *Heller* decision, Justice Alito's

12:07:54 21   majority opinion emphasized that quintessential self-defense

12:07:57 22   weapons have strong protections while "weapons most useful

12:08:02 23   in military service M16s and the like may be banned."

12:08:08 24           So, that's the Second Amendment framework we're

12:08:12 25   applying.  I'd like to turn now to applying it based on the

12:08:17  1    really unrebutted factual record on this motion that

12:08:20  2    Mr. Ross touched on and which is in our papers and in our

12:08:23  3    expert declarations.

12:08:24  4                All right.  So, Mr. Ross explained why LCMs are

12:08:31  5    not even arms.  Assault weapons and LCMs, if you were to

12:08:37  6    consider them under this framework, are not in common use

12:08:41  7    for self-defense.  They're not quintessential self-defense

12:08:44  8    weapons.  They're weapons that are most useful in military

12:08:47  9    service.  Those are the kinds of things that the Supreme

12:08:50 10    Court has said may be banned.

12:08:52 11                And whether you take common use or

12:08:54 12    self-defense -- which I do strongly submit is what the

12:08:57 13    Supreme Court in both *Bruen* and *Heller* is talking about as a

12:09:01 14    preexisting right -- but whether you take common use for

12:09:03 15    self-defense or just common use for lawful purposes, the

12:09:06 16    undisputed record on this motion is enough to show that

12:09:09 17    assault weapons are not in common use.

12:09:14 18                We've heard about numbers today.  Even using the

12:09:16 19    10-million figure that Mr. Lehman gave out, of the more than

12:09:21 20    470 million guns in the United States, Your Honor said that

12:09:25 21    comes out to somewhere in the ball park of 2.5 percent.

12:09:28 22    2.5 percent --

12:09:29 23                THE COURT:  That number is 470 million now?

12:09:31 24                MR. MORITZ:  So, yes, that is -- I believe it's

12:09:36 25    Footnote 14 of our opposition brief.

12:09:38 1                    THE COURT:  Okay.

12:09:39 2                    MR. MORITZ:  It cites to sources for that.  It

12:09:41 3      might be higher since it's been a few weeks since we filed

12:09:44 4      that, but that's what we put in there.  And we provided

12:09:47 5      record support for that.

12:09:51 6                    THE COURT:  All right.

12:09:52 7                    MR. MORITZ:  2.5 percent is not common, let

12:09:54 8      alone in common use for self-defense.  And so, the Second

12:09:57 9      Amendment challenge, as you indicated, can end there.

12:10:00 10                   THE COURT:  Well, so what number would be in

12:10:03 11     common use?

12:10:04 12                   MR. MORITZ:  That's something that is, I think,

12:10:07 13     developing.  I don't have the exact number, but it's not

12:10:11 14     2.5 percent.  When you're talking about handguns, something

12:10:14 15     that the Supreme Court described as, you know, the most

12:10:16 16     popular self-defense weapon, and that was something --

12:10:19 17     clearly, that's enough.

12:10:22 18                   THE COURT:  It was undisputed in their case.

12:10:23 19                   MR. MORITZ:  Right.  We're not anywhere near

12:10:26 20     that.  And --

12:10:28 21                   THE COURT:  But so, could the State sort of

12:10:35 22     piecemeal this?  We'll ban a MAC-10 in this piece of

12:10:39 23     legislation.  Wait a few weeks and ban an AR-15 and so

12:10:46 24     forth.  And, you know, the more specific you make it, it's

12:10:51 25     not going to be in common use.  You've got -- so, I don't

12:11:02  1    know.  How should you deal with that?

12:11:05  2            I mean, there's, what, 38 categories, 44

12:11:08  3    categories of assault weapons that are banned in the State's

12:11:12  4    legislation.  Presumably any one of them is not actually in

12:11:16  5    common use.  Maybe all of them together are in common use.

12:11:19  6            MR. MORITZ:  Well, I don't think they are.  And,

12:11:22  7    certainly, there's certainly no evidence of that.  But I

12:11:25  8    don't see why there couldn't be a challenge to a suite of

12:11:28  9    regulations if the State did one regulation, regulation two,

12:11:32 10    regulation three.  And after 20 years, there are no guns of

12:11:34 11    any kind that could be used for self-defense anymore, could

12:11:37 12    there be a challenge brought to the overarching military

12:11:40 13    regime based on the Second Amendment?  I'm sure there could.

12:11:42 14            And so, I think there's a response to that

12:11:44 15    problem, which isn't at all this case.  I don't think the

12:11:47 16    State has tried to, you know, go after one particular model.

12:11:52 17    It's a pretty robust list, and it's -- and so, that's what

12:11:57 18    we have here.

12:11:58 19            History.  So, even if the Court finds that

12:12:03 20    Plaintiffs have succeeded in establishing the Second

12:12:07 21    Amendment presumptively covering the regulations, which we

12:12:09 22    submit they do not, Defendants, nonetheless, have met their

12:12:13 23    burden, basically, met it without any rebuttal, to prove

12:12:18 24    that the regulations are part of our nation's historical

12:12:22 25    tradition of weapons regulation, at least for purposes of

12:12:25 1   today's motion.  To try to get out of the analogy inquiry

12:12:32 2   that *Bruen* mandates for recently emerging weapons

12:12:35 3   technologies, Plaintiffs make a claim that really these

12:12:39 4   technologies are not unusual, even going back to the

12:12:43 5   founding.

12:12:44 6            So, take a look at Slide 41, and this is from

12:12:49 7   the DSSA Plaintiffs' brief, Footnote 6.  And they make the

12:12:53 8   claim that ammunition magazines capable of holding more than

12:12:57 9   17 rounds have been around -- have been in common use for

12:13:02 10  centuries.  And the only evidence Plaintiffs provide for

12:13:05 11  this is the report of this lone Girandoni air rifle taken on

12:13:10 12  the Lewis & Clark Expedition.

12:13:12 13           But we looked at the book that they cite, and

12:13:14 14  here's what their own source says on Slide 42 about that.

12:13:18 15  It says that the Girandoni air rifle Merriweather Lewis had

12:13:22 16  was a type of rifle that Austrian soldiers used during the

12:13:28 17  Napoleonic Wars.  That Napoleon, not an activist, I'm pretty

12:13:29 18  sure, thought that those were the kinds of weapons of

12:13:32 19  assassins.  No one knows how Lewis got it.  There's no other

12:13:36 20  good evidence for Girandoni-style air rifles having made it

12:13:38 21  to the United States during that era.  That the one air

12:13:42 22  rifle was being used to impress tribes on the expedition.

12:13:47 23  And even in 1845 when it was auctioned at an estate sale, it

12:13:53 24  was described then as a great curiosity.

12:13:56 25           We pointed this out at Footnote 1 of our

12:13:59 1   opposition.  Plaintiffs don't respond to it.  They continue

12:14:02 2   to claim in their reply brief.

12:14:04 3          There are ample examples of large-capacity

12:14:06 4   magazines in critical moments of the nation's history.  But

12:14:08 5   the only thing they cite is this Merriweather Lewis

12:14:11 6   Girandoni air rifle.  It's just not supported even by their

12:14:15 7   own source.

12:14:16 8          Defendants have submitted an unrebutted expert

12:14:19 9   affidavit from Professor Kevin Sweeney.  We have this at

12:14:22 10  Slide 43.  He is a professor of history emeritus at Amherst.

12:14:29 11         THE COURT:  One thing that I noticed, looking at

12:14:31 12  some of these declarations, is that many of the experts that

12:14:39 13  you all have are presumably filing more or less similar

12:14:45 14  declarations in most of the other litigation that's going on

12:14:48 15  on this topic; is that right?

12:14:50 16         MR. MORITZ:  They are filed in some other cases.

12:14:52 17  I think that's generally correct.

12:14:55 18         THE COURT:  I mean, I take it the states that

12:14:58 19  have passed the legislation are sort of working together to

12:15:06 20  sustain the legislation; is that right?

12:15:09 21         MR. MORITZ:  As you probably know, Attorney

12:15:11 22  Generals offices at the state level around the country

12:15:13 23  coordinate on various issues, and there is some of that

12:15:16 24  going on.

12:15:16 25         THE COURT:  All right.

12:15:18  1          MR. MORITZ:  Okay.  So, Professor Sweeney is a

12:15:22  2   very eminent historical professor specializing in material

12:15:25  3   culture in the 1700s and the founding era.  And he goes

12:15:31  4   into -- this is Slide 44 -- how common were repeating

12:15:36  5   firearms in the 18th Century in the United States.

12:15:38  6   Extraordinarily rare.  And many did not even have contextual

12:15:45  7   magazines.

12:15:47  8          Giradoni's air rifle was a curiosity, just like

12:15:49  9   Plaintiffs' own source says.  We don't offer this unrebutted

12:15:52 10   evidence to claim that the Second Amendment only protects

12:15:55 11   weapons coming at the time of the founding.  That is not our

12:15:58 12   argument.

12:15:59 13          We're just offering this to show that assault

12:16:02 14   weapons and LCMs are a new technology.  They're a new issue

12:16:06 15   that's come out in the 20th Century.  They're being dealt

12:16:09 16   with in modern times.  They're not something from the

12:16:12 17   founding, and that puts us in the analogy inquiry under

12:16:15 18   *Bruen*.

12:16:16 19          So, let's go to the analogy.

12:16:17 20          THE COURT:  Well, in terms of a new

12:16:19 21   technology --

12:16:20 22          MR. MORITZ:  Mm-hmm.

12:16:21 23          THE COURT:  -- whether it's new or my favorite,

12:16:28 24   patentable sense, that's one thing.  But it also occurs to

12:16:32 25   me that why would -- you know, most legislatures try to

12:16:44  1   legislate about things that are perceived to be problems.

12:16:46  2                 MR. MORITZ:  Right.

12:16:47  3                 THE COURT:  And there's doesn't seem to be any

12:16:55  4   evidence in the record that whatever the amount of repeating

12:17:03  5   firearms that there were in the 19th Century were leading to

12:17:12  6   anything like the problems that the legislature seems to

12:17:16  7   have been trying to address in the law.

12:17:21  8                 So, I guess the question or it seems to me like

12:17:26  9   if we're getting to this point, you have to consider both

12:17:29 10   things.  And that's presumably the reason why you're talking

12:17:32 11   about Bowie knives is that was perceived to be a problem.

12:17:34 12                 MR. MORITZ:  Right.  The Bowie knife craze, as

12:17:39 13   Professor Spitzer called it at Paragraph 22, that was an

12:17:41 14   issue in the 1830s, and in that time period we're dealing

12:17:46 15   with another one.  It's -- you know, we're in the social

12:17:49 16   concern that wasn't an issue in the 1800s that we have

12:17:53 17   today, but you have to look for analogs to it.

12:17:55 18                 And so, if we go to Slide 45, we have Professor

12:18:01 19   Robert Spitzer.  He is someone who's devoted his career to

12:18:08 20   studying gun regulation, writing books and articles about

12:18:10 21   it.  I'm not going to go over his CV, but to summarize some

12:18:16 22   of his evidence, Slide 46 -- and I can tell Your Honor has

12:18:21 23   spent some time with his declaration -- but he goes through

12:18:26 24   the historical tradition of weapons regulation in the United

12:18:30 25   States.  He talks about in this 1830s forward through the

12:18:33  1   1800s time period, Bowie knives and similar fighting knives.

12:18:38  2   Go back to the prior slide, please.  The Bowie

12:18:40  3   knives and fighting knives were heavily regulated in that

12:18:43  4   area.

12:18:43  5   And to touch on the question Your Honor asked --

12:18:45  6   THE COURT:  I'm sorry, Mr. Moritz.  Do you think

12:18:47  7   it makes any difference to your argument that most of the

12:18:53  8   things you're citing, all of the things, almost all the

12:18:56  9   things that are up here are mostly not firearms?

12:19:01 10   MR. MORITZ:  I don't think so.  I think that the

12:19:08 11   weapons regulation, the problems that society were dealing

12:19:11 12   with are -- and we're going to get to some 20th Century

12:19:15 13   firearms --

12:19:15 14   THE COURT:  But this is pretty much -- haven't

12:19:18 15   they said the 20th Century is irrelevant?

12:19:20 16   MR. MORITZ:  I don't think that that's quite

12:19:22 17   right, because they said that if the later regulation is

12:19:26 18   inconsistent with this historical tradition, then it's

12:19:30 19   irrelevant.  But if it's part of -- it doesn't say that if

12:19:33 20   it's part of a pattern.  And machine gun regulations,

12:19:37 21   sawed-off shotgun regulation that -- I don't think there's

12:19:40 22   any question that that's acceptable.

12:19:44 23   Scalia said that would be startling to suggest

12:19:46 24   that the Second Amendment would protect those kinds of

12:19:49 25   items.  So, I think that the well-accepted 20th Century

12:19:54  1    firearms regulation are just part of the historical

12:19:57  2    tradition that goes back to Bowie knives.

12:19:59  3            And so, to go to one of Your Honor's questions

12:20:03  4    from earlier, Bowie knives, as Professor Spitzer says, there

12:20:07  5    was this craze for Bowie knives, and they were associated

12:20:12  6    with problems.  They were viewed as something that were

12:20:14  7    being used in dueling, in criminal activity, but they were

12:20:21  8    proliferating.  There was a craze for them.  Lots of people,

12:20:24  9    you know, were acquiring them or making them.

12:20:28 10            Blunt weapons.  We talked about that.  Very

12:20:30 11    extensive regulation of bludgeons, billy clubs, slungshots,

12:20:34 12    et cetera, and we go on with other regulations.

12:20:38 13            Now, let's go to the next slide, Slide 47.  So,

12:20:45 14    in the mid-1920s to mid-1930s, there's this round of State

12:20:52 15    machine gun regulation followed by the Federal National

12:20:57 16    Firearms Act in 1934, which at that time imposed a tax on

12:21:01 17    machine guns and sawed-off shotguns.

12:21:05 18            And then in 1986, the Gun Control Act at the

12:21:10 19    federal level made it unlawful to possess a machine gun with

12:21:14 20    some grandfathering and other exceptions.  And Professor

12:21:18 21    Spitzer -- everyone agrees, Supreme Court, Justice Scalia,

12:21:21 22    the Plaintiffs' counsel here today, we all agree those

12:21:23 23    machine gun regulations are not a Second Amendment problem.

12:21:28 24    They're well within the nation's historical tradition.

12:21:32 25            Just to touch on one thing you asked about, I

12:21:35  1  thought it was interesting, because there's a claim that

12:21:38  2  Tommy guns were -- you know, like people were running wild

12:21:41  3  with them in terms of using them for criminality.  But what

12:21:46  4  Professor Spitzer actually says at Paragraph 52 of his

12:21:49  5  declaration is that, Although guns like the Tommy gun and

12:21:53  6  the BAR, which is another machine gun, were actually used

12:21:57  7  relatively infrequently by criminals, when they were used,

12:22:00  8  they exacted a devastating toll and garnered national

12:22:04  9  attention, such as the Valentine's Day Massacre, which was a

12:22:09  10 very notorious and horrific piece of the Tommy gun.

12:22:13  11           THE COURT:  Yeah, I remember that one.

12:22:14  12           MR. MORITZ:  So, the machine gun problem was one

12:22:17  13 that it was a concern because when it happened, when they

12:22:22  14 were used by criminals, it was really, really bad, but not

12:22:26  15 that they were being used constantly or anything like that.

12:22:29  16 It was -- that's the actual record on Tommy guns.

12:22:34  17           All right.  Slide 48, I'm going to try to get

12:22:38  18 through this quickly, so I can hand off to Mr. Ross.  We've

12:22:40  19 got a table of magazine restrictions in the 1917 to 1934

12:22:46  20 time period.  It represented more than 50 percent of the

12:22:50  21 population at the time, almost half of the states.

12:22:52  22           These 20th Century regulations, including the

12:22:56  23 machine gun restrictions -- so, they weren't a departure

12:22:59  24 from our nation's history.  And I've talked about the fact

12:23:03  25 that it's accepted.

12:23:05  1          So, there's a lot more covered in Professor

12:23:10  2   Spitzer that I'll get to today, but I won't -- in the

12:23:13  3   interest of time, I'll move past it.  But Professor

12:23:17  4   Spitzer -- we can go to Slide 49 -- talks about a pattern

12:23:20  5   that throughout American history, both firearms and other

12:23:26  6   dangerous weapons, were subject to, you know, a wide range

12:23:31  7   of regulations.

12:23:32  8          And there was a process.  They have to enter

12:23:36  9   society.  They have to proliferate.  There has to be

12:23:38 10   violence and concerns from society, and then they get

12:23:41 11   regulated.  And if we go to Paragraph 50, he specifically

12:23:46 12   talks about how gun technologies emerge in the military

12:23:50 13   context, come over to the civilian context and eventually

12:23:54 14   are regulated.

12:23:55 15          And so, what we have here are assault weapons.

12:24:01 16   We have military technology.  World War II.  The German

12:24:06 17   emergence of that, really in the United States.  The testing

12:24:09 18   we saw in the M16, AR-15 in Vietnam.  This is something

12:24:13 19   that's happening in the late 20th Century and within a

12:24:16 20   decade or two of assault weapons starting to move from their

12:24:19 21   military origin into civilian hands.  States start to ban

12:24:24 22   them.

12:24:24 23          The Federal Government bans them from 1994 to

12:24:27 24   2004 and also bans what was defined by the Federal

12:24:31 25   Government at that time as large-capacity magazines, which

12:24:34  1   was just a ten-round cutoff, not a 17-round cutoff.  That

12:24:38  2   federal assault weapons ban from 1994 to 2004 was not an

12:24:43  3   outlier.  It's right within the tradition of restricting or

12:24:47  4   prohibiting weapons viewed as particularly problematic that

12:24:51  5   runs throughout our historical tradition, and that flows

12:24:54  6   from the unrebutted historical evidence we presented on this

12:24:56  7   motion.

12:24:57  8           And Professor Spitzer bolsters this.  That's at

12:25:01  9   Slide 51.  I'm not going to put that up, but that's the

12:25:05 10   conclusion that we've reached, and we've submitted to you.

12:25:08 11   And it's a conclusion that Professor Spitzer, a serious

12:25:11 12   scholar in the history of American gun regulation, has

12:25:14 13   reached.  And it's unrebutted, and the Plaintiffs made the

12:25:16 14   choice not to put in any contrary evidence.

12:25:20 15           So, looking at the considerations that *Bruen*

12:25:24 16   identifies as central for determining whether historical

12:25:27 17   regulations by analogy are relevantly similar, let's go to

12:25:34 18   Slide 52.  The things that *Bruen* says are central in the

12:25:38 19   analogy inquiry are whether modern and historical

12:25:41 20   regulations impose a comparable burden on the right of armed

12:25:44 21   self-defense and whether that burden is comparably

12:25:48 22   justified.  *Bruen* at 2133.

12:25:50 23           On the first of these considerations, we made

12:25:53 24   the record to show that the regulations place little burden

12:25:56 25   on armed self-defense because the unrebutted expert record

12:26:00 1   here establishes that assault weapons and LCMs are not well

12:26:04 2   suited for self-defense.

12:26:06 3            And on the second consideration, any limited

12:26:09 4   burden on self-defense is comparably justified because the

12:26:13 5   quintessential self-defense weapon, handguns, are

12:26:16 6   unaffected.  As Justice Scalia wrote in *Heller*, weapons most

12:26:19 7   useful in military service may be banned.  M16s and the like

12:26:23 8   may be banned.

12:26:23 9            Assault weapons, they're like M16s.  Assault

12:26:28 10  weapons are most useful in military service.  Relevantly

12:26:32 11  similar, assault weapons regulations, relatively similar to

12:26:36 12  the regulation of machine guns and to Bowie knives, with the

12:26:41 13  social concerns of the 1830s.  Restricting assault weapons

12:26:44 14  comports with our nation's historical tradition of weapons

12:26:48 15  regulation.

12:26:48 16           On this motion, we've made that record.  And

12:26:51 17  although they are not even arms, if they were to be

12:26:54 18  considered arms, the same holds for large-capacity

12:26:58 19  magazines.  Plaintiffs have not shown a likelihood of

12:27:00 20  success on their Second Amendment challenge.

12:27:02 21           I'm glad to answer any questions on this piece.

12:27:05 22           THE COURT:  I do have right this minute just one

12:27:11 23  question, which is during the time when the Federal

12:27:14 24  Government banned assault weapons from 1994 to 2004 -- so I

12:27:19 25  understand from something I read somewhere that that

12:27:24  1   legislation was sunsetted after ten years.  But was there

12:27:32  2   litigation as to whether or not that violated the Second

12:27:35  3   Amendment?

12:27:35  4           MR. MORITZ:  It's interesting, Your Honor.  I

12:27:37  5   haven't done a comprehensive study of that, but I would

12:27:40  6   think if there was some really meaningful litigation over

12:27:43  7   that, it would have come up in our research.  I think the

12:27:45  8   fact that, you know, Congress was able to pass that

12:27:49  9   legislation and it existed for ten years, it's pretty

12:27:53 10   telling as far as, you know, what is our historical

12:27:58 11   tradition and whether what was happening now is really true

12:28:00 12   to the historical tradition as opposed to sort of a modern

12:28:05 13   development in how people think about weapons regulation.

12:28:08 14           THE COURT:  I mean, it's a question that occurs

12:28:10 15   to me, but I'm not sure in the end whether it would have any

12:28:16 16   impact on the Supreme Court's analysis because essentially

12:28:23 17   what happens in the -- once you get past reconstruction,

12:28:30 18   what happens doesn't inform any relevant understanding of

12:28:38 19   what's covered or not covered by the Second Amendment right.

12:28:40 20           MR. MORITZ:  I don't think that's correct.  I

12:28:41 21   think that's too strong.  I would say the following:  I

12:28:44 22   would say the most relevant is that the Bill of Rights and

12:28:49 23   1868 time period, no question.  And the things that are

12:28:52 24   immediately around that era, those are the most relevant.

12:28:55 25   But the Supreme Court doesn't say throw the rest of American

12:28:58  1   history out.  It's useless.  It actually says

12:29:01  2   post-enactment, subsequent history can be very relevant for

12:29:05  3   interpreting the widely-held understanding.

12:29:08  4          What it says, what *Bruen* says is, when

12:29:10  5   inconsistent with the 20th Century or late 19 -- I think

12:29:13  6   it's late 19th Century -- when late 19th Century

12:29:16  7   regulations, there was a spade of regulations of pistols or

12:29:19  8   something like that.  When they were inconsistent with the

12:29:25  9   history of weapons regulation, don't pay attention to those.

12:29:29 10   But if it's -- it doesn't say when it's consistent, when it

12:29:32 11   fits the pattern.

12:29:33 12          THE COURT:  But, I mean, you know, part of the

12:29:57 13   inconsistency in *Bruen* for the New York legislation is what

12:30:04 14   it was inconsistent with was an absence of earlier

12:30:10 15   legislation; right?  What was it inconsistent with?

12:30:15 16          MR. MORITZ:  Because it -- so, what it was

12:30:17 17   inconsistent with is that it was putting almost absolute

12:30:23 18   burden on the most popular form of self-defense today in

12:30:28 19   terms of, you know, handguns.  And so, that, again, looking

12:30:33 20   at the core, what's the analysis *Bruen* says to do in

12:30:37 21   historical analysis?  What's the burden on self-defense, on

12:30:40 22   the ability to self defend in the analogical inquiry?

12:30:44 23          And they go through that.  And they say this is

12:30:45 24   a huge burden, saying people basically can't have -- you

12:30:48 25   know, putting a very, very restrictive may issue a

12:30:53  1    permitting regime on handguns, is the burden of self-defense

12:30:58  2    too much?

12:30:59  3                THE COURT:  The way the Supreme Court was

12:31:01  4    looking at it was, you know, it's the State's burden.  And

12:31:07  5    so, you basically can't come up with anything that supports

12:31:14  6    it.

12:31:20  7                And here, you've got -- going back to the

12:31:24  8    National Firearms Act or whatever it's called in 1994, your

12:31:37  9    argument is actually the earlier legislation dealt with

12:31:43 10    various other kinds of arms, mostly other arms.  And there

12:31:48 11    was a lot of regulation, shall we say, at the margins.  And

12:31:56 12    so, this is consistent with that.  So, maybe it doesn't

12:32:00 13    carry much weight, but it carries a little bit of weight?

12:32:03 14                MR. MORITZ:  I think that's pretty close, but I

12:32:05 15    would say the following, which is machine guns and then

12:32:11 16    later in the late 20th Century, assault weapons.  You can't

12:32:15 17    look to the 1800s and say, ah-ha, like that same weapon was

12:32:20 18    dealt with.  You have to proceed by analogy.

12:32:23 19                So, the more important things are in the 1800s.

12:32:26 20    But how those traditions continued to be applied in the

12:32:31 21    1930s or in the 1960s, that's relevant.  And they were

12:32:35 22    consistent.

12:32:35 23                THE COURT:  And actually I think you just said

12:32:37 24    something which I hadn't really thought about which is so

12:32:40 25    regulation of machine guns and sawed-off shotguns, which we

12:32:49  1    seem to agree is constitutional, then that becomes part of

12:33:04  2    the tradition of relevantly similar, or if it is relevantly

12:33:10  3    similar, but it's something that can be considered for

12:33:13  4    relevantly similar litigation or regulation, I mean.

12:33:22  5    Because even if it's not exactly in the right time frame,

12:33:25  6    you know, it's kind of like the transitive law.  You know,

12:33:28  7    that's valid, so there must be something earlier that makes

12:33:32  8    it valid.  And so, even though -- even to the extent that we

12:33:36  9    can't necessarily identify what that is, because I don't

12:33:38 10    think in the Supreme Court case, which I haven't read, but I

12:33:43 11    don't think in the Supreme Court case they were probably

12:33:45 12    talking about Bowie knives.  It's a reflection of something

12:33:53 13    that you're now trying to get a reflection on something kind

12:33:58 14    of analogous.

12:33:59 15            MR. MORITZ:  I think that that is a fair way to

12:34:02 16    look at it, Your Honor, that, you know, it's not like you

12:34:05 17    just ignore these things that we recognize are valid

12:34:08 18    regulations.  They're part of the picture, too.

12:34:11 19            THE COURT:  Yeah.  Well, so, I mean, that's part

12:34:14 20    of what I've been trying to think about over the last week

12:34:21 21    or so when I've been thinking about this was how, if at all,

12:34:29 22    to integrate machine guns and sawed-off shotguns which, to

12:34:36 23    some extent, seemed more relevant to me than Bowie knives or

12:34:42 24    at least more understandable.  How they fit, how they

12:34:50 25    would -- you know, it would seem to me wrong, as a practical

12:35:00  1   matter, to only take what the Supreme Court could -- to take

12:35:06  2   what the Supreme Court says about the method of analysis and

12:35:08  3   not consider things that are apparently consistent with that

12:35:13  4   method of analysis, like machine guns and sawed-off

12:35:18  5   shotguns.

12:35:18  6           MR. MORITZ:  Look, I think you're wrestling with

12:35:21  7   what we've been working through as well, and our conclusion

12:35:23  8   is that it is consistent with that.  The only, you know,

12:35:26  9   slight amendment I think I would add is that although Bowie

12:35:31  10  knives might seem very -- you said like you don't think it's

12:35:34  11  quite as relevant because Bowie knives are -- you know, I

12:35:37  12  mean, the thing that jumps out is that they're so much less

12:35:40  13  dangerous than an assault weapon.

12:35:42  14          I think that that actually is helpful for us,

12:35:45  15  that people in the 1830s and the states that were

12:35:50  16  restricting -- you know, it's a broad swath of the United

12:35:56  17  States.  If they could put those types of sweeping

12:35:59  18  restrictions on Bowie knives in the 1830s, assault weapons,

12:36:03  19  given the issues they have, I think, is a foreshadow of that

12:36:08  20  historical tradition.

12:36:10  21          THE COURT:  If you have this number on the top

12:36:12  22  of your head, how many states put restrictions on Bowie

12:36:16  23  knives in the 1830s?

12:36:18  24          MR. MORITZ:  I believe it was -- oh, in the

12:36:20  25  1830s?

12:36:20  1                    THE COURT:  Or in that general.

12:36:21  2                    MR. MORITZ:  Yeah.

12:36:22  3                    THE COURT:  I assume the Bowie knife craze ended

12:36:25  4      after a few years, after a decade or two.

12:36:27  5                    MR. MORITZ:  Yeah.  So, I believe in the end it

12:36:29  6      was north of 40 states, but it took several decades.  It

12:36:32  7      went on --

12:36:32  8                    THE COURT:  I mean, because there weren't even

12:36:33  9      40 states in the 1830's.

12:36:35 10                    MR. MORITZ:  Exactly.  Exactly.  But in the

12:36:37 11      1830s, you know, this is --

12:36:41 12                    THE COURT:  But, you know, sorry to keep

12:36:44 13      interrupting, Mr. Moritz, but basically you'd say almost

12:36:49 14      every state that could passed a Bowie knife law?

12:36:54 15                    MR. MORITZ:  An awful lot.  Let me just -- if

12:36:56 16      you just bear with me one moment.  If you go to Exhibit C to

12:37:01 17      Spitzer's declaration.

12:37:02 18                    THE COURT:  Yeah.  I don't have the exhibits

12:37:03 19      with me.

12:37:04 20                    MR. MORITZ:  Can we bring that up perhaps?

12:37:06 21      Spitzer's declaration, Exhibit C.  That's a chart that's

12:37:09 22      pretty handy.  And it has a table of regulations by state

12:37:12 23      and it gives the year.

12:37:20 24                    Exhibit C.  Exhibit C.  While we're bringing

12:37:28 25      that up, it goes through the states, and it lists by the

12:37:31  1    year of the regulation.  And I mean, almost every column --

12:37:38  2    and I have a clean printout.  I could hand it up if that's

12:37:41  3    useful.

12:37:42  4                    THE COURT:  All right.  I'd be interested in

12:37:44  5    seeing it.

12:37:45  6                    MR. MORITZ:  Oh, here we go.  May I approach?

12:37:48  7                    THE COURT:  I can -- sure.  Why don't you

12:37:52  8    just --

12:37:52  9                    MR. MORITZ:  Any way, you get the picture.  The

12:37:55 10    column that says Bowie knives far left.

12:37:58 11                    THE COURT:  I think I did see this somewhere.

12:38:00 12    Maybe it was --

12:38:03 13                    MR. MORITZ:  And, yeah, as you'll see, it's

12:38:06 14    right in that sweet spot.  The 1830s, the

12:38:09 15    post-reconstruction era.  1860s.  1870s.

12:38:12 16                    THE COURT:  I see Alaska was busy enacting

12:38:15 17    something 50-odd years before it was a state.  I guess

12:38:19 18    territorial legislature or something.

12:38:24 19                    All right.  Well, that's -- okay.  All right.

12:38:30 20                    So, Mr. Moritz, I think we need to finish with

12:38:34 21    you here.

12:38:36 22                    Mr. Ross, if you're going to talk to me about

12:38:38 23    the Delaware Supreme Court, let's skip that.  Okay?

12:38:42 24                    MR. ROSS:  Okay.

12:38:42 25                    THE COURT:  And were you going to talk about

12:38:44  1    something else?

12:38:44  2            MR. ROSS:  Only one thing in response to Your

12:38:46  3    Honor's question about how the legislature -- how an issue

12:38:50  4    arises and that's what cause a legislature to act.  The only

12:38:54  5    thing I would point Your Honor to is to the declaration of

12:38:56  6    Ms. Allen at Exhibit C.  She has a list of firearms and

12:39:01  7    public mass shootings.  And what you see is that in the

12:39:04  8    first 14 -- first five years between 1982 and about 1987,

12:39:10  9    there are 14.  There's one, just one in 1985 and one in

12:39:14 10    1986.  In the final 22 months, there are 15.  And you have

12:39:19 11    to go back more than 20 years to find another year looking

12:39:23 12    backwards where there was just one.

12:39:26 13            So, apropos of Your Honor's point of what

12:39:29 14    legislatures do is they see issues and they react to them.

12:39:32 15    That's exactly what happened here.

12:39:33 16            THE COURT:  Yeah.  I mean, it's probably

12:39:37 17    irrelevant to the -- not irrelevant, but not very

12:39:43 18    significant to the Second Amendment question, but it seems,

12:39:51 19    you know, the recitation of events at the beginning of HB

12:39:57 20    450, it makes it pretty clear what legislature was reacting

12:40:01 21    to; right?

12:40:01 22            MR. ROSS:  It does, and it is consistent, and

12:40:04 23    I'm not going to go back to what Mr. Moritz talked about --

12:40:06 24    where technologies emerge.  And we're talking about, you

12:40:09 25    know, assault weapons post-Vietnam.  The issue increases.

12:40:13  1    Public mass shootings.  Legislatures responded.  It's

12:40:17  2    consistent with the historical legislation.

12:40:22  3                Thank you, Your Honor.

12:40:22  4                THE COURT:  Unless you're really burning to tell

12:40:25  5    me something.

12:40:27  6                MR. LEHMAN:  I'm really burning to tell you

12:40:29  7    perhaps one thing.

12:40:30  8                THE COURT:  All right.  Come on and do it then.

12:40:33  9                MR. LEHMAN:  I was supposed to start judging a

12:40:35 10    high school mock trial competition over at the State

12:40:37 11    courthouse ten minutes ago, so I'm going to have to let them

12:40:39 12    know I'm late.  But there was one thing that came up, Your

12:40:42 13    Honor, during your discussion with Mr. Moritz about --

12:40:47 14    first, I think you were correct.  I think if you look back

12:40:49 15    through *Bruen* -- I don't have the page for you.  I could

12:40:51 16    certainly find it and let you know about it later, but --

12:40:54 17                THE COURT:  No.

12:40:55 18                MR. LEHMAN:  -- I'm fairly confident they said

12:40:58 19    forget about the 20th Century in the context of these

12:41:00 20    discussions.  And I'll tell you why is because you asked

12:41:02 21    what was inconsistent with the New York situation.  And what

12:41:07 22    was inconsistent with the history in the New York situation

12:41:10 23    was it was inconsistent with the tradition of banning

12:41:14 24    dangerous and unusual arms.

12:41:15 25                And so, when you look back and you say, okay,

12:41:18   1   well, there are also these sawed-off shotgun regulations and

12:41:22   2   machine gun regulations in the 20th Century, the idea under

12:41:25   3   *Bruen*, particularly because the Court essentially said you

12:41:28   4   can disregard the 20th Century, is not to look back and say,

12:41:31   5   well, now those are part of the tradition.  What is the

12:41:34   6   tradition is only banning dangerous and unusual arms.  Those

12:41:37   7   are dangerous and unusual.  They were not in common use for

12:41:40   8   lawful purposes at the time.  They're still not.

12:41:43   9            The arms that are at issue here are in common

12:41:46  10   use for lawful purposes.  And the only other thing would be

12:41:50  11   just to remind the Court that the law is -- the case law is

12:41:52  12   very clear, that the question is about common use for lawful

12:41:55  13   purposes.  I think probably consciously the State has

12:41:58  14   repeated self-defense hundreds of times, but you can have

12:42:01  15   other --

12:42:01  16            THE COURT:  That's the last word from *Bruen*,

12:42:04  17   right.  They repeated it, not a hundred times, but more than

12:42:08  18   ten times.

12:42:09  19            MR. LEHMAN:  Right.  Well, as I explained

12:42:10  20   earlier, Your Honor, naturally in that case that was the

12:42:12  21   focus because it was concealed to carry handguns.  But in

12:42:16  22   several other Supreme Court decisions and various Circuit

12:42:19  23   Court decisions, it's been made very clear that other

12:42:20  24   purposes are absolutely lawful, recreation, hunting, you

12:42:24  25   know.

12:42:24 1            THE COURT:  And I can understand why -- I'm

12:42:27 2   going to have to think about it, but I can understand why

12:42:29 3   you say that because, yes, you don't go hunting with

12:42:33 4   carrying a concealed weapon so you can sneak up on the deer.

12:42:36 5   So, what you say is, and I don't mean any criticism by this,

12:42:42 6   it's perfectly plausible.  It's one of those things you have

12:42:48 7   to spend some time, more time studying these things.

12:42:50 8            And, of course, I'm not actually at this

12:42:54 9   point -- you know, the issue before me is not to come to a

12:42:58 10  final decision on any of this.  It's to, you know, judge the

12:43:01 11  likelihood of success or probability of success on the

12:43:06 12  merits which indicates a certain -- so, it's a different

12:43:15 13  determination.

12:43:16 14           So, is there anything else you want to say?

12:43:18 15           MR. LEHMAN:  I would only say we heard a lot

12:43:19 16  about suitability, Your Honor, which is totally immaterial.

12:43:22 17           THE COURT:  Sorry.  Did you say --

12:43:24 18           MR. LEHMAN:  Suitability.

12:43:25 19           THE COURT:  Oh, suitability.

12:43:26 20           MR. LEHMAN:  We heard a lot about the

12:43:28 21  suitability of these specific arms for self-defense in the

12:43:31 22  home.  It's immaterial, and the Court has made clear that

12:43:35 23  what the people choose is what controls, not what the State

12:43:38 24  thinks they ought to have.

12:43:40 25           And we've also heard that these are weapons most

12:43:44 1    suitable for military purposes, which I think begs the

12:43:47 2    question why they all have military counterparts and aren't

12:43:51 3    actually used by the military.

12:43:52 4              So, with that, Your Honor, I think I would

12:43:55 5    conclude.

12:43:55 6              THE COURT:  All right.

12:43:56 7              MR. LEHMAN:  I don't know if Mr. Pileggi has

12:43:58 8    anything, but if he does, Your Honor, I would appreciate

12:44:01 9    being excused for a moment.

12:44:03 10             THE COURT:  Yes.  No, we're going to be done in

12:44:04 11   a minute, one way or another.

12:44:06 12             Do you have anything, Mr. Pileggi?

12:44:07 13             MR. PILEGGI:  I promise I will be limited to one

12:44:09 14   minute.

12:44:10 15             THE COURT:  Okay.  One minute.

12:44:13 16             And, Mr. Lehman, you ought to step out and take

12:44:16 17   care of this because it's important, this what you have --

12:44:20 18             MR. LEHMAN:  Thank you, Your Honor.

12:44:21 19             THE COURT:  -- to do.

12:44:22 20             MR. PILEGGI:  I'll be done before he's out the

12:44:23 21   door, Your Honor.

12:44:24 22             THE COURT:  Yeah, he needs a head start.

12:44:26 23             MR. PILEGGI:  I just wanted to respond to Your

12:44:29 24   Honor's question when I was at the podium and also something

12:44:32 25   about whether or not armed -- excuse me, whether or not

12:44:36  1    magazines are considered arms.  That same Third Circuit

12:44:39  2    decision from 2018 that we referred to --

12:44:41  3            THE COURT:  Right.

12:44:42  4            MR. PILEGGI:  -- *Association of New Jersey*, they

12:44:44  5    also said, in addition to ammunition, this arms -- excuse

12:44:47  6    me, that magazines are considered arms within the meaning of

12:44:50  7    the Second Amendment.

12:44:51  8            So, I know you asked me that question, and I

12:44:53  9    focused on the ammunition part, but that same decision said

12:44:58 10    that magazines as well within the definition of arms under

12:45:01 11    the Second Amendment.

12:45:02 12            I just wanted to follow up, because it's also

12:45:05 13    rebuttal to what my friend said that we didn't cite to any

12:45:09 14    cases that rebutted the *Ocean State* decision which --

12:45:13 15            THE COURT:  So, under that reading, it would

12:45:15 16    still leave the question of whether or not there's a

12:45:18 17    historical tradition of regulation?

12:45:21 18            MR. PILEGGI:  And that same decision said there

12:45:22 19    is no historical tradition of regulation of large-capacity

12:45:26 20    magazines.  So, that completes the circle, Your Honor.

12:45:31 21            Thank you.

12:45:31 22            THE COURT:  Okay.  All right.  Thank you.

12:45:33 23            All right.  Well, thank you for all your time

12:45:35 24    this morning.  I am cognizant that I need to get a decision

12:45:44 25    to you, and so I will endeavor to do that.  And I don't have

12:45:55  1    a sense right now of what the right balance is between

12:46:08  2    thoroughness and recognizing that this is a preliminary

12:46:11  3    injunction.  So, I don't know how long it will take, but I

12:46:14  4    do understand it's significant and important that I get

12:46:18  5    something out so you all can make decisions about what to do

12:46:22  6    next.

12:46:22  7                    All right.  So thank you.  We'll be in recess.

12:46:26  8                    (Everybody said, Thank you, Your Honor.)

12:46:27  9                    DEPUTY CLERK:  All rise.

12:46:28 10                    (Court was recessed at 12:46 p.m.)

        11                    I hereby certify the foregoing is a true and

        12    accurate transcript from my stenographic notes in the

        13    proceeding.

        14                    /s/ Heather M. Triozzi
                              Certified Merit and Real-Time Reporter
        15                    U.S. District Court

        16

        17

        18

        19

        20

        21

        22

        23

        24

        25